## INTERIM FRAMEWORK AGREEMENT

THIS INTERIM FRAMEWORK AGREEMENT (this "Agreement") is made and entered into as of December 25, 2018 by and among STUDIO ENTERPRISE MANAGER, LLC, a Delaware limited liability company ("Studio"), DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona not-for-profit limited liability company ("DCEH"), DREAM CENTER EDUCATION MANAGEMENT, LLC, an Arizona not-for-profit limited liability company ("DCEM" and together with DCEH, the "DCEH Parties"), DREAM CENTER SOUTH UNIVERSITY, LLC, an Arizona not-for-profit limited liability company ("South" and collectively with all of its Subsidiaries immediately following the Conversion with respect to South, the "South University System"), ARGOSY EDUCATION GROUP, LLC, a California not-for-profit limited liability company ("AEG"), DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC, a California not-for-profit limited liability company ("Argosy" and collectively with AEG and all of their respective Subsidiaries immediately following the Conversion with respect to Argosy, the "Argosy University System"), THE ARTS INSTITUTES INTERNATIONAL, LLC, an Arizona not-for-profit limited liability company ("Ai" and collectively with all of its Subsidiaries immediately following the Conversion with respect to Ai, the "Ai University System"), CANDLEWOOD SPECIAL SITUATIONS MASTER FUND II, L.P., a Delaware limited partnership ("CSSMF"), FLAGLER MASTER FUND SPC, LTD, a Cayman Islands segregated portfolio company, for and on behalf of the Class B segregated portfolio ("Flagler" and together with CSSMF, the "Candlewood Parties"), which constitute the Requisite Lenders under and as defined in the DCEH Credit Agreement, and the other Persons set forth on the signature pages hereto.  Studio, DCEH, DCEM, South, AEG, Argosy, Ai, CSSMF, Flagler and the other Person set forth on the signature pages hereto are sometimes referred herein individually as a "Party" and collectively as the "Parties."

RECITALS

WHEREAS, on December 22, 2018 the DCEH Parties, Argosy, Ai, Studio and certain Subsidiaries, Affiliates and Related Persons of the aforementioned Parties entered into a Framework Agreement (the "FWA"), a Master Bundled Services Agreement (the "BSA", a Technology License and Services Agreement (the "TLSA"), a Master Asset Purchase Agreement (the "APA"), a License Agreement (the "License"), and a Restrictive Covenant Agreement (the "Restrictive Covenant Agreement" and collectively with the FWA, BSA, TSLA, APA and License, the "Ai Transaction Documents");

WHEREAS, the DCEH Parties and their Affiliates desire to conduct an orderly reorganization (the "Reorganization") of the South University System, the Argosy University System and the Ai University System whereby each university system will consummate a Change of Control (as defined herein) approved by the United States Department of Education ("ED") and all applicable accreditation agencies and state regulatory authorities and, upon such Change of Control, all campuses of the South University System, the Argosy University System and the Ai University System will be owned and controlled by not-for-profit entities that are not controlled or owned by the DCEH Parties or any of their Related Persons;

WHEREAS, the DCEH Parties desire that Studio and certain of its Subsidiaries and Affiliates enter into a managed services agreement with each of South, Argosy and Ai and

EXHIBIT
B
ALL-STATE LEGAL®

certain of their respective Subsidiaries and Affiliates whereby Studio and certain of its Subsidiaries and Affiliates will provide certain non-core services to the South University System, the Argosy University System and the Ai University System to the extent set forth in this Agreement; and

WHEREAS, the DCEH Parties require urgent funding to consummate the Reorganization and to continue operating the campuses of the South University System, the Argosy University System and the Ai University System, including to provide the services under the Transition Services Agreement, and Studio and Bridge Loan Lenders are willing to provide the Bridge Loan, subject to the satisfaction of the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements, covenants and other promises set forth herein, the mutual benefits to be gained by the performance thereof, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, the Parties hereby agree as follows:

1.    Defined Terms.    Capitalized terms in this Agreement have the respective meanings ascribed to them in this Agreement.  For all purposes of this Agreement, the following terms shall have the following respective meanings:

(a)    "Affiliate" means, with respect to any Person, any other Person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with such other Person.  For purposes of the immediately preceding sentence, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(b)    "Ai Online" means the online division of Ai Pittsburgh.

(c)    "Ai Pittsburgh" means The Art Institute of Pittsburgh, DC, LLC, a Pennsylvania not-for-profit limited liability company.

(d)    "Applicable Lenders" means (a) until all obligations (other than contingent reimbursement and indemnification obligations) owing under the Bridge Loan have been paid in full, Studio and the Other Bridge Loan Lenders, (b) thereafter, until all obligations (other than contingent reimbursement and indemnification obligations) owing under the DCEH Credit Agreement have been paid in full, the DCEH Lenders, (c) thereafter, the EDMC Collateral Agent.

(e)    "Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"), (iii) has involuntary petition filed against it under the Bankruptcy Code, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, Law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks, consents to

or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (vii) has a trustee, receiver or liquidator appointed with respect to such Person or of all or any substantial part of its properties.

(f) "Board" means, with respect to any Person, the board of trustees, board of managers, board of directors or similar governing body of such Person.

(g) "Board Committee" means, with respect to any Person, any committee of the Board or any committee to which the Board has delegated authority. For the avoidance of doubt, the Ai Coordinating Council is a Board Committee of the Board of DCEH.

(h) "Change of Control" means any of the following: (i) a "change of control", "change in control" or words of similar import as defined or determined by any Educational Agency as constituting a regulatory event; (ii) changes to the Board of a Person or its Affiliates that result in a change to 25% or more of the voting members of the Board of such Person or its Affiliates in any rolling, 12-month period; (iii) a change in the number of voting members of the Board of any Person or its Affiliates in any rolling, 12-month period that will allow a group of directors to exercise control who could not exercise control before the change; (iv) a transaction pursuant to which an unaffiliated third-party becomes the "beneficial owner", directly or indirectly, of securities of another Person representing 50% or more of the voting power of such Person's then outstanding securities; (v) a transaction effected as a consolidation, share exchange, reorganization or merger of a Person that results in the equityholders of such Person immediately prior to such event not owning at least a majority of the voting power of the resulting entity's securities outstanding immediately following such event; (vi) a sale, license, lease or other disposition of a material portion of a Person's assets; (vii) a liquidation, dissolution or other winding up of such Person or any of its Subsidiaries; or (viii) a transfer of assets that comprises a substantial portion of the educational business of a Title IV eligible institution, except where the transfer consists exclusively in the granting of a security interest in those assets.

(i) "Code" means the Internal Revenue Code of 1986, as amended.

(j) "Curricular Materials" means all (a) educational materials, media and tools and (b) other resources that provide educational, curriculum, instructional and research experiences for students, in each case ((a) and (b)) in whatever format (including written, verbal, electronic, auditory, visual, tactile or otherwise) and whether developed before or after the date of this Agreement, that are used in, held for use in, or necessary for the operation of the business of the applicable university system, and including the following: lesson plans and planning materials; syllabi; textbooks; know-how; workbooks; manipulatives; charts; graphs; pictorials; posters; learning standards or objectives; lesson objectives; assignments and projects given to students; books, materials, videos, presentations, and readings used in a course; and the tests, assessments, and other methods used to evaluate student learning.

(k) "DCEH Credit Agreement" means that certain Senior Secured Credit and Guaranty Agreement, dated as of October 17, 2017, by and among DCEH, Ai, South, Argosy, DCEM and The Dream Center Foundation, certain Subsidiaries of the borrowers thereunder, the various lenders party thereto from time to time (the "DCEH Lenders") and U.S. Bank National Association as administrative agent and collateral agent thereunder with respect to a senior

secured credit facility in the aggregate principal amount of $55,000,000, as the same may have been or may hereafter be amended, restated or otherwise modified from time to time.

(l)  "EDMC Credit Agreement" means that certain Credit and Guaranty Agreement, dated as of January 5, 2015, by and among Education Management II LLC, Education Management Corporation, Education Management Holdings II LLC, certain Subsidiaries of Education Management Holdings, II LLC, various lenders party thereto from time to time (the "EDMC Lenders") and U.S. National Bank Association, as administrative agent and collateral agent thereunder (the "EDMC Collateral Agent") with respect to a senior secured credit facility in the aggregate principal amount of $656,440,701, as the same may have been or may hereafter be amended, restated or otherwise modified from time to time.

(m)  "Educational Agency" means any entity or organization, whether governmental, government chartered, tribal, private, or quasi-private, that engages in granting or withholding Educational Approvals, administers Financial Assistance Programs to or for students of, or otherwise regulates postsecondary schools or programs, in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such schools and programs, including (i) ED; (ii) any non-governmental entity, including institutional and specialized accrediting agencies, which engage in the granting or withholding of accreditation of postsecondary educational institutions or programs in accordance with standards relating to the performance, operations, financial condition or academic standards of such institutions, including the Southern Association of Colleges and Schools, the Northwest Commission on Colleges and Universities, WASC Senior Commission of Colleges and Schools, and the Accrediting Council of Independent Colleges and Schools (each an "Accrediting Body"); and (iii) any state or local educational licensing body that provides a license or authorization necessary any campus, branch, additional location or other educational facility to provide postsecondary education in that state, or which administers Financial Assistance Programs in that state.

(n)  "Educational Approval" means any license, permit, consent, franchise, approval, authorization, certificate, or accreditation issued or required to be issued by an Educational Agency to an educational institution with respect to any aspect of such educational institution's operations subject to the oversight of such Educational Agency, including any such approval for such educational institution to participate in any Financial Assistance Program, but excluding any such approvals or permits with respect to the activities of recruiters or individual employees or agents of such educational institution.

(o)  "Educational Consent" means any approval, authorization or consent by any Educational Agency, or any notification to be made by the Parties to an Educational Agency, with regard to the transactions contemplated by this Agreement, whether required to be obtained prior to or after the date of the consummation of the transactions contemplated hereby, which is necessary under applicable Laws or regulations in order to maintain or continue any Educational Approval held by any educational institution party hereto as of the date of this Agreement.

(p)  "Family Member" means as to any individual, any parent, spouse, child, spouse of a child, brother, sister or other immediate family member of such individual

(whether by blood, marriage or adoption), and each trust or other entity created for the benefit of one or more of such Persons and/or the estates of any such Person.

(q) "Financial Assistance Programs" means each Title IV Program pursuant to which Title IV Program funding has been provided to or on behalf of educational institution's students; and any other government-sponsored or private program of student financial assistance other than the Title IV Programs pursuant to which student financial assistance, grants or loans were provided to or on behalf of any educational institution's students and such funds constituted at least 2% of such educational institution's tuition and fee revenues during any fiscal year.

(r) "Governing Documents" means all legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation include its certificate of incorporation and by-laws, the "Governing Documents" of a limited partnership include its certificate of formation and its limited partnership agreement and the "Governing Documents" of a limited liability company include its certificate of formation and its operating agreement or limited liability company agreement. With respect to any Person organized as a not-for-profit entity under state Law and/or exempt from tax under federal Law, Governing Documents include such Person's conflict of interest policy and other governance policies, its IRS Forms 1023, 8975, 1024, 1024-A, 990-T, 990, 990-EZ, 990-N or 990-PF and any related schedules and any corresponding state tax documents.

(s) "Governmental Authority" means any government, any governmental or regulatory entity or body, department, commission, board, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, and whether local or foreign.

(t) "Indebtedness Period" means (i) with respect to the South University System, the period beginning on the date hereof and ending on the date when no obligations (other than contingent reimbursement and indemnification obligations) remains outstanding in respect of the South Secured Debt described in in Section 13, (ii) with respect to DCEH and its Affiliates, the period beginning on the date hereof and ending on the date when no obligations (other than contingent reimbursement and indemnification obligations) remains outstanding to the DCEH Lenders, the EDMC Collateral Agent and/or the Other Bridge Loan Lenders by DCEH or any its Affiliates under the Bridge Loan, the DCEH Credit Agreement or the Second Lien Guaranty, and (iii) with respect to the Argosy University System, the period beginning on the date hereof and ending on the date when no obligations (other than contingent reimbursement and indemnification obligations) remain outstanding to the DCEH Lenders, the EDMC Collateral Agent and/or the Other Bridge Loan Lenders  by Argosy under the Bridge Loan, the DCEH Credit Agreement or the Second Lien Guaranty. For the avoidance of doubt, there shall be no Indebtedness Period with respect to the Ai University System.

(u) "Law" means any applicable law, statute, treaty, constitution, principle of common law, ordinance, code, rule, regulation, Order or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority, as amended, unless expressly specified otherwise herein.

(v) "Lenders" means, collectively, the DCEH Lenders, the EDMC Lenders and the South Lenders.

(w) "Liens" means any lien, pledge, hypothecation, charge, mortgage, security interest, deed of trust or encumbrance of any nature or of any kind whether voluntarily incurred or arising by operation of law or otherwise.

(x) "Order" means any order, judgment, decision, decree, injunction, pronouncement, ruling, writ or assessment of, by or on behalf of any Governmental Authority (whether temporary, preliminary or permanent) or arbitrator.

(y) "ordinary course" and "ordinary course of business" means, with respect to any Person, in the ordinary, usual and normal course of business consistent with its past custom and practice (including with respect to quantity, quality, frequency, cost and/or pricing).

(z) "Other Bridge Loan Lenders" means the Candlewood Parties and any other DCEH Lender that elects to act as a lender under the Bridge Loan.

(aa) "Person" means an individual, corporation, partnership, association, limited liability company, trust, estate or other similar business entity or organization, including a Governmental Authority.

(bb) "Proceeding" means any claim, charge, complaint, grievance, inquiry, audit, investigation, action, suit, litigation or proceeding by or before (or could come before) or brought on behalf of any Governmental Authority or arbitrator.

(cc) "Related Persons" means, with respect to any Person, such Person's (i) direct and indirect equityholders, directors, officers, trustees, managers, and Affiliates; (ii) any direct and indirect equityholders, directors, officers, trustees, managers, and controlling Affiliates of the persons set forth in clause (i); and (iii) any Family Member of any natural person described in clause (i) or (ii). For the avoidance of doubt, DCEM is a Related Person of DCEH.

(dd) "Second Lien Guaranty" means that certain Second Lien Guaranty dated as of October 17, 2017 made by each of the guarantors party thereto (including DCEH and each of its Subsidiaries) in favor of U.S. Bank National Association, as collateral agent.

(ee) "Shared IT Systems" means Technology owned by any DCEH Party or its Affiliates and made available by such DCEH Party or Affiliates on a non-exclusive, restrictive access, shared service basis to any of the Specified Ai Campuses, on the one hand, and any of the following, on the other hand: (i) the Argosy University System, (ii) the South University System, (iii) Ai Pittsburgh, either on ground or Ai Online or (iv) any other institutions operated by any Party which are the subject of a teach-out, in each case, as of the date of this Agreement.

(ff) "South Lenders" means the lenders from time to time party to the documents governing the South Secured Debt.

(gg)  "Specified Ai Subsidiaries" means each of Ai, Ai San Diego, DC Miami International University of Art & Design, LLC, DC Art Institute of Atlanta, LLC, DC Art Institute of Houston, LLC, DC Art Institute of Seattle, LLC, DC Art Institute of Virginia Beach, LLC, AiH Restaurant, LLC, DC Art Institute of San Antonio, LLC, DC Art Institute of Austin, LLC, DC Art Institute of Tampa, LLC, AiTampa Restaurant, LLC, and each other Subsidiary of Ai or Ai institution (including any Ai institution which is part of the Argosy University System) designated by Studio in its sole discretion.

(hh)  "Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (a) such Person or any other subsidiary of such Person is a general partner (excluding such partnerships where such Person or any subsidiary of such Person does not have a majority of the voting interest in such partnership) or (b) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries.

(ii)  "Technology" means information technology, hardware and computer systems, including those relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of all data and information collected, generated, or used in the conduct of the business of any of the South University System, the Argosy University System or the Ai University System.  Technology includes: (a) software, integrations, cloud services, databases, websites, domain names, applications, telecommunications solutions, other information technology infrastructure and assets, hardware and other information technology or communications equipment and (b) all related source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded and all documentation associated with the foregoing.

(jj)  "Title IV" means Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1001 et seq., as amended, or any successor statute thereto.

(kk)  "Title IV Programs" means the programs of federal student financial assistance administered pursuant to Title IV.

(ll)  "Transaction Documents" means this Agreement, the Ai Transaction Documents, the documents executed and delivered by the Parties in connection with the Bridge Loan, and the documents, instruments and certificates contemplated by this Agreement to be entered into or delivered by any Party in connection with any of the foregoing.

(mm) "United States" means the United States of America.

2.  Conversion to Non-Stock Corporations.  As soon as practicable but no later than December 31, 2018, the DCEH Parties and their Affiliates shall convert Ai and South (whether by merger or conversion) into non-stock corporations which are exempt from United States federal taxes as organizations described in Section 501(c)(3) of the Code and exempt from state taxes pursuant to applicable state law (each a "Conversion").  In connection with the Conversion of South, the DCEH Parties shall cause the name of South to be changed to remove the words

"Dream Center" therefrom and as soon as practicable after the conversion of South and Ai to cooperate with Studio to change the names of all of the Subsidiaries of South and Ai to remove the words "Dream Center" or initials "DC" therefrom.  The Conversion and Governing Documents and the composition of the Boards and Board Committees of South and its Subsidiaries shall be subject to the approval of Studio during the term of the South MSA (as defined herein) and the approval of the South Lenders during the Indebtedness Period with respect to the South University System and shall be effectuated in accordance with all applicable Laws.  The conversion and Governing Documents and the composition of the Boards and Board Committees of Ai shall be subject to approval by Studio during the term of the Ai MSA (as defined herein) and shall be effectuated in accordance with all applicable Laws.  The DCEH Parties and South each hereby grant Studio the right of first refusal (i.e., the right to match the terms) on any Change of Control transaction involving the South University System (including for the avoidance of doubt any Change of Control involving any of its campuses or Subsidiaries or their respective assets or properties). Each of the DCEH Parties and South hereby represent and warrant to Studio that such Party has not granted any right of first refusal, option, right of first offer, right of exclusivity or similar right to any Person which are similar to the rights contained in, which if complied with would cause a breach of, or the terms of which conflict with, the immediately preceding sentence.

3.      Transfer of Assets and Employees.

(a)      As soon as practicable and in any event prior to the Conversion with respect thereto, the DCEH Parties and their Affiliates shall assign and transfer to (i) the South University System all assets and employees solely related to or used solely by the South University System in the operation of its campuses and (ii) Ai all assets and employees solely related to or used solely by Ai University System in the operation of its campuses (including the Ai San Diego (as defined herein) campus which is currently part of the Argosy University System).  For the avoidance of doubt, all Curricular Material used solely by the Ai University System shall be transferred (at the direction of Studio) to a Specified Ai Subsidiary and all Curricular Material used solely by South University System shall be transferred to South and/or its Subsidiaries.  At Studio's election and direction, any assets or employees solely related to or used solely by the Ai University System which are not currently owned, held or employed by a Specified Ai Campus shall be transferred to a Specified Ai Campus.

(b)      In furtherance of Section 3(a):

(i)      The Art Institute of Houston, LLC shall form a California limited liability company entitled The Art Institute of San Diego, LLC ("Ai San Diego") and shall take all reasonable actions to ensure that such limited liability company is treated as disregarded entity under the Code.

(ii)      The Governing Documents of Ai San Diego shall be in accordance with applicable Law and shall be in form and substance satisfactory to Studio.  Studio shall have the right to consent to the composition of the Board and each Board Committee of Ai San Diego during the term of the Ai MSA, subject to all applicable Laws.

(iii)    Argosy shall assign and transfer to Ai San Diego all assets and employees solely related to or used solely by the Art Institute of California - San Diego (the "San Diego Campus") in the operation of its university and all other Ai assets and Ai employees requested by Studio. Argosy shall use its reasonable best efforts to obtain (i) the consent of the landlord to assign the lease the San Diego Campus to Ai San Diego and (ii) the consent of any other third parties (including Governmental Authorities) required in connection with such transfer and assignment.

(c)    All Shared IT Systems shall remain with the DECH Parties and the South University System, the Argosy University System and the Ai University System will obtain the benefit of such shared assets under the Transition Services Agreement (as defined herein) during the term of the applicable MSA (as defined herein); *provided*, that the DCEH Parties and the South University System agree to negotiate in good faith regarding the terms of a transition services agreement that will permit South University System to have continued access to the Shared IT Systems following the termination of the South MSA.

(d)    The DCEH Parties shall cooperate with Studio to cause a "Non-Core Asset Closing" (as such term is defined in the FWA) with respect to the Specified Ai Campuses pursuant to and in accordance with the terms of the FWA and the APA, subject to the terms of this Agreement.

4.    Realignment of Certain Entities.  As soon as practicable and in any event prior to the Conversion with respect thereto, the DCEH Parties and their Affiliates shall transfer to DCEH the membership interests in all Subsidiaries of (a) Argosy and Ai that are not desired to be included in the Reorganization, as identified by Studio and approved by the South Lenders (other than with respect to Ai) and ED and (b) South, that are not desired to be included in the Reorganization, as identified by Studio or the South Lenders and approved by ED. The Parties agree that each Subsidiary of Ai other than the Specified Ai Subsidiaries will be transferred to DCEH.  For example, all Subsidiaries of closed campuses or campuses that are proposed to be closed will be transferred out of the remaining organizational structures of South, Argosy and Ai.

5.    Timing.  The Change of Control of Ai and South contemplated by this Agreement shall occur on or about January 1, 2019.

6.    Removal of DCEH Directors, Trustees, Managers and Officers.  Effective on or prior to the Change of Control of each of Ai and South contemplated by this Agreement, DCEH shall remove or cause the removal of all directors, trustees, managers and officers who are employees or Affiliates of the DCEH Parties from all Boards and Board Committees and all other positions at South, Argosy, Ai and their respective Subsidiaries. Studio shall have the right to designate replacement directors, trustees, managers and officers for South, Argosy, Ai and their respective Subsidiaries, subject to and in accordance with the procedures of the relevant Governing Documents and any applicable Laws (including the requisite percentage of independent members for such Boards and Board Committees); *provided, however*, with respect to South and its Subsidiaries, during the Indebtedness Period with respect to the South University System, such replacements shall be subject to the approval of the South Lenders.  In addition, during the Indebtedness Period with respect to the South University System, the South Lenders shall have the right to have a non-voting board observer attend each meeting of all Boards and

Board Committees of South and its Subsidiaries, including special and/or emergency meetings as defined by the relevant Governing Documents. The removed directors, trustees, managers and officers shall remain subject to any indemnification provisions of the applicable Governing Documents and any D&O policies and shall receive customary mutual releases from South, Argosy, Ai, and those certain Lenders executing a release agreement (which will include the Candlewood Parties), subject to limitations under applicable Law or contained in the relevant Governing Documents (including with respect to any fraud and willful misconduct by the removed directors, trustees, managers, and officers). As a condition to such releases, the released parties shall provide ongoing and timely cooperation as requested by Studio, the Lenders, and the Other Bridge Loan Lenders to satisfy and implement the terms of this Agreement and the other Transaction Documents.

7. _Managed Services Agreements_. As soon as practicable but no later than December 31, 2018, the DCEH Parties shall cause each of South, Argosy and Ai to enter into a Managed Services Agreement with Studio and certain of its Subsidiaries and Affiliates whereby Studio and certain of its Subsidiaries and Affiliates will provide non-core services to the South University System (the "_South MSA_"), the Argosy University System (the "_Argosy MSA_") and the Ai University System (the "_Ai MSA_" and collectively with the South MSA and the Argosy MSA, the "_MSAs_") which shall include terms and conditions similar to the BSA that is included in the Ai Transaction Documents, except as described herein, and subject to the South Lenders' approval of the form and substance of the South MSA. In addition, Studio will cooperate and assist DCEH (at the expense of DCEH) with the teach-out of any Ai campuses that are not Specified Ai Campuses and any South University System campuses that are not Subsidiaries of South as of the Conversion, including any disposition or teach-out of Ai Pittsburgh or Ai Online. For the avoidance of doubt, Studio will not receive any Liens in the assets of the South University System to secure any obligations owing to Studio or any of its Subsidiaries, including any fees payable pursuant to the South MSA. The DCEH Parties, South, Argosy and Ai each represent and warrant to Studio that such Party is not party to any managed services agreement, bundled services, transition services, technology services (or similar agreement) pursuant to which South, Argosy or Ai receive services of the type contemplated by the MSAs, the TSLA or the BSA; _provided_ that concurrently with the execution and delivery of the MSAs, the DCEH Parties and their Affiliates and Related Persons will terminate, or cause to be terminated, any managed services agreement, bundled services, transition services, technology services (or similar agreement) pursuant to which South, Argosy or Ai receive services of the type contemplated by the MSAs, the TSLA or the BSA.

8. _Service Fees_. Studio will be paid a monthly fee under each MSA equal to (a) the fully burdened costs of the non-core services, including the TSA Fee (as defined herein), incurred by the South University System, the Argosy University System or the Ai University System under their respective MSAs (the "_Non-Core Expenses_"), plus (b) the product of (i) the Non-Core Expenses multiplied by (ii) 15% (such product, the "_Service Margin_" and together with the Non-Core Expenses, the "_Service Fee_"). Solely with respect to the South MSA, during the term of the South MSA, the determination of the amount of non-core services that are to be performed by Studio (and the corresponding Service Fee) shall be approved by the Board of South, subject to approval of the South Lenders during the Indebtedness Period with respect to the South University System, but in no event shall such determination of non-core services reduce the Service Margin under the South MSA to less than $1 million per month (the

"Minimum Monthly Fee"); *provided, however,* if South and Studio agree to extend the term of the South MSA beyond the initial one year period, then the Service Fee for such extended term, unless otherwise agreed by Studio and South, subject to approval of the South Lenders during the Indebtedness Period with respect to the South University System, will be based on the actual Non-Core Expenses related to the non-core services approved by the Board of South, subject to approval of the South Lenders during the Indebtedness Period with respect to the South University System. During the term of their respective MSAs, the South University System, the Argosy University System, and the Ai University System shall pay their costs and expenses in the following order of priority:  (A) all costs of the core services (i.e., services other than those covered by the Non-Core Expenses and the TSA Fee), but only to the extent that such costs are related to obligations, agreements and employees actually employed directly by and paid by the South University System, the Argosy University System or the Ai University System, as the case may be, (B) solely in the case of South, the payment of debt service on the South Secured Debt, (C) Non-Core Expenses (other than the TSA Fee), (D) the TSA Fee, and (E) the Service Margin; *provided,* that to the extent that the South University System, the Argosy University System, or the Ai University System are unable to pay the Non-Core Expenses, the TSA Fee, or the Service Margin, such amounts will accrue interest at a rate of 6% per annum; *provided, further,* that, anything in this Agreement notwithstanding (including, but not limited to, Section 9 hereof), during the Indebtedness Period with respect to the South University System, the Service Margin and any interest accruing on the Non-Core Expenses (including the TSA Fee) or the Service Margin with respect to the South University System will accrue and may be paid to Studio only with the consent of the South Lenders.  For the avoidance of doubt, in no event shall Studio be required to fund any shortfall in the expenses of the South University System, the Argosy University System, or the Ai University System if the revenues of such university systems, as the case may be, are not sufficient to pay such expenses; *provided, however,* that none of the South University System, the Argosy University System or the Ai University System, as the case may be, shall be required to pay any expenses, including the TSA Fee or Service Margin, that is not related to its university system pursuant to its MSA.  Studio agrees to negotiate in good faith a longer-term deferral of a portion of the Service Margin to assist the South University System in complying with its composite score of financial responsibility.

9.    Term.  The Ai MSA shall be a minimum of 15 years.  The South MSA and Argosy MSA shall each have a term of one year and may be terminated by either party upon 60 days prior notice.  Subject to the terms and conditions in the documents governing the South Secured Debt, upon expiration or termination of each MSA, all accrued but unpaid Service Fees plus accrued interest thereon shall be immediately due and payable.  In addition, in the event of (a) a Change of Control (other than to Studio) of South or Argosy, as the case may be, during the term, or (b) a termination of the South MSA or Argosy MSA by South or Argosy, as the case may be, prior to end of the term, then Studio shall be paid the amount of the Services Margin that Studio would have earned for the remainder of the original term based on the average monthly Service Margin payable for the partial term then ended; *provided, however,* in the event of a Change of Control of South (other than to Studio) in which the South Secured Debt is being paid off, Studio agrees that the average Service Margin for such calculation shall be equal to the Minimum Monthly Fee.  For the avoidance of doubt, if Studio terminates any MSA other than due to a breach by the other Party, then Studio shall only be entitled to receive all accrued but unpaid Service Fees plus accrued interest thereon through the effective date of such termination. The DCEH Parties, South and Argosy hereby grant Studio the right of first refusal (i.e., the right

to match the terms) on any managed services agreement, bundled services, transition services, technology services (or similar agreement) that South or Argosy proposes to enter into within one year after the termination of the South MSA or Argosy MSA; *provided*, that any amounts due or paid pursuant to the proceeding sentence shall be credited dollar-for-dollar against the service and other fees payable under any management services agreement entered into by Studio entered into pursuant to the right of first refusal set forth in this Section 9. Each of the DCEH Parties, South and Argosy hereby represent and warrant to Studio that such Party has not granted any right of first refusal, option, right of first offer, right of exclusivity or similar right to any Person which are similar to the rights contained in, which if complied with would cause a breach of, or the terms of which conflict with, the immediately preceding sentence.

10. <u>Transition Services</u>. As soon as practicable but no later than December 31, 2018, DCEH and Studio shall enter into a Transition Services Agreement (the "<u>Transition Services Agreement</u>") whereby DCEH shall provide certain transition services and license certain intellectual property (including the Shared IT Systems) to Studio that are necessary for Studio to provide the services under the MSAs which shall include terms and conditions similar to the BSA, TLSA and License that are included in the Ai Transaction Documents, except as described herein. With respect to the South University System, the Transition Services Agreement shall provide for the assignment of Studio's rights thereunder (including with respect to the Shared IT Systems) to any subsequent non-core service provider as determined by the South Board (with the consent of the South Lenders).

11. <u>Transition Services Fees</u>. Studio will pay DCEH a monthly fee per student in accordance with and on similar terms as the fee schedule set forth in the BSA included in the Ai Transaction Documents (the "<u>TSA Fee</u>"). To the extent that the revenues for any of South, Argosy or Ai, as the case may be, are not sufficient for such Party to pay Studio the entire TSA Fee due under the applicable MSA, the TSA Fee applicable to such MSA shall be accrued and not paid to DCEH until such time as such Party has revenues sufficient to pay the accrued and unpaid TSA Fee due under such MSA. For the avoidance of doubt, in no event shall Studio be required to fund any shortfall in the TSA Fee resulting from the inability of the South University System, the Argosy University System or the Ai University System to pay such TSA Fee or to pay Studio the Service Fee in a sufficient amount for Studio to pay the TSA Fee.

12. <u>Bridge Loan</u>. Studio and the Other Bridge Loan Lenders will each make a bridge loan to DCEH in the amount of $3,188,863.00 for a total of $6,377,726.00 (the "<u>Bridge Loan</u>"), of which $5,000,000.00 will be held in reserve by Studio and the Other Bridge Loan Lenders to cover the legal fees and expenses of the Lenders and their respective agents incurred in accordance with their respective credit facilities, the Other Bridge Loan Lenders and Studio until DCEH satisfies all terms and conditions of this Agreement. The Bridge Loan will be a super priority secured loan with liens on all of the assets of the DCEH Parties, including the Shared IT Systems.

13. <u>South Secured Debt</u>. $25 million of the Tranche A Term Loans (as defined in the DCEH Credit Agreement) will be reinstated or replaced on the South University System on terms and conditions acceptable to the DCEH Lenders (the "<u>South Secured Debt</u>"), including the following terms:

(a)    Term:  20 years

(b)    Interest Rate:  8% per annum, payable quarterly in arrears

(c)    Amortization:  None

(d)    Acceleration:  Upon default and change of control

(e)    Mandatory Prepayments:  Up to 50% of excess cash flow will be made available to lenders annually each lender will have the option to accept the excess cash flow in repayment of its South Secured Debt at par without make whole

(f)    Make-whole:  Upon a prepayment (other than a Mandatory Prepayment described above) or change of control, Treasury plus 50 bps from the prepayment date through the end of the term

14.    <u>Release of Liens</u>.  The Candlewood Parties will coordinate with the other DCEH Lenders and EDMC Lenders to cause the release, in connection with the Change of Control of Ai and South on January 1, 2019, of (a) all Liens on the assets (including bank accounts) and membership interests of Ai and its subsidiaries and (b) all Liens on the assets (including bank accounts) and membership interests of South and its subsidiaries, except liens retained or created in accordance with <u>Section 13</u> above.

15.    <u>Lock Box Accounts</u>.  All federal funds (e.g., Title IV and the DCEH Letter of Credit (as defined in the DCEH Credit Agreement)) and the Bridge Loan shall be deposited in separate lock box accounts to be designated by Studio, subject to the approval of the South Lenders and the Applicable Lenders (solely during the Indebtedness Period) and ED, and all disbursements from such lock box accounts must be in accordance with the Budget (as defined below) and approved by an independent person to be appointed by Studio, subject to the approval of the South Lenders and the Applicable Lenders (solely during the Indebtedness Period) and ED; *provided* that after the Conversion, no consent of the Lenders shall be required to disburse any funds in respect of Ai University System.  In addition, ED shall have the right to require the removal of such independent person and the South Lenders and the Applicable Lenders (solely during the Indebtedness Period) and ED will approve any replacement.

16.    <u>Bankruptcy</u>.  None of the DCEH Parties, Argosy or their respective Affiliates shall enter into or permit to continue any Bankruptcy proceedings prior to the consummation of the Change of Control for both of South and Ai.

17.    <u>Operating Budget</u>.  Prior to disbursement of any letter of credit funds to DCEH from ED or the Bridge Loan from Studio and the Other Bridge Loan Lenders, DCEH shall provide a 13-week cash flow statement and budget for the period from January 31, 2019 and March 31, 2019 (the "<u>Budget</u>") for approval by ED, Studio and the Other Bridge Loan Lenders. In addition, ten days prior to the start of each academic quarter, South, Argosy and academi will provide updated Budgets for approval by ED, Studio and the Other Bridge Loan Lenders.  All such subsequent Budgets will include an itemized list of all projected cash receipts; core expenses;  Non-Core  Expenses  (including,  employees,  rent,  vendor  contracts,  capital

expenditures, etc.); and TSA Fee for each week of the applicable Academic Quarter based on actual contractual obligations; historical income and cost data and good faith estimates of projected income and costs for the applicable period.

18.    <u>Operation in the Ordinary Course</u>.  DCEH shall continue to operate South, Argosy and Ai in the ordinary course and within the Budget, including continuing to enroll students, and not take any actions that would have a material adverse effect on any of South, Argosy or Ai.

19.    <u>Conditions Precedent</u>.  The Bridge Loan and the other agreements of Studio and Candlewood Parties contained herein, and the Candlewood Parties' support for the transactions contemplated by this Agreement, shall be conditioned upon (a) the consummation of an agreement between ED and the EDMC Lenders under the EDMC Credit Agreement respecting the disposition of certain letter of credit proceeds held by ED in accordance with terms and conditions discussed between ED and certain of the EDMC Lenders, (b) receipt of the Educational Consents, (c) the agreement of ED to provide $15 million of the existing letter of credit to DCEH by January 2, 2019 to fund operations in accordance with the Budget, (d) approval of the MSAs and Change of Control of Ai and South in accordance with the terms and conditions discussed among Studio, certain of the Lenders and ED, (e) execution and delivery of the Bridge Loan documents, MSAs, Transition Services Agreement and other Transaction Documents and (f) execution and delivery by all Parties to the Ai Transactions Documents of amendments to such Ai Transaction Documents to reflect the terms of this Agreement and (g) approval by the DCEH Lenders and South Lenders of the form and substance of each Transaction Document.  The obligations of Studio to consummate the transactions contemplated by this Agreement are further subject to the compliance in all material respects by the DCEH Parties, Ai, South, Argosy and the Candlewood Parties with the terms of this Agreement and the other Transaction Documents.  The obligations of the Candlewood Parties to consummate the transactions contemplated by this Agreement are further subject to the compliance in all material respects by the DCEH Parties, Ai, South, Argosy and Studio with the terms of this Agreement and the other Transaction Documents.

20.    <u>Cooperation and Further Assurances; Consents and Approvals</u>.  Each of the DCEH Parties, South, Argosy and Ai shall take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with Studio and its affiliates in doing, all things necessary under applicable laws and regulations to consummate and make effective, in the most expeditious manner practicable, the Reorganization, Change of Control and other transactions contemplated by this Agreement.  Without limiting the generality of the foregoing, each of the DCEH Parties, South, Argosy and Ai shall use reasonable best efforts to obtain the consent of any third parties to the transactions contemplated by this Agreement (including the consent of any landlords and the Lenders and any Educational Consents).

21.    <u>Representations and Warranties of the Parties</u>.  Each Party represents and warrants to each other Party hereto as follows:

(a)    Such Party has the requisite corporate, limited partnership, limited liability company or other entity power and authority to enter into and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder (including the consummation by such Party of the transactions contemplated hereby and thereby).

(b)      The execution and delivery by such Party of this Agreement and the other Transaction Documents and the performance by such Party of its obligations under this Agreement and the other Transaction Documents (including the consummation by such Party of the transactions contemplated hereby and thereby) have been duly authorized by all necessary limited liability company action on the part of such Party, and no other corporate, limited partnership, limited liability company or other entity proceedings on the part of such Party are necessary to authorize the execution or delivery by such Party of this Agreement or the other Transaction Documents or the performance by such Party of its obligations under this Agreement or the other Transaction Documents in accordance with their respective terms (including the consummation by such Party of the transactions contemplated hereby and thereby).

(c)      This Agreement has been, and each other Transaction Document to which such Party is a party will when executed and delivered be, duly executed and delivered by such Party and, assuming the due authorization, execution and delivery by each party hereto or thereto, constitutes the valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as such enforceability may be subject to (i) the Laws of general application relating to bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting or relating to creditors' rights generally and (ii) general principles of equity.

(d)      The execution and delivery by such Party of this Agreement and the other Transaction Documents does not, and the performance by such Party of its obligations under this Agreement and the other Transaction Documents (including the consummation by such Party of the transactions contemplated hereby and thereby) will not, conflict with, result in any violation of or default under (with or without notice or lapse of time, or both) or give rise to a right of termination, cancellation, modification or acceleration of any obligation, payment of any benefit, or loss of any benefit (any such event, a "Conflict") under (i) any provision of such Party's or Subsidiary of such Party's Governing Documents, (ii) any contract, agreement, instrument, or other binding commitment of such Party or any permit, license, approval or other authorization of a Governmental Authority of such Party or its Subsidiaries, or (iii) any Law or Order applicable to such Party or any of its Subsidiaries, or any of their respective properties or assets, except in the case of clauses (ii) and (iii) above, for such Conflicts which would not reasonably be expected to (x) prevent or delay the transactions contemplated in this Agreement and the other Transaction Documents and (y) in the case of the DCEH Parties, Ai, Argosy and South, have a material adverse effect on their respective businesses, assets, properties or prospects.

22.      Notices.  Any notice required to be given hereunder shall be sufficient if in writing and sent by E-mail transmission (*provided* that any notice received by E-mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (local time of the recipient) shall be deemed to have been received at 9:00 a.m. (local time of the recipient) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 20):

(a)     if to the DCEH Parties, to:

Dream Center Education Holdings, LLC
1400 Penn Avenue
Pittsburgh, PA 15222
E-Mail:  rbarton4953@gmail.com
Attention:  Randall K. Barton, Executive Chairman

with copy (which shall not constitute notice) to:

Rouse Frets White Goss Gentile & Rhodes, LLC
1100 Walnut Street, Suite 2900
Kansas City, Missouri 64106
E-mail: rholt@rousepc.com
Attention:  Ronald L. Holt

(b)     if to Studio, to:

1201 West 5th Street, Ste. T410
Los Angeles, CA 90017
E-mail: bryan@studioenterprise.com
Attention: Bryan Newman, CEO

with copies (which shall not constitute notice) to:

Cooley LLP
4401 Eastgate Mall
San Diego, CA  92121-1909
E-mail: kleecarey@cooley.com
Attention:  Katherine (Kate) Lee Carey

and:

Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
E-mail:  jpotash@cov.com; awollensack@cov.com
Attention:  Jeffrey Potash and Amy Wollensack

(c)     if to the Candlewood Parties, to:

Candlewood Special Situations Master Fund II, L.P.555 Theodore Fremd Avenue
Suite C-303
Rye, NY 10580

E-mail: mlau@candlewoodgroup.com; jmiller@candlewoodgroup.com
Attention:  Michael Lau and Janet Miller

and:

Flagler Master Fund SPC, Ltd, acting for and on behalf of the Class B segregated portfolio
555 Theodore Fremd Avenue
Suite C-303
Rye, NY 10580

E-mail: mlau@candlewoodgroup.com; jmiller@candlewoodgroup.com
Attention:  Michael Lau and Janet Miller

with copies (which shall not constitute notice) to:

Morrison & Foerster LLP
250 West 55th Street
New York, New York, NY 10019-9601
E-mail:  glee@mofo.com; jnewton@mofo.com
Attention:  Gary S. Lee and James A. Newton

23.    Interpretation.

(a)    Unless otherwise indicated, all references herein to Articles, Sections or Annexes, shall be deemed to refer to Articles, Sections or Annexes of or to this Agreement, as applicable.

(b)    Unless otherwise indicated, the words "include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation.

(c)    The word "or" is not exclusive.

(d)    The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(e)    The headings set forth in this Agreement are for convenience of reference purposes only and shall not affect or be deemed to affect in any way the meaning or interpretation of this Agreement or any term or provision hereof.

(f)    Unless otherwise indicated, all references herein to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person unless otherwise indicated or the context otherwise requires.

(g)    Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

(h)    References to "$" and "dollars" are to the currency of the United States of America.

(i)     Any dollar or percentage thresholds set forth herein shall not be used as a benchmark for the determination of what is or is not "material" under this Agreement.

(j)     When used herein, the word "extent" and the phrase "to the extent" means the degree to which a subject or other thing extends, and such word or phrase shall not simply mean "if."

(k)     Any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws.

(l)     Unless "Business Days" are expressly specified, all references to "days" are to calendar days.

(m)     The Parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the Party drafting such agreement or document.

24.     <u>No Joint Venture</u>.  Nothing in this Agreement, expressed or implied, is intended to or shall constitute the Parties hereto partners or participants in a joint venture.

25.     <u>Assignment</u>.  The Parties may not assign (including by operation of law) either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Studio.  During the applicable Indebtedness Period with respect to such Person, the DCEH Parties, South and Argosy may not assign (including by operation of Law) either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the applicable Lenders.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.  The Parties shall not be required to obtain any approvals from a Lender pursuant to this paragraph if no obligations (other than contingent reimbursement and indemnification obligations) remain outstanding under such Lender's respective credit documents.

26.     <u>Entire Agreement</u>.  This Agreement, the Ai Transaction Documents, and the Transaction Documents the documents and agreements contemplated by this Agreement, constitute the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof.

27.     <u>Amendment</u>.  Prior to the Conversions, this Agreement may not be amended or modified except by execution of an instrument in writing signed on behalf of DCEH, Studio and the Candlewood Parties.  Following the Conversions, this Agreement may not be amended or modified except by execution of an instrument in writing signed on behalf of DCEH, Studio, Ai, South, Argosy and the Candlewood Parties.

28.     <u>Waiver</u>.  No failure or delay by any Party hereto in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

29.     Third-Party Beneficiaries.  This Agreement is not intended to, and shall not, confer upon any other Person any rights or remedies hereunder.

30.     Expenses.  Except as may otherwise be expressly set forth herein or in any of the Transaction Documents, all fees and expenses incurred in connection with the authorization, preparation, negotiation, execution and performance of this Agreement and the Transaction Documents and the potential consummation of the transactions contemplated hereby shall be the obligation of the respective Party incurring such fees and expenses.

31.     Severability.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto.  The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

32.     Remedies.

(a)     Except as otherwise provided herein, any and all remedies available at law or in equity, whether or not herein expressly conferred upon a Party, will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or in equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)     The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the transactions contemplated by this Agreement) in accordance with its specified terms or otherwise breach such provisions.  Accordingly, the Parties acknowledge and agree that the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.  Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other Party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity.  Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

(c)     The Parties hereto further agree that (i) by seeking the remedies provided for in this Section 32, a Party shall not in any respect waive its right to seek any other form of relief that may be available to a Party under this Agreement (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 32 are not available or otherwise are not granted, and (ii) nothing set forth in this

Section 32 shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 32 prior or as a condition to exercising any termination right under this Agreement (and pursuing damages after such termination), nor shall the commencement of any Proceeding pursuant to this Section 32 or anything set forth in this Section 32 restrict or limit any Party's right to terminate this Agreement or pursue any other remedies under this Agreement that may be available then or thereafter.

33.    Governing Law.  This Agreement, and all proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the actions of the Parties hereto in the negotiation, administration, performance and enforcement hereof and thereof, shall be governed by and construed in accordance with the internal substantive Laws of the State of Delaware, without giving effect to any choice or conflict of Laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

34.    Jurisdiction and Venue.  Each of the Parties hereto submits to the exclusive jurisdiction and venue of the Delaware Chancery Courts located in Wilmington, Delaware, or, if such court shall not have jurisdiction, any state or federal court sitting in Wilmington, Delaware, in any action or proceeding arising out of or relating to this Agreement or any other Transaction Document and agrees that all claims in respect of the action or proceedings may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each of the Parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in Section 20, such service to become effective ten (10) days after such mailing.

35.    Waiver of Jury Trial.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

36.    Federal Rule of Evidence 408.  The Parties acknowledge and agree that this Agreement, the terms in this Agreement, and the discussions and negotiations leading up to this Agreement are subject to Federal Rule of Evidence 408 and were made in an effort to amicably resolve certain dispute among the Parties.  Therefore, if this Agreement does not become effective for any reason, it shall be deemed negotiation for settlement purposes only and will not be admissible in evidence or usable for any purpose whatsoever.

37.    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Party, it being understood that all Parties need not sign the same counterpart.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by E-mail of a

.pdf attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

38.    Lender Consents.  Any consents or approvals to be provided by any Lenders in connection with this Agreement shall be provided in accordance with the terms of the applicable credit documents (including in accordance with any voting or amendment provisions contained therein).

*[Remainder of Page Intentionally Left Blank; Signature Pages to Follow.]*

IN WITNESS WHEREOF, the undersigned have caused this Framework Agreement to be signed, all as of the date first written above.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
      Name:
      Title:

CANDLEWOOD SPECIAL SITUATIONS MASTER
FUND II, L.P.,

By: Candlewood Investment Group, LP, its investment
advisor

By: _____
    Name:
    Title:

FLAGLER MASTER FUND SPC, LTD, acting for and on
behalf of the Class B segregated portfolio


By: Candlewood Investment Group, LP, its investment
advisor

By: _____
    Name:
    Title:

DREAM CENTER EDUCATION HOLDINGS, LLC

By: _____
    Name:
    Title:


DREAM CENTER EDUCATION MANAGEMENT, LLC

By: _____
    Name:
    Title:

DREAM CENTER ARGOSY UNIVERSITY OF
CALIFORNIA, LLC

By: _____
      Name:
      Title:

ARGOSY EDUCATION GROUP, LLC

By: _____
      Name:
      Title:

DREAM CENTER SOUTH UNIVERSITY, LLC

By: _____
    Name:
    Title:

SOUTH UNIVERSITY SAVANNAH, LLC

By: _____
    Name:
    Title:

SOUTH UNIVERSITY OF ALABAMA, LLC

By: _____
    Name:
    Title:

DC SOUTH UNIVERSITY FLORIDA, LLC

By: _____
    Name:
    Title:

SOUTH UNIVERSITY RESEARCH II, LLC

By: _____
    Name:
    Title:

SOUTH UNIVERSITY OF MICHIGAN, LLC

By: _____
    Name:
    Title:

DC SOUTH UNIVERSITY OF NORTH CAROLINA, LLC

By: _____
    Name:
    Title:

SOUTH UNIVERSITY OF OHIO, LLC

By: _____
    Name:
    Title:

SOUTH UNIVERSITY OF CAROLINA, LLC

By: _____
    Name:
    Title:

DC SOUTH EDUCATION - TEXAS, LLC

By: _____
    Name:
    Title:

DC SOUTH UNIVERSITY OF VIRGINIA, LLC

By: _____
    Name:
    Title:

THE ARTS INSTITUTES INTERNATIONAL, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF ATLANTA, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF CHARLESTON, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF WASHINGTON, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF VIRGINIA BEACH, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF TENNESSEE - NASHVILLE, LLC

By: _____
     Name:
     Title:

AITN RESTAURANT, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF COLORADO, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF PHOENIX, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF SEATTLE, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF PORTLAND, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF PITTSBURGH, DC, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF PHILADELPHIA, DC, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF FORT LAUDERDALE, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF HOUSTON, LLC

By: _____
     Name:
     Title:

AIH RESTAURANT, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF SAN ANTONIO, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF AUSTIN, LLC

By: _____
     Name:
     Title:

THE ILLINOIS INSTITUTE OF ART, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF MICHIGAN, LLC

By: _____
     Name:
     Title:

THE ILLINOIS INSTITUTE OF ART AT
SCHAUMBURG, LLC

By: _____
     Name:
     Title:

DC MIAMI INTERNATIONAL UNIVERSITY OF ART
& DESIGN, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF LAS VEGAS, LLC

By: _____
    Name:
    Title:

THE ART INSTITUTE OF INDIANAPOLIS, LLC

By: _____
    Name:
    Title:

AIIN RESTARUANT, LLC

By: _____
    Name:
    Title:

DC ART INSTITUTE OF TAMPA, LLC

By: _____
    Name:
    Title:

AITAMPA RESTAURANT, LLC

By: _____
    Name:
    Title:

THE DC ART INSTITUTE OF CHARLOTTE, LLC

By: _____
    Name:
    Title:

THE DC ART INSTITUTE OF RALEIGH-DURHAM, LLC

By: _____
    Name:
    Title:

DC ART INSTITUTE OF DALLAS, LLC

By: _____
    Name:
    Title:

DC AID RESTAURANT, LLC

By: _____

    Name:

    Title: