*Execution Version*

---

AMENDED AND RESTATED FRAMEWORK AGREEMENT

by and among

STUDIO ENTERPRISE MANAGER, LLC,

DREAM CENTER EDUCATION HOLDINGS, LLC,

DREAM CENTER SOUTH UNIVERSITY, LLC

DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC,

ARGOSY EDUCATION GROUP, LLC,

THE ARTS INSTITUTES INTERNATIONAL, LLC

AND

THE OTHER PARTIES LISTED ON THE SIGNATURE PAGES HERETO

DATED AS OF JANUARY __, 2019

---



# TABLE OF CONTENTS

**Page**

ARTICLE I CLOSINGS AND VARIOUS DELIVERIES ...............................................2

    1.1    Initial Non-Core Closing ...........................................................................2

    1.2    Subsequent Non-Core Closings ................................................................3

    1.3    Final Core Campus Closings. ....................................................................3

    1.4    Purchase Agreements ................................................................................4

    1.5    Managed Services Agreement ...................................................................5

    1.6    Place of Closings ......................................................................................5

    1.7    Initial Non-Core Closing Transactions .....................................................5

    1.8    Subsequent Non-Core Closing Transactions .............................................6

    1.9    South University .......................................................................................6

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE DREAM PARTIES
.......................................................................................................................................7

    2.1    Organization of the Dream Parties.............................................................7

    2.2    Capital Structure of DCEH and its Subsidiaries .......................................7

    2.3    Subsidiaries ..............................................................................................7

    2.4    Authority ..................................................................................................7

    2.5    No Conflict ...............................................................................................8

    2.6    Governmental Consents ............................................................................8

    2.7    Financial Statements .................................................................................9

    2.8    Absence of Undisclosed Liabilities ..........................................................9

    2.9    No Changes ..............................................................................................9

    2.10    Compliance with Laws; Permits .............................................................10

    2.11    Educational Compliance and  Approvals .................................................10

    2.12    Proceedings ............................................................................................16

    2.13    Taxes ......................................................................................................16

    2.14    Labor Matters..........................................................................................16

    2.15    Employee Benefit Plans ..........................................................................17

    2.16    Insurance ................................................................................................19

    2.17    Brokers' Fees ..........................................................................................19

    2.18    Transactions with Affiliates.....................................................................19

    2.19    Intellectual Property Rights .....................................................................19

    2.20    Cyber Security and IT..............................................................................22

2.21     Privacy and Data. ............................................................23

2.22     No Other Assets; No Transfers of Assets or Liabilities.............................24

2.23     Adequate Disclosure ...........................................................24

ARTICLE III REPRESENTATION AND WARRANTIES OF STUDIO .......................24

3.1      Organization...................................................................24

3.2      Authority .....................................................................25

3.3      No Conflict ...................................................................25

3.4      Governmental Consents .........................................................25

3.5      Litigation.....................................................................25

3.6      Sufficiency of Funds ...........................................................25

3.7      Brokers' Fees .................................................................25

ARTICLE IV COVENANTS AND AGREEMENTS.............................................26

4.1      Conduct of Business of Dream Parties ..........................................26

4.2      Exclusivity; No Solicitation ...................................................30

4.3      Access to Information ..........................................................30

4.4      Delivery of Financial Statements ...............................................31

4.5      Public Disclosure .............................................................31

4.6      Reasonable Best Efforts ........................................................31

4.7      Educational Approvals ..........................................................33

4.8      Notification of Certain Matters ................................................34

4.9      Restrictive Covenants ..........................................................34

4.10     DCEH Reorganization ...........................................................36

4.11     Certain Matters Related to Boards ..............................................37

4.12     Offers of Employment ..........................................................37

4.13     Maintenance of Employees.......................................................38

4.14     No Solicitation of DCEH and Affiliate Employees................................38

4.15     Access to Courses for Certain Employees and Program Participants .......38

4.16     COBRA Matters .................................................................40

4.17     Disability Matters ............................................................40

4.18     WARN Act ......................................................................40

4.19     Certain Intellectual Property Matters..........................................40

4.20     Online Campus Access ..........................................................42

4.21     Renegotiation of Leases .......................................................42

4.22     Teach-Out Matters .............................................................42

| 4.23 | Transfer Taxes | 42 |
| 4.24 | Delivery of Schedules | 43 |
| 4.25 | Bank Accounts; Cash Management Practices | 43 |
| 4.26 | Business Contracts | 44 |
| 4.27 | Consent Judgment Compliance | 46 |
| 4.28 | Grant of Security Interest | 46 |
| 4.29 | Affirmation; Limitation on Actions of DCEH | 48 |
| 4.30 | Assignment of Assets and Liabilities to Specified Campuses | 48 |
| 4.31 | Affiliate Transactions | 48 |
| 4.32 | Name Changes | 48 |
| 4.33 | Assignment of Ai Receivables | 49 |
| 4.34 | South University | 49 |
| 4.35 | Tuition Options Agreements | 49 |

ARTICLE V CONDITIONS TO THE CLOSINGS ........................................................50

| 5.1 | Conditions to the Obligations of Each Party to Effect the Closing Transactions | 50 |
| 5.2 | Additional Conditions to the Obligations of Studio | 50 |
| 5.3 | Additional Conditions to the Obligations of the Dream Parties | 53 |

ARTICLE VI INDEMNIFICATION OF STUDIO .......................................................54

| 6.1 | Survival of Representations, Warranties, Covenants and Agreements of the Dream Parties | 54 |
| 6.2 | General Indemnification | 55 |
| 6.3 | Manner of Calculation | 56 |
| 6.4 | Non-Exclusive Remedy | 56 |
| 6.5 | Insurance | 56 |
| 6.6 | Manner of Payment | 56 |
| 6.7 | Adjustment Treatment | 56 |
| 6.8 | Disclaimer of Certain Damages | 56 |

ARTICLE VII TERMINATION, AMENDMENT AND WAIVER ................................57

| 7.1 | Termination | 57 |
| 7.2 | Effect of Termination | 57 |
| 7.3 | Cross Default | 57 |
| 7.4 | Amendment | 58 |
| 7.5 | Extension; Waiver | 58 |

ARTICLE VIII GENERAL PROVISIONS ....................................................................58

8.1    No Survival of Representations, Warranties, Covenants and Agreements of Studio; Waiver and Release ........................................................58

8.2    Notices .............................................................................................60

8.3    Interpretation ...................................................................................61

8.4    Defined Terms .................................................................................62

8.5    No Joint Venture ..............................................................................62

8.6    Assignment .....................................................................................62

8.7    Entire Agreement ............................................................................62

8.8    Third-Party Beneficiaries ................................................................63

8.9    Expenses .........................................................................................63

8.10    Severability ...................................................................................63

8.11    Remedies ......................................................................................64

8.12    Governing Law .............................................................................64

8.13    Jurisdiction and Venue ..................................................................64

8.14    Waiver of Jury Trial ......................................................................65

8.15    Counterparts .................................................................................65

8.16    Intention of the Parties ..................................................................65

## INDEX OF ANNEXES, EXHIBITS AND SCHEDULES

| Annex | Description |
|---|---|
| Annex 1 | Specified Campuses; Excluded Campuses |
| Annex 2 | Defined Terms |

| Exhibit | Description |
|---|---|
| Exhibit A | Form of Managed Services Agreement |
| Exhibit B | Form of Asset Purchase Agreement |
| Exhibit C | Form of Sublease Agreement |
| Exhibit D | Form of IP Assignments |
| Exhibit E | Form of Restrictive Covenant Agreement |
| Exhibit F | Form of License Agreement |
| Exhibit G | Form of Transition Service and License Agreement |
| Exhibit H | Form of Uncertificated Equity Interest Powers |
| Exhibit I | Form of Resignation and Release Letter |
| Exhibit J | Form of Bill of Sale, Assignment and Assumption Agreement |

| Schedule | Description |
|---|---|
| Schedule A-3 | Parties to Restrictive Covenant Agreements |
| Schedule 1.7(f) | Closing Consideration |
| Schedule 4.1(a) | Ordinary Course Exceptions, Relationships |
| Schedule 4.1(b) | Ordinary Course Exceptions, Operations |
| Schedule 4.7(b) | Pre-Closing Educational Consents |
| Schedule 4.7(d) | Post-Closing Educational Consents |
| Schedule 4.10 | Reorganization |
| Schedule 4.12 | Studio Offerees |
| Schedule 4.13 | Maintenance of Employees |
| Schedule 4.23 | Transfer Taxes |
| Schedule 5.2(h)(ii) | Consents |

| Disclosure Schedule | Description |
|---|---|
| Section 2.2(a) | Ownership |
| Section 2.2(b) | Closing Indebtedness |
| Section 2.3 | Subsidiaries |
| Section 2.5 | No Conflict |
| Section 2.6 | Governmental Consents |
| Section 2.7 | Financial Statements |
| Section 2.8 | Absence of Undisclosed Liabilities |
| Section 2.9(a) | No Changes |
| Section 2.9(b) | No Material Adverse Effect |
| Section 2.9(c) | No Claims or Payments |
| Section 2.10 | Compliance with Laws; Permits |
| Section 2.11(a)(i) | Educational Approvals |
| Section 2.11(a)(ii) | Applications for Educational Approvals |
| Section 2.11(a)(iii) | Notices from Educational Agencies |

| | |
|---|---|
| Section 2.11(b) | Licensure Qualifications |
| Section 2.11(c) | Compliance with Laws and Educational Laws |
| Section 2.11(d) | Specified Campus Addresses |
| Section 2.11(e) | Timely Disclosure under Educational Laws |
| Section 2.11(f) | Title IV Program Compliance |
| Section 2.11(h) | Revenue from Title IV Programs |
| Section 2.11(j) | Educational Instruction |
| Section 2.11(k) | Student Lending Relationship |
| Section 2.11(l)(i) | Score for Financial Responsibility |
| Section 2.11(l)(ii) | Compliance with Financial Responsibility Requirements |
| Section 2.11(l)(iii) | Requests by Educational Agencies |
| Section 2.11(m) | Compliance with Educational and DOE Requirements |
| Section 2.11(n) | Official Cohort Default Rates |
| Section 2.11(w) | Compliance Reviews |
| Section 2.12 | Proceedings |
| Section 2.14(a) | Labor Matters; Business Employees |
| Section 2.14(b) | Compensation |
| Section 2.14(c) | Collective Bargaining Agreements |
| Section 2.14(f) | Plant Closings; Mass Layoffs |
| Section 2.15(a) | Employee Benefit Plans |
| Section 2.15(d) | Vesting Under Employee Benefit Plans |
| Section 2.16 | Insurance |
| Section 2.18 | Transactions with Affiliates |
| Section 2.19(a) | Intellectual Property Rights |
| Section 2.19(b) | Rights in Intellectual Property |
| Section 2.19(c) | AI Intellectual Property Rights Disputes |
| Section 2.19(f) | Intellectual Property Rights Prior Commitments |
| Section 2.20(b) | Security Incidents |
| Section 2.21(a) | Voluntary and/or Self-Regulatory Guidelines |

## AMENDED AND RESTATED FRAMEWORK AGREEMENT

THIS AMENDED AND RESTATED FRAMEWORK AGREEMENT (this "Agreement") is made and entered into as of January __, 2019 by and among STUDIO ENTERPRISE MANAGER, LLC, a Delaware limited liability company ("Studio"), DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona not-for-profit limited liability company ("DCEH"), DREAM CENTER SOUTH UNIVERSITY, LLC, an Arizona not-for-profit limited liability company ("South" and collectively with all of its Subsidiaries, "South University"), ARGOSY EDUCATION GROUP, LLC, a California not-for-profit limited liability company ("AEG"), DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC, a California not-for-profit limited liability company ("Argosy" and collectively with AEG and all of their respective campuses, the "Argosy University System"), THE ARTS INSTITUTES INTERNATIONAL, LLC, an Arizona not-for-profit limited liability company ("AII" and collectively with all of its Subsidiaries, the "Ai University System"), and the other Parties listed on the signature pages hereto (collectively, the "Other Dream Parties" and together with DCEH, South, Argosy, AEG and AII, as of immediately prior to the execution of this Agreement, the "Dream Parties").

## RECITALS

A.     Studio, DCEH, Dream Center Education Management, LLC ("DCEM") and certain members of the Ai University System entered into a Framework Agreement, dated December 22, 2018 (the "Original Agreement").

B.     Studio, DCEH and the Ai University System desire to amend and restate the Original Agreement in its entirety as set forth herein and to remove DCEM as a party and add the additional parties signatory hereto.

C.     Studio desires to provide to certain Dream Parties, and such Dream Parties wish to receive from Studio, certain services pursuant to and in accordance with the terms of this Agreement and the managed services agreement in the form set forth on EXHIBIT A (the "Managed Services Agreement"), and the Parties desire, that in connection with the entering into of the Managed Services Agreement and this Agreement:

1.     Studio may, in its sole discretion, purchase or cause its Subsidiaries to purchase from the Dream Parties certain Non-Core Assets required to provide the services outlined in the Managed Services Agreement with respect to the University Systems, and, in such cases, the Dream Parties will transfer, assign and convey to Studio such Non-Core Assets and the Non-Core Assumed Liabilities pursuant to the terms of, and in accordance with, this Agreement and a master asset purchase agreement in the form set forth on EXHIBIT B (the "Asset Purchase Agreement").

2.     Studio may, in its sole discretion, cause its Subsidiaries to assume certain real property lease obligations of the Dream Parties with respect to the University Systems (the "Assumed Lease Obligations"), and, in such cases, Studio may, in its sole discretion, then cause such Subsidiaries to sublease the Assumed Lease Obligations to the Dream Parties pursuant to the terms of, and in accordance with, this Agreement and the form of sublease agreements set forth on EXHIBIT C (the "Subleases").  Studio shall have the

right to assign the Assumed Lease Obligations in accordance with the terms of this Agreement.

       3.     DCEH and Studio shall enter into a Transition Services and License Agreement, in the form set forth on EXHIBIT G (the "Transition Services and License Agreement").

    D.     The Parties desire to give Studio the right, in its sole discretion, to cause its Subsidiaries to acquire the Core Assets and Core Assumed Liabilities of any Specified Campus for which Studio or its Affiliates have acquired the Non-Core Assets and, if Studio desires to cause the purchase of such Core Assets and assumption of the Core Assumed Liabilities (1) the Dream Parties desire to transfer, assign and convey to Studio such Core Assets and Assumed Core Liabilities pursuant to the terms of, and in accordance with this Agreement and the Asset Purchase Agreement with respect to such Core Assets and (2) the Parties desire that, to the extent applicable and requested by Studio, the relevant Sublease(s) then be terminated.

    E.     The Parties desire to give Studio the right, in its sole discretion, to cause DCEH to assign and transfer 100% of the issued and outstanding equity interests in AII, Argosy and South to any not-for-profit corporation of its election (the "Foundation") pursuant to the terms of, and in accordance with, this Agreement and the form of uncertificated equity interest powers attached hereto as EXHIBIT H (the "Equity Power") and an equity and asset purchase agreement in the form of the EAPA (defined below) (the "Equity Transfer").

    F.     Contemporaneously with the execution and delivery of this Agreement, the Foundation, AII, South and DCEH entered into an Equity and Asset Purchase Agreement (the "EAPA") pursuant to which the Foundation will purchase the Equity Interest of each of AII and South owned by DCEH and DCEH will transfer, assign and convey to AII certain assets of DCEH used by the Ai University System and to South certain assets of DCEH used by South University.

    G.     On December 22, 2018, the persons listed on Schedule A-3 executed and delivered the restrictive covenant agreements in the form set forth on Exhibit E (the "Restrictive Covenant Agreements").

    H.     The Parties desire to make certain representations, warranties, covenants and other agreements in connection with the transactions contemplated by this Agreement.

    NOW, THEREFORE, in consideration of the mutual agreements, covenants and other promises set forth herein, the mutual benefits to be gained by the performance thereof, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, the Parties hereby agree as follows:

ARTICLE I
CLOSINGS AND VARIOUS DELIVERIES

    1.1    Initial Non-Core Closing. Subject to the satisfaction or, if permissible, waiver of the conditions set forth in ARTICLE V, the initial closing of the transactions contemplated by this Agreement (the "Initial Non-Core Closing") will take place as promptly as practicable after Studio delivers notice to the applicable University System or Specified Campus, as applicable, that it

desires to hold the Initial Non-Core Closing, but not earlier than two (2) Business Days following satisfaction or waiver of the conditions set forth in ARTICLE V (other than those conditions that by their nature are to be satisfied at the Initial Non-Core Closing, but subject to the fulfillment or waiver of those conditions) and in ARTICLE II of the Asset Purchase Agreement.  The date upon which the Initial Non-Core Closing actually occurs shall be referred to herein as the "Initial Non-Core Closing Date."  Studio shall determine in its sole discretion which Specified Campuses shall be part of the Initial Non-Core Closing, if any (each such Specified Campus, an "Initial Non-Core Closing Campus") and shall identify such Specified Campuses in the notice delivered pursuant to this Section 1.1.  Any Specified Campus that is not an Initial Non-Core Closing Campus shall be referred to as a "Subsequent Non-Core Closing Campus."  For the avoidance of doubt the Initial Non-Core Closing shall be held at the sole discretion of Studio and Studio shall not be obligated to enter into the Initial Non-Core Closing Transactions or to consummate the Initial Non-Core Closing.

1.2     Subsequent Non-Core Closings.  Subject to the satisfaction or, if permissible, waiver of the conditions set forth in ARTICLE V, at any time after the Initial Non-Core Closing, one or more subsequent closings of the transactions contemplated by this Agreement (each, a "Subsequent Non-Core Closing") will take place as promptly as practicable after Studio delivers notice to the applicable University System or Specified Campus, as applicable, that it desires to hold a Subsequent Non-Core Closing with respect to a Subsequent Non-Core Closing Campus; *provided* that each Subsequent Non-Core Closing shall not be earlier than two (2) Business Days following satisfaction or waiver of the conditions set forth in ARTICLE II of the applicable Asset Purchase Agreement with respect to such Subsequent Non-Core Closing (other than those conditions that by their nature are to be satisfied at such Subsequent Non-Core Closing, but subject to the fulfillment or waiver of those conditions).  The date upon which any Subsequent Non-Core Closing actually occurs shall be referred to herein as a "Subsequent Non-Core Closing Date."  Each Subsequent Non-Core Closing shall be held at the sole discretion of Studio with respect the Subsequent Non-Core Closing Campus(es) specified by Studio in the notice delivered pursuant to this Section 1.2 (such specified Subsequent Non-Core Closing Campus(es), the "Subject Subsequent Non-Core Closing Campus(es)").  For the avoidance of doubt any Subsequent Non-Core Closing shall be held at the sole discretion of Studio and Studio shall not be obligated to enter into any Subsequent Non-Core Closing Transactions or to consummate any Subsequent Non-Core Closing.  Notwithstanding anything to the contrary contained in this Agreement, in no event may Studio elect to hold a Non-Core Closing with respect to South or any of its Subsidiaries or campuses after (a) such Person has undergone a Change of Control (excluding any Change of Control occurring pursuant to this Agreement, the EAPA and the documents related hereto and thereto) in accordance with the terms of the South MSA pursuant to which any Person other than the Foundation, Studio or their respective Affiliates holds the Equity Interest or all or substantially of the assets of such member of South University or (b) the Managed Services Agreement to which South is a party has been terminated in accordance with its terms.

1.3     Final Core Campus Closings.

(a)     Studio may, at its election in its sole discretion, deliver written notice to the applicable University System or Specified Campus that it desires to acquire or cause the Foundation or its Affiliates to acquire the Core Assets and Core Assumed Liabilities of any Initial Non-Core Closing Campus or any Subsequent Non-Core Closing Campus.  If Studio delivers such

a notice, the closing (the "Final Core Closings") of the transactions contemplated by this Agreement and the Asset Purchase Agreement with respect to the acquisition of such Core Assets will take place as promptly as practicable thereafter, but not earlier than two (2) Business Days following satisfaction or waiver of the conditions set forth in ARTICLE II of the applicable Asset Purchase Agreement (other than those conditions that by their nature are to be satisfied at such Final Core Closing, but subject to the fulfillment or waiver of those conditions); *provided*, that if the second Business Day falls after the 15th of any given months, the Final Core Closing will take place on the first Business Day of the subsequent month. The date upon which any Final Core Closing actually occurs shall be referred to herein as a "Final Core Closing Date." For the avoidance of doubt, (a) there shall be no Final Core Closing for any Specified Campus that is not an Acquired Campus, (b) any Final Core Closing shall be held at the sole discretion of Studio and (c) Studio shall not be obligated to consummate any Final Core Closing. The transactions contemplated by the EAPA shall be deemed a "Final Core Closing" with respect to each Specified Campus which is the subject thereof; *provided* that Studio shall still have the right to cause a Final Core Closing under this Agreement and the Ai Asset Purchase Agreement with respect to any member of the Ai University System.

(b) The Parties agree that, to the extent applicable, the applicable Sublease with respect to the Specified Campus for which the Final Core Closing has been consummated shall be terminated, effective as of the date of consummation of such Final Core Closing; *provided* that any term of such Sublease which expressly survives such termination shall remain in effect in accordance with its terms.

(c) At its election, Studio may cause any Final Core Closing to be effectuated as an Equity Transfer of the equity interests of a University System and, in such case, DCEH shall deliver an executed Equity Power to the Person designated by Studio as the recipient of such Equity Transfer to effect such transfer and shall execute and deliver each document and instrument requested by Studio to take assignment of any Subsidiaries or assets and liabilities of such University System which Studio determines, in its sole discretion, will not be part of such Equity Transfer, including any Subsidiaries, assets and liabilities related to any Excluded Campus.

(d) For the avoidance of doubt, at the election of Studio, a Non-Core Closing and a Final Core Closing may occur contemporaneously with respect to a Specified Campus. If a Final Core Closing is structured as an Equity Transfer, the Non-Core Closings related thereto may take place after such Final Core Closing.

1.4 Purchase Agreements. On December 22, 2018, certain Affiliates of Studio and certain members of the Ai University System executed and delivered to Studio an Asset Purchase Agreement with respect to certain campuses of the Ai University System and certain Ai campuses of the Argosy University System (the "Ai Asset Purchase Agreement"). On or after the date hereof, at the request of Studio, any Dream Party requested by Studio shall enter into an Asset Purchase Agreement (*mutatis mutandis*) or an equity purchase agreement in the form of the EAPA (*mutatis mutandis*) with respect to any Specified Campus of such Dream Party or with respect to the Argosy University System. Each of the Ai Asset Purchase Agreement and any other Asset Purchase Agreement entered into pursuant to this Section 1.4 shall be an Asset Purchase Agreement for the purposes of this Agreement.

1.5     Managed Services Agreement.    Contemporaneously with the execution and delivery of this Agreement (and prior to the consummation of the transactions contemplated by the EAPA), each University System shall execute and deliver to Studio a Managed Services Agreement, and Studio shall execute and deliver to such University System the applicable Managed Services Agreement.  As set forth in the respective Managed Services Agreements, Studio and the Dream Parties have agreed upon a budget for the operations of each University System that reflects sufficient revenue to support the fees payable under the Managed Services Agreement for such Specified Campus, as well as appropriate funding for all required operations including the ongoing delivery of academic and other Core Services which are outside the scope of such Managed Services Agreement.

1.6     Place of Closings.  The Initial Non-Core Closing and each Subsequent Non-Core Closing and Final Core Closing will take place at 10:00 a.m. local time at the offices of Covington & Burling LLP, 620 Eighth Avenue, New York, NY, 10018, unless another time and place is mutually agreed upon in writing by Studio and DCEH.

1.7     Initial Non-Core Closing Transactions.  Subject to the terms and conditions set forth in this Agreement, the Parties shall consummate the following transactions at the Initial Non-Core Closing (the "Initial Non-Core Closing Transactions"):

(a)     Asset Purchase Agreement.  A "Non-Core Assets Closing" shall occur pursuant to the terms of the applicable Asset Purchase Agreement.

(b)     [This section is intentionally left blank.]

(c)     Assumption of Lease Obligations.  If directed in writing by Studio, the applicable Dream Parties shall, or shall cause their respective Affiliates to, if applicable, execute and deliver to the other parties thereto the lease assignment and assumption agreements in form and substance satisfactory to Studio (the "Lease Assignment and Assumption Agreements") with respect to each Initial Non-Core Closing Campus, and in such cases Studio shall cause one of its Subsidiaries to execute and deliver to DCEH such Lease Assignment and Assumption Agreements; provided, that Studio, at its sole option, may elect not to assume any lease obligations with respect to any Specified Campus.  In the event that Studio elects not to assume such lease, at Studio's sole option and subject to the applicable landlord's consent where required, each Dream Party agrees that at Studio's election, such Dream Party will enter into a sublease of the lease with the applicable Studio Affiliate or other designee of Studio on the same terms as the master lease.  Studio may elect to assume or to cause a designee to assume such master lease at any time thereafter and upon Studio's election to assume such lease, Studio and the applicable Dream Party will assume such lease obligations and, if requested by Studio, the applicable Dream Party will enter into the Sublease for such Specified Campus pursuant to which it sublets such leased real property from Studio or its designee.

(d)     Subleases.  Subject to the last two sentences of Section 1.7(c), the applicable Dream Parties shall, or, if applicable, shall cause their respective Affiliates to, execute and deliver a Sublease with respect to each Initial Non-Core Closing Campus.

(e)     Other Deliveries.  The Parties will deliver the documents, instruments and

- 5 -

certificates required to be delivered pursuant to <u>ARTICLE V</u> and <u>ARTICLE II</u> of the Asset Purchase Agreement.

(f)     <u>Closing Consideration</u>.  Without duplication of any amounts payable under the Asset Purchase Agreement, Studio shall pay, or cause to be paid, in cash or immediately available funds, the consideration set forth on <u>Schedule 1.7(f)</u> (the "<u>Closing Consideration</u>") for each Initial Non-Core Closing Campus in accordance with written instructions delivered by DCEH, which instructions shall be delivered at least two (2) Business Days prior to the Initial Non-Core Closing Date.

1.8     <u>Subsequent Non-Core Closing Transactions</u>.  Subject to the terms and conditions set forth in this Agreement, the Parties hereto shall consummate the following transactions at each Subsequent Non-Core Closing (the "<u>Subsequent Non-Core Closing Transactions</u>" and together with the Initial Non-Core Closing Transactions, the "<u>Closing Transactions</u>"):

(a)     <u>Asset Purchase Agreement</u>.  A "Non-Core Assets Closing" shall occur pursuant to the terms of the Asset Purchase Agreement.

(b)     [This section is intentionally left blank.]

(c)     <u>Assumption of Lease Obligations</u>.  If directed in writing by Studio, and subject to <u>Section 1.7(c)</u>, the applicable Dream Parties shall, or shall cause their respective Affiliates to, if applicable, execute and deliver to the other parties thereto the Lease Assignment and Assumption Agreements with respect to each Subject Subsequent Non-Core Closing Campus, and in such cases Studio shall cause one of its Subsidiaries to execute and deliver to DCEH such Lease Assignment and Assumption Agreements.

(d)     <u>Subleases</u>.  Subject to the last two sentences of <u>Section 1.7(c)</u>, the applicable Dream Parties shall, or shall cause their respective Affiliates to, if applicable,  execute and deliver a Sublease with respect to each Subject Subsequent Non-Core Closing Campus.

(e)     <u>Other Deliveries</u>.  The Parties will deliver the documents, instruments and certificates required to be delivered pursuant to <u>ARTICLE II</u> of the Asset Purchase Agreement.

(f)     <u>Closing Consideration</u>.  Without duplication of any amounts payable under the Subsequent Non-Core Closing Asset Purchase Agreement, Studio shall pay, or cause to be paid, in cash or immediately available funds, the Closing Consideration in accordance with written instructions delivered by DCEH, which instructions shall be delivered at least two (2) Business Days prior to such Subsequent Non-Core Closing Date.

1.9     <u>South University</u>.  Notwithstanding anything to the contrary contained herein, (a) during the South Indebtedness Period, South and South University shall not be required to execute or deliver an Asset Purchase Agreement without the prior written consent of the South Lenders given in accordance with the terms of the IFWA; *provided* that if requested by Studio, South shall use commercially reasonable efforts to obtain such consent, and (b) the respective obligations of each party hereto to effect the Closing Transactions at any Closing, as applicable, including pursuant to <u>ARTICLE V</u> hereof, shall not be subject to the execution and delivery of an

Asset Purchase Agreement by South or South University.

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF THE DREAM PARTIES

DCEH hereby represents and warrants to Studio and its Affiliates (as of the date hereof, as of the Initial Non-Core Closing Date and as of each Subsequent Non-Core Closing Date and each Final Core Closing Date), except as disclosed in the Disclosure Schedule (referencing the appropriate Section and paragraph numbers in this <u>ARTICLE II</u>; *provided, however,* that any disclosure under one such Section or paragraph number shall be deemed to have been disclosed for each other Section of the Disclosure Schedule to the extent that the relevance of such disclosure to such other sections of the Disclosure Schedule is readily apparent on its face without reference to any underlying document) supplied by the Dream Parties to Studio on the date of this Agreement (the "<u>Disclosure Schedule</u>") as to the matters specified in this <u>ARTICLE II</u>. For the purposes of this <u>ARTICLE II</u>, references to DCEH and its Subsidiaries shall include the Dream Parties (including any former Subsidiaries of DCEH in their capacities as such) and references to DCEH and its Affiliates shall include the Dream Parties (including any former Affiliates of DCEH in their capacities as such).

2.1     <u>Organization of the Dream Parties</u>.  Each Dream Party is a limited liability company duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization. Each of the Dream Parties has the power to own its properties and to carry on its business as currently conducted. The Dream Parties have delivered to Studio true, correct and complete copies of their respective Governing Documents (collectively, the "<u>Dream Governing Documents</u>"). No Dream Party is in violation of any of the provisions of the Dream Governing Documents.

2.2     <u>Capital Structure of DCEH and its Subsidiaries</u>.

(a)     No Person other than a Dream Party directly or indirectly owns, or has any interest in or right to acquire any equity interest in any Specified Campus. Each Specified Campus is owned by the Person specified in <u>Section 2.2(a)</u> of the Disclosure Schedule.

(b)     <u>Section 2.2(b)</u> of the Disclosure Schedule lists (i) all Indebtedness of DCEH and its Subsidiaries, and (ii) for each item of Indebtedness, the material agreement(s) governing such Indebtedness.

2.3     <u>Subsidiaries</u>. <u>Section 2.3</u> of the Disclosure Schedule lists each Subsidiary of DCEH and its applicable jurisdiction of incorporation or formation, its status as a not-for-profit or for-profit entity and each campus (if any) owned by such Subsidiary. All of the outstanding shares of capital stock of, or other equity or voting interests in, each Subsidiary of DCEH have been validly issued and are fully paid and non-assessable and are owned directly or indirectly by DCEH, free and clear of all Liens (other than Permitted Liens), except for restrictions imposed by applicable securities Laws.

2.4     <u>Authority</u>. Each of the Dream Parties has the requisite limited liability company power and authority to enter into and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder (including the consummation by such

- 7 -

Dream Party of the transactions contemplated hereby and thereby). The execution and delivery by each Dream Party of this Agreement and the other Transaction Documents and the performance by such Dream Party of its obligations under this Agreement and the other Transaction Documents (including the consummation by such Dream Party of the transactions contemplated hereby and thereby) have been duly authorized by all necessary limited liability company action on the part of such Dream Party, and no other limited liability company proceedings on the part of such Dream Party are necessary to authorize the execution or delivery by such Dream Party of this Agreement or the other Transaction Documents or the performance by such Dream Party of its obligations under this Agreement or the other Transaction Documents in accordance with their respective terms (including the consummation by such Dream Party of the transactions contemplated hereby and thereby). This Agreement has been, and each other Transaction Document to which a Dream Party is a party will when executed and delivered be, duly executed and delivered by such Dream Party and, assuming the due authorization, execution and delivery by each party hereto or thereto which is not a Dream Party, constitutes the valid and binding obligation of such Dream Party, enforceable against such Dream Party in accordance with its terms, except as such enforceability may be subject to (a) the Laws of general application relating to bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting or relating to creditors' rights generally and (b) general principles of equity.

2.5 <u>No Conflict</u>. Except as set forth in <u>Section 2.5</u> of the Disclosure Schedule, assuming the receipt or making of the consents, waivers, approvals, orders, authorizations, registrations, declarations and filings specified in <u>Section 2.6</u> of the Disclosure Schedule, the execution and delivery by the Dream Parties of this Agreement and the other Transaction Documents does not, and the performance by the Dream Parties of its obligations under this Agreement and the other Transaction Documents (including the consummation by such Dream Party of the transactions contemplated hereby and thereby) will not, conflict with, result in any violation of or default under (with or without notice or lapse of time, or both) or give rise to a right of termination, cancellation, modification or acceleration of any obligation, payment of any benefit, or loss of any benefit (any such event, a "<u>Conflict</u>") under (a) any provision of such Dream Party's or Subsidiary of such Dream Party's Governing Documents, (b) any Contract, Company Material Contract or Company Permit of such Dream Party or its Subsidiaries, or (c) any Law or Order applicable to such Dream Party or any of its Subsidiaries, or any of their respective properties or assets, except in the case of clauses (b) and (c) above, for such Conflicts which would not reasonably be expected to be, individually or in the aggregate, material to DCEH and its Subsidiaries, taken as a whole, or the ability of DCEH and its Subsidiaries to consummate the transactions contemplated in this Agreement.

2.6 <u>Governmental Consents</u>. Except as set forth in <u>Section 2.6</u> of the Disclosure Schedule, no consent, waiver, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority, is required by or with respect to any Dream Party or its Subsidiaries in connection with the execution and delivery by the Dream Parties of this Agreement or the performance by such Dream Party of its obligations under this Agreement (including the consummation by such Dream Party of the transactions contemplated hereby), except for such consents, waivers, approvals, orders, authorizations, registrations, declarations and filings which, if not obtained or made, would not reasonably be expected to be, individually or in the aggregate, material to DCEH and its Subsidiaries, taken as a whole.

2.7     Financial Statements. Section 2.7 of the Disclosure Schedule sets forth true, correct and complete copies of (a) the audited consolidated balance sheet of DCEH and its Subsidiaries as of October 17, 2017, (b) the unaudited consolidated balance sheet of DCEH and its Subsidiaries as of June 30, 2018 and unaudited statements of income and cash flows for the period then ended and (c) the unaudited consolidated balance sheet of DCEH and its Subsidiaries as of September 30, 2018 (the "Most Recent Balance Sheet") and the related unaudited statements of income and cash flows for the period then ended (collectively, the "Financial Statements"). The Financial Statements (including in all cases the notes, if any, thereto) (w) are true and correct, (x) have been prepared in accordance with GAAP, consistently applied throughout the periods indicated (provided, however, that the unaudited Financial Statements do not contain all notes required under GAAP and are subject to normal year-end adjustments (none of which will, individually or in the aggregate, materially alter the condition (financial or otherwise) of DCEH and its Subsidiaries presented by the Financial Statements)), (y) have been prepared from, and in accordance with, the books and records of DCEH and its Subsidiaries, and (z) fairly present the financial condition of DCEH and its Subsidiaries and accurately reflect the operating results and cash flows of each DCEH and its Subsidiaries (in each case as of the applicable dates or for the applicable periods). Since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, the books of account, minute books and other records of each Dream Party, all of which have been made available to Studio, are, in all material respects, true, correct and complete and have been maintained in accordance with sound business practices. All financial projections provided by the Dream Parties to Studio prior to the date hereof have been prepared in good faith, on the basis of assumptions believed at the time made to be reasonable in light of the facts and circumstances known to management at the time made.

2.8     Absence of Undisclosed Liabilities. Except as set forth in Section 2.8 of the Disclosure Schedule, none of DCEH or the Dream Parties nor any of their respective Subsidiaries, has any liability other than (a) liabilities set forth on the liabilities side of the Most Recent Balance Sheet (excluding any notes thereto), (b) liabilities expressly contemplated by the Transaction Documents, (c) liabilities which have arisen after the date of the Most Recent Balance Sheet in the ordinary course of business, (d) liabilities for which no Specified Campus could not be liable, or (e) liabilities for which none of Studio or any of its Affiliates could be liable.

2.9     No Changes.

(a)     Except as set forth in Section 2.9(a) of the Disclosure Schedule, and except in connection with the authorization, preparation, negotiation, execution or performance of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby, DCEH and its Subsidiaries have operated in all material respects in the ordinary course of business, and have not taken any action which if taken during the Pre-Closing Period would be prohibited by Section 4.1(b).

(b)     Except as set forth in Section 2.9(b) of the Disclosure Schedule, there has not been, occurred or arisen any event, change, circumstance, development, condition or effect that, individually or in the aggregate, has had or would reasonably be expected to have a DCEH Material Adverse Effect.

- 9 -

(c)     Except as set forth in Section 2.9(c) of the Disclosure Schedule:

(i)     there are no claims that have been or can be made (including claims that would erode the deductible to which such claim is subject) by DCEH or its Subsidiaries against Education Management;

(ii)    there are no amounts that are payable or have been paid by Education Management to DCEH or its Affiliates;

(iii)   there are no inaccuracies or breaches of the representations and warranties of Education Management set forth in the Prior Acquisition Agreement and Education Management has not breached any of its covenants under the Prior Acquisition Agreement; and

(iv)    there are no liabilities of DCEH or its Affiliates to Education Management or its Affiliates.

2.10    Compliance with Laws; Permits.    Except as set forth in Section 2.10 of the Disclosure Schedule:

(a)     Each of DCEH and its Subsidiaries has complied in all material respects with, is in compliance in all material respects with, and has operated its business and maintained its assets in compliance in all material respects with, all applicable Laws.  No notice has been received by, and no claims have been filed against, DCEH and its Subsidiaries alleging a violation of any such Laws.  There is no proposed Law that would prohibit or restrict any Specified Campus from, or otherwise materially adversely affect any Specified Campus in, conducting its business in any jurisdiction in which it is now conducting its business or in which it has proposed to conduct its business.

(b)     Each Specified Campus (i) holds all Permits used or necessary in the conduct of its business or the ownership of its assets, (ii) such Permits are valid and in full force and effect, (iii) no notice has been received by DCEH or its Subsidiaries alleging the failure to hold any such Permit, (iv) DCEH and its Subsidiaries are in compliance in all material respects with the terms and conditions of such Permits, and (v) all of such Permits will be available for use on the same terms by each applicable Specified Campus after each Closing.

2.11    Educational Compliance and Approvals.

(a)     DCEH and its Subsidiaries and each Specified Campus are and have been, since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, in material compliance with all applicable Educational Laws.  DCEH, its Subsidiaries and each Specified Campus currently hold and, since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, have held, all necessary Educational Approvals, including approvals required for each campus, additional location, branch, facility or other location where any Specified Campus has offered all or any portion of an educational program, and, since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, have complied with and are in compliance with the terms and conditions of all such Educational Approvals. Section 2.11(a)(i) of the Disclosure Schedule includes a correct and complete list of all Educational Approvals issued to, with respect to or used by each Specified Campus that are or, since the

Compliance Date, and prior to such date to the Knowledge of the Dream Parties, have been in effect. The Dream Parties have delivered to Studio correct and complete copies of all Educational Approvals listed on Section 2.11(a)(i) of the Disclosure Schedule. Each current Educational Approval is in full force and effect, and no proceeding for the suspension, limitation, revocation, termination or cancellation of any of them is pending or threatened. Except as set forth in Section 2.11(a)(ii) of the Disclosure Schedule, no application made to an Educational Agency by DCEH or any of its Subsidiaries, or by any Specified Campus while under DCEH's ownership, has been denied. Except as set forth in Section 2.11(a)(iii) of the Disclosure Schedule, none of DCEH, its Subsidiaries, any Specified Campus or any campus or location thereof, has received any notice from any Educational Agency that it has been placed on probation or ordered to show cause why any Educational Approval for an Specified Campus or any of its educational programs should not be revoked, and none of DCEH, its Subsidiaries or any Specified Campus has received notice that any current Educational Approval will not be renewed, or alleging a material violation of any Educational Law.

(b)     Except as set forth in Section 2.11(b) of the Disclosure Schedule, each Specified Campus and each campus or location thereof, since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, has met the qualifications to be licensed or exempt from licensure by the applicable State Educational Agencies, accredited by the applicable Accrediting Body or Accrediting Bodies, and has been certified by the DOE as an eligible institution of higher education (or as an eligible additional location thereof) and is a party to a valid Program Participation Agreement with the DOE. Except as set forth in Section 2.11(b) of the Disclosure Schedule, none of DCEH, its Subsidiaries or any Specified Campus has received any notice of (i) any investigation, review, or audit of the operation of the Title IV Programs of DCEH or its Subsidiaries with respect to any Specified Campus by an Educational Agency resulting in the assertion of material violations or (ii) any alleged violation of any Law or Educational Law related to the Title IV Programs, or of any standard of any applicable Educational Agency, or of any Educational Law related to maintaining and retaining in full force and effect any and all Educational Approvals necessary for any Specified Campus's existing operations and its Financial Assistance Programs. In addition, to the Knowledge of the Dream Parties no fact or circumstance exists or is reasonably likely to occur that would result in the termination, revocation, suspension, or failure of DCEH, its Subsidiaries or any Specified Campus to obtain renewal of any Educational Approval or to obtain any Educational Consent or the imposition of any material fine, penalty or other sanction as a result of a material violation of any legal or regulatory requirements relating to any Educational Approval.

(c)     Except as set forth in Section 2.11(c) of the Disclosure Schedule, DCEH, its Subsidiaries and each Specified Campus are and, since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, have been in material compliance with any and all Laws and Educational Laws relating to Financial Assistance Programs, including the program participation, financial responsibility and administrative capability requirements, as defined by the DOE at 34 C.F.R. §§ 668.14, 668.15-16, and 668.171-175, as applicable, as well as the student eligibility requirements, as defined by the DOE at 34 C.F.R.§ 668.31-40, and all other statutory and regulatory provisions related to any Specified Campus' participation in the Title IV Programs.

(d)     Section 2.11(d) of the Disclosure Schedule sets forth the full address of each Specified Campus and each campus, additional location, branch, facility or other location where the Specified Campus has offered all or any portion of an educational program. DCEH, its Subsidiaries and each Specified Campus have obtained all Educational Approvals required to operate each additional campus, location, branch or other facility of any Specified Campus listed in Section 2.11(d) of the Disclosure Schedule. Each location where Title IV Program funds are offered or administered and is and since the Compliance Date, and to the Knowledge of the Dream Parties prior to the Compliance Date, has been approved by all applicable Educational Agencies. Each educational program offered by DCEH, its Subsidiaries or any Specified Campus for which Title IV Program funds have been provided, since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, has been and is an "eligible program" in material compliance with the requirements of 34 C.F.R. §668.8.

(e)     Except as set forth in Section 2.11(f) of the Disclosure Schedule, DCEH, its Subsidiaries and each Specified Campus since the Compliance Date, and to the Knowledge of the Dream Parties prior to the Compliance Date, have disclosed and timely reported, in compliance in all material respects with the applicable provisions of 34 C.F.R. Part 600: (i) the addition of any new educational programs or locations; and (ii) the proper ownership of each Specified Campus, including any shifts in ownership or control, including any changes in reported ownership levels or percentages. Except as set forth in Section 2.11(f) of the Disclosure Schedule, with respect to any location or facility that has closed or at which DCEH, any of its Subsidiaries or any Specified Campus ceased operating educational programs, DCEH, its Subsidiary or the Specified Campus, as applicable, complied with all Educational Laws related to the closure or cessation of instruction at such location or facility, including requirements for teaching out students from such location or facility.

(f)     Except as set forth in Section 2.11(f) of the Disclosure Schedule, DCEH, its Subsidiaries and each Specified Campus have materially complied with the DOE requirements that no student receive a disbursement of Title IV Program funds prior to the date for which such student was eligible for such disbursement.

(g)     Each Specified Campus eligible and certified to participate in the Title IV Programs, and DCEH and its Subsidiaries, as applicable, have complied with Title IV Program requirements, as set forth at 20 U.S.C. § 1094(a)(20) and implemented at 34 C.F.R. §668.14(b)(22), regarding the payment of a commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of Title IV Program funds.

(h)     For the fiscal year ended June 30, 2018 and, to the Knowledge of the Dream Parties, for the fiscal year ended June 30, 2017, no Specified Campus received more than ninety percent of its revenues from the Title IV Programs as calculated under 34 C.F.R. §600.5 as modified by Section 493 of the Higher Education Opportunity Act of 2008 (Public La 110-315). Section 2.11(h) of the Disclosure Schedule contains a correct statement of (i) the percentage of revenue received by each Specified Campus from the Title IV Programs for the fiscal years ended June 30, 2017, as reported in their audited Financial Statements for their fiscal year ended June 30, 2017, issued under prior ownership, and (ii) a good faith unaudited estimate of the percentage of

revenue received by each Specified Campus from the Title IV Programs for the fiscal year ended June 30, 2018, as calculated under 34 C.F.R. § 668.28 as modified by Section 493 of the Higher Education Opportunity Act of 2008 (Public Law 110-315) and 34 C.F.R. §668.28, as applicable.

(i)     DCEH, its Subsidiaries and each Specified Campus are and since the Compliance Date, and prior to the Compliance date to the Knowledge of the Dream Parties, have been in material compliance with the requirements governing preferred lender relationships, Private Educational Loans, and codes of conduct as set forth in 20 U.S.C. §1094.  To the Knowledge of DCEH, none of DCEH, any Subsidiary or any Specified Campus has received any written notice of any investigation by any Educational Agency or other Governmental Authority regarding DCEH's or any School's student lending practices.

(j)     Except as set forth in Section 2.11(j) of the Disclosure Schedule, none of DCEH, any Subsidiary or any Specified Campus has provided any educational instruction on behalf of any other institution or organization of any sort, and no other institution or organization of any sort has provided any educational instruction on behalf of the Specified Campus.

(k)     Except as set forth in Section 2.11(k) of the Disclosure Schedule, no entity or organization that has a student lending relationship with DCEH, any of its Subsidiaries or any Specified Campus and which provides or originates five percent (5%) or more of either Educational Loans or Private Educational Loans of either DCEH or any Specified Campus has terminated or otherwise significantly modified or reduced the availability of such loans to students enrolled in any Specified Campus.

(l)     Section 2.11(l)(i) of the Disclosure Schedule also sets forth the good faith unaudited estimate of the composite score of financial responsibility for DCEH and its Subsidiaries, on a consolidated basis, as calculated in accordance with 34 C.F.R. §668.172 and 34 C.F.R. Part 668, Subpart L, Appendix A, for the fiscal year ended June 30, 2018. Except as set forth in Section 2.11(l)(ii) of the Disclosure Schedule, DCEH has complied in all material respects with the DOE's financial responsibility requirements in accordance with 34 C.F.R. §668.15 and 668.171 for the fiscal year ended June 30, 2018, including any compliance based on the posting of an irrevocable letter of credit in favor of the DOE also set forth in Section 2.11(k)(ii) of the Disclosure Schedule.  Except as set forth in Section 2.11(l)(iii) of the Disclosure Schedule, since the Compliance Date, and to the Knowledge of the Dream Parties prior to the Compliance Date, none of DCEH, any Subsidiary or any Specified Campus has received written notice of a request by any Educational Agency requiring DCEH, its Subsidiaries or any Specified Campus to post a letter of credit or other form of surety for any reason, including any request for a letter of credit based on late refunds pursuant to 34 C.F.R. §668.173 or pursuant to the requirements of 34 C.F.R. §668.175, or received any request or requirement that any Specified Campus process its Title IV Program funding under the reimbursement or heightened cash monitoring procedures, as those procedures are set forth at 34 C.F.R. §668.162.

(m)     Except as set forth in Section 2.11(m) of the Disclosure Schedule, DCEH, its Subsidiaries and each Specified Campus are in compliance in all material respects with all Educational Agency and DOE requirements and regulations, including the requirements set

forth at 34 C.F.R. §668.22, relating to (i) fair and equitable refunds policy and (ii) the calculation and timely repayment of federal and nonfederal funds.  DCEH, its Subsidiaries and each Specified Campus, since the Compliance Date, and prior to the Compliance Date to the Knowledge of the Dream Parties, has calculated and paid refunds and calculated dates of withdrawal and leaves of absence in compliance with all applicable Educational Laws.

(n)     Section 2.11(n) of the Disclosure Schedule sets forth each Specified Campus' official cohort default rates, as calculated and published by the DOE pursuant to 34 C.F.R. § Part 668, Subpart N and 34 C.F.R. § 674.5, or predecessor regulations, for the three most recently completed federal fiscal years for which such official rates have been published, together with the most recently issued draft cohort default rate of DCEH and its Subsidiaries.

(o)     To the Knowledge of DCEH, there exist no facts or circumstances attributable to DCEH, any of its Subsidiary or any Specified Campus, or any other Person that exercises Substantial Control with respect to DCEH, any of its Subsidiaries or any Specified Campus, that would, individually or in the aggregate, adversely affect the ability of Studio any of its Subsidiaries, or any Specified Campus to obtain any Pre-Closing Educational Consent, Post-Closing Educational Consent, or Educational Approval or other consent or approval that must be obtained in order to continue the operation of the Specified Campus (to the extent such Specified Campus becomes an Acquired Campus) following the consummation of the transactions contemplated by this Agreement.

(p)     None of DCEH, any of its Subsidiaries, or any Person that exercises Substantial Control over DCEH, any of its Subsidiary or any Specified Campus, or member of such person's family (as the term "family" is defined in 34 C.F.R. §668.174(c)(4)), alone or together, (i) exercises or exercised Substantial Control over another institution or third-party servicer (as that term is defined in 34 C.F.R. § 668.2) that owes a liability for a violation of a Title IV Program requirement or (ii) owes a liability for a Title IV Program violation.

(q)     None of DCEH, any of its Subsidiaries or any Specified Campus has knowingly employed in a capacity that involves the administration of the Title IV, HEA programs, or the receipt of funds under those programs, any individual who has been convicted of, or has pled *nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of federal, state or local government funds, or has been administratively or judicially determined to have committed fraud or any other material violation of Law involving federal, state or local government funds.

(r)     None of DCEH, any of its Subsidiaries or any Specified Campus while under DCEH's ownership has knowingly contracted with an institution or third-party servicer that has been terminated under Section 432 of the HEA for a reason involving the acquisition, use, or expenditure of federal, state or local government funds, or that has been administratively or judicially determined to have committed fraud or any other material violation of Law involving federal, state or local government funds.

(s)     None of DCEH, any of its Subsidiaries or any Specified Campus, nor any DOE Affiliate of any Specified Campus, nor any Person or DOE Affiliate that has the power, by contract or ownership interest, to direct or cause the direction of management of

- 14 -

policies of any Specified Campus, has filed for relief in Bankruptcy or had entered against it an order for relief in Bankruptcy.

(t)　　None of DCEH, any of its Subsidiaries or any Specified Campus, nor DCEH's, any of its Subsidiaries' or any Specified Campus' chief executive officer, president, chairman, chief financial officer, chief operating officer or other executive officer, have pled guilty to, pled *nolo contendere,* or been found guilty of, a crime involving the acquisition, use or expenditure of funds under the Title IV Programs or been judicially determined to have committed fraud involving funds under the Title IV Programs.

(u)　　None of DCEH, any of its Subsidiaries or any Specified Campus has contracted with or employed any Person that has been, or whose officers or employees have been, convicted of, or pled *nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of funds of any Governmental Authority or Educational Agency, or administratively or judicially determined to have committed fraud or any other violation of Law involving funds of any Governmental Authority or Educational Agency

(v)　　Neither DCEH nor any of its Subsidiaries, or any principal (as such term is defined in 2 C.F.R. Parts 180 and 3485) or affiliate (as such term is defined in 2 C.F.R. Part 180) of any of the foregoing, is debarred or suspended under 2 C.F.R. Part 180, 2 C.F.R. 3485, 48 C.F.R. Part 9, or 48 C.F.R. Part 3409, nor does cause exist for such debarment or suspension.

(w)　　DCEH, its Subsidiaries and each Specified Campus have delivered to Studio true and complete copies of all material correspondence and documents received from the DOE or any Educational Agency that relate to (i) any written notice that any Educational Approval is not in full force and effect or that an event has occurred which constitutes or, with the giving of notice or the passage of time or both, would be expected to result in revocation of such Educational Approval; (ii) any written notice that the Specified Campus, location, or campus thereof, has materially violated or is materially violating any legal requirement, regulation, rule, standard or requirement related to the Title IV Programs, or any standard or requirement of the DOE or any other applicable Educational Agency, or any legal requirement, regulation, rule, standard or requirement related to maintaining and retaining in full force and effect any Educational Approval; (iii) any audits, program review, or investigations conducted by the DOE or any other Educational Agency, any site visits conducted by the DOE or any other Educational Agency that are in the possession or under the control of DCEH or any of its Subsidiaries or any Specified Campus, or any independent audit reviewing compliance with the statutory, regulatory or other requirements of the Title IV Programs by the Specified Campus, any location, or campus thereof; (iv) any written notice of an intent to substantially limit, show cause, place on probation, suspend, terminate, revoke, cancel, or not renew the accreditation of the Specified Campus, and location, or campus thereof; (v) any written notice of an intent to condition the provision of Title IV Program funds to the Specified Campus, or the continued  operation of the education programs offered by the Specified Campus on the posting of a letter of credit or other surety in favor of the DOE or any other Educational Agency; (vi) any written notice of an intent to provisionally certify the eligibility of the Specified Campus to participate in the Title IV Programs or (vii) the placement or removal of the Specified Campus, on or from the reimbursement or cash monitoring method of payment under Title IV Programs.  Section 2.11(w) of the Disclosure Schedule provides a complete

and correct list of all Compliance Reviews that since the Compliance Date, and prior to such date to the Knowledge of the Dream Parties, have been conducted at the Specified Campuses.

      2.12   <u>Proceedings</u>.  Except as set forth in <u>Section 2.12</u> of the Disclosure Schedule, there is no Proceeding pending before any Governmental Authority, Educational Agency or arbitrator or threatened against any Dream Party, or involving any assets or properties of any of them, at law or in equity, that (a) involves a claim or potential claim of liability in excess of $25,000, (b) enjoins or seeks to enjoin any activity by any Dream Party or (c) that could affect the legality, validity or enforceability of this Agreement or the other Transaction Documents or prevent the consummation transactions contemplated hereby or thereby.  No Dream Party is subject to the provisions of any Order applicable to it or its respective assets, operations or businesses.

      2.13   <u>Taxes</u>.  There are no liens for Taxes on any of the assets transferred pursuant to any Asset Purchase Agreement or with respect to any of the real properties subject to the Assumed Lease Obligations, other than statutory liens for Taxes not yet due or payable.  With respect to each University System with respect to which the Final Core Closing is effectuated as an Equity Transfer, (1) such Dream Party and each of its Subsidiaries has timely filed all Tax Returns that it is required to file, (2) all such Tax Returns are true in all material respects, (3) all Taxes (whether or not shown as due on any Tax Return) have been timely paid in full, and (4) no Dream Party nor any Subsidiary thereof is subject to any examination or audit, or any administrative or judicial proceeding with respect to Taxes, and no such examination, audit or proceeding is currently threatened.  Each of DCEH, each Dream Party and each of their respective Subsidiaries is either an organization exempt from federal tax pursuant to Section 501(c)(3) and similar provisions for state income tax purposes, or an entity disregarded as separate from its owner for U.S. federal and state income tax purposes.

      2.14   <u>Labor Matters</u>.

         (a)   <u>Section 2.14(a)</u> of the Disclosure Schedule contains a true and complete list (by University System) of (i) all employees of the Dream Parties who provide services for or with respect to Specified Campuses (collectively, the "<u>Business Employees</u>"), (ii) their title, (iii) the rate of all current compensation payable to each such employee, including any bonus, contingent or deferred compensation, (iv) hire date, (v) accrued vacation and paid time-off, (vi) principal work location, (vii) employment authorization or work visa status (to the extent required for employment authorization or verification purposes in the applicable jurisdiction and permitted by applicable Laws), (viii) each such Business Employee's status as being exempt or nonexempt from the application of state and federal wage and hour Laws and (ix) their legal employer. <u>Section 2.14(a)</u> of the Disclosure Schedule also identifies each Business Employee who is not fully available to perform his or her duties as a result of disability or other leave and sets forth the basis of such leave and the anticipated date of return to full service.

         (b)   Except as set forth on <u>Section 2.14(b)</u> of the Disclosure Schedule, to the Knowledge of the Dream Parties, neither (i) any Business Employee receiving annual compensation in excess of $50,000 with respect to the services provided to the Dream Parties or any of their respective Affiliates, nor (ii) any group of Business Employees, has any plans to cease providing services to the Dream Parties or any of their respective Affiliates.

(c)     None of the Dream Parties nor any of their respective Affiliates is party to, or, to the Knowledge of the Dream Parties, has been party to within the past five (5) years, any collective bargaining agreement or other relationship with any union or similar collective bargaining representative.  There are no ongoing or threatened strikes, work stoppages, walk outs, or other material labor disputes relating to any Business Employee, and, to the Knowledge of the Dream Parties, no such dispute has occurred in the past five (5) years.  To the Knowledge of the Dream Parties, there are no ongoing or threatened union organizing or decertification activities relating to any Business Employee and no such activities have occurred in the past five (5) years.

(d)     Each of the Dream Parties and each of their respective Affiliates is in compliance in all material respects with all applicable Laws, statutes, rules and regulations respecting employment and employment practices, terms and conditions of employment, wages and hours, pay equity, discrimination in employment, wrongful discharge, classification, collective bargaining, fair labor standards, occupational health and safety, personal rights or any other labor and employment-related matters, in each case, with respect to the Business Employees.

(e)     No Business Employee has a principal place of employment outside the United States or is subject to the labor and employment Laws of any jurisdiction other than the United States or any state or municipality thereof.

(f)     Except as disclosed in <u>Section 2.14(f)</u> of the Disclosure Schedule, in the three (3) years prior to (and not including) the date hereof, none of the Dream Parties nor any of their respective Affiliates has effectuated (i) a "plant closing" (as defined in the WARN Act or any similar state, local or foreign Law) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of any of the Dream Parties or any of their respective Affiliates, or (ii) a "mass layoff" (as defined in the WARN Act, or any similar state, local or foreign Law) affecting any site of employment or facility of any Dream Party or any of their respective Affiliates.

2.15    <u>Employee Benefit Plans</u>.

(a)     <u>Section 2.15(a)</u> of the Disclosure Schedule contains a complete and accurate list of all Employee Benefit Plans in which any of the Business Employees are participants.  Each Employee Benefit Plan has been maintained, funded and administered in accordance with its terms and in compliance with all applicable Laws in all material respects.  Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter from the Internal Revenue Service upon which it is entitled to rely, and nothing has occurred that could reasonably be expected to adversely affect the qualified status of any such Employee Benefit Plan. The Dream Parties and any of their respective ERISA Affiliates have complied and are in compliance, in all material respects, with the requirements of COBRA.

(b)     None of the Dream Parties or any of their respective ERISA Affiliates maintains, sponsors, contributes to, has any obligation to contribute to, or has any current or potential liability or obligation under or with respect to (i) single employer plan or other pension plan that is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code, (ii) any multiemployer plan (within the meaning Section 3(37) of ERISA), (iii) any "multiple

employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the Code), or (iv) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA). No Dream Party has any liability or potential liability under ERISA or the Code solely by reason of being treated as a single employer under Section 414 of the Code with any other Person. No Dream Party has any current or potential liability as a result of its status as an ERISA Affiliate. Each Employee Benefit Plan that is a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) has been operated and administered in compliance with, and is in documentary compliance with, Section 409A of the Code and the regulations and other official guidance promulgated thereunder.

(c)     No Dream Party has any liability or obligation to provide post-retirement or post-termination medical, health, or life insurance or other welfare type benefits for any Person other than coverage mandated by Code Section 4980B, Subtitle B of Title I of ERISA or similar state group health plan continuation Laws. There has been no "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) and no breach of fiduciary duty (as determined under ERISA) with respect to any Employee Benefit Plan. No Proceeding with respect to any Employee Benefit Plan (other than routine claims for benefits) is pending or threatened, and, to the Knowledge of the Dream Parties, there is no fact or circumstance that could reasonably be expected to give rise to any such Proceeding.

(d)     Except as set forth in Section 2.15(d) of the Disclosure Schedule, the transactions contemplated by this Agreement alone, or in combination with a termination of any employee, officer, director, stockholder or other service provider of any Dream Party or any of their respective Affiliates (whether current, former or retired) or their beneficiaries, will not cause the acceleration of vesting in, or payment of, any benefits or compensation under any Employee Benefit Plan and will not otherwise accelerate or increase any liability or obligation under any Employee Benefit Plan.

(e)     Each Dream Party has, for purposes of each Employee Benefit Plan or otherwise, properly classified those individuals performing services for any of the Dream Parties or any of their respective Affiliates as common law employees, leased employees, independent contractors or agents. None of the Dream Parties nor any of their respective Affiliates has any liability by reason of an individual who performs or performed services for any of the Dream Parties or any of their Subsidiaries in any capacity being improperly excluded from participating in an Employee Benefit Plan.

(f)     All payments, benefits, contributions and premiums related to each Employee Benefit Plan, including all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of any employees or other service providers prior to any Closing shall have been timely paid or made in full or, to the extent not yet due, properly accrued in accordance with the terms of the Employee Benefit Plan and all applicable Laws.

(g)     No Employee Benefit Plan provides compensation or benefits to any employee or former employee (or any dependent thereof) which is, or would cause any of the Dream Parties or any of their respective Affiliates to be, subject to the Laws of any jurisdiction outside of the United States.

(h)     With respect to the Employee Benefit Plans, there does not now exist, nor do any circumstances exist that could reasonably be expected to result in, any liabilities of Studio or its Affiliates following any Closing under ERISA, the Code or any other applicable Laws.

(i)     Section 280G of the Code will not apply to any of the transactions contemplated by this Agreement.

2.16     Insurance.  Section 2.16 of the Disclosure Schedule contains a description of each insurance policy maintained by the Dream Parties with respect to each Specified Campus, its employees and the assets and properties used in the Business.  Each such policy is (a) in full force and effect as of date hereof and will be in full force and effect as of each Closing with respect to such Specified Campus, and (b) is fully paid as of the date hereof and will be fully paid as of the date of each Closing with respect to such Specified Campus.  The Dream Parties are not in default with respect to their obligations under any insurance policy maintained by them, and the Dream Parties have never been denied insurance coverage.  Neither DCEH nor any of its Affiliates have any self-insurance or co-insurance programs.

2.17     Brokers' Fees.  There is no financial advisor, investment banker, broker, finder, agent or other Person that has been retained by, or is authorized to act on behalf of, DCEH or its Subsidiaries that is entitled to any financial advisor's, investment banking, brokerage, finder's or other fee or commission from DCEH or its Subsidiaries in connection with the transactions contemplated by this Agreement or the other Transaction Documents.

2.18     Transactions with Affiliates.

(a)     Section 2.18 of the Disclosure Schedule sets forth all Contracts, arrangements or business relationships between any Dream Party, on the one hand, and its Related Persons, on the other hand.  Except as set forth in Section 2.18 of the Disclosure Schedule, no Related Person owns or has rights in or with respect to any property or right, tangible or intangible, which is used by DCEH or any of its Subsidiaries.

(b)     No Dream Party has any cause of action or other claim whatsoever against, or owes any amount to, any other Dream Party, except for claims in the ordinary course of business, such as for accrued vacation pay, accrued benefits under employee benefit plans and similar matters and agreements.

(c)     No Dream Party has received any loan, advance or investment from any other Dream Party, that has not been repaid in full prior to the date hereof.

2.19     Intellectual Property Rights.

(a)     Section 2.19(a) of the Disclosure Schedule contains a complete and accurate list of all of the following that are used or held for use by the Dream Parties and their Affiliates in the conduct of the Business:  (i) registered Intellectual Property Rights (including Internet domain names), (ii) pending patent applications or other applications for registration of other Intellectual Property Rights, (iii) all computer software and cloud services (other than commercially-available, off-the-shelf software with a replacement cost and/or aggregate annual license and maintenance fees of less than $5,000) that is (A) used only at any particular Specified

- 19 -

Campus, or (B) used only by the Dream Parties, (iv) all Shared IT Systems (other than commercially-available, off-the-shelf software with a replacement cost and/or aggregate annual license and maintenance fees of less than $5,000), (v) curricula, teaching processes, texts, course materials, and other Curricular Materials, Curricular Know-How and other documents that are considered material to the operation of the Business, (vi) social media accounts and domain names, (vii) material unregistered Marks, (viii) material unregistered copyrights, (ix) databases of Business Data, including those that hold only data of the Specified Campuses and those that are Shared IT Systems administered by DCEH which hold both data of the Specified Campuses and data for other institutions, and (x) any other material Intellectual Property Rights.

(b)      The Dream Parties and their Affiliates own and possess, free and clear of all Liens other than Permitted Liens, all right, title and interest in and to, or have the right to use pursuant to a valid and enforceable written license or service agreement set forth on Section 2.19(b) of the Disclosure Schedule all Intellectual Property Rights used in, held for use in, or necessary for the operation of the Business as presently conducted and as presently proposed to be conducted (the "Dream Intellectual Property Rights"), including all Intellectual Property Rights listed on Section 2.19(a) of the Disclosure Schedule, *provided* that the Dream Parties and their Affiliates (other than DCEH) hold only the non-exclusive right to use on a shared service basis the Shared IT Systems under the administration of those systems by DCEH and do not hold any other rights with respect to such Shared IT Systems including without limitation any rights concerning source code or object code. All of the Dream Intellectual Property Rights are valid, subsisting and enforceable, and none of the Dream Intellectual Property Rights have been misused. To the Dream Parties' Knowledge, no loss of any of the Dream Intellectual Property Rights is threatened, pending or reasonably foreseeable. The Dream Parties and their Affiliates have taken all commercially reasonable or necessary action to maintain, protect and enforce the Dream Intellectual Property Rights. Following the date of this Agreement, the applicable University System will own all right, title and interest in and to, or will have a valid and enforceable written license or rights under a written service agreement to use, the Dream Intellectual Property Rights, *provided* that, with respect to rights pertaining to the Shared IT Systems or Shared IT Services, the fee basis upon which Studio shall gain rights of continuing usage of such systems is set forth in the Transition Services and License Agreement. Commencing on the date hereof and at all times thereafter Studio and its Affiliates will own all right, title and interest in and to, or have a valid and enforceable written license or rights under the Transition Services and License Agreement to use, all of the Intellectual Property Rights used in, held for use in, or necessary for the conduct of the business of each Acquired Campus that is a party to an Asset Purchase Agreement for which a Managed Services Agreement has been executed and delivered. The Dream Parties constitute all of the Persons who own or control any right, title or interest in or to any Dream Intellectual Property Rights.

(c)      Except as set forth on Section 2.19(c) of the Disclosure Schedule, (i) there are no claims pending or, to the Dream Parties' Knowledge, that have been brought in the last six (6) years, or threatened, contesting the validity, use, ownership or enforceability of any of the Dream Intellectual Property Rights, and, to the Dream Parties' Knowledge, there is no reasonable basis for any such claim, (ii) the Dream Intellectual Property Rights, since the Compliance Date, and, to the Dream Parties' Knowledge for five (5) years preceding the Compliance Date, have not infringed, misappropriated or conflicted with, and the operation of the Business or use of the Dream Intellectual Property Rights does not infringe, misappropriate or conflict with, any

- 20 -

Intellectual Property Rights of other Persons, and neither the Dream Parties nor their Affiliates have received any notice regarding any of the foregoing (including, any demand or offer to license any Intellectual Property Rights from any other Person), and (iii) to the Knowledge of the Dream Parties, no third-party has, and in the last six (6) years none of the Dream Parties or their Affiliates have, alleged that any other Person has, infringed, misappropriated or conflicted with any of the Dream Intellectual Property Rights. The Dream Intellectual Property Rights are not subject to any outstanding consent, settlement, decree, order, injunction, judgment or ruling restricting the use thereof, provided that certain provisions in the EMC Consent Judgment impose restrictions on the use that the Dream Parties may make of their communication systems in communications with prospective students.

(d)     The computer software, information technology services (including cloud services), hardware, firmware, networks and related systems owned, licensed, leased, provided or made available by DCEH or its Affiliates pursuant to the Transition Services and License Agreement and to which Studio and its Affiliates will obtain access as a result of the Transition Services and License Agreement (collectively, "Dream Computer Systems", which term includes for the avoidance of doubt the Shared IT Systems and Shared IT Services), are sufficient for the conduct of the Business as the Business is conducted and as it is proposed to be conducted, and, in the last twelve (12) months, there have been no material failures, crashes, security breaches or other adverse events affecting such Dream Computer Systems. The Dream Computer Systems constitute all information technology and computer systems owned, leased or licensed by any of the Dream Parties or their Affiliates and which are used by or for the benefit of the Specified Campuses in connection with the Business, including those relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of all data and information collected, generated, or used in the conduct of the Business.

(e)     The Dream Parties have no reason to believe and no facts or circumstances exist, to suggest that the Dream Parties and the Specified Campuses do not have full right and authority to transfer to Studio and its Affiliates all Business Data pursuant to the Transition Services and License Agreement and the Asset Purchase Agreements; or that the execution of this Agreement and the consummation of the transactions contemplated hereby requires the Dream Parties or their Affiliates to seek any consent from any employee, student, supplier, service provider or other third-party; the execution of this Agreement and the consummation of the transactions contemplated hereby will not impose any restrictions upon Studio's (and its Affiliates') ability to Process such Business Data in the manner that the Dream Parties and their Affiliates Processed such or similar Business Data prior to the applicable Closing or the execution of the Transition Services and License Agreement, as applicable.

(f)     Except as expressly contemplated by this Agreement or as set forth on Section 2.19(f) of the Disclosure Schedule, neither the Dream Parties nor their Affiliates are a party to, or bound by, any written or oral royalty agreements or inbound or outbound license agreements, or any other agreements (including settlement agreement and agreements containing covenants not to sue) with respect to any Dream Intellectual Property Rights (other than licenses for unmodified, commercially-available, off-the-shelf software involving a replacement cost and/or aggregate annual license and maintenance fees of less than $5,000 and confidentiality agreements entered into in the ordinary course of business).

2.20    Cyber Security and IT.

(a)    To the Knowledge of the Dream Parties, none of the Dream Computer Systems contain any virus, malware, Trojan horse, worm or other software routines or hardware components designed or intended to permit unauthorized access to, unauthorized acquisition of, or disable, erase or otherwise harm software, hardware or data.  The Dream Parties and their Affiliates have implemented commonly accepted industry standard processes and procedures to mitigate against the likelihood of any of the foregoing.

(b)    Except as set forth on Section 2.20(b) of the Disclosure Schedule, since the Compliance Date there have not been any actual or alleged Security Incidents or claims or investigations (including, but not limited to, investigations by regulatory authorities or any data protection authorities) related to Security Incidents, and there are no facts or circumstances which could reasonably serve as the basis for any such allegations, investigations, or claims.  There are no data security, information security or other technological vulnerabilities with respect to the Dream Computer Systems, and neither the Dream Parties nor any of their Affiliates have been notified by any third-party (including by "white hat" hackers) of any such vulnerabilities, that (i) are unpatched or otherwise unresolved and (ii) could (A) adversely impact the operation of the Dream Computer Systems or (B) cause a Security Incident.  Neither the Dream Parties nor any of their Affiliates have previously notified, have obligations to notify, or been previously required to notify, any person of any Security Incident.  Neither the Dream Parties nor any of their Affiliates have received any notice of any claims, investigations (including, but not limited to, investigations by regulatory authorities or any data protection authorities), or alleged violations of Privacy Laws with respect to Personal Information possessed by or otherwise subject to the control of the Dream Parties or any of their Affiliates, and, to the Knowledge of the Dream Parties, there are no facts or circumstances which could form the basis for any such claim.

(c)    To Knowledge of the Dream Parties, in the past six (6) years, there has been no failure or breakdown of, unauthorized access to, theft or loss or unauthorized acquisition of, or unauthorized use of, any Dream Computer System that has resulted in a material disruption or material interruption in the operation of the Business.

(d)    The Dream Computer Systems are reasonably adequate for the Business and operations of the Dream Parties and their Affiliates as currently conducted and are sufficient in all material respects for the current needs of the Business and operations of the Specified Campuses. The Dream Parties and their Affiliates have taken or caused to be taken reasonable precautions designed to keep all Dream Computer Systems (i) free from any material defect, bug, vulnerability, virus or programming, design or documentation error or corruption or material defect, and (ii) functional and operating in a reasonable and efficient business manner.  The Dream Parties and their Affiliates have fully implemented commercially reasonable incident response, disaster recovery, and business continuity plans and procedures to cover all Dream Computer Systems, Personal Information, and any other information utilized in the Business.  None of the Dream Computer Systems have experienced any material failures, breakdowns or continued substandard performance in the past twelve (12) months that has caused substantial disruption or substantial interruption in the use thereof or to the Business.

- 22 -

2.21    Privacy and Data.

(a)    The Dream Parties and their Affiliates have at all times since the Compliance Date (i) complied in all material respects with all applicable Privacy Laws, regulatory and self-regulatory guidelines, published interpretations by Governmental Authorities of such Privacy Laws and guidelines, and all similar consumer protection Laws relating to the Processing of Personal Information that is Processed by or on behalf of the Dream Parties or their Affiliates in connection with the Business; and (ii) complied in all material respects with all of the Dream Privacy Policies, Terms of Use, or similar documents, including (A) any notice to or consent from the provider of Personal Information, and (B) any existing contractual commitment made by the Dream Parties or their Affiliates with respect to such Personal Information. Section 2.21(a) of the Disclosure Schedule sets forth all voluntary and/or self-regulatory guidelines established by third parties (other than Privacy Laws or Laws generally) to which the Dream Parties or any of their Affiliates have agreed to abide by concerning the Processing of Personal Information in connection with the Business.

(b)    Neither the Dream Parties nor any of their Affiliates have received notice of any claims, investigations, allegations, or been charged with, the violation of Privacy Laws in connection with the Business. Neither the Dream Parties nor any of their Affiliates are under investigation with respect to any violation of any such Privacy Laws and, to the Knowledge of the Dream Parties, there are no facts or circumstances which could form the basis for any such violation. The Dream Parties have no reason to believe and no facts or circumstances exist to suggest that: (i) the Dream Parties and their Affiliates do not have full right and authority to transfer to Studio and its Affiliates all Personal Information that is in the possession of the Dream Parties or their Affiliates and which is Processed in connection with the Business, for use in the same manner and for the same purposes as used by the Dream Parties and their Affiliates; and (ii) that the execution of this Agreement and the consummation of the transactions contemplated hereby violates any of the Dream Privacy Policies or contractual commitment made by the Dream Parties or their Affiliates nor requires the Dream Parties nor any of their Affiliates to seek any consent from, any employee, customer, supplier, service provider or other third-party under any Dream Privacy Policy or contractual commitment made by the Dream Parties or their Affiliates. No Dream Privacy Policy or contractual commitment made by the Dream Parties or their Affiliates will impose any restrictions upon Studio's and its Affiliates' ability to Process such Personal Information in the same manner that the Dream Parties and their Affiliates have Processed such or similar Personal Information prior to the applicable Closing (or the execution of the Transition Services and License Agreement, as applicable).

(c)    The Dream Parties and their Affiliates, since the Compliance Date, have contractually obligated all third-party service providers, outsourcers, or similar processors of Personal Information collected, held, or controlled by the Dream Parties or any of their Affiliates in connection with the Business to (i) comply with applicable Privacy Laws with respect to Personal Information, (ii) take reasonable steps to protect and secure Personal Information from unauthorized access, acquisition, modification, or disclosure, (iii) restrict Processing of Personal Information to those Persons authorized or required under the servicing, outsourcing, processing, or similar arrangements and (iv) certify or guarantee the return or adequate disposal or destruction of Personal Information. The Dream Parties and their Affiliates, since the Compliance Date, have taken reasonable measures to ensure that all such third-party service providers, outsourcers, or

similar processors of such Personal Information have complied with their contractual obligations, including periodically auditing such third-party service providers, outsourcers, processors, or other users of Personal Information to ensure compliance.

(d)      Except for disclosures of information required by Law (including Privacy Laws), authorized by the provider of Personal Information, or as set forth in Schedule 3.7 to each Asset Purchase Agreement as a Company Material Contract, neither the Dream Parties nor any of their Affiliates have shared, sold, rented or otherwise made available, and does not share, sell, rent or otherwise make available, to third parties any Personal Information.

2.22    No Other Assets; No Transfers of Assets or Liabilities.  Following the Change of Control with respect to the University Systems that is contemplated to occur as of the date of the Agreement pursuant to the EAPA, neither The Dream Center Foundation nor DCEH directly or indirectly owns, or has any interest in or right to acquire, any assets or properties which are used by any of the other Dream Parties other than (i) the Intellectual Property Rights that are being transferred pursuant to the IP assignments, (ii) the Shared IT Systems which are being licensed pursuant to the Transition Services and License Agreement and (iii) assets of Argosy which are directly held by either Argosy or AEG.  Dream Center Education Management, LLC does not have any property, assets or operations.  Since the Compliance Date, no Dream Party (other than DCEH) has transferred any assets which are used by or held for use by such Dream Party to DCEH or the Dream Center Foundation, other than (i) the Intellectual Property Rights that are being transferred pursuant to the IP assignments,  (ii) the Shared IT Systems which are being licensed pursuant to the Transition Services and License Agreement and (iii) the rights of AII and its Subsidiaries in respect of the claims against Education Management under the Prior Acquisition Agreement under the EDMC which were assigned to DCEH on or about the date hereof.  Since the Compliance Date, none of The Dream Center Foundation, DCEH, the Dream Center Foundation or any of their Affiliates has transferred, assigned or conveyed any liability to any Dream Party (other than DCEH).

2.23    Adequate Disclosure.   The representations and warranties contained in this ARTICLE II, as supplemented by applicable schedules, do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this ARTICLE II not misleading.

ARTICLE III
REPRESENTATION AND WARRANTIES OF STUDIO

Studio hereby represents and warrants to each of the other Parties hereto as follows:

3.1    Organization.  Studio is a limited liability company duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.  Studio has the limited liability company power to own its properties and to carry on its business as currently being conducted in all material respects.  Studio is duly qualified or licensed to do business and in good standing as a foreign limited liability company (if applicable) in each jurisdiction in which it conducts business, except in those jurisdictions where the failure to be so qualified would not prevent or materially delay the transactions contemplated by the Transaction Documents.

3.2     Authority.  Studio has the requisite corporate power and authority to enter into and deliver this Agreement and to perform its obligations hereunder (including the consummation by such Party of the transactions contemplated hereby).  The execution and delivery by Studio of this Agreement and the performance by Studio of its obligations under this Agreement (including the consummation by Studio of the transactions contemplated hereby) have been duly authorized by all necessary organizational and membership action on the part of Studio, and no other corporate proceedings on the part of Studio are necessary to authorize the execution or delivery by Studio of this Agreement or the performance by Studio of its obligations under this Agreement in accordance with its terms (including the consummation by Studio of the transactions contemplated hereby).  This Agreement has been duly executed and delivered by Studio and, assuming the due authorization, execution and delivery by the other Parties hereto, constitutes the valid and binding obligations of Studio, enforceable against Studio in accordance with its terms, except as such enforceability may be subject to (a) the Laws of general application relating to bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting or relating to creditors' rights generally and (b) general principles of equity.

3.3     No Conflict.  Assuming the receipt or making of the consents, waivers, approvals, orders, authorizations, registrations, declarations and filings specified in Section 3.4 of the Disclosure Schedule, the execution and delivery by Studio of this Agreement does not, and the performance by Studio of its obligations under this Agreement (including the consummation by Studio of the transactions contemplated hereby) will not, Conflict with (a) any provision of the certificate of formation of Studio, (b) any Contract or Permit that is material to Studio or any of its Subsidiaries, taken as a whole, or (c) any Law or Order applicable to Studio or any of its Subsidiaries or any of their respective properties or assets, except in the case of clauses (b) and (c) above, for such Conflicts which would not reasonably be expected to be, individually or in the aggregate, material to Studio and its Subsidiaries, taken as a whole, or the ability of Studio to consummate the transactions contemplated in this Agreement.

3.4     Governmental Consents.  Except as set forth in Section 3.4 of the Disclosure Schedule, no consent, waiver, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority is required by or with respect to Studio in connection with the execution and, delivery by Studio of this Agreement or the performance by Studio of its obligations under this Agreement (including the consummation by Studio of the transactions contemplated hereby), except for such consents, waivers, approvals, orders, authorizations, registrations, declarations and filings which, if not obtained or made, would not reasonably be expected to be, individually or in the aggregate, material to Studio and its Subsidiaries, taken as a whole.

3.5     Litigation.  No legal action by or against Studio is pending that would affect the legality, validity or enforceability of this Agreement or the other Transaction Documents or prevent the consummation transactions contemplated hereby or thereby.

3.6     Sufficiency of Funds.  At each Closing, Studio will have sufficient funds available to (i) pay the consideration payable by Studio (if any) at such Closing and (ii) perform its obligations with respect to such Closing under the other Transaction Documents.

3.7     Brokers' Fees.  There is no financial advisor, investment banker, broker, finder,

agent or other Person that has been retained by or is authorized to act on behalf of Studio or any of its Affiliates that is entitled to any financial advisor's, investment banking, brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement.

ARTICLE IV

COVENANTS AND AGREEMENTS

4.1     Conduct of Business of Dream Parties.

(a)     During the Pre-Closing Period with respect to each University System, except (x) as expressly permitted or required by this Agreement, (y) as expressly set forth on Schedule 4.1(a) or (z) as otherwise consented to by Studio in writing (which consent shall not be unreasonably withheld, conditioned or delayed), each Dream Party shall, with respect to such University System, (i) operate the Business of the Specified Campuses in the ordinary course of business, (ii) use its commercially reasonable efforts to keep available the services of the Specified Campuses present officers and employees (other than in connection with ordinary course attrition or termination for cause), (iii) maintain compliance with all applicable Educational Agencies' standards to ensure ongoing authorization and/or approval of all programs and applicable campus locations required to operate the Specified Campuses and retain eligibility for funding pursuant to Title IV of the HEA, and any other material funding source such as the Veterans Administration and the U.S. Department of Defense, (iv) use its commercially reasonable efforts to preserve the Specified Campuses' beneficial relationships with customers, students, instructors, suppliers, distributors, licensors, licensees and others having such business dealings with it and (v) maintain existing policies of insurance set forth in Section 2.16 of the Disclosure Schedule and timely pay all premiums with respect thereto.

(b)     During the Pre-Closing Period with respect to each University System, except (x) as expressly permitted or required by this Agreement, (y) as expressly set forth on Schedule 4.1(b) or (z) as otherwise consented to by Studio in writing (which consent shall not be unreasonably withheld, conditioned or delayed), none of the Dream Parties shall with respect to, or in a manner that could affect the Specified Campuses of such University System and items set forth in clauses (i)-(xxix) below with respect to such Specified Campuses, their operations or businesses or any assets or properties (tangible or intangible) owned or used by any such Specified Campus or its Business:

(i)     (A) sell, license (other than non-exclusive licenses of Technology in the ordinary course of business), abandon or assign or convey to any Person, or otherwise dispose of, any ownership of or any other right in, any Company Intellectual Property or Dream Intellectual Property Right, or (B) enter into any Contract with respect to the development of any Technology with any other Person, other than in the ordinary course of business;

(ii)     (A) enter into any Company Material Contract, or (B) amend any such Contract or any other Company Material Contract (including in connection with obtaining any consent in connection with this Agreement);

(iii)     declare, set aside, or pay any dividends on or make any other distributions (whether in cash, stock or property) in respect of any capital stock or equity interests

- 26 -

of such Person;

      (iv)    split, combine, reclassify, amend the terms of, encumber any capital stock or equity securities of such Person, or issue any other securities in respect of, in lieu of or in substitution for shares of capital stock or equity securities of such Person;

      (v)    issue, grant, deliver or sell, pledge, dispose of or purchase, redeem or otherwise acquire, any shares of capital stock or other equity securities of DCEH or any of its Subsidiaries or any phantom equity or stock appreciation rights or securities convertible into such shares, equity securities or subscriptions, rights, warrants or options to acquire any such shares, equity securities, convertible securities, phantom equity or stock appreciation rights;

      (vi)    amend or otherwise modify any of its Governing Documents;

      (vii)    acquire any Person or other business enterprise, business line, division or any material portion of the assets thereof (whether by merger, consolidation, sale of stock, sale of assets or otherwise);

      (viii)    make any capital contributions to any Person or make any donation or gift to any Person;

      (ix)    with respect to matters not addressed in clause (i) above, sell, lease, sublease, license, sublicense, convey or otherwise dispose of material assets, properties or rights of such Person, other than in the ordinary course of business;

      (x)    with respect to matters not addressed in clause (vii) above, merge or consolidate with or into any other Person or adopt a plan of complete or partial liquidation, dissolution, restructuring, recapitalization or other reorganization;

      (xi)    incur, guarantee or assume any Indebtedness other than Indebtedness incurred (x) by South and its Subsidiaries pursuant to the South Credit Agreement, and (y) by DCEH and its Subsidiaries pursuant to the DCEH Credit Agreement and the Second Lien Guaranty;

      (xii)    grant any loans to any Person or purchase debt securities of any Person;

      (xiii)    forgive, cancel or compromise any material indebtedness or claim owed to such Dream Party or waive, release or assign any right of material value, including under any Company Material Contract;

      (xiv)    except (x) as required in accordance with the terms of any Employee Benefit Plan in effect as of the date of this Agreement or (y) as required by applicable Law, (A) adopt, amend or terminate any Employee Benefit Plan (including any underlying agreements), except as required to maintain the qualified status of such Employee Benefit Plan, or (B) pay, announce, promise or grant, whether orally or in writing, any increase in or establishment of (as applicable) any wages, base pay, fees, salaries, compensation, bonuses, incentives, deferred compensation, pensions, severance or termination payments, retirement, profit sharing, fringe

benefits, equity or equity-linked awards, employee benefit plans, or any other form of compensation or benefits payable to any Business Employee;

(xv) (A) hire any new employee having total compensation, including any bonus potential in addition to base salary, in excess of $100,000 in the aggregate, (B) terminate any Business Employee, other than pursuant to Section 4.13 of this Agreement or (C) implement any employee layoffs that would reasonably be expected to implicate the WARN Act or any similar or related Law;

(xvi) enter into any collective bargaining agreement or other agreement with a labor union, works council or similar organization covering any Business Employee;

(xvii) transfer internally, or otherwise alter the designation, duties or responsibilities, of any employee of any Business Employee;

(xviii) except as required by GAAP, change any accounting principles or practices or revalue any of its assets (whether tangible or intangible), including writing up, down or off the value of any material asset;

(xix) (A) make, revoke or change any material election in respect of Taxes, (B) adopt or change any accounting period or accounting method in respect of Taxes, (C) file any amended Tax Return, (D) enter into any closing agreement, settle, compromise, or fail to contest any claim or assessment in respect of Taxes, (E) surrender or abandon any right to claim a refund of Taxes, (F) consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes, (G) take any action or omit any action related to the filing of any Tax Return or the payment of any Tax if such action (or failure to act) would reasonably be expected to have the effect of increasing the present or future Tax liability or decreasing any present or future Tax asset of DCEH or any of its Subsidiaries or (H) cease to be exempt from federal tax pursuant to Section 501(c)(3) of the Code;

(xx) enter into any transaction, Contract or arrangement, or modify, amend or terminate any transaction, Contract or arrangement with any of its current or former directors, officers, employees or Affiliates (or any directors, officers or employees of any such Affiliate) or any other Related Person;

(xxi) mortgage, pledge or subject to any Lien, other than Permitted Liens, any of its material assets or leased real property, except (x) by South and its Subsidiaries in connection with the South Credit Agreement, or (y) by DCEH and its Subsidiaries in connection with the DCEH Credit Agreement, or (z) by DCEH and its Subsidiaries in connection with the EDMC Credit Agreement as of the date hereof;

(xxii) make any material changes in the manner in which such Person markets its products or services (including making any material change in the manner in which it extends discounts, credits or scholarships to students or other customers); *provided* that, for avoidance of doubt, it shall be permissible for each Dream Party to honor any Teach-Out Tuition Discounts;

(xxiii) make any material changes to its policies with respect to the

payment of accounts payable or accrued expenses or the collection of accounts receivable, including any acceleration, deferral or collection thereof, as applicable, or make any material change in its cash management practices or in the accounting methods, principles or practices used by the Dream Parties, except as required by GAAP;

(xxiv)    permit any Change of Control of any Dream Party;

(xxv)    commence or permit to continue any Bankruptcy;

(xxvi)    fail to materially comply with all applicable Educational Laws, including the submissions of all applicable responses due to such agencies, and full compliance with all applicable regulations, standards and reporting requirements, as required by all applicable Educational Agencies;

(xxvii)    except as required by the Transaction Documents, make any material change that requires any Educational Approvals or Educational Consents without first notifying Studio, and any such agreed-upon change will not be initiated unless and until all required Educational Approvals and Educational Consents have been issued to the Specified Campus;

(xxviii)    commence or settle any material Proceeding, except in the ordinary course of business; or

(xxix)    agree to take any of the actions described in clauses (i) through (xxviii) of this Section 4.1(b).

Studio acknowledges and agrees that (x) nothing contained in this Agreement shall give Studio, directly or indirectly, the right to control or direct the operations of DCEH or its Subsidiaries during the Pre-Closing Period, and (y) during the Pre-Closing Period, DCEH shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over their respective operations.

(c)    The entry into and consummation of the transactions set forth in the IFWA shall not constitute a breach of this Agreement.  For the avoidance of doubt, nothing in this Agreement (including this Section 4.1 or Section 4.2) shall prevent (i) any Dream Party from taking any action expressly authorized to be taken by such Dream Party pursuant to the IFWA or any transaction document required to be entered into by it pursuant to the IFWA, (ii) any University System from reducing or modifying services to be provided under its Managed Services Agreement in accordance with the terms of such Managed Services Agreement, (iii) South University from undertaking any of the actions described in Section 4.2 below or effectuating a Change of Control in accordance with the terms of its Managed Services Agreement; (iv) South University from taking any actions reasonably necessary to obtain non-core services from a replacement non-core service provider (i.e., other than Studio) in accordance with the terms of its Managed Services Agreement; (v) any lender to any of the Dream Parties from selling its loans to any other party; and (vi) Argosy or South, or any of their respective Subsidiaries, from taking any actions reasonably necessary to effectuate the restructuring of their respective accounts receivable (other than the Assigned Receivables) as required in accordance with the terms of the DCEH Credit Agreement and the South Credit Agreement, respectively, as amended.

4.2     Exclusivity; No Solicitation.  During the Pre-Closing Period, no Dream Party shall, nor shall they authorize or permit any of their respective Representatives to, directly or indirectly, (a) solicit, initiate or induce the making, submission or announcement of, or knowingly encourage, facilitate or assist, an Acquisition Proposal, (b) furnish to any Person (other than Studio or any designees of Studio) any non-public information relating to such Dream Party or its Subsidiaries, or afford to any Person (other than Studio or any of its Representatives) access to the Business, properties, assets, books, records or other non-public information, or to any personnel, of such Dream Party or any of its Subsidiaries, in any such case with the intent to induce the making, submission or announcement of, or the intent to encourage, facilitate or assist, an Acquisition Proposal or any inquiries that would reasonably be expected to lead to an Acquisition Proposal, (c) participate or engage in discussions or negotiations with any Person with respect to an Acquisition Proposal, or (d) enter into any Contract relating to an Acquisition Proposal.  To the extent permitted by applicable Law or confidentiality obligations (none of which that would limit the following actions shall be created or entered into by any Dream Party during the Pre-Closing Period), each Dream Party shall promptly notify Studio if any Representative of such Dream Party or any of its Affiliates receives or becomes aware of any receipt by such Persons of (i) any Acquisition Proposal, (ii) any request for information that would reasonably be expected to lead to an Acquisition Proposal, or (iii) any inquiry with respect to, or which would reasonably be expected to lead to, any Acquisition Proposal, which shall include the terms and conditions of such Acquisition Proposal, request or inquiry, and the identity of the Person or group making any such Acquisition Proposal, request or inquiry.  Immediately following the execution of this Agreement, each Dream Party shall, and shall cause each of its respective Subsidiaries, and shall direct their respective Affiliates and Representatives to, terminate any existing discussions or negotiations with any Persons, other than Studio (and its respective Affiliates and Representatives), concerning any Acquisition Proposal and request the return or destruction of any confidential or proprietary information regarding any of the Dream Parties previously made available to any Persons, other than Studio (and its Affiliates and Representatives), in connection with such discussions or negotiations.  During the Pre-Closing Period, each of Dream Party will promptly (and in any event within two (2) Business Days of receipt thereof) provide Studio with a copy of any written communication or a reasonably detailed summary of any verbal communication received by such Person from any other Person (other than Studio) that constitutes an Acquisition Proposal.

4.3     Access to Information.  During the term of the applicable Managed Services Agreement with respect thereto or, with respect to DCEH, during the term that any Managed Services Agreement is in effect, each Dream Party shall afford Studio and its Representatives reasonable access during normal business hours, upon reasonable advance notice, to the properties, books and records, senior management and other Representatives of such Dream Party, the Core Services, the Transition Services (as applicable) or any assets or properties used by the Specified Campuses, liabilities of the Specified Campuses, or employees who provide services to the Specified Campuses or students taking classes at the Specified Campuses; *provided, however,* that any Dream Party may restrict or otherwise prohibit access to any portion of any documents or information to the extent that (a) any applicable Law requires such Dream Party to restrict or otherwise prohibit access to such documents or information, (b) access to such documents or information would give rise to a material risk of waiving any attorney-client privilege, work product doctrine or other privilege applicable to such documents or information, or (c) access to a Contract to which such Dream Party is a party or otherwise bound would violate or cause a default under, or give a third-party the right terminate or accelerate the rights under, such Contract;

*provided, further* that each Dream Party shall use reasonable efforts to cooperate with Studio to reach an acceptable solution to make such documents and information available in full. In the event that any Dream Party does not provide access or information in reliance on the preceding sentence, such Dream Party and its Affiliates shall use their reasonable best efforts to communicate the applicable information to Person requesting access thereto in a way that would not violate the applicable Law, Contract or obligation or to waive such a privilege. Any investigation conducted pursuant to the access contemplated by this Section 4.3 shall be conducted during normal business hours in a manner that does not unreasonably interfere with the conduct of the business of the Dream Parties.

4.4    Delivery of Financial Statements. The Dream Parties shall deliver to Studio, for each month ending during the Pre-Closing Period, unaudited consolidated balance sheets and related statements of income of each University System for such month in form consistent with past practice, no later than thirty (30) days after the end of such month.

4.5    Public Disclosure. The Parties agree that no Dream Party shall, and each Dream Party shall cause its Affiliates and Representatives not to, make any press release or public announcement regarding the subject matter of this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby without advance approval thereof by Studio, except as may be required by applicable Law. If any such press release or public announcement is required by applicable Law to be made by any Dream Party, prior to making such announcements, such Dream Party will deliver a draft of such announcement to Studio and shall give Studio a reasonable opportunity to comment thereon and will consider such comments in good faith. The Parties agree that the provisions of this Section 4.5 shall survive the Last Final Core Closing and shall not (a) restrict any Affiliate of any Party hereto which is a private equity or other investment fund from disclosing the transactions contemplated by this Agreement to its current or prospective investors or in providing general information about the subject matter of this Agreement in connection with its fund raising, marketing, informational or reporting activities or (b) restrict any Party from enforcing its rights under this Agreement or defending any claims in connection herewith.

4.6    Reasonable Best Efforts.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, each of Studio and the Dream Parties shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with such other Parties in doing, all things reasonably necessary, proper or advisable under applicable Law or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement and the other Transaction Documents, including using reasonable best efforts to: (i) in connection with any Closing that occurs at the election of Studio, cause the conditions to the Closings set forth in ARTICLE V and ARTICLE II of any Asset Purchase Agreement to be satisfied; (ii) obtain all necessary actions or non-actions, waivers, consents, approvals, orders and authorizations from Governmental Authorities and make all necessary registrations, declarations and filings with Governmental Authorities, that are necessary to consummate the transactions contemplated by this Agreement; (iii) obtain all necessary or appropriate consents, waivers and approvals under any Company Material Contracts in connection with this Agreement and the consummation of the transactions contemplated hereby so as to

maintain and preserve the benefits under such Company Material Contracts following the consummation of the transactions contemplated by this Agreement; and (iv) obtain all necessary or appropriate consents, waivers and approvals from the Federal Receiver and any other applicable Governmental Authorities in connection with any receivership proceeding involving any of the Dream Parties or any of the Specified Campuses (the "Receivership"). In addition to the foregoing, neither Studio nor any Dream Party shall take any action, or fail to take any action, that is intended to have the effect of preventing, impairing, delaying or otherwise adversely affecting the consummation of each Closing contemplated hereunder or the ability of such Party to fully perform its obligations under this Agreement or the other Transaction Documents. Notwithstanding anything to the contrary herein, Studio shall not be required to pay any consent or other similar fee, "profit sharing" or other similar payment or other consideration (including increased rent or other similar payments or any amendments, supplements or other modifications to (or waivers of) the existing terms of any Contract) to obtain the consent, waiver or approval of any Person under any Contract. Notwithstanding the foregoing, (x) all fees required in connection with all applications, registrations, declarations and filings with Governmental Authorities, including the cost of a closing balance sheet audit required by the DOE for any Final Core Closing, in each case, solely in connection with a Final Core Closing which is deemed a Change of Control under applicable Educational Law, shall be paid by Studio and all other such fees (including in connection with the Reorganization) shall be borne by the Dream Parties and (y) any legal fees of a landlord which such landlord requires be paid by the tenant in connection with any assignment of a lease for Specified Campus to Studio or its Subsidiaries which is the subject of the Initial Non-Core Closing or a Subsequent Non-Core Closing shall be the responsibility of Studio.

(b)     The applicable Dream Parties and Studio shall jointly develop, and the applicable Dream Parties shall consult and cooperate in all respects with Studio, and consider in good faith the views of Studio, in connection with the form and content of any filings, analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Dream Party hereto in connection with proceedings under or relating to the Receivership prior to their submission. The Dream Parties shall (i) promptly notify Studio of any communication inquiry or investigation received from, or given by them to, any Federal Receiver Party and, subject to applicable Law, permit Studio to review in advance any proposed communication to any Federal Receiver Party and incorporate Studio's reasonable comments, (ii) not agree to participate in any meeting or discussion with any Federal Receiver Party in respect of any filing, investigation or inquiry concerning this Agreement, the Transaction Documents, the transactions contemplated hereby or by the other Transaction Documents or the Receivership with respect to the Specified Campuses unless, to the extent reasonably practicable, it consults with Studio in advance and, to the extent permitted by such Federal Receiver Party, gives Studio the opportunity to attend and participate therein and (iii) promptly furnish Studio with copies of all correspondence, filings and written communications between them and their Affiliates and their respective Representatives, on one hand, and any such Federal Receiver Party on the other hand, with respect to this Agreement, the Transaction Documents, the transactions contemplated hereby or by the other Transaction Documents or the Receivership with respect to the Specified Campuses in order for Studio to meaningfully consult and participate in accordance with the preceding clauses(i) and (ii); *provided* that materials furnished pursuant to this Section 4.6(b) may be redacted as necessary solely with respect to matters that are not related to, or that could not affect, the Specified Campuses.

4.7    Educational Approvals.  Without limiting the generality of Section 4.6:

(a)    Prior to the date hereof, certain Dream Parties submitted the Original Agreement and the Ai Asset Purchase Agreement to all relevant Educational Agencies for their review, and, to the extent possible, will secure assurances from said Educational Agencies that the proposed services to be offered and Non-Core Assets to be purchased will not violate any Educational Agency statute, regulation or standard, nor will the proposed structure trigger a change of ownership or control for which Regulatory Approval would be required.  To the extent that any Educational Agency notifies the Dream Parties that compliance with the terms of any Transaction Document would result in a loss of or the failure to obtain any Educational Approval required by a Dream Party in respect of its operations as currently conducted, the Dream Parties and Studio agree to promptly amend the terms of such documents to the extent reasonably necessary to comply with the Educational Agency's requirements; *provided* that no Party shall be required to amend the terms of any Managed Services Agreement; *provided*, *further* that no Party shall be required pursuant to this sentence to remedy any action or forbearance taken in accordance with such Transaction Document prior to such amendment.

(b)    Each of Studio and each Dream Party will cooperate with each other to give any notices to, and to make any filings with, any Educational Agencies which are necessary to consummate the transactions contemplated, including obtaining the Pre-Closing Educational Consents set forth in Schedule 4.7(b).  Without limiting the generality of the foregoing, Studio and each Dream Party shall cooperate on the prompt delivery to the DOE of the pre-acquisition review applications for the Acquired Campuses in order to obtain the Pre-Acquisition Review Response.  Each applicable Dream Party shall respond to any requests from the DOE and any other Educational Agency for additional financial or other information that may be required to obtain any Educational Consent, whether during or following the Pre-Closing Period.

(c)    During the Pre-Closing Period, none of the Dream Parties nor any of their Affiliates nor any of their respective Representatives or advisors shall contact, communicate with, submit any documentation to, or make any filing with, any Educational Agency with specific regard to and identifying any of the transactions contemplated by this Agreement or the other Transaction Documents, without the prior consent of Studio, such consent not to be unreasonably withheld, conditioned or delayed.  Studio shall have the right, in a reasonable and timely manner, to participate in all such contacts and communications and to review, comment upon and approve any information regarding the Dream Parties, their Affiliates, or the transactions contemplated by this Agreement and the other Transaction Documents that is included in any such documentation or filing.

(d)    Notwithstanding anything to the contrary in this Agreement, after the Final Core Closing with respect to an Acquired Campus, the Parties will work collaboratively to obtain a TPPPA and PPPA from the DOE for such Acquired Campus and for obtaining all Post-Closing Educational Consents.  The Dream Parties shall cooperate in providing information necessary for such filings as is reasonably and customarily requested.  The Dream Parties or their respective counsel and Representatives shall cooperate with Studio, as reasonably requested by Studio, in obtaining any TPPPA or PPPA from the DOE for each Acquired Campus, and any Post-Closing Educational Consents set forth in Schedule 4.7(d) required to be obtained from and after the Final Core Closing Date with respect to such Acquired Campus.

4.8     Notification of Certain Matters.

(a)     During the Pre-Closing Period, each of the Dream Parties shall give prompt notice to Studio upon becoming aware that any representation or warranty made by it in this Agreement has become untrue or inaccurate, or of any failure of such Dream Party to perform or comply with or satisfy any covenant or agreement to be performed or complied with by it under this Agreement, in any such case if and only to the extent that such untruth or inaccuracy, or such failure, would cause any of the conditions to the Closing Transactions set forth in Section 5.2(a) or Section 5.2(b) to not be satisfied at such time.

(b)     During the Pre-Closing Period, Studio shall give prompt notice to DCEH upon becoming aware that any representation or warranty made by Studio in this Agreement has become untrue or inaccurate, or of any failure of Studio to perform or comply with any covenant or agreement to be performed or complied with by it under this Agreement, in any such case if and only to the extent that such untruth or inaccuracy, or such failure, would cause any of the conditions to the Closing Transactions set forth in Section 5.3(a) or Section 5.3(b) to not be satisfied at such time.

4.9     Restrictive Covenants.

(a)     Each Dream Party acknowledges that during such Dream Parties' ownership, directly or indirectly, of the Specified Campuses owned by it prior to the date hereof, such Dream Party has become familiar with the Specified Campuses trade secrets and with other Confidential Information concerning the Specified Campuses.    Therefore, and in further consideration of the compensation to be paid to the Dream Parties hereunder, each Dream Party agrees to the covenants set forth in this Section 4.9 and acknowledges that (i) the covenants set forth in this Section 4.9 are reasonably limited in time and in all other respects, (ii) the covenants set forth in this Section 4.9 are reasonably necessary for the protection of Studio and its Affiliates, (iii) Studio and its Affiliates would not have entered into this Agreement or the other Transaction Documents to which such Persons are party but for the Dream Parties' agreement to the restrictions set forth in this Section 4.9 and (iv) the covenants set forth in this Section 4.9 have been made in order to induce Studio and its Affiliates to enter into this Agreement and the other Transaction Documents.

(b)     During the Pre-Closing Period and for a period of five (5) years from and after the end of the Pre-Closing Period (the "Restricted Period"), none of DCEH and its Affiliates shall directly or indirectly, own, operate, lease, manage, control, engage in, invest in, permit its name to be used by, act as consultant or advisor to, render services for (alone or in association with any person, firm, corporate or other business organization), provide financing to or otherwise assist in any manner any Person in any business that competes with the Businesses of the Specified Campuses, including any Competitive Program, in each case, anywhere within fifty (50) miles of each Specified Campus (the "Restricted Area"); provided, however, that nothing herein shall prohibit DCEH or its Affiliates from (i) being a passive, beneficial owner of less than two percent (2%) of the outstanding stock of any publicly-traded corporation; (ii) taking any action with respect to a Specified Campus during the Pre-Closing Period which is expressly contemplated by this Agreement or the Transition Services and License Agreement with respect to such Specified Campus (solely to the extent permitted and contemplated by this Agreement and such Managed

- 34 -

Services Agreement); (iii) engaging in a Teach-Out in accordance with applicable Law of any campus that is an Excluded Campus; *provided* that in no event shall any Argosy University campus or any other institution operating under any Permit of Argosy University offer any Competitive Programs within the Restricted Area, but, for avoidance of doubt the offering of online programs which are similar to Competitive Programs shall not be deemed to be a violation of this Section 4.9(b) regardless of where the facilities of the offering Person are located; *provided further*, that DCEH and its Affiliates shall use their reasonable best efforts to take all necessary actions, including obtaining all required regulatory approvals, to cause any Excluded Campus to cease using any Marks related to the Specified Campuses within one year from the date of this Agreement and assuming that DCEH and its Affiliates have complied with their obligations hereunder, Studio will grant DCEH and its Affiliates such additional time as may be reasonably required to complete the foregoing process. Studio further agrees that, if any of the Excluded Campus is hereafter acquired by a Person which owns a postsecondary institution or organization that offers a Competitive Program at a location within the Restricted Area, such acquired Excluded Campus shall not be deemed to be in violation of this Section 4.9(b) merely by reason of its new ownership.

(c) During the Restricted Period, no Dream Party shall, directly or indirectly: (i) induce or attempt to induce any employee of Studio and its Affiliates (including any Transferred Employee) to leave the employ of Studio or its Affiliates, or in any way interfere with the relationship between Studio or any of its Affiliates and any employee thereof (including any Transferred Employee); *provided* that the foregoing shall not prevent the Dream Parties from placing general employment advertising prepared without the use of any Confidential Information and not specifically targeting employees of Studio or any of its Affiliates; (ii) hire any person who was a Business Employee or an employee of Studio or any of its Affiliates unless such person is no longer employed by Studio or any of its Affiliates and such person was not solicited by any Dream Party other than a general employment advertising prepared without the use of any Confidential Information and not specifically targeting employees of Studio or any of its Affiliates; (iii) induce, or attempt to induce, any student, customer, supplier, licensee, licensor, franchisee or other business relation of the Business to cease doing business with Studio or its Affiliates; or (iv) in any way interfere with the relationship between any such student, customer, supplier, licensee, licensor, franchisee or business relation of Studio and its Affiliates (including making any negative statements or communications about Studio or any of its Affiliates or their products, campuses, degrees or services).

(d) During the Restricted Period, DCEH and its Affiliates shall (and shall cause each of their Affiliates and Representatives to) treat and hold as confidential and not disclose to any third-party the Confidential Information, refrain from using any of the Confidential Information except in connection with undertaking the activities set forth in clauses (ii) and (iii) of Section 4.9(b), and deliver promptly to Studio or destroy, at the request and option of Studio, all tangible embodiments (and all copies) of the Confidential Information which are in such Dream Party's or any of such Dream Party's Affiliates' or Representatives' possession or control (*provided* that, to the extent required by applicable Law, such Dream Party's or any of such Dream Party's Affiliates or Representatives may keep copies of such Confidential Information; *provided, however*, that such copies will remain subject to the provisions hereof for so long as they are retained). In the event that DCEH or its Affiliates (or any Affiliate or Representative of DCEH and its Affiliates) is requested or required (by oral question or request for information or

documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, such Person shall notify the applicable Dream Party promptly in writing of the request or requirement so that such Dream Party, as applicable may seek an appropriate protective order or waive compliance with the provisions of this Section 4.9(d). If, in the absence of a protective order or the receipt of a waiver hereunder, DCEH or its Subsidiaries (or Affiliate or Representative thereof) is, in the written opinion of such Person's outside counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, such Person (or the applicable Affiliate or Representative thereof) may disclose the Confidential Information to such tribunal; *provided, however*, that such Person (or the applicable Affiliate or Representative thereof) shall (i) use commercially reasonable efforts to obtain a protective order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed and (ii) disclose only such portion of the Confidential Information as is strictly required by Law.

(e)     The Parties hereto agree that Studio and each of its Affiliates, successors and assigns would suffer irreparable harm from a breach of this Section 4.9 by a Dream Party and that money damages would not be an adequate remedy for any such breach.  Therefore, in the event a breach or threatened breach of this Section 4.9, Studio and each of its Affiliates or their respective successors and assigns, in addition and supplementary to other rights and remedies existing in their favor, shall be entitled to specific performance and/or injunctive or other equitable relief from an arbitrator or court of competent jurisdiction in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security and at the expense of such Dream Party, including reasonable attorneys' fees and expenses).

(f)     If the final judgment of an arbitrator or court of competent jurisdiction declares any term or provision of this Section 4.9 to be invalid or unenforceable, the Parties hereto agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified to cover the maximum, duration, scope or area permitted by Law.  In addition, in the event of an alleged breach or violation of this Section 4.9 by any Dream Party, the period described in clauses (a), (b) and (d) above shall be tolled until such breach or violation has been duly cured.

4.10     DCEH Reorganization.  DCEH and its Affiliates shall use their best efforts and take all action necessary to consummate the transactions set forth on Schedule 4.10 as soon as reasonably practicable (the "Reorganization") and shall not take any actions in connection with the Reorganization that would prevent, adversely affect or frustrate the consummation of the transactions contemplated by the Transaction Documents by any Party; *provided* that Schedule 4.10 may be updated by DCEH after the date hereof from time to time with the consent of Studio, in its sole discretion; *provided, however*, that Schedule 4.10 shall not be updated in a manner that would affect a reorganization of South and its Subsidiaries without the consent of South.  Any Person who directly or indirectly takes ownership of, or any interest in, any Specified Campus or any of its assets or properties in connection with the transactions contemplated by this Section 4.10 shall be deemed a Dream Party and shall promptly execute and deliver to Studio a joinder to this Agreement as a Dream Party.  Promptly after execution of this Agreement, DCEH

shall deliver to Studio a detailed memorandum setting forth the steps and plan to effectuate the Reorganization which shall be in form and substance satisfactory to Studio (the "Reorganization Plan").

4.11    Certain Matters Related to Boards.

(a)    The Dream Parties shall cause each individual nominated by the Foundation, upon the recommendation of Studio, as an independent member of the Board of Managers (the "Foundation Board Nominees") to be considered for appointment to each Board and Board Committee of the Dream Parties, subject to and in accordance with the procedures of the relevant Dream Governing Documents; *provided* that none of the Dream Parties shall have any obligation to elect any Foundation Board Nominee to any Board or Board Committee where (i) the election of such Foundation Board Nominee might cause a Change of Control under applicable Educational Law and for which consent of the applicable Educational Agency would be required unless such Change of Control has been approved by the applicable Educational Agency, or (ii) the Dream Parties assert reasonable cause to question the qualifications of the nominee. In addition to the rights of the South Lenders under the IFWA, DCEH and the Dream Parties shall agree to allow Studio to designate, at its sole discretion, a non-independent, non-voting board observer to attend each meeting of the Board and Board Committee, including special and/or emergency meetings as defined by the relevant Governing Documents of the Dream Parties.

(b)    Unless otherwise directed by the Foundation, upon the recommendation of Studio, in accordance with Section 6 of the IFWA and a resignation and release agreement in the form set forth on EXHIBIT I, effective on or prior to the Change of Control of each of AII and South contemplated by this Agreement, DCEH shall remove or cause the removal of all directors, trustees, managers and officers from all Boards and Board Committees and all other positions at South, Argosy, AII and their respective Subsidiaries. The Foundation party to the EAPA shall have the right to designate the replacement directors, trustees, managers and officers for South, Argosy, Ai and their respective Subsidiaries, subject to and in accordance with the procedures of the relevant Governing Documents and any applicable Laws (including the requisite percentage of independent members for such Boards and Board Committees) and during the South Indebtedness Period solely with respect to South and its Subsidiaries, the IFWA.

4.12    Offers of Employment. At any time on or following the date hereof, Studio may, in its sole discretion, offer or cause one of its Subsidiaries to offer employment to any Business Employee (each such employee a "Studio Offeree"); *provided* that it is understood and agreed that Studio is not obligated to offer employment to any Business Employee and any such offers of employment shall be on terms (including compensation and benefit terms) satisfactory to Studio and its Affiliates, in their sole discretion. The Dream Parties shall or shall cause their Affiliates to, terminate the employment of each Transferred Employee; *provided* that in connection with any such termination, the Dream Parties shall comply with all applicable Laws, including the WARN Act, and the Dream Parties and their Affiliates shall be solely responsible for the payment of any amounts due to such Transferred Employees, including as a result of any unpaid wages or bonus or other amounts owed by DCEH and the Dream Parties and any of their respective Subsidiaries to such Transferred Employees, but Studio agrees that Transferred Employees shall be allowed to transfer and use at Studio any Dream Party accrued and unused vacation or personal time off days, subject to their work schedule and with authorization from their immediate Studio supervisor. Any

employee of DCEH or the Dream Parties or any of their respective Subsidiaries who (i) accepts such offer of employment, (ii) signs, and does not repudiate, such new employee documentation required by Studio, which may include an offer letter or employment agreement, confidentiality and restrictive agreement, and (iii) meets Studio's other requirements for new employees, including background checks, shall be a "Transferred Employee." Notwithstanding the foregoing, (a) in no event shall Studio or any of its Affiliates assume the obligations and liabilities of DCEH or the Dream Parties or any of their respective Subsidiaries with respect to any accrued and unpaid payroll, severance, bonus, or any other compensation or benefit for any Transferred Employee; and (b) nothing in this Agreement or any other Transaction Document shall limit the ability of Studio and its Affiliates to terminate any employee (including any Transferred Employee) at any time and for any or no reason. Nothing in this Section 4.12 or any other provision of this Agreement shall create any third-party beneficiary right in any Person other than the Parties to this Agreement, or any right to employment or continued employment or to a particular term or condition of employment with Studio or any of its Affiliates. Nothing in this Section 4.12 or any other provision of this Agreement (x) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement, or (y) shall limit the ability of Studio or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them. Notwithstanding the foregoing, during the South Indebtedness Period, (a) Studio may not solicit for employment any Business Employee who provides services exclusively to South University without the prior written consent of South, and (b) South shall be permitted to solicit for employment any Business Employee who provides services exclusively to South University and is not a "Dedicated Employee" as of the date hereof under the terms of the Transition Services and License Agreement.

4.13   Maintenance of Employees.  During the Pre-Closing Period for each University System, none of the Dream Parties shall terminate without cause the employment of the persons set forth on Schedule 4.13 that are employed by such University System, or materially reduce the compensation, title, job responsibilities or access to information of such persons, or relocate any such person's place of employment, without the prior written consent of Studio. In the event that any of the persons set forth on Schedule 4.13 voluntarily resigns such person's employment with the Dream Parties, the Dream Parties shall consult with Studio regarding a replacement for such person and such replacement shall be reasonably acceptable to Studio. For the avoidance of doubt, the obligations under this Section 4.13 are in addition to any obligations set forth in Section 4.1(b).

4.14   No Solicitation of DCEH and Affiliate Employees.  For the period from the date hereof through the one-year anniversary of the date hereof, neither Studio nor its Affiliates shall, directly or indirectly induce or attempt to induce any employee of DCEH and its Affiliates (except in accordance with Section 4.12) to leave the employ of DCEH or its Affiliates; *provided* that the foregoing shall not prevent Studio and its Affiliates from placing general employment advertising prepared without the use of any Confidential Information and not specifically targeting employees of DCEH and its Affiliates.

4.15   Access to Courses for Certain Employees and Program Participants.

(a)    As the continuation of an employee benefit existing with the Dream Parties, following each applicable Core Closing, each University System shall, and shall provide that its

- 38 -

Subsidiaries shall, permit each Transferred Employee who, while previously working for a Dream Party was enrolled in courses in an academic program at an Acquired Campus, to continue to enroll in up to 15 academic credits in the aggregate per semester in Approved Courses in the same academic program (the "Scholarship Limit"), free of any tuition charge; *provided* that the employee shall be responsible for any expenses for books, equipment or supplies required for the Approved Courses (each an "Dream Employee Scholarship"). No University System shall be required to permit any Transferred Employee to enroll, without paying tuition, in courses that go beyond the Scholarship Limit. Each University System shall honor any academic credits successfully earned by Transferred Employees while enrolled at an Acquired Campus during their employment with a Dream Party, as well as any incoming credits accepted by such Acquired Campus, and shall issue any degrees to such Transferred Employees earned by them as a result of the accrual of the required academic credits at the Acquired Campus and otherwise.

(b) DCEH and the Dream Parties, following the date hereof and through the earlier of the applicable Final Core Closing or the termination of the Managed Services Agreement with respect to such Specified Campus and the relevant Asset Purchase Agreement with respect to such Specified Campus, shall permit each full-time Studio employee, who in connection with the Managed Services Agreement is providing services at a Specified Campus and who has been working in that capacity (either as an employee of a Dream Party or its Affiliates or of Studio or its Affiliates) for at least 90 days in good standing, to enroll in academic credits not to exceed the Scholarship Limit in Approved Courses at the Specified Campus where such employee is employed, free of any tuition charge; *provided* that the Studio employee shall be responsible for any expenses for books, equipment or supplies required for the Approved Courses (each a "Studio Employee Scholarship" and collectively with the Dream Employee Scholarships, the "Employee Scholarships"). DCEH and the other Dream Parties shall not be required to permit any Studio employee to enroll, without paying tuition, in courses that go beyond the Scholarship Limit. The Specified Campus shall accept any academic credits successfully earned by Studio employees at another institution which meet the credit transfer policy of the Specified Campus during their employment with a Dream Party, as well as any incoming credits accepted by such Specified Campus, and shall issue any degrees to such Transferred Employees earned by them as a result of the accrual of the required academic credits at the Specified Campus and otherwise.

(c) Following each applicable Final Core Closing, each University System shall, or shall use commercially reasonable efforts to cause its permitted assigns to, permit individuals who are employees of the Los Angeles Dream Center or have been admitted to any of the Dream Center's programs in existence as of the date hereof, including its addiction recovery programs (men and women discipleship), sex trafficking rescue program, emancipated minors program, veterans program (but only to the extent Veterans Administration benefits will not pay for tuition) and similar programs (each a "Program Participant"), to enroll in academic credits at any of the Acquired Campuses of such University System in the aggregate not to exceed the Scholarship Limit, free of any tuition charge; *provided* that such employees and Program Participants shall be responsible for any expenses for books, equipment or supplies required for the Approved Courses (each a "Dream Center Scholarship"), and *provided further* that each University System's obligation to provide Dream Center Scholarships shall terminate on the later of (i) five (5) years after the date of each applicable Final Core Closing or (ii) the date of termination or expiration of the Managed Services Agreement for the Acquired Campus (if any) located in Los Angeles.

(d)     Notwithstanding the foregoing, if any employee or Program Participant is eligible for a Pell Grant, Cal Grant (or other grant programs, but not loans), the available grant shall be used as first dollars to pay for tuition prior to an award of an Employee Scholarship or a Dream Center Scholarship.

(e)     Each University System shall, and shall use commercially reasonable efforts to cause its permitted assigns to, honor all Art Grants and any Teach-Out Tuition Discounts that have been granted prior to a Final Core Closing by any Acquired Campus of such University System to students who enroll at such Acquired Campus at any time following the Final Core Closing with respect to such Acquired Campus.

4.16    <u>COBRA Matters</u>.  After each Closing, any of the Dream Parties and any of their respective Affiliates, in each case who maintain a "group health plan" (within the meaning of Treas. Reg. § 54.4980B-2 Q&A 1) as of immediately prior to any Closing shall continue to maintain a "group health plan" and shall make continuation coverage available to (a) each employee of any of the Dream Parties or any of their respective Affiliates who is not a Transferred Employee (or a beneficiary of such an employee) who becomes an "M&A qualified beneficiary" (within the meaning of Treas. Reg. § 54.4980B-9) in connection with the transactions contemplated by this Agreement, (b) each other individual who becomes a M&A qualified beneficiary as a result of such individual's relationship to an employee who is not a Transferred Employee and (c) each other individual is not a Transferred Employee whose COBRA qualifying event under such group health plan occurs on or prior to the applicable Closing, in each case until the expiration of such individual's continuation rights under COBRA.

4.17    <u>Disability Matters</u>.  Any current or former employee of the Dream Parties who, as of any Closing, is receiving benefit payments or becomes eligible to receive benefit payments under a current or former long-term disability policy or plan of the Dream Parties shall continue to receive benefit payments under such policy or plan until he or she ceases to be eligible for benefit payments under the terms of such policy or plan, without payment of any additional premiums or other costs.

4.18    <u>WARN Act</u>.  On the date of each Closing, the Dream Parties shall provide Studio with a list of employees who have suffered an "employment loss" (as defined in the WARN Act) in the 90 days preceding such Closing or had a reduction in hours of at least 50% in the 180 days preceding such Closing, each identified by date of employment loss or reduction in hours, employing entity and facility location.

4.19    <u>Certain Intellectual Property Matters</u>.

(a)     On the date hereof, DCEH shall assign all of the Dream Intellectual Property Rights used or held for use exclusively by a University System to the applicable University System and may, at Studio's election, thereafter be assigned by such University System to Studio or its designee.  Unless otherwise agreed by the Parties, each of the Dream Parties shall execute and deliver to Studio the assignments of certain Intellectual Property Rights in the form set forth on <u>EXHIBIT D</u> (the "<u>IP Assignments</u>") to be effective upon the execution thereof.  In order to enable DCEH to make use any Dream Intellectual Property Rights assigned pursuant to the immediately preceding sentence, Dream and each of AII, Argosy and South shall execute and deliver a copy of

the license agreement in the form set forth on EXHIBIT F (the "License Agreements"); *provided* that it is understood and agreed that any Dream Intellectual Property which is the subject of the License Agreements shall be used by DCEH solely in connection with a Teach-Out (and the operation of The Art Institute of California - San Diego, a campus of the Argosy University System and the Art Institute of Seattle, a campus of the Art Institute of Seattle, LLC, unless otherwise directed by Studio) and subject to the terms of the applicable License Agreement.  If any Party discovers or identifies, or if any Party uses, at any time, including after the date of this Agreement, any Intellectual Property Rights that are owned or purported to be owned by any member of the Dream Parties or their Affiliates that has been previously or currently is primarily used in or primarily held for use for the conduct or operation of the Business of a University System but which Intellectual Property Rights were not transferred to the applicable University System (or its Affiliates, as applicable): (i) the Dream Parties agree to (or cause its appropriate Affiliate to) transfer such Intellectual Property Rights to the applicable University System (or an Affiliate of such University System, as applicable); and (ii) the Dream Parties acknowledge and agree that, without limiting any other provision of this Agreement, upon the completion of such transfer, its obligations under this Agreement shall apply to any such Intellectual Property Rights. Notwithstanding anything to contrary in this Agreement, it is acknowledged and agreed that no Dream Intellectual Property Rights used or held for use by multiple University Systems shall be transferred by DCEH and its Subsidiaries without the prior written consent of the South Lenders during the South Indebtedness Period and Studio.

(b)     To the extent that any Dream Intellectual Property Rights are neither (i) assigned to a University System nor (ii) licensed to Studio and/or the University Systems pursuant to the Transition Services and License Agreement, then in each case ((i) and (ii)) DCEH or such other applicable Dream Party (on behalf of themselves and their Affiliates) hereby grant, and hereby cause their Affiliates to grant, to the applicable University Systems, Studio and their respective Affiliates, effective as of the date of this Agreement, a non-exclusive, perpetual, irrevocable, royalty-free, fully paid-up, worldwide right and license to fully use, reproduce, prepare derivative works of, distribute, publicly perform, publicly display, practice, transmit, make, use, offer to sell, sell, import, and otherwise exploit, solely in connection with the Business, any and all Dream Intellectual Property Rights that may be useful for the conduct or operation of the Business; *provided* that Studio, upon identifying any such Dream Intellectual Property Right that was omitted from prior Dream assignments and licenses, shall provide prompt notice of same to the applicable Dream Parties.  Subject to any applicable consent rights set forth in Section 4.19(a), such right and license may be sublicensed and assigned or otherwise transferred by Studio and any of its Affiliates (or by any successors or permitted assigns) (including the right to grant further sublicenses through multiple tiers of sublicensees) with respect to any items of such Dream Intellectual Property, but only in connection with the conduct or operation of the Business.

4.20    Online Campus Access.  At the Final Core Closing for each Specified Campus, the applicable Dream Parties shall immediately assign the existing consortium agreement with Ai Online and Ai Pittsburgh online program providing continued access to continuing students at the applicable Specified Campus.  DCEH shall cause its Affiliates and their respective successors and permitted assigns to, permit each student who is a student of the Dream Parties at any Specified Campus, as of the Final Core Closing with respect to such Specified Campus, to continue to take courses through Ai Online and Ai Pittsburgh's online program and shall issue academic credit to such students for such online courses; *provided* that all terms of the assigned consortium agreement are satisfied by Studio.  Notwithstanding anything to the contrary in any consortium agreement, the parties to such consortium agreement shall not agree to, and no Dream Party or its affiliates shall, increase in the amount charged per student or other costs incurred by the Dream Party thereto without the prior written consent of Studio.

4.21    Renegotiation of Leases.  The Dream Parties shall, and shall cause their Affiliates to, cooperate with Studio and its Affiliates and the applicable landlords with respect to the renegotiation and assignment of the leases with respect to the Specified Campuses.  The Dream Parties shall execute and deliver any documents reasonably requested by Studio in connection with the renegotiation and assignment of any such leases.

4.22    Teach-Out Matters.  The Dream Parties (other than South or South University) shall not, and shall cause their respective Affiliates not, without the prior written consent of Studio, to (a) seek to close any Specified Campus or initiate a Teach-Out, unless the Teach-Out is required by an Educational Agency despite the best efforts of the Dream Parties and their respective Affiliates to avoid such Teach-Out, or (b) take any actions related to the Reorganization or Change of Control that could reasonably be expected to result in a forced closure or Teach-Out of any Specified Campus by any Educational Agency; *provided*, that, except for The Art Institute of California - San Diego, a campus of the Argosy University System and the Art Institute of Seattle, a campus of the Art Institute of Seattle, LLC, DCEH shall Teach-Out any campus which is an Excluded Campus or otherwise cause such Excluded Campus to engage in a Change of Control and shall notify Studio, and keep Studio reasonably appraised, of the status and terms of, any such Teach-Out and Change of Control.  The Dream Parties shall, and shall cause their respective Affiliates to (i) as applicable, operate the Specified Campuses and provide the Core Services in accordance with the terms of the Managed Services Agreements, (ii) as applicable, provide the Transition Services in accordance with the terms of the Transition Services and License Agreement, and (iii) comply in all material respects with all applicable Laws.

4.23    Transfer Taxes.  Any and all transfer, documentary, registration, stamp, sales, use, value added, goods and services and similar Taxes ("Transfer Taxes") imposed in connection with the transfer of any asset pursuant to any Asset Purchase Agreement, the EAPA or the assumption of the Assumed Lease Obligations shall be borne DCEH except those Transfer Taxes set forth on Schedule 4.23 which shall be borne by Studio.  DCEH shall prepare and timely file any Tax Return in respect of Transfer Taxes, and shall timely pay in full any Transfer Taxes required to be paid but shall have the right to be timely reimbursed thereafter for the Transfer Taxes set forth on Schedule 4.23 upon presentation of appropriate documentation to Studio.  DCEH and the relevant Subsidiary, on the one hand, and Studio, on the other, shall cooperate in preparing any Tax Returns in respect of any Transfer Tax and lawfully minimizing any Transfer Taxes.

4.24    Delivery of Schedules.  The Dream Parties shall deliver to Studio no later than January 31, 2019 (or such later date that Studio may determine in its sole discretion) all of the schedules contemplated to be delivered under this Agreement (including the Disclosure Schedules) and the EAPA and each such schedule shall be acceptable to Studio, in its sole discretion.  In the event that Studio is not satisfied with the schedules delivered pursuant to this Section 4.24 or DCEH fails to deliver such schedules and Studio has entered into any Transaction Document with the Dream Parties or consummated any transaction with the Dream Parties pursuant to this Agreement or the other Transaction Documents, Studio or its designee may terminate any Transaction Document (in whole or in part) or, to the extent permitted by applicable Law, unwind in whole or in part such transaction consummated pursuant to a Transaction Document, in each case without any liability or obligation of Studio or its Affiliates to any Dream Party or any other Person with respect thereto.  The Disclosure Schedules and schedules to the EAPA shall to the extent possible, be organized by University System and further organized by campus or other entity with each University System.  Notwithstanding the foregoing, South and South University shall not be required to deliver an Asset Purchase Agreement (or any documents related thereto) to Studio.

4.25    Bank Accounts; Cash Management Practices.

(a)    During the Pre-Closing Period, the Dream Parties shall provide Studio with statements of each of their Bank Accounts on a monthly basis no later than the earlier of (a) two (2) Business Days following receipt thereof and (b) the 15th day of the month following the month to which a statement relates (e.g., the January statement for Bank Accounts would be provided not later than February 15th).  The Dream Parties shall provide Studio with daily reports specifying the activity of each of its Bank Accounts the previous day.  To the extent permitted by Law, the Dream Parties shall promptly provide access (including the authority to withdraw funds and sign checks) to their Bank Accounts to any Person designated by Studio; provided, that, (i) during the Indebtedness Period with respect to South University, if applicable, this sentence shall not apply such to South University and (ii) during the Indebtedness Period with respect to DCEH and its Subsidiaries, this sentence shall not apply to DCEH and its Subsidiaries.

(b)    During the Pre-Closing Period, the Dream Parties shall cause all amounts which are held or deposited in the Bank Accounts of the Dream Parties (including Bank Accounts which are or should be listed on Schedule 3.18 of the Asset Purchase Agreement or the EAPA) other than any Concentration Account or otherwise established with respect to the University Systems, or any receivables related to the University System, to be promptly transferred to the Concentration Account within one (1) Business Day of receipt thereof; provided that all amounts which are held in such Bank Accounts (other than the Concentration Account) shall be transferred to the Concentration Account within one (1) Business Day following the execution of this Agreement; provided, however, that this paragraph shall not (x) apply to South or South University (or any funds or accounts receivable that belong or are attributable to South or South University), and (y) impair the ability of DCEH, Argosy, AEG, or any of their respective Subsidiaries, to take any actions reasonably necessary to effectuate the restructuring of their respective accounts receivable (other than the Assigned Receivables) as required in accordance with the terms of the DCEH Credit Agreement and the South Credit Agreement, respectively, as amended.

(c)    Promptly after the date hereof, (x) the Dream Parties shall use their

- 43 -

reasonable best efforts to cause any Bank Accounts which contain co-mingled funds among the University Systems to be separated and the funds therein tendered to the applicable University System to whom such funds belong, and (y) the Studio and the Dream Parties agree to use their reasonable best efforts to promptly cause all accounts receivable to be assigned, transferred, directed, or disposed of in accordance with the terms of this Agreement and the other Transaction Documents and to cooperate with each other Party to cause any reasonable direction (written or otherwise) to be provided to all applicable third parties in connection therewith.

    4.26   <u>Business Contracts</u>.

        (a)    The Dream Parties shall, and shall cause their Affiliates to, maintain all Contracts, including all Contracts related to the Transition Services and License Agreement (including those Contracts set forth on <u>Section 2.19(f)</u> of the Disclosure Schedule), which are necessary for, or used in the operation of the Business (collectively, the "<u>Business Contracts</u>"); provided, that upon reasonable notice to Studio and subject to Studio's prior written approval (not to be unreasonably withheld, conditioned or delayed), the Dream Parties may negotiate a commercially reasonable alternative contract to any Business Contract, which alternative contract shall provide similar products and/or services on substantially similar terms and shall be deemed to be a "Business Contract." Each Dream Party shall, and shall cause its Affiliates to, (a) comply in all material respects with their respective Business Contracts, (b) timely pay all amounts due under such Business Contracts, (c) without the prior written consent of Studio, not materially modify, waive any right under, terminate, or fail to renew such Business Contracts, or permit such Business Contracts to expire, (d) without the prior written consent of Studio, not fail to enforce any right available to any Dream Party or its Affiliates thereunder, and (e) without the prior written consent of Studio, not assign or otherwise transfer such Business Contracts; *provided* that, as set forth in <u>Section 2.19(b)</u> hereof, the Dream Parties shall give 120 days' prior written notice to Studio before the expiration of any of the Contracts comprising or related to the Shared IT Systems or Shared IT Services, and Studio and its Affiliates agree that they are responsible for establishing their own replacement agreement with a vendor of their own choice with the cooperation of the Dream Parties to the extent set forth in <u>Section 5</u> of the Transition Services and License Agreement. In the event that any Business Contract might expire or be terminated, or in the event of any breach under any Business Contract, the Dream Parties shall immediately notify Studio. At any time, if any of such Business Contracts are not used by the Dream Parties or their Affiliates with respect to any campus operated by such Persons as of the date hereof which is not a Specified Campus, and if the Dream Parties are not obligated under any service or management agreement to maintain such contracts, and if such Contract can be assigned without any cost to the Dream Parties, the Dream Parties shall, or shall cause their Affiliates to, at the request of Studio, assign such Business Contracts to Studio or its designated Affiliates without additional consideration payable therefor. In connection with such assignment, each Dream Party shall, and shall cause its Affiliates to, use its reasonable best efforts to obtain the consent to the assignment of any such Business Contract to Studio or its Affiliate, as applicable, in all cases in which such consent is required for assignment or transfer. If any such consent has not been obtained, the Dream Parties shall, and shall cause their Affiliates, to cooperate with Studio and its Affiliates in any reasonable arrangements designed to provide all benefits thereunder to Studio and its Affiliates, including enforcement for the benefit of Studio and its Affiliates of any and all rights under such Contract against the other party or parties thereto, provided that Studio and its Affiliates shall pay for any reasonable, pre-approved out-of-pocket cost associated with such efforts or arrangements, and

provided that this sentence does not for the avoidance of doubt apply to Third-Party Agreements, which are the subject of the Transition Services and License Agreement.  Notwithstanding the forgoing, each Managed Services Agreement may be terminated in accordance with its terms.

(b)      It is expressly understood and agreed by Studio and its Affiliates that the Shared IT Systems set forth on Section 2.19(a) of the Disclosure Schedule, as made available to Studio following the date hereof, shall consist of three categories of agreements: (i) agreements for which Studio shall hold the position of an end user, (ii) agreements for which Studio shall have administrator rights; and (iii) agreements for which Studio shall have the right to request certain reports pursuant to a service level agreement or "SLA" in addition to the associated Shared IT Services, in each case ((i)-(iii)) consistent with the rights, access permissions and reports the Dream Parties receive on the date of this Agreement.  The foregoing access rights will be provided following the date of this Agreement on a fee basis in accordance with each University System's respective Managed Services Agreement.  The Dream Parties agree to give written notice to Studio and its Affiliates no less than 120 days in advance of any expiration date for any of the agreements related to or comprising the Shared IT Systems or associated Shared IT Services.  Studio and its Affiliates agree that they are responsible for establishing their own replacement agreement with a vendor of their own choice with the cooperation of the Dream Parties to the extent set forth in the Transition Services and License Agreement (as defined herein) and any Managed Services Agreement.

(c)      DCEH represents and warrants that transactions contemplated by this Agreement shall not impair the right, title or interest of the Dream Parties in or to the Dream Intellectual Property Rights, and all of the Dream Intellectual Property Rights will be available for use by Studio and its Affiliates immediately after the applicable Closing pursuant to the Transition Services and License Agreement or owned by a University System pursuant to the applicable IP Assignment on terms and conditions identical to those under which the Dream Parties and their Affiliates owned or used the Dream Intellectual Property Rights immediately prior to such applicable Closing (or the execution of the IP Assignment, the License Agreement or the Transition Services and License Agreement, as applicable), *provided* that, following the date hereof, immediate access to the Shared IT Systems shall be in accordance with the terms of the Transition Services and License Agreement through the existing system connections utilized by Dream Parties' employees at the applicable Specified Campus, pending the completion of system changes needed to allow direct access by Studio and its Affiliates, and following such transitional period the Dream Parties shall ensure that Studio and its Affiliates have the ability to use the Shared IT Systems through system connections as requested by Studio.

(d)      DCEH and its Affiliates have in effect and will maintain in effect all rights, licenses, permits, and other authorizations necessary and sufficient to grant the rights, authorizations and licenses under the Transition Services and License Agreement, and to otherwise perform the Transition Services and License Agreement, *provided* that, with respect to Dream Computer Systems licensed from third parties, DCEH shall give written notice to Studio and its Affiliates no less than 120 days in advance of any expiration date for any of the Contracts related to the Dream Computer Systems, and Studio and its Affiliates agree that, with respect to such expiring Contracts, they are responsible for establishing their own replacement agreement with a vendor of their own choice with the cooperation of the Dream Parties to the extent set forth in Section 3.4 of the Transition Services and License Agreement, and Studio and its Affiliates shall

not have any obligation for payment of licensing or other fees to any third Person for the exercise of their rights under the Transition Services and License Agreement, except as expressly provided in the Transition Services and License Agreement.

(d)     This Section 4.26 shall not bind or benefit South and South University following the expiration of the Pre-Closing Period.

4.27     Consent Judgment Compliance.

(a)     From and after the Initial Non-Core Closing and prior to the Last Final Core Closing, Studio and its subsidiaries agree to comply with all obligations and conditions set forth in the EMC Consent Judgment which are applicable to the services provided by Studio's Subsidiaries pursuant to the Managed Services Agreements and applicable to the acquired Non-Core Assets purchased by Studio's Subsidiaries; *provided* that nothing in this Section 4.27(a) shall cause Studio to have any liability or obligation with respect to any obligations under the EMC Consent Judgment which arise prior to the Initial Non-Core Closing or after the Last Final Core Closing.

(b)     At all times required under the EMC Consent Judgement, the Dream Parties and their Affiliates agree to fully comply with all obligations and conditions set forth in the Consent Judgment.

(c)     From and after the Core Assets Closing with respect to an Acquired Campus, to the extent that the EMC Consent Judgment remains applicable to such Acquired Campus as of and after the date of such Closing, Purchaser (as defined in the Asset Purchase Agreement) with respect to such Acquired Campus agrees to comply with all obligations and conditions set forth in the EMC Consent Judgment which are applicable to such Acquired Campus for such period of time as the EMC Consent Judgment remains in effect.

4.28     Grant of Security Interest.

(a)     Each of DCEH, each member of the Argosy University System (subject to Section 4.28(e)) and each member of the Ai University System hereby grants to Studio, for its benefit and the benefit of the its Affiliates, to secure the payment and performance in full of all of the obligations and liabilities of DCEH, the Argosy University System (subject to Section 4.28(e)) and the Ai University System pursuant to this Agreement and the other Transaction Documents (the "Obligations"), a continuing security interest in, and pledges to Studio, for its benefit and the benefit of its Affiliates and permitted assigns, all of its respective right, title and interest in and to, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.  All Obligations shall also be secured by any and all security agreements, mortgages or other Collateral granted to Studio, for its benefit and the benefit of its Affiliates and permitted assigns, by DCEH or the Ai University System as security for the Obligations, now or in the future.  If this Agreement is terminated, Studio's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity and reimbursement obligations for which no claim has been asserted) are satisfied in full, and at such time, shall automatically terminate and all rights therein shall revert to the applicable Parties.

(b)    Each of DCEH, each member of the Argosy University System (subject to Section 4.28(e)) and the Ai University System represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only to Permitted Liens that expressly have superior priority to Studio's Lien under this Agreement).

(c)    Each of DCEH, each member of the Argosy University System (subject to Section 4.28(e)) and each member of the Ai University System hereby authorizes Studio, on behalf of itself and its Affiliates, to file financing statements with all appropriate jurisdictions to perfect or protect Studio and its Affiliates interests or rights hereunder in the Collateral.

(d)    Without limiting the foregoing, each of DCEH, each member of the Argosy University System (subject to Section 4.28(e)) and each member of the Ai University System will, and will cause each of its Affiliates, as applicable, to, execute and deliver, or cause to be executed and delivered, to Studio such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, execution of Account Control Agreements, deeds of trust and other documents and such other actions or deliveries of the type required hereunder, as applicable), which may be required by any applicable Law or which Studio may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Transaction Documents and to ensure perfection and priority of the Liens created or intended to be created by the Transaction Documents, all in form and substance reasonably satisfactory to Studio.  If any material assets (including, but not limited to, any real property or improvements thereto or any interest therein or any Collateral Accounts) (other than Excluded Property) are acquired or established by any member of the Ai University System or any member of the Argosy University System (subject to Section 4.28(e)) after the date of this Agreement (other than assets constituting Collateral under this Agreement that become subject to the Lien under this Agreement upon acquisition thereof), an authorized officer of such Dream Party will (i) promptly, and in any event within five (5) Business Days of knowledge thereof, notify Studio and, if requested by Studio, cause such assets to be subjected to a Lien securing the Obligations and (ii) promptly take, and cause each applicable Dream Party to take, such actions as shall be necessary or reasonably requested by Studio to grant and perfect such Liens.

(e)    Notwithstanding anything to the contrary contained herein, the security interest granted by the Argosy University System herein shall only apply to the assets of following Arts Institute campuses which are part of the Argosy University System: The Art Institute of California - Hollywood, a campus of Argosy University; The Art Institute of California - Inland Empire, a campus of Argosy University; The Art Institute of California - Orange County, a campus of Argosy University; The Art Institute of California - Sacramento, a campus of Argosy University; The Art Institute of California - San Diego, a campus of Argosy University; and The Art Institute of California - San Francisco, a campus of Argosy University (the "Argosy Ai Campuses").

(f)    On or prior to the date hereof, the Dream Parties shall cause all existing Liens to be released on the Collateral and shall deliver to Studio evidence reasonably satisfactory to Studio of such Lien releases.

- 47 -

4.29    Affirmation; Limitation on Actions of DCEH.   Each Dream Party agrees and affirms that it is bound by the representations, warranties, covenants, agreements and conditions of such Dream Party set forth in this Agreement, and such representations, warranties, covenants, agreements and conditions shall remain effective and enforceable in accordance with this Agreement notwithstanding that certain Dream Parties may cease to be Affiliates of other Dream Parties at any time on or after the date of this Agreement. Following the date on which a University System is no longer an Affiliate of DCEH, DCEH shall not be permitted to take any action hereunder on behalf of such University System and notwithstanding anything to the contrary contained herein, following such time, any consent, approval or waiver required by DCEH in this Agreement shall be deemed to be a requirement for a consent, approval or waiver from (a) AI, in the case of any action which affects AII and its Subsidiaries, (b) South, in the case of any action which affects South and its Subsidiaries, and (c) Argosy, in the case of any action which affects Argosy and its Subsidiaries.

4.30    Assignment of Assets and Liabilities to Specified Campuses.

(a)    To the extent DCEH owns any Core Assets and/or Core Liabilities of any University System, Studio shall have the right, in its sole discretion, to cause DCEH to assign and transfer to the applicable University System or the applicable Specified Campuses of such University System pursuant to the terms of, and in accordance with, this Agreement, the EAPA (or equivalent agreement) and an Asset Purchase Agreement, as applicable.

(b)    To the extent DCEH owns any Non-Core Assets and/or Non-Core Liabilities of the Ai University System, the Argosy University System or South University, Studio shall have the right, in its sole discretion, to cause DCEH to assign and transfer such Non-Core Assets and/or Non-Core Liabilities to the applicable University System or the applicable Specified Campuses of such University System pursuant to the terms of, and in accordance with, this Agreement, the EAPA (or equivalent agreement) and an Asset Purchase Agreement, as applicable.

(c)    Notwithstanding anything to the contrary contained in this Agreement, in no event may Studio elect to transfer any Core Assets, Non-Core Assets, Core Liabilities or Non-Core Liabilities, in each case of South or South University after the expiration of the Pre-Closing Period without the prior written consent of South.

4.31    Affiliate Transactions. The Dream Parties shall terminate to Studio's sole satisfaction any Contract, arrangement or business relationship set forth or required to be set forth on Section 2.18(a) of the Disclosure Schedule that Studio requests in writing and DCEH shall pay amounts due thereunder in connection with such termination; provided, that this paragraph shall not require the Dream Parties to terminate any Contract, arrangement or business relationship (a) if such termination is prohibited under the terms of DCEH Credit Agreement or and South Credit Facility, each as in effect as of the date hereof, or (b) with respect to South or South University, after the expiration of the Pre-Closing Period with respect to South.

4.32    Name Changes.   To the extent applicable, each Dream Party (other than DCEH and any Excluded Campus) shall promptly after the date hereof and subject to the requirements of applicable Law, cause its name to be changed to remove the words "Dream Center" or the letters "DC". If any name resulting from compliance with this Section 4.32 is unavailable, the applicable

Dream Party shall consult with Studio in determining a mutually acceptable name.

4.33    _Assignment of Ai Receivables._   DCEH and each member of the Ai University System (including the Specified Campuses and the Excluded Campuses) and Argosy and AEG (each an "Ai Receivable Assignor") shall execute and deliver to Studio the bill of sale, assignment and assumption agreement attached hereto as EXHIBIT J pursuant to which each Ai Receivable Assignor will assign to Studio all accounts receivable that are Collateral (the "Assigned Receivables"); _provided_, that with respect to Argosy and AEG, the Assigned Receivables will consist solely of accounts receivable related to the Argosy Ai Campuses.   The consideration for the Assigned Receivables shall be (a) one dollar ($1.00) and (b) Studio entering into this Agreement and the other Transaction Documents to which it is party and consummating the transactions contemplated hereby and thereby.   Each of Ai Receivable Assignor agrees that from and after the date hereof (i) such Ai Receivable Assignor shall promptly deliver any Assigned Receivables received by it to Studio and (ii) Studio shall have the right to endorse all payments received by Studio in respect of any of the Assigned Receivables in the name of an Ai Receivable Assignor and to deposit the same into such Studio's bank accounts.

4.34    _South University._   The following Sections of this Agreement shall not bind South or South University following a Change of Control of the type described in clauses (d), (e), or (f) of the definition thereof with respect to South or South University that occurs after the Effective Date:   Section 4.11, Section 4.13, Section 4.15, Section 4.22, Section 4.25(a), Section 4.25(b), Section 4.26, Section 4.30, and Section 4.31.   To the extent that any assets of or with respect to South or South University are transferred to Studio or its Subsidiaries pursuant to the terms of this Agreement, and South determines, in its sole discretion, that such assets should be returned to South or South University, then the parties shall work in good faith to cause such assets to be promptly returned to South or South University, as applicable.   Studio will, from time to time, at the reasonable request of South and subject to the terms of the South MSA including the payment of any Service Fees owing by South in accordance with the terms of the South MSA, use commercially reasonable efforts to cooperate with South University to assist in the orderly transfer of the Services (as defined in the South MSA) to another service provider or to South in accordance with (a) the terms of the South MSA applicable during the term of the South MSA, and (b) the terms of the South MSA applicable following the termination or expiration of the South MSA.

4.35    _Tuition Options Agreements._ The Parties hereto agree that they shall coordinate and cooperate in good faith to obtain an amendment to (i) the Loan Origination and Purchase Agreement effective as of February 26, 2013 by and between Tuition Options, LLC and Education Finance II LLC (the "Loan Origination and Purchase Agreement") and (ii) the Master Servicing Agreement dated as of December 22, 2014 (as amended, modified, supplemented or restated from time to time) between Tuitions Options LLC and Education Management (the "Tuitions Options Agreement" and together with the Loan Origination and Purchase Agreement, the "Tuition Options Agreements") in order to cause any accounts receivable distributed pursuant to the Tuition Options Agreements to be distributed to the appropriate parties and (y) will otherwise cooperate in making arrangements to properly allocate such accounts receivable to its owner.

ARTICLE V

CONDITIONS TO THE CLOSINGS

5.1     Conditions to the Obligations of Each Party to Effect the Closing Transactions. The respective obligations of each party hereto to effect the Closing Transactions at any Closing, as applicable, shall be subject to the satisfaction or (to the extent permitted by Law) waiver in writing by Studio and DCEH, at or prior to such Closing, of the following conditions:

(a)     No Laws. No Governmental Authority of competent jurisdiction shall have enacted, issued or promulgated any Law that is in effect and has the effect of making such Closing Transactions illegal or which has the effect of prohibiting, enjoining, restraining or otherwise preventing the consummation of the Closing Transactions.

(b)     No Orders. No Governmental Authority of competent jurisdiction shall have issued or granted any Order that is in effect and has the effect of making the Closing Transactions illegal or which has the effect of prohibiting, enjoining, restraining or otherwise preventing the consummation of the Closing Transactions.

5.2     Additional Conditions to the Obligations of Studio. With respect to each Closing, the obligation of Studio to effect the Closing Transactions at any Closing also shall be subject to the satisfaction at or prior to the applicable Closing of each of the following conditions, any of which may be waived, in writing, exclusively by Studio:

(a)     Representations and Warranties. The representations and warranties of the Dream Parties contained in the Transaction Documents shall be true and correct in all material respects on and as of such Closing Date with the same force and effect as if made on and as of such Closing Date (except for those representations and warranties which address matters only as of a particular date, which shall have been true and correct as of such particular date); *provided* that the representations and warranties set forth in Sections 2.1, 2.2, 2.3, and 2.4 shall be true and correct in all respects (other than any *de minimis* failures to be true and correct in all respects) as of such Closing Date as though made on and as of such Closing Date.

(b)     Covenants. Each of the Dream Parties shall have performed and complied in all material respects with each covenant and agreement under this Agreement and the other Transaction Documents required to be performed and complied with by such Person prior to such Closing.

(c)     No Material Adverse Effect; No Changes. There shall not have occurred a DCEH Material Adverse Effect and there shall exist no Changes that could reasonably be expected to have a DCEH Material Adverse Effect. There shall have been no material change in the business, assets, condition (financial or otherwise) or liabilities of the Dream Parties since the date of the most recent projections provided to Studio as of the date of this Agreement.

(d)     Reorganization. Studio shall have received the Reorganization Plan and the Reorganization shall have been consummated and Studio shall have received the documents, instruments and certificates evidencing such transactions.

(e)     No Proceedings. There shall exist no pending Proceeding against DCEH and its Subsidiaries or their respective Boards, Board members, Board Committees, Board

Committee members or officers that could reasonably be expected to have a DCEH Material Adverse Effect and no such Proceeding shall be threatened.

(f) <u>Certificate of DCEH</u>. Studio shall have received a certificate, validly executed on behalf of DCEH by an authorized executive officer of DCEH, to the effect that, as of such Closing, the conditions to the obligations of Studio set forth in <u>Section 5.2(a)</u>, <u>Section 5.2(b)</u>, <u>Section 5.2(c)</u> and <u>Section 5.2(d)</u> have been satisfied

(g) <u>Release of Liens</u>. All Liens on the Collateral shall have been released, including any Liens granted pursuant to the October 17, 2017 Senior Secured Credit And Guaranty Agreement, the October 17, 2017 Pledge And Security Agreement and the October 17, 2017 Second Lien Pledge And Security Agreement.

(h) <u>Specified Campuses Conditions</u>. At the Initial Non-Core Closing and each Subsequent Non-Core Closing, with respect to the Specified Campuses for which such Initial Non-Core Closing Campus or a Subsequent Non-Core Closing Campus is occurring, as applicable, at such Closing:

(i) <u>Lease Negotiations</u>. Studio shall be satisfied, in its sole discretion, as to the terms of Assumed Lease Obligations for such Specified Campus and the terms of the Lease Assignment and Assumption Agreement with respect to such Assumed Lease Obligations.

(ii) <u>Consents</u>. DCEH shall have delivered to Studio each of the consents, notices, approvals or waivers set forth on <u>Schedule 5.2(h)(ii)</u> with respect to such Specified Campus.

(iii) <u>Educational Approvals</u>. The Pre-Closing Educational Consents for such Specified Campus shall have been obtained or made.

(iv) [This section is intentionally left blank.]

(v) <u>Termination of Affiliate or Related Person Arrangements</u>. The Dream Parties shall have terminated any Contract, arrangement or business relationship set forth or required to be set forth on <u>Section 2.18(a)</u> of the Disclosure Schedule that Studio requests in writing to Studio's sole satisfaction and all amounts due thereunder in connection with such termination shall have been paid.

(vi) <u>Due Diligence</u>. Studio shall have completed its ongoing due diligence investigation of the business, assets, operations, properties, regulatory compliance, financial condition, contingent liabilities, prospects and material agreements of such Specified Campus and the results of such due diligence investigation shall be satisfactory to Studio in its sole discretion.

(vii) <u>DOE Notification of Receivership</u>. The Dream Parties shall have provided Studio with written evidence that DCEH has notified the DOE regarding its Receivership and DOE has responded indicating that the Receivership: (A) will not create a Change of Control under applicable Educational Law; (B) will not cause DOE to place the Specified Campuses on heightened cash monitoring level 2 (HCM2) or other cash restriction beyond that to which DCEH

- 51 -

and the Specified Campuses were subject as of November 30, 2018; (C) will not trigger a requirement that DCEH post an additional letter of credit to the DOE in order to maintain its participation in the Title IV Program or to otherwise receive funding or any other benefit; (D) will not cause DOE to initiate an emergency action, or an action to limit, suspend or terminate DCEH's participation in the Title IV Program; and (E) will not cause DOE to take any action that would be DCEH Material Adverse Effect or otherwise be material and adverse to the Specified Campuses or their operations, assets or prospects.

(viii)    <u>Accrediting Body Notification of Receivership</u>.  The Dream Parties shall have provided Studio with written evidence that DCEH has notified its Accrediting Bodies of all relevant details of its Receivership and the corresponding Accrediting Bodies have: (A) indicated in writing that the Receivership will not create a substantive or structural change, including a Change of Control, for which prior approval is necessary; and (B) not indicated an intent to, or initiated an action to, place the institution on show-cause, probation, or warning, or to otherwise take action to suspend or terminate the accreditation of the Specified Campuses.

(ix)    <u>State Authorizing Agencies Notification of Receivership</u>.    The Dream Parties shall have provided Studio with written evidence that DCEH has notified each Specified Campus' applicable state authorizing agency(s) regarding the Receivership and the corresponding state agencies: (A) have indicated that Receivership will not create a substantive or structural change, including a Change of Control, for which prior approval is necessary; and (B) have not indicated an intent to, or initiated any action to, take any action that would be DCEH Material Adverse Effect or otherwise be material and adverse to the Specified Campuses or their operations, assets or prospects.

(x)    <u>Delivery of Schedules</u>.  Subject to <u>Section 4.24</u>, the Dream Parties shall have delivered all schedules (including the Disclosure Schedules) to this Agreement and the other Transaction Documents and Studio shall be satisfied with such schedules in its sole discretion.

(xi)    <u>Deliveries</u>.  Studio shall have received the following items:

(1)    Counterpart signature pages to the Asset Purchase Agreement for each such Specified Campus, duly executed by each party thereto (other than Studio and its Affiliates).

(2)    Counterpart signature pages to the Managed Services Agreement for each such Specified Campus, duly executed by each party thereto (other than Studio and its Affiliates).

(3)    Counterpart signature pages to the Lease Assignment and Assumption Agreement for each such Specified Campus, duly executed by each party thereto (other than Studio and its Affiliates), to the extent applicable.

(4)    Counterpart signature pages to the Sublease for each such Specified Campus, duly executed by each party thereto (other than Studio and its Affiliates), to the extent applicable.

(5)     Lien releases with respect to all Liens on the Acquired Campuses.

(6)     A certificate executed by the secretary of each Dream Party who will execute and deliver any documents in connection with such Closing attaching, and attesting to, (A) the Governing Documents of such Dream Party, (B) the resolutions adopted by the Board of such Dream Party approving the transactions contemplated by this Agreement and the other Transaction Documents and (C) the identities and signatures of the officers or other authorized Persons of such Dream Party authorized to execute any agreements to be executed by such Dream Party in connection with the transactions contemplated by the Transaction Documents.

(7)     Certificates issued by public officials to establish the existence and good standing of the Dream Parties who will execute and deliver any documents in connection with such Closing.

(8)     At the Initial Non-Core Closing only, the IP Assignments duly executed by the Dream Parties.

(9)     Such other documents, instruments and certificates, duly executed by the applicable Dream Party, if applicable, as Studio may determine are necessary or desirable to effectuate the transactions contemplated by this Agreement and the other Transaction Documents.

Each of the documents, instruments and certificates delivered to Studio pursuant to this Section 5.2 shall be in form and substance satisfactory to Studio.

5.3    Additional Conditions to the Obligations of the Dream Parties.  With respect to the Initial Non-Core Closing or any Subsequent Non-Core Closing, the obligation of the Dream Parties to effect the Closing Transactions at such Closing also shall be subject to the satisfaction at or prior to the applicable Closing of each of the following conditions, any of which may be waived, in writing, exclusively by DCEH:

(a)    Representations and Warranties.  The representations and warranties of Studio contained in ARTICLE III of this Agreement shall be true and correct on and as of such Closing Date with the same force and effect as if made on and as of such Closing Date, except where the failure to be so true and correct, individually or in the aggregate, has not had and would not be reasonably likely to have a material adverse effect on Studio or its Subsidiaries to consummate the transactions to be consummated at such Closing.

(b)    Covenants. Studio shall have performed and complied in all material respects with all covenants and agreements under this Agreement required to be performed and complied by Studio prior to the Closing.

(c)    Certificate of Studio.  DCEH shall have received a certificate, validly executed on behalf of Studio by an executive officer of Studio, to the effect that, as of such Closing, the conditions to the obligations of DCEH set forth in Section 5.3(a) and Section 5.3(b) have been satisfied.

- 53 -

(i)     Deliveries.  DCEH shall have received the following items:

(1)     A counterpart signature page to the Asset Purchase Agreement for each such Specified Campus, duly executed by Studio or one of its Subsidiaries, as applicable.

(2)     A counterpart signature page to the Managed Services Agreement for each such Specified Campus, duly executed by Studio or one of its Subsidiaries, as applicable.

(3)     A counterpart signature page to the Lease Assignment and Assumption Agreement for each such Specified Campus, duly executed by Studio or one of its Subsidiaries, to the extent applicable.

(4)     A counter signature page to the Sublease for each such Specified Campus, duly executed by Studio or one of its Subsidiaries, to the extent applicable.

(5)     At the Initial Non-Core Closing only, a counterpart signature page to the IP Assignments, duly executed by Studio or one of its Affiliates.

## ARTICLE VI
## INDEMNIFICATION OF STUDIO

6.1     Survival of Representations, Warranties, Covenants and Agreements of the Dream Parties.

(a)     Each of the Parties, intending to modify the applicable statute of limitations, agree that (i) the representations and warranties, other than the Fundamental Representations, of the Dream Parties contained in this Agreement and the other Transaction Documents shall survive until 11:59 PM New York City time on the date which is eighteen months from the date of the final Closing under this Agreement, and (ii) the Fundamental Representations and covenants of the Dream Parties shall survive until 11:59 PM New York City time on the 180th day after the date on which all applicable statute of limitations with respect thereto (including extensions) have expired.

(b)     Any representation, warranty or covenant in respect of which indemnity may be sought under this ARTICLE VI, and the indemnity with respect thereto, shall survive the time at which it would otherwise terminate pursuant to this Section 6.1 if written notice of the inaccuracy or breach or potential inaccuracy or breach thereof giving rise to such right or potential right of indemnity shall have been given to the party against whom such indemnity may be sought prior to such time, and in any such case such representation or warranty shall survive until any claim for indemnity related to such inaccuracy or breach or potential inaccuracy or breach is finally resolved (without the ability to assert appeals).

(c)     The representations and warranties contained in this Agreement or in any other Transaction Document shall survive for the periods set forth in this Section 6.1 and shall in no event be affected by any investigation, inquiry or examination made or which could have been made for or on behalf of any party, or the knowledge of any party's Representatives or the

acceptance by any party of any certificate or opinion hereunder.

6.2     <u>General Indemnification</u>.  DCEH and its Subsidiaries shall indemnify Studio and its Affiliates and their respective equityholders, partners, Representatives, successors and permitted assigns (collectively, the "<u>Studio Indemnified Parties</u>") and save and hold each of them harmless against, and pay on behalf of, or reimburse such Studio Indemnified Parties as and when incurred for any Losses which any such Studio Indemnified Party may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of:

(a)     any facts, events, or Changes which constitute a breach of any representation or warranty of any Dream Party under any Transaction Document;

(b)     any nonfulfillment or breach of any covenant or agreement of any Dream Party under any Transaction Document;

(c)     any (i) Taxes of any Dream Party or, with respect to any Dream Party acquired pursuant to an Equity Transfer described in <u>Section 1.3(c)</u>, Taxes of or with respect to such Dream Party and each of its Subsidiaries (A) with respect to any taxable period (or portion thereof) ending on the relevant Closing Date, (B) imposed on a consolidated, affiliated, combined, unitary or similar basis, or (C) for which it is liable as a successor or transferee, or by contract, and (ii) Taxes imposed on any Studio Indemnified Party as a result of being deemed a "disqualified person" within the meaning of Section 4958(f)(1) or Section 4946(a)(1) of the Code or equivalent state or local Law;

(d)     any liabilities of the Dream Parties, including any liabilities of the Dream Parties with respect to the Specified Campuses which have not been assumed pursuant to the terms of the Asset Purchase Agreement; and

(e)     any Bankruptcy of DCEH and its Subsidiaries;

(f)     any operations of DCEH and its Subsidiaries, including the operation by DCEH and its Subsidiaries of the Specified Campuses prior to the Core Closing for each Subsidiary;

(g)     fraud of DCEH and any Person who is or was an Affiliate and Related Person of DCEH;

(h)     any failure of any of any Dream Party to maintain Permits required of Governmental Authorities for the conduct of their business and ownership of their properties;

(i)     any liabilities relating to any Employee Benefit Plan;

(j)     any liabilities related to the employment of any employees of any of the Dream Parties or any of their respective Affiliates or related to the termination of any employees by any of the Dream Parties or any of their respective Affiliates;

(k)     any failure of any Dream Party to comply with the WARN Act;

(l)      the Reorganization;

(m)     any item set forth on a schedule delivered pursuant to Section 4.24;

(n)      the Excluded Campuses;

(o)      any Transaction Expenses or Indebtedness of any of DCEH and its Affiliates; and

(p)      the Retained Liabilities.

If and to the extent any provision of this Section 6.2 is unenforceable for any reason, DCEH and its Subsidiaries hereby agree to make the maximum contribution to the payment and satisfaction of any Loss for which indemnification is provided under this Section 6.2 which is permissible under applicable Laws.

6.3      Manner of Calculation.  For the purposes of determining whether there has been a breach of any representation or warranty or the amount of Loss related thereto, the representations and warranties set forth in this Agreement shall be considered without regard to any materiality qualification (including terms such as "material" and "DCEH Material Adverse Effect") set forth therein.  For purposes of Section 6.2(c)(i)(A), Taxes imposed with respect to a period that begins on or before and ends after the relevant Closing Date shall be allocated to the portion of the taxable period ending on the relevant Closing Date on a closing of the books basis, except that items of Taxes determined on a time basis shall be allocated to the portion of the tax period ending on the relevant Closing Date based on daily pro-rating

6.4      Non-Exclusive Remedy.  It is expressly understood and agreed that the remedies provided by this ARTICLE VI shall be in addition to all other rights and remedies (by Contract, at law, in equity or otherwise) of the Studio Indemnified Parties.

6.5      Insurance.  Any indemnification amount payable to any Party under this ARTICLE VI shall be net of any insurance recovery actually received by such Party with respect to such claim.

6.6      Manner of Payment.  Any indemnification of the Studio Indemnified Parties pursuant to this ARTICLE VI shall be effected by wire transfer of immediately available funds from DCEH and its Subsidiaries to an account designated in writing by the applicable Studio Indemnified Party within thirty (30) days after the determination thereof.  Any indemnification payments shall be made together with interest accruing thereon from the date written notice of the indemnification claim is made to the date of payment at eight percent (8%) per annum, compounding quarterly.

6.7      Adjustment Treatment.  All indemnification payments made pursuant to this ARTICLE VI shall be treated as adjustments to the Closing Consideration, including for U.S. federal income tax purposes.

6.8      Disclaimer of Certain Damages.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT BUT SUBJECT TO THE IMMEDIATELY

FOLLOWING SENTENCE, NO DREAM PARTY, NOR ITS AFFILIATES, OFFICERS, DIRECTORS, TRUSTEES, EMPLOYEES, AGENTS, SUBCONTRACTORS OR SUPPLIERS, WILL BE LIABLE TO ANY OF THE STUDIO INDEMNIFIED PARTIES FOR ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS, LOST REVENUE, FAILURE TO REALIZE EXPECTED SAVINGS) SUSTAINED OR INCURRED IN CONNECTION WITH THE PERFORMANCE OR NONPERFORMANCE OF SERVICES UNDER THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), WARRANTY, OR OTHERWISE AND WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE.  THE FOREGOING SHALL NOT LIMIT ANY SUCH DAMAGES TO THE EXTENT SUCH DAMAGES ARE PAYABLE BY A PARTY TO A THIRD PARTY.

ARTICLE VII
TERMINATION, AMENDMENT AND WAIVER

7.1    <u>Termination</u>.    This Agreement may be terminated and the other transactions contemplated hereby may be abandoned by Studio if the Dream Parties have not delivered to Studio by January 31, 2019 (or such later date that Studio may determine in its sole discretion) all of the schedules contemplated to be delivered under this Agreement (including the Disclosure Schedules) and the other Transaction Documents in form and substance satisfactory to Studio in its sole discretion.

7.2    <u>Effect of Termination</u>.    Any proper and valid termination of this Agreement pursuant to <u>Section 7.1</u> shall be effective immediately upon the delivery of written notice of the terminating Party to the other Parties hereto, as applicable, specifying the provisions hereof pursuant to which such termination is made and the basis therefor described in reasonable detail. In the event of termination of this Agreement as provided in <u>Section 7.1</u>, this Agreement shall forthwith become void and there shall be no liability or obligation on the part of any party or their respective Representatives, if applicable; *provided, however,* that except as otherwise provided in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the Parties acknowledge and agree shall not be limited to reimbursement of out-of-pocket fees, costs or expenses incurred in connection with the transactions contemplated hereby, and may include, to the extent proven, the benefit of the bargain lost by a party's stockholders (taking into consideration relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party) resulting from any breach of this Agreement prior to such termination, in which case the aggrieved party shall be entitled to all remedies available at law or in equity; *provided, further*, that, the provisions of <u>Section 4.5</u> (*Public Disclosure*), <u>Section 4.29</u> (*Affirmation; Limitation on Actions of DCEH*), <u>ARTICLE VI</u> (*Indemnification of Studio*), <u>ARTICLE VIII</u> (*General Provisions*) and this <u>Section 7.2</u> (*Effect of Termination*) shall remain in full force and effect and survive any termination of this Agreement pursuant to the terms of this <u>ARTICLE VII</u>.

7.3    <u>Cross Default</u>.    In the event of (a) any breach of, or nonfulfillment by, any Dream Party of its any of its covenants or obligations contained in any Transaction Document which breach or nonfulfillment remains uncured thirty (30) days following the date on which any Dream Party is notified in writing thereof, or (b) any material breach of or material inaccuracy in any

representations or warranties of any Dream Party contained in any Transaction Document in any material respect, then Studio shall have the right to terminate this Agreement and each other Transaction Document to which it is a party.

7.4   Amendment.   This Agreement may be amended by DCEH and Studio at any time by execution of an instrument in writing signed on behalf of each of DCEH and Studio; *provided* that (a) no amendment which affects AII and its Subsidiaries shall be effective against AII and its Subsidiaries without the prior written consent of AII, (b) no amendment which affects South and its Subsidiaries shall be effective against South and its Subsidiaries without the prior written consent of South and, during the South Indebtedness Period, the South Lenders obtained in accordance with the terms of the IFWA, and (c) no amendment which affects Argosy and its Subsidiaries shall be effective against Argosy and its Subsidiaries without the prior written consent of Argosy.

7.5   Extension; Waiver.   Each Party, on behalf of itself may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations of the other Parties, respectively, (b) waive any breaches of or inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions for the benefit of such Party contained herein. Any agreement on the part of any Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party. Notwithstanding the foregoing, no failure or delay by any Party hereto in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder. Each of AII, South and Argosy may provide a waiver on behalf of itself and its Subsidiaries and such waiver shall be deemed to be in compliance with this Section 7.5.

ARTICLE VIII
GENERAL PROVISIONS

8.1   No Survival of Representations, Warranties, Covenants and Agreements of Studio; Waiver and Release.

(a)   The representations, warranties, covenants and agreements of Studio contained in this Agreement and the other Transaction Documents shall terminate at the end of the Pre-Closing Period (it being understood and agreed that no Dream Party shall have recourse under this Agreement or the other Transaction Documents following end of the Pre-Closing Period for any breach of or inaccuracy in any such representation, warranty, covenant or agreement), except that only the covenants and agreements that by their terms survive the Pre-Closing Period shall so survive the termination of the Pre-Closing Period in accordance with their respective terms.

(b)   Each Dream Party, on behalf of itself and its Affiliates and their respective Representatives, successors and assigns, hereby unconditionally and irrevocably acquits, remises, discharges and forever releases Studio, its Affiliates and their respective Representatives, Related Persons, successors and assigns of their employees from any and all liabilities, including those arising under any Law, Contract, arrangement, commitment or undertaking, whether written or oral, to the extent arising on or prior to the termination of the Pre-Closing Period or otherwise related to the transactions contemplated hereby and by the other Transaction Documents (other

than with respect to knowing and intentional fraud); *provided* that for the avoidance of doubt the foregoing release shall not apply to release claims with respect to executory obligations of Studio and its Subsidiaries under the Transaction Documents which are the subject of Proceedings initiated by the Dream Parties during the Pre-Closing Period and carried out during and after the Pre-Closing Period.

(c)     Each Dream Party, on behalf of itself and its Affiliates and their respective Representatives, Related Persons, employees, officers, directors, successors and assigns, hereby agrees that such Person shall not make any claims for indemnification hereunder against Studio or any of its Related Persons by reason of the fact that such Dream Party was an equityholder, director, officer, employee or agent of a Dream Party or a Specified Campus or was serving at the request of such Dream Party or Specified Campus as a partner, trustee, director, officer, employee or agent of another entity (whether such claim is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses or otherwise) with respect to any claim for indemnification brought by any of the Studio Indemnified Parties against the Dream Parties or any claim against the Dream Parties in connection with the transactions contemplated by the Transaction Documents and each Dream Party hereby acknowledges and agrees that such Dream Party shall have no claims or right to contribution or indemnity from Studio or its Affiliates with respect to any amounts paid by such Dream Party in connection with the transactions contemplated by the Transaction Documents.

(d)     Each Dream Party acknowledges and agrees that notwithstanding anything to the contrary in this agreement in no event shall any of Studio's Related Persons have any liability related to this Agreement, any other Transaction Document or the transactions contemplated herein or therein, including by way of piercing the corporate, limited liability company or partnership veil or other similar theories of liability, other than in the case of knowing and intentional fraud or unless such Person is a party to a Transaction Document. Each Dream Party, on behalf of itself and its Related Persons, herby unconditionally and irrevocably releases Studio's Related Persons from any and all claims, causes of actions, damages, liabilities, whether known or unknown, now existing or hereinafter arising, in connection with, related to or arising or resulting from this Agreement, the other Transaction Documents and the transactions contemplated hereunder and thereunder.

(e)     Studio, on behalf of itself and each of its Subsidiaries, hereby acknowledges and agrees that notwithstanding anything to the contrary in this agreement in no event (other than in the case of fraud, willful misconduct or willful misrepresentation) shall any of DCEH's Related Persons (other than the Dream Parties) have any liability related to this Agreement, any other Transaction Document (unless such Person is party to a Transaction Document) or the transactions contemplated herein or therein, including by way of piercing the corporate, limited liability company or partnership veil or other similar theories of liability.

(f)     Other than DCEH and its Subsidiaries, no Dream Party shall have any liability or obligation to any other Dream Party for any misrepresentation under or breach of this Agreement. AII and its Subsidiaries shall not be liable for any misrepresentation under or breach of this Agreement by any other Dream Party. South and its Subsidiaries shall not be liable for any misrepresentation under or breach of this Agreement by any other Dream Party. Argosy and its Subsidiaries shall not be liable for any misrepresentation under or breach of this Agreement by

any other Dream Party except for DCEH and its Subsidiaries and solely for as long as Argosy and its Subsidiaries remain Subsidiaries of DCEH.

(g)     For the avoidance of doubt, Studio shall have no obligation pursuant to this Agreement to take an action which is not expressly obligated under this Agreement, including giving any consent or waiver or causing any transaction which is at its option to occur.

8.2     <u>Notices</u>.  Any notice required to be given hereunder shall be sufficient if in writing and sent by E-mail transmission (provided that any notice received by E-mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (local time of the recipient) shall be deemed to have been received at 9:00 a.m. (local time of the recipient) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 8.2</u>):

(a)     <u>if to DCEH or any other Dream Party prior to the Core Closing for or with respect such other Dream Party, to</u>:

> Dream Center Education Holdings, LLC
> 1400 Penn Avenue
> Pittsburgh, PA 15222
> E-Mail:  rbarton4953@gmail.com
> Attention:  Randall K. Barton, Executive Chairman
>
> with copy (which shall not constitute notice) to:
>
> Rouse Frets White Goss Gentile & Rhodes, LLC
> 1100 Walnut Street, Suite 2900
> Kansas City, Missouri 64106
> E-mail: rholt@rousepc.com
> Attention:  Ronald L. Holt

(b)     <u>if to Studio or any Dream Party (other than DCEH) prior to the Core Closing for or with respect such other Dream Party, to</u>:

> 1201 West 5th Street, Ste. T410
> Los Angeles, CA 90017
> E-mail: bryan@studioenterprise.com
> Attention: Bryan Newman, CEO
>
> with copies (which shall not constitute notice) to:
>
> Cooley LLP
> 4401 Eastgate Mall
> San Diego, CA  92121-1909
> E-mail: kleecarey@cooley.com
> Attention:  Katherine (Kate) Lee Carey

- 60 -

and:

Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
E-mail: jpotash@cov.com; awollensack@cov.com
Attention: Jeffrey Potash and Amy Wollensack

The provisions set forth in this Section 8.2, including the contact information of the Parties hereto, shall apply to all of the Transaction Documents.

8.3    Interpretation.

(a)    Unless otherwise indicated, all references herein to Articles, Sections or Annexes, shall be deemed to refer to Articles, Sections or Annexes of or to this Agreement, as applicable.

(b)    Unless otherwise indicated, the words "include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation."

(c)    The word "or" is not exclusive.

(d)    The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(e)    The table of contents and headings set forth in this Agreement are for convenience of reference purposes only and shall not affect or be deemed to affect in any way the meaning or interpretation of this Agreement or any term or provision hereof.

(f)    Unless otherwise indicated, all references herein to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person unless otherwise indicated or the context otherwise requires.

(g)    Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

(h)    References to "$" and "dollars" are to the currency of the United States of America.

(i)    Any dollar or percentage thresholds set forth herein shall not be used as a benchmark for the determination of what is or is not "material," or "DCEH Material Adverse Effect" under this Agreement.

(j)    When used herein, the word "extent" and the phrase "to the extent" means the degree to which a subject or other thing extends, and such word or phrase shall not simply

- 61 -

mean "if."

(k)     Any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws.

(l)     Unless "Business Days" are expressly specified, all references to "days" are to calendar days.

(m)     The Parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

(n)     The words "made available" or words of similar import with respect to any item made available prior to the date of this Agreement by a Dream Party means delivered by such Person or such item was posted prior to October 6, 2108 in the online SharePoint available to Studio and its Representatives in a manner which was continuously visible from the date of posting until such date to Studio (and the Representatives of Studio) and which is labeled and filed in such a manner as to make its contents reasonably apparent.

(o)     The words "member of a University System", "University System member" or words of similar import refer to the applicable of AII, Argosy or South and its respective current and former Subsidiaries, each of which is a member of the applicable University System.

8.4     Defined Terms.  Capitalized terms in this Agreement have the respective meanings ascribed to them in this Agreement or in ANNEX 2.

8.5     No Joint Venture.   Nothing in this Agreement or in any other Transaction Document, expressed or implied, is intended to or shall constitute the Parties hereto partners or participants in a joint venture.

8.6     Assignment.  The Dream Parties may not assign (including by operation of law) either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Studio.   Studio may not assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of DCEH; *provided* that notwithstanding the foregoing, Studio may without the prior written approval of DCEH (a) assign this Agreement or any rights, interests or obligations hereunder to any of its Affiliates or in connection with any Change of Control of Studio, (b) assign this agreement or any rights or obligations hereunder to any Person designated by Studio, including the Foundation, (c) assign its rights but not its obligations hereunder as collateral in respect of any Indebtedness of Studio or its Affiliates and (d) assign its rights and obligations hereunder in whole or in part to the Foundation. Any purported assignment of this Agreement, or any rights or obligations hereunder, which does not comply with this Section 8.6 shall be void.  Subject to the provisions of this Section 8.6, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

8.7     Entire Agreement.  This Agreement (including the Disclosure Schedule, the

Annexes, the Schedules and the Exhibits hereto which are expressly made part of this Agreement as if set forth herein) and the other Transaction Documents, constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. In the event of conflict between the provisions of this Agreement and the provisions of any other Transaction Agreement, the provisions of this Agreement shall control; *provided, however*, that in the event of a conflict between the provisions of this Agreement and the provisions of the IFWA, the provisions of the IFWA (as applicable) shall control; *provided, further*, that in the event of a conflict between the provisions of this Agreement and the provisions of the South MSA, solely with respect to South and its Subsidiaries the provisions of the South MSA shall control.  This Agreement amends and restates the Original Agreement in its entirety; *provided* for the avoidance of doubt, no party to the Original Agreement shall be relieved from liability in accordance with the terms of the Original Agreement for its breach of the Original Agreement prior to the execution and delivery of this Agreement.

8.8    Third-Party Beneficiaries.  This Agreement is not intended to, and shall not, confer upon any other Person any rights or remedies hereunder; *provided* that (a) the Studio Indemnified Parties are express third-party beneficiaries of ARTICLE VI of this Agreement and (b) during the South Indebtedness Period, the South Lenders are express third party beneficiaries of each provision of this Agreement which references them specifically and is intended for their benefit. The representations and warranties in this Agreement are the product of negotiations among the Parties hereto and are for the sole benefit of the Parties hereto.  Any inaccuracies in such representations and warranties are subject to waiver by the Parties hereto in accordance with Section 7.5 without notice or liability to any other Person.  The representations and warranties in this Agreement may represent an allocation among the Parties hereto of risks associated with particular matters regardless of the knowledge of any of the Parties hereto.  Accordingly, Persons other than the Parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

8.9    Expenses.  Except as may otherwise be expressly set forth herein or in any other Transaction Document, all fees and expenses incurred in connection with the authorization, preparation, negotiation, execution and performance of this Agreement and the potential consummation of the transactions contemplated hereby shall be the obligation of the respective party incurring such fees and expenses.

8.10    Severability.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto.  The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

8.11    Remedies.

(a)     Except as otherwise provided herein, any and all remedies available at law or in equity, whether or not herein expressly conferred upon a party, will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or in equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

(b)     The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the transactions contemplated by this Agreement) in accordance with its specified terms or otherwise breach such provisions.  Accordingly, the Parties acknowledge and agree that the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

(c)     The Parties hereto further agree that (i) by seeking the remedies provided for in this Section 8.11, a party shall not in any respect waive its right to seek any other form of relief that may be available to a party under this Agreement (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 8.11 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 8.11 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 8.11 prior or as a condition to exercising any termination right under ARTICLE VII (and pursuing damages after such termination), nor shall the commencement of any Proceeding pursuant to this Section 8.11 or anything set forth in this Section 8.11 restrict or limit any party's right to terminate this Agreement in accordance with the terms of ARTICLE VII or pursue any other remedies under this Agreement that may be available then or thereafter.

8.12    Governing Law.  This Agreement, and all Proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement and the Transaction Documents or the actions of the Parties hereto in the negotiation, administration, performance and enforcement hereof and thereof, shall be governed by and construed in accordance with the internal substantive Laws of the State of Delaware, without giving effect to any choice or conflict of Laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

8.13    Jurisdiction and Venue.  Each of the Parties hereto submits to the exclusive jurisdiction and venue of the Delaware Chancery Courts located in Wilmington, Delaware, or, if such court shall not have jurisdiction, any state or federal court sitting in Wilmington, Delaware,

in any action or proceeding arising out of or relating to this Agreement or any other Transaction Document and agrees that all claims in respect of the action or proceedings may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each of the Parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in Section 8.2, such service to become effective ten (10) days after such mailing.

8.14  Waiver of Jury Trial. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

8.15  Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other party, it being understood that all Parties need sign the same counterpart. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by E-mail of a .pdf attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

8.16  Intention of the Parties. Notwithstanding anything to the contrary contained herein, it is the intention of the Parties that the asset and equity transfers contemplated by this Agreement, if consummated in accordance with the terms of this Agreement and the other Transaction Documents, will result in (a) each University System being operated as a standalone entity or as a Subsidiary of a Foundation which is not Affiliated with DCEH or the Dream Center Foundation, (b) each University System (excluding any campuses subject to a Teach-Out) having access to the assets, properties and employees owned or used by it (whether as a result of direct ownership engagement thereof or as result of its Managed Services Agreement and the Transition Services and License Agreement), and (c) each University System having Boards and Board Committees which contain no Persons which are Related Persons of DCEH or The Dream Center Foundation. Notwithstanding anything in this Agreement to the contrary, each of the parties hereby acknowledge and agree that nothing herein is meant to frustrate the purpose or any provision of or otherwise conflict with (a) any Managed Services Agreement, (b) the IFWA, or (c) with respect to South and its Subsidiaries, during the South Indebtedness Period, the operations or governance of South or South University or the rights of the South Lenders under the South Credit Agreement and related collateral documents. This Agreement and the other Transaction Documents should be construed in accordance with the foregoing intention.

*[Remainder of Page Intentionally Left Blank; Signature Pages to Follow.]*

IN WITNESS WHEREOF, the undersigned have caused this Framework Agreement to be signed, all as of the date first written above.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
    Name:
    Title:

DREAM CENTER EDUCATION HOLDINGS, LLC

By: _____
    Name:
    Title:

DREAM CENTER EDUCATION MANAGEMENT, LLC
(solely to acknowledge its removal as a party to the Framework Agreement)

By: _____
    Name:
    Title:

DREAM CENTER ARGOSY UNIVERSITY OF
CALIFORNIA, LLC

By: _____
      Name:
      Title:

ARGOSY EDUCATION GROUP, LLC

By: _____
      Name:
      Title:

DREAM CENTER SOUTH UNIVERSITY, LLC

By:  _____
     Name:
     Title:

SOUTH UNIVERSITY SAVANNAH, LLC

By:  _____
     Name:
     Title:

SOUTH UNIVERSITY OF ALABAMA, LLC

By:  _____
     Name:
     Title:

DC SOUTH UNIVERSITY FLORIDA, LLC

By:  _____
     Name:
     Title:

SOUTH UNIVERSITY RESEARCH II, LLC

By:  _____
     Name:
     Title:

SOUTH UNIVERSITY OF MICHIGAN, LLC

By:  _____
     Name:
     Title:

DC SOUTH UNIVERSITY OF NORTH CAROLINA, LLC

By:  _____
     Name:
     Title:

SOUTH UNIVERSITY OF OHIO, LLC

By: _____
    Name:
    Title:

SOUTH UNIVERSITY OF CAROLINA, LLC

By: _____
    Name:
    Title:

DC SOUTH EDUCATION - TEXAS, LLC

By: _____
    Name:
    Title:

DC SOUTH UNIVERSITY OF VIRGINIA, LLC

By: _____
    Name:
    Title:

THE ARTS INSTITUTES INTERNATIONAL, LLC

By: _____
      Name:
      Title:

DC ART INSTITUTE OF ATLANTA, LLC

By: _____
      Name:
      Title:

DC ART INSTITUTE OF CHARLESTON, LLC

By: _____
      Name:
      Title:

DC ART INSTITUTE OF WASHINGTON, LLC

By: _____
      Name:
      Title:

DC ART INSTITUTE OF VIRGINIA BEACH, LLC

By: _____
      Name:
      Title:

THE ART INSTITUTE OF TENNESSEE - NASHVILLE, LLC

By: _____
      Name:
      Title:

AITN RESTAURANT, LLC

By: _____
      Name:
      Title:

*[Signature Page to Framework Agreement]*

THE ART INSTITUTE OF COLORADO, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF PHOENIX, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF SEATTLE, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF PORTLAND, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF PITTSBURGH, DC, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF PHILADELPHIA, DC, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF FORT LAUDERDALE, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF HOUSTON, LLC

By: _____

*[Signature Page to Framework Agreement]*

Name:
Title:

AIH RESTAURANT, LLC

By: _____
    Name:
    Title:

DC ART INSTITUTE OF SAN ANTONIO, LLC

By: _____
    Name:
    Title:

DC ART INSTITUTE OF AUSTIN, LLC

By: _____
    Name:
    Title:

THE ILLINOIS INSTITUTE OF ART, LLC

By: _____
    Name:
    Title:

THE ART INSTITUTE OF MICHIGAN, LLC

By: _____
    Name:
    Title:

THE ILLINOIS INSTITUTE OF ART AT
SCHAUMBURG, LLC

By: _____
    Name:
    Title:

DC MIAMI INTERNATIONAL UNIVERSITY OF ART
& DESIGN, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF LAS VEGAS, LLC

By: _____
     Name:
     Title:

THE ART INSTITUTE OF INDIANAPOLIS, LLC

By: _____
     Name:
     Title:

AIIN RESTAURANT, LLC

By: _____
     Name:
     Title:

DC ART INSTITUTE OF TAMPA, LLC

By: _____
     Name:
     Title:

AITAMPA RESTAURANT, LLC

By: _____
     Name:
     Title:

THE DC ART INSTITUTE OF CHARLOTTE, LLC

By: _____
     Name:
     Title:

*[Signature Page to Framework Agreement]*

THE DC ART INSTITUTE OF RALEIGH-DURHAM,
LLC

By: _____
    Name:
    Title:

DC ART INSTITUTE OF DALLAS, LLC

By: _____
    Name:
    Title:

DC AID RESTAURANT, LLC

By: _____
    Name:
    Title:

*[Signature Page to Framework Agreement]*

**ANNEX 1**

**Specified Campuses**

| Specified Campus | University System | Legal Entity |
|---|---|---|
| Ai Atlanta | Ai University System | DC Art Institute of Atlanta, LLC |
| Ai Virginia Beach | Ai University System | DC Art Institute of Virginia Beach, LLC |
| Ai Tampa | Ai University System | The Art Institute of Tampa, LLC |
| Ai Miami | Ai University System | DC Miami International University of Art & Design, LLC |
| Ai Dallas | Ai University System | DC Art Institute of Dallas, LLC |
| Ai Houston | Ai University System | The Art Institute of Houston, LLC |
| Ai San Antonio | Ai University System | DC Art Institute of San Antonio, LLC |
| Ai Austin | Ai University System | DC Art Institute of Austin, LLC |
| N/A | Ai University System | AiH Restaurant, LLC |
| N/A | Ai University System | DC AiD Restaurant, LLC |
| N/A | Ai University System | AiTampa Restaurant, LLC |
| South University - Savannah | South University | South University Savannah, LLC |
| South University - Montgomery | South University | South University of Alabama, LLC |
| South University - Tampa | South University | DC South University Florida, LLC |
| South University - West Palm Beach | South University | DC South University Florida, LLC |
| South University - Austin | South University | DC South Education - Texas, LLC |
| South University - Richmond | South University | DC South University of Virginia, LLC |
| South University - Virginia Beach | South University | DC South University of Virginia, LLC |
| South University - Columbia | South University | South University of Carolina, LLC |
| South University - Atlanta (teaching site) | South University | South University Savannah, LLC |

| Specified Campus | University System | Legal Entity |
|---|---|---|
| South University - Orlando (teaching site) | South University | DC South University Florida, LLC |
| N/A | South University | South University Research II LLC |
| South University - Highpoint | South University | DC South University of North Carolina, LLC |

**Excluded Campuses\***

| Excluded Campus | University System | Legal Entity | Transferring Parent |
|---|---|---|---|
| Ai Charleston | Ai University System | DC Art Institute of Charleston, LLC | DC Art Institute of Atlanta, LLC |
| Ai Washington | Ai University System | DC Art Institute of Washington, LLC | DC Art Institute of Atlanta, LLC |
| Ai Nashville | Ai University System | The Art Institute of Tennessee - Nashville, LLC | DC Art Institute of Atlanta, LLC |
| Ai Colorado | Ai University System | The Art Institute of Colorado, LLC | AII |
| Ai Phoenix | Ai University System | DC Art Institute of Phoenix, LLC | AII |
| Ai Portland | Ai University System | The Art Institute of Portland, LLC | AII |
| Ai Pittsburgh | Ai University System | The Art Institute of Pittsburgh, DC, LLC | AII |
| Ai Philadelphia | Ai University System | The Art Institute of Philadelphia, DC, LLC | AII |
| Ai Fort Lauderdale | Ai University System | DC Art Institute of Fort Lauderdale, LLC | AII |
| Ai Illinois | Ai University System | The Illinois Institute of Art, LLC | AII |
| Ai Michigan | Ai University System | The Art Institute of Michigan, LLC | N/A |
| Ai Schaumburg | Ai University System | The Illinois Institute of Art at Schaumburg, LLC | N/A |
| N/A | Ai University System | DC Art Institute of Michigan, | N/A |

ii

| Excluded Campus | University System | Legal Entity | Transferring Parent |
|---|---|---|---|
| | | LLC | |
| Ai Las Vegas | Ai University System | The Art Institute of Las Vegas, LLC | N/A |
| Ai Indianapolis | Ai University System | The Art Institute of Indianapolis, LLC | N/A |
| Ai Charlotte | Ai University System | The DC Art Institute of Charlotte, LLC | DC Miami International University of Art & Design, LLC |
| Ai Raleigh-Durham | Ai University System | The DC Art Institute of Raleigh-Durham, LLC | N/A |
| N/A | Ai University System | AiIN Restaurant, LLC | N/A |
| N/A | Ai University System | AiTN Restaurant, LLC | N/A |
| Ai Seattle | Ai University System | The Art Institute of Seattle, LLC | The Arts Institute International, LLC |
| South University - Novi | South University | South University of Michigan, LLC | South University Savannah, LLC |
| N/A | South University | DC South Michigan | South |
| South University - Cleveland | South University | South University of Ohio, LLC | South University Savannah, LLC |
| The Art Institute of California - Hollywood, a campus of Argosy University | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| The Art Institute of California - Inland Empire, a campus of Argosy University | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| The Art Institute of California - Orange County, a campus of Argosy University | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| The Art Institute of California - Sacramento, a campus of Argosy University | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| The Art Institute of California - San Diego, a campus of Argosy University | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| The Art Institute of California - San | Argosy | Argosy Education Group, | Argosy Education Group, |

| Excluded Campus | University System | Legal Entity | Transferring Parent |
|---|---|---|---|
| Francisco, a campus of Argosy University | | LLC | LLC |
| Argosy University, Atlanta | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Chicago | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Dallas | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Denver | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Hawaii | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Inland Empire | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Los Angeles | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Nashville | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Northern Virginia | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Orange County | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Phoenix | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Salt Lake City | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, San Diego | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, San Francisco Bay Area | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Sarasota | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Schaumburg | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Seattle | Argosy | Argosy Education Group, | Argosy Education Group, |

| Excluded Campus | University System | Legal Entity | Transferring Parent |
|---|---|---|---|
| | | LLC | LLC |
| Argosy University, Tampa | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Argosy University, Twin Cities | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |
| Western State College of Law at Argosy University | Argosy | Argosy Education Group, LLC | Argosy Education Group, LLC |

*Orange shading denotes the legal entity which much be transferred, or who may sell assets, to remove the Excluded Campus and if applicable, its Subsidiaries from the University System and such legal entities is herein referred to as "Excluded Parent".

**ANNEX 2**
**DEFINED TERMS**

For all purposes of this Agreement, the following terms shall have the following respective meanings:

"Account Control Agreement" means any control agreement entered into among any depository institution at which any Dream Party maintains an account with respect to a Specified Campus, including any Deposit Account (as such term is defined in the UCC with such additions to such term as may hereafter be made) or the securities intermediary or commodity intermediary at which any Dream Party maintains a Securities Account (as such term is defined in the UCC with such additions to such term as may hereafter be made) or a Commodity Account (as such term is defined in the UCC with such additions to such term as may hereafter be made), such Dream Party, and Studio, pursuant to which Studio obtains control (within the meaning of the UCC) over such Account.

"Accrediting Body" means any non-governmental entity, including institutional and specialized accrediting agencies, which engage in the granting or withholding of accreditation of postsecondary educational institutions or programs in accordance with standards relating to the performance, operations, financial condition or academic standards of such institutions, including the Southern Association of Colleges and Schools, the Northwest Commission on Colleges and Universities, WASC Senior Commission of Colleges and Schools, and the Accrediting Council of Independent Colleges and Schools.

"Acquired Campus" means, as applicable, each Initial Non-Core Closing Campus and Subsequent Non-Core Campus Closing which Studio determines, in its sole discretion, will be acquired by Studio or its Affiliates in accordance with the terms of this Agreement and the applicable Asset Purchase Agreement or the EAPA (or equivalent agreement).

"Acquisition Proposal" means any offer or proposal (other than an offer or proposal by Studio or any of its Affiliates) to directly or indirectly engage in an any transaction or series of related transactions (other than the transactions contemplated by this Agreement) involving any sale of assets, services agreements or any Change of Control involving the Specified Campuses or their assets, properties, employees or students or that would frustrate or prevent the consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

"AEG" has the meaning set forth in the preamble.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with such other Person; *provided* that unless otherwise specified the term "Affiliate" shall refer only to those Persons that are Affiliates of a Person as of the date of determination thereof (it being understood and agreed that following the Change of Control with respect to the University Systems that is contemplated to occur as of the date of the Agreement pursuant to the EAPA, such University Systems shall no longer be Affiliates of DCEH and its Affiliates); *provided* further that notwithstanding the foregoing, for the purposes of ARTICLE II, each University System shall be deemed an Affiliate of DCEH. For purposes of the immediately preceding sentence, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or

otherwise.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Ai Online</u>" means the online division of Ai Pittsburgh.

"<u>Ai Pittsburgh</u>" means The Art Institute of Pittsburgh, DC, LLC, a Pennsylvania not-for-profit limited liability company.

"<u>Ai Receivable Assignor</u>" has the meaning set forth in <u>Section 4.33</u>.

"<u>AII</u>" has the meaning set forth in the preamble.

"<u>Approved Course</u>" means any course currently offered at an Acquired Campus with available space after all non-tuition-assistance-eligible students have been seated; *provided* that the Acquired Campus has the option of limiting the total number of courses an employee, student or Program Participant may take per term or per year based on workload, budget considerations or other reasons; and *provided further* that such employee, student or Program Participant meets all academic requirements and other requirements for such course.

"<u>Argosy Ai Campuses</u>" has the meaning set forth in <u>Section 4.28(e)</u>.

"<u>Argosy University</u>" means the campuses operated by AEG and Argosy and its, direct and indirect, wholly owned Subsidiaries.

"<u>Argosy</u>" has the meaning set forth in the preamble.

"<u>Art Grant</u>" means the existing tuition grants that Dream Parties offer to students for Approved Courses which can average up to 20% of the total tuition amount for bachelor's degree programs and up to 15% for associate's degree programs.

"<u>Asset Purchase Agreement</u>" has the meaning set forth in <u>Recital C.1</u>.

"<u>Assigned Receivables</u>" has the meaning set forth in <u>Section 4.33</u>.

"<u>Assumed Lease Obligations</u>" has the meaning set forth in <u>Recital C.2</u>.

"<u>Bank Account</u>" means each bank, depository, checking, investment or other account in which revenue attributable to the Specified Campuses is kept or from which liabilities of the Specified Campuses are paid, including G5 accounts of the Specified Campuses, any Collateral Account or any safe deposit box.

"<u>Bankruptcy</u>" means, with respect to any Person, if (a) such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, Law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (b)(i) 120 days after the

commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, Law or regulation, the proceeding has not been dismissed, or (ii) within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

"Board Committee" means, with respect to any Person, any committee of the Board or any committee to which the Board has delegated authority.  For the avoidance of doubt, the Ai Coordinating Council is a Board Committee of the Board of DCEH.

"Board" means, with respect to any Person, the board of trustees, board of managers, board of directors or similar governing body of such Person.

"Bundled Services Agreement" means the Master Bundled Services Agreement, dated December 22, 2018, by and among Studio, certain of its Subsidiaries and the certain members of the Ai University System party thereto.

"Business" means the business of the Specified Campuses, as it is conducted it may be determined to be conducted the future.

"Business Data" means all data or information, in any format, collected, generated, or used in the conduct of the Business or necessary for the conduct of the Business, including all financial data related to the Business and all student data contained in any databases that are used in or necessary for the conduct of the Business.

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions located in New York, New York and Los Angeles, California are permitted or required by Law, executive order or governmental decree to remain closed.

"Business Employees" has the meaning set forth in Section 2.14(a).

"Change of Control" means any of the following: (a) a "change of control", "change in control" or words of similar import as defined or determined by any Educational Agency; (b) changes to the Board of a Person or its Affiliates that result in a change to 25% or more of the voting members of the Board of a Person or its Affiliates in any rolling, 12-month period; (c) a change in the number of voting members of the Board of any Person or its Affiliates in any rolling, 12-month period that will allow a group of directors to exercise control who could not exercise control before the change; (d) a transaction pursuant to which an unaffiliated third-party becomes the "beneficial owner", directly or indirectly, of securities of another Person representing 50% or more of the voting power of such Person's then outstanding securities; (e) a transaction effected as a consolidation, share exchange, reorganization or merger of a Person that results in the equityholders of such Person immediately prior to such event not owning at least a majority of the voting power of the resulting entity's securities outstanding immediately following such event; (f) a sale, license, lease or other disposition of a material portion of a Person's assets; (g) a liquidation, dissolution or other winding up of such Person or any of its Subsidiaries; or (h) a transfer of assets that comprises a substantial portion of the educational business of a Title IV eligible institution, except where the transfer consists exclusively in the granting of a security interest in those assets.

"Change" has the meaning set forth in the definition of "DCEH Material Adverse Effect."

"Closing Consideration" has the meaning set forth in Section 1.7(f).

"Closing Date" means any of the Initial Non-Core Closing Date, any Subsequent Non-Core Closing Date, or any Final Core Closing Date.

"Closing Transactions" has the meaning set forth in Section 1.8.

"Closing" means any of the Initial Non-Core Closing, any Subsequent Non-Core Closing, or any Final Core Closing.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, and any similar state Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral Account" means any foreign or domestic Deposit Account (as such term is defined in the UCC with such additions to such term as may hereafter be made), Securities Account (as such term is defined in the UCC with such additions to such term as may hereafter be made), or Commodity Account (as such term is defined in the UCC with such additions to such term as may hereafter be made).

"Collateral" means all of the following (other than Excluded Property): all assets of or with respect to the Ai University System, including both Specified Campuses and Excluded Campuses and all assets of or with respect to the Argosy Ai Campuses, including the Non-Core Assets, the Core Assets, the Leases, the Bank Accounts, the Company Intellectual Property. For the avoidance of doubt, Collateral includes the following types of assets included therein (capitalized terms used in this definition and not defined herein have the meanings given to them in the UCC): (i) Accounts; (ii) Chattel Paper; (iii) Commercial Tort Claims; (iv) Deposit Accounts; (v) Documents; (vi) General Intangibles; (vii) Goods (including Goods held on consignment with third parties); (viii) Instruments; (ix) Investment Property; (x) Letter-of-Credit Rights and Letters of Credit; (xi) Supporting Obligations; (xii) all books, records, writings, databases, information and other property relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the foregoing; (xiii) all Proceeds of any of the foregoing and, to the extent not otherwise included, (x) all payments under insurance (whether or not Studio is the loss payee thereof) in respect of Collateral and (y) all tort claims; and (xiv) all other property and rights of every kind and description and interests therein.

"Company Intellectual Property" means any and all Intellectual Property Rights owned or purported to be owned by DCEH or any of its Subsidiaries that are either (a) used or held for possible use by any of the Specified Campuses or (b) owned by a Dream Party set forth on Schedule 1.4.

"Company Material Contracts" means any Contract which is or is required to be disclosed on the disclosure schedules to any Asset Purchase Agreement, including the Ai Asset Purchase Agreement.

"Competitive Program" means all (a) existing programs currently conducted by the Dream Parties at any of their respective campuses, and (b) existing programs currently conducted by Studio and any of its Affiliates programs at any of their respective campuses.

"Compliance Date" means October 17, 2017.

iv

"Compliance Review" means (a) any audit, program review, or investigation, conducted by any Educational Agency with respect to any Specified Campus' compliance with Educational Laws, (b) any site visit or guaranty agency review conducted by any Educational Agency with respect to any Specified Campus' compliance with Educational Laws which resulted in material findings, or (c) any independent auditor review of any Institution's compliance with the statutory, regulatory or other requirements of the Title IV Programs.

"Concentration Account" means the East West Bank account number 8003115105 or any other account designated by Studio.

"Confidential Information" means any information concerning the businesses and affairs of the Specified Campuses or the Business that is not already generally available to the public; provided that Confidential Information shall also include the terms and conditions of this Agreement and the transactions contemplated hereby.

"Conflict" has the meaning set forth in Section 2.5.

"Contract" means any written or oral contract, subcontract, note, bond, mortgage, indenture, lease, sublease, license, sublicense, undertaking or other legally binding agreement.

"Core Assets" has the meaning set forth in the Asset Purchase Agreement set forth on EXHIBIT B.

"Core Assumed Liabilities" has the meaning set forth in the Asset Purchase Agreement set forth on EXHIBIT B.

"Core Services" means, with respect to any Specified Campus for which a Statement of Work has been executed and delivered by each party thereto, the "Core Services" as defined in the Managed Services Agreement.

"Curricular Know-How" has the meaning set forth in the License Agreement.

"Curricular Materials" has the meaning set forth in the License Agreement.

"DCEH" has the meaning set forth in the preamble.

"DCEH Credit Agreement" means that certain Senior Secured Credit and Guaranty Agreement, dated as of October 17, 2017, by and among DCEH, Ai, South, Argosy, DCEM and The Dream Center Foundation, certain Subsidiaries of the borrowers thereunder, the various lenders party thereto from time to time and U.S. Bank National Association as administrative agent and collateral agent thereunder with respect to a senior secured credit facility in the aggregate principal amount of $55,000,000.

"DCEH Material Adverse Effect" means any and all changes, effects, events, circumstances, conditions, developments (each a "Change", and collectively, "Changes"), that individually or in the aggregate taken together with all other Changes has had or would reasonably be expected to have a material adverse effect on the business, operations, financial condition, assets or results of operations of DCEH and its Subsidiaries, taken as a whole, or to prevent or materially delay the transactions contemplated hereby, including any Initial Non-Core Closing, any Subsequent Non-Core Closing or any Final Core Closing; provided, however, that no Change (by itself or when aggregated or taken together with any and all other Changes) directly or indirectly resulting from, attributable to or arising out of any

of the following shall be deemed to be or constitute a "DCEH Material Adverse Effect," and no Change (by itself or when aggregated or taken together with any and all other such Changes) directly or indirectly resulting from, attributable to or arising out of any of the following shall be taken into account when determining whether a "DCEH Material Adverse Effect" has occurred or may, would or could occur:

(i)     general economic conditions (or changes in such conditions) in the United States or any other country or region in the world, or conditions in the global economy generally;

(ii)     conditions (or changes in such conditions) in the securities markets, capital markets, credit markets, currency markets or other financial markets in the United States or any other country or region in the world, including (A) changes in interest rates in the United States or any other country or region in the world and changes in exchange rates for the currencies of any countries and (B) any suspension of trading in securities (whether equity, debt, derivative or hybrid securities) generally on any securities exchange or over-the-counter market operating in the United States or any other country or region in the world;

(iii)     conditions (or changes in such conditions) in the industries in which DCEH and its Subsidiaries conduct business;

(iv)     political conditions (or changes in such conditions) in the United States or any other country or region in the world or acts of war, sabotage or terrorism (including any escalation or general worsening of any such acts of war, sabotage or terrorism) in the United States or any other country or region in the world;

(v)     earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions and other force majeure events in the United States or any other country or region in the world;

(vi)     changes in Law or other legal or regulatory conditions (or the interpretations thereof) or changes in GAAP (or the interpretation thereof);

(vii)     the announcement of this Agreement or the pendency or consummation of the transactions contemplated hereby, including (A) the identity of Studio, (B) the loss or departure of officers or other employees of DCEH or any of its Subsidiaries, (C) the termination or potential termination of (or the failure or potential failure to renew or enter into) any Contracts with customers, suppliers, distributors or other business partners, and (D) any other negative development (or potential negative development) in DCEH's relationships with any of its customers, suppliers, distributors or other business partners; and

(viii)     any failure by DCEH to meet any internal budgets, plans or forecasts of its revenues, earnings or other financial performance or results of operations, in and of itself (but not, in each case, the underlying cause of such changes or failures, unless such changes or failures would otherwise be excepted from this definition).

Notwithstanding anything herein to the contrary, no Change or Changes described in clauses (i) through (vi) of this definition shall be disregarded to the extent such Change or Changes had a material disproportionate effect on DCEH or its Subsidiaries relative to other companies in the same industry.

"DCEM" has the meaning set forth in Recital A.

"Disclosure Schedule" has the meaning set forth in preamble to ARTICLE II.

"DOE Affiliate" has the meaning ascribed to "affiliate" in 34 C.F.R. §85.905.

"DOE" means the United States Department of Education and any successor agency administering student financial assistance under Title IV.

"Dream Center Scholarship" has the meaning set forth in Section 4.15(c).

"Dream Computer Systems" has the meaning set forth in Section 2.19(b).

"Dream Employee Scholarship" has the meaning set forth in Section 4.15(a).

"Dream Governing Documents" has the meaning set forth in Section 2.1.

"Dream Intellectual Property Rights" has the meaning set forth in Section 2.19(d).

"Dream Parties" has the meaning set forth in the preamble.

"Dream Privacy Policies" means each external or internal, past or present privacy policy of the Dream Parties or any of their Affiliates, including any policy, procedure, or statement relating to: (a) the privacy of users of any Dream Parties' website, application, or Dream Software; (b) the collection, storage, disclosure, and transfer of any Personal Information; and (c) any employee information.

"Dream Software" means all computer software, websites, or applications (including all source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded and all documentation associated with any of the foregoing) owned or purportedly owned by the Dream Parties, licensed by the Dream Parties from third parties, or otherwise used or held for use in the Business.

"EDMC Credit Agreement" has the meaning set forth in the IFWA.

"Education Management" means collectively Education Management LLC, Education Management II LLC, Education Management Corporation and each of their respective Affiliates and Related Persons.

"Educational Agency" means any entity or organization, whether governmental, government chartered, tribal, private, or quasi-private, that engages in granting or withholding Educational Approvals, administers Financial Assistance Programs to or for students of, or otherwise regulates postsecondary schools or programs, in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such schools and programs, including the DOE and any Accrediting Body or State Educational Agency.

"Educational Approval" means any license, permit, consent, franchise, approval, authorization, certificate, or accreditation issued or required to be issued by an Educational Agency to the Specified Campuses with respect to any aspect of the Specified Campuses operations subject to the oversight of such Educational Agency, including any such approval for any Specified Campus to participate in any Financial Assistance Program, but excluding any such approvals or permits with respect to the activities of recruiters or individual employees or agents of the Specified Campus.

"Educational Consent" means any approval, authorization or consent by any Educational Agency, or any notification to be made by the Parties to an Educational Agency, with regard to the transactions contemplated by this Agreement, whether required to be obtained prior to or after the Closing Date, which is necessary under applicable Laws or regulations in order to maintain or continue any Educational Approval held by any Specified Campus as of the date of this Agreement.

"Educational Law" means any United States federal, state, local or similar statute, Law, ordinance, regulation, rule, Accrediting Standard, code, order or standard, including the provisions of Title IV and any regulations implementing or relating thereto, issued or administered by any Educational Agency or any Financial Assistance Program.

"Educational Loan" means any student loan made, insured, or originated under Title IV.

"EMC Consent Judgement" has the meaning set forth in each Managed Services Agreement.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other employee plan, program, policy, practice, contract, agreement or other arrangement, including, without limitation, any compensation, severance, termination pay, deferred compensation, performance awards, stock or stock-related awards, fringe, retirement, death, disability, welfare or medical benefits or other employee benefits or remuneration of any kind, whether written, unwritten or otherwise, funded or unfunded, whether or not subject to ERISA, that is or has been maintained, contributed to, or required to be contributed to, by any of the Dream Parties or any of their respective Affiliates or with respect to which any of the Dream Parties, any of their respective Affiliates or ERISA Affiliates has or may have any liability or obligation.

"Employee Scholarship" has the meaning set forth in Section 4.15(b).

"ERISA Affiliate" means, with respect to any Person, any other Person under common control with such Person within the meaning of Section 414(b), (c), (m) or (o) of the Code, and the regulations issued thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Campus" means any campus or Subsidiary of a University System determined by Studio in its sole discretion to be an Excluded Campus. As of the date hereof, the Excluded Campuses are as set forth on Annex 1 under the heading "Excluded Campuses"; *provided* that Studio may update such list in its sole discretion; *provided, however,* that no Subsidiary of South as of the Effective Date shall be deemed to be an Excluded Campus without the consent of South.

"Excluded Property" means (i) any Shared IT Systems, Dream Intellectual Property Rights, and/or Dream Computer Systems; (ii) any lease, license, contract or agreement to which any Dream Party is a party, if and to the extent that a security interest therein is prohibited by or in violation of (x) any applicable Law, or (y) a term, provision or condition of any such lease, license, contract or agreement (unless in each case, such applicable Law, term, provision or condition would be rendered ineffective with respect to the creation of such security interest pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the Code (or any successor provision or provisions) of any relevant jurisdiction or any other applicable Law or principles of equity) or would give any other party thereto the right to terminate, accelerate or otherwise alter such Dream Party's rights, titles and interests thereunder (including upon the giving of notice or lapse of time or both); *provided, however,* that the foregoing shall cease to be

viii

treated as "Excluded Property" (and shall constitute Collateral) immediately at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, such security interest shall attach immediately to any portion of such lease, license, contract or agreement not subject to the prohibitions specified in clause (x) or (y) above, (iii) any United States intent-to-use trademark applications for which an amendment to allege use or a statement of use has not been filed and accepted by the Patent and Trademark Office, to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal Law, provided that upon submission to and acceptance by the Patent and Trademark Office of an amendment to allege use or a statement of use pursuant to 15 U.S.C. Section 1051(c) or (d) (or any successor provision), such intent-to-use trademark application shall be considered Collateral; (iv) any equipment of a Dream Party that is subject to a perfected lien that is a Permitted Lien if and for so long as the grant of a security interest therein to Studio in such equipment shall constitute or result in a breach or termination pursuant to the terms of, or a default under, the agreement entered into in connection with such Permitted Lien on such equipment; *provided, however*, that such security interest shall attach immediately at such time as the term in the relevant agreement restricting the attachment of a security interest in such equipment is no longer operative or the attachment of a security interest in such equipment would not constitute or result in a breach or termination pursuant to the terms of, or a default under, such agreement; (v) assets in respect of which pledges and security interests are prohibited by applicable Law; (vi) any Title IV Program funds maintained by any Dream Party in a fiduciary trust capacity prior to such funds being applied to eligible institutional charges for currently enrolled students, or any student accounts receivable pending to be received from Title IV Programs; (vii) all assets of or with respect to South University, (viii) all assets of or with respect to the Argosy University System (other than the Argosy Ai Campuses); and (xi) all accounts receivable of or with respect to the Dream Parties (other than those accounts receivable of or with respect to the Ai University System (including Excluded Campuses and Specified Campuses) and the Argosy Ai Campuses).

"Family Member" means as to any individual, any parent, spouse, child, spouse of a child, brother, sister or other immediate family member of such individual (whether by blood, marriage or adoption), and each trust or other entity created for the benefit of one or more of such Persons and/or the estates of any such Person.

"Federal Receiver Party" means the Federal Receiver or any Representative thereof.

"Federal Receiver" means Dottore Companies, LLC, or any alternative Person validly appointed as receiver in the Receivership.

"Final Core Closing Date" has the meaning set forth in Section 1.3.

"Final Core Closings" has the meaning set forth in Section 1.3.

"Financial Assistance Programs" means each Title IV Program pursuant to which Title IV Program funding has been provided to or on behalf of any Specified Campus' students; and any other government-sponsored or private program of student financial assistance other than the Title IV Programs pursuant to which student financial assistance, grants or loans were provided to or on behalf of any Specified Campus' students and such funds constituted at least 2% of the Specified Campus' tuition and fee revenues during any fiscal year.

"Financial Statements" has the meaning set forth in Section 2.7.

ix

"Foundation" has the meaning set forth in Recital E.

"Foundation Board Nominees" has the meaning set forth in Section 4.11.

"Fundamental Representations" means the representations and warranties set forth in Section 2.1 (Organization of the Dream Parties), Section 2.2 (Capital Structure of DCEH and its Subsidiaries), Section 2.3 (Subsidiaries), Section 2.4 (Authority), Section 2.5 (No Conflict), Section 2.9 (No Changes), Section 2.11 (Educational Compliance and Approvals) and Section 2.13 (Taxes).

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governing Documents" means all legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation include its certificate of incorporation and by-laws, the "Governing Documents" of a limited partnership include its certificate of formation and its limited partnership agreement and the "Governing Documents" of a limited liability company include its certificate of formation and its operating agreement or limited liability company agreement. With respect to any Person organized as a not-for-profit entity under state Law and/or exempt from tax under federal Law, Governing Documents include such Person's conflict of interest policy and other governance policies, its IRS Forms 1023, 8975, 1024, 1024-A, 990-T, 990, 990-EZ, 990-N or 990-PF and any related schedules and any corresponding state tax documents.

"Governmental Authority" means any government, any governmental or regulatory entity or body, department, commission, board, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, and whether local or foreign.

"HEA" means the Higher Education Act of 1965, 20 U.S.C. § 1001 et seq., as amended, or any successor statute thereto.

"Indebtedness" means, with respect to any Person, any of the following, without duplication: (a) any indebtedness of such Person for borrowed money, loans or advances, including any principal and interest, (b) any indebtedness of such Person evidenced by notes, bonds, mortgages, debentures or any other debt instrument or security, (c) any obligations of such Person under any leases which are required to be classified as capitalized leases under GAAP, (d) all obligations in respect of any financial hedging arrangements including any interest rate swap, (e) all obligations or commitments by which a Person assures a creditor against loss (including letters of credit and bankers' acceptances and contingent reimbursement obligations with respect to letters of credit and bankers' acceptances), (f) all indebtedness for earn outs or the deferred purchase price of property or services with respect to which a Person is liable as obligor or otherwise; (g) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (h) any guaranty by such Person of any indebtedness of any other Person of a type described in clauses (a) through (g) above and (i) all interest, fees, prepayment premiums, penalties and other fees and expenses owed with respect to the indebtedness referred to above assuming the repayment in full of such indebtedness as of such time. Notwithstanding the foregoing, Indebtedness shall exclude (i) any trade payables to the extent not past due and other current liabilities not yet past due and arising in the ordinary course of business, (ii) any operating or lease obligations (other than capitalized leases described in clause (c) of this definition), and (iii) any Transaction Expenses.

"Indebtedness Period" has the meaning set forth in the IFWA.

"IFWA" means that certain Interim Framework Agreement dated as of December 26, 2018 by and among Studio, DCEH, DCEM, Dream Center South University, LLC, AEG, Argosy, AII, Candlewood Special Situations Master Fund II, L.P., Flagler Master Fund SPC, LTD, and the other persons set forth on the signature pages thereto, as amended on or about the date hereof.

"Initial Non-Core Closing Campus" has the meaning set forth in Section 1.1.

"Initial Non-Core Closing Date" has the meaning set forth in Section 1.1.

"Initial Non-Core Closing Transactions" has the meaning set forth in Section 1.7.

"Initial Non-Core Closing" has the meaning set forth in Section 1.1.

"Intellectual Property Rights" means any and all of the following in any jurisdiction throughout the world: (i) all inventions (whether or not patentable or reduced to practice), patents, patent applications and patent disclosures as well as any reissues, continuations, continuations-in-part, divisionals, revisions, extensions or reexaminations thereof, (ii) trademarks, service marks, trade dress, trade names, slogans, designs, logos, internet domain names, corporate names and all other indicia of origin (and all translations, adaptations, derivations, and combinations of the foregoing), together with all of the goodwill associated with the foregoing (collectively, "Marks"), (iii) all copyrights and other works of authorship, mask works and moral rights, (iv) registrations, applications and renewals for any of the foregoing (as applicable), (v) computer software (including source code and object code), data, data bases and documentation thereof, and (vi) trade secrets and other confidential information (including ideas, formulas, compositions, inventions, know-how, manufacturing and production and other processes, techniques and methods, research and development information, drawings, specifications, designs, plans, proposals, technical data, business and marketing plans and customer and supplier lists and related information), (vii) all other intellectual property and proprietary rights and (viii) all tangible embodiments of the foregoing (in whatever form or medium).

"Knowledge" means with respect to any Person, the actual knowledge; *provided*, that with respect to the Dream Parties, "Knowledge" shall mean the actual knowledge of Brent Richardson, Randall Barton, John Crowley, Chad Garrett, Denis Yevstifyev, Claude Brown, Chris Richardson, Deb Landesman, Eldon Monday, Melissa Esbinshade, any other member of a Board or Board Committee, the president of each University System and each Specified Campus leader.

"Last Final Core Closing" means, with respect to any University System, the earlier to occur of (a) the first date on which a Final Core Closing has been consummated with respect to all campuses which are or could be Specified Campuses of such University System or (b) in the event that a Final Core Closing has not occurred with regards to all campuses of a University System, it has been determined that any campuses which have not undergone a Final Core Closing will enter into a Teach-Out.

"Law" means any applicable law, statute, treaty, constitution, principle of common law, ordinance, code, rule, regulation, Order or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority, as amended, unless expressly specified otherwise herein.

"Lease Assignment and Assumption Agreements" has the meaning set forth in Section 1.7(c).

"Lease Assumption Conditions" has the meaning set forth in Section 1.7(c).

"liability" means any obligation or liability whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated and whether due or to become due, regardless of when asserted.

"Liens" means any lien, pledge, hypothecation, charge, mortgage, security interest, deed of trust or encumbrance of any nature or of any kind whether voluntarily incurred or arising by operation of law or otherwise.

"Losses" means any loss, liability, action, cause of action, cost, damage or expense, Tax, penalty, or fine, in each case whether or not arising out of third-party claims including interest, penalties, attorneys', consultants' and experts' fees and expenses (including such attorneys', consultants' and experts' fees and expenses incurred in connection the enforcement of a party's rights) and all amounts paid in investigation, defense or settlement of any of the foregoing.

"Managed Services Agreement" has the meaning set forth in Recital C.

"Marks" has the meaning set forth in the definition of "Intellectual Property Rights".

"Most Recent Balance Sheet" has the meaning set forth in Section 2.7.

"Non-Core Assets" has the meaning set forth in the Asset Purchase Agreement set forth on EXHIBIT B.

"Non-Core Assumed Liabilities" has the meaning set forth in the Asset Purchase Agreement set forth on EXHIBIT B.

"Non-Core Closing" means an Initial Non-Core Closing or a Subsequent Non-Core Closing.

"Obligations" has the meaning set forth in Section 4.28.

"Order" means any order, judgment, decision, decree, injunction, pronouncement, ruling, writ or assessment of, by or on behalf of any Governmental Authority (whether temporary, preliminary or permanent) or arbitrator.

"ordinary course" and "ordinary course of business" means, with respect to any Person, in the ordinary, usual and normal course of business consistent with its past custom and practice (including with respect to quantity, quality, frequency, cost and/or pricing).

"Other Dream Parties" has the meaning set forth in the preamble.

"Parties" means Studio and the Dream Parties, and "Party" means any one of them.

"Permit" means any permits, licenses, authorizations, consents, approvals and franchises from Governmental Authorities.

"Permitted Liens" means any of the following: (a) Liens or other defects, imperfections or

irregularities in title, easements, covenants and rights of way and other similar restrictions of record, and zoning, building and other similar codes or restrictions which are imposed by any governmental authority having jurisdiction over such leased real property, in each case that do not adversely affect in any material respect the current use of the applicable property owned, leased, used or held for use by DCEH or any of its Subsidiaries; and (b) statutory, common law or contractual liens of landlords for amounts not yet due and payable or delinquent and that do not otherwise arise as a result of any default under any lease arrangement.

"Person" means an individual, corporation, partnership, association, limited liability company, trust, estate or other similar business entity or organization, including a Governmental Authority.

"Personal Information" means, in addition to any definition provided by the Dream Parties for any similar term (e.g., "personally identifiable information" or "PII") in any Dream Parties' Privacy Policy or other public-facing statement, all information regarding or capable of being associated with an individual person or device, including without limitation (a) information that identifies, could be used to identify or is or can be associated with personally identifiable information, including a person's name; physical address; telephone number; email address; financial account number; payment card number; government-issued identifier (including Social Security number, driver's license number, or passport number); medical, health or insurance information, including protected health information (as defined in the Health Insurance Portability and Accountability Act of 1996, as amended); gender; date of birth; educational or employment information; religion; sexual orientation; political affiliation; and any other data used or intended to be used to identify, contact or precisely locate an individual (e.g., geolocation data), (b) information that is created, maintained, or accessed by an individual (e.g., videos, audio or individual contact information), (c) any data regarding an individual's activities online or on a mobile device or other application (e.g., searches conducted, web pages or content visited or viewed), and (d) Internet Protocol addresses, unique device identifiers, cookies or other persistent identifiers. Personal Information may relate to any individual, including a current, prospective, or former student, customer, teacher, or employee of any person.  Personal Information includes information in any form, including paper, electronic, and other forms.

"Post-Closing Educational Consents" means those Educational Consents identified as such on Schedule 4.7(d).

"PPA" means a program participation agreement issued to a postsecondary educational institution and countersigned or to be countersigned by or on behalf of the secretary of the DOE, evidencing certification of that institution to participate in the Title IV Programs.

"PPPA" means a provisional PPA issued to an Acquired Campus, and countersigned or to be countersigned by or on behalf of the secretary of the DOE, for the purposes of certifying the Acquired Campus to continue its Title IV Program participation following consummation of the transactions contemplated by this Agreement.

"Pre-Acquisition Review Application" means a materially complete electronic application to the DOE with respect to the transactions contemplated hereby, marked for pre-acquisition review, together with any required exhibits or attachments.

"Pre-Acquisition Review Response" means a written notice from the DOE following the DOE's review of a Pre-Acquisition Review Application regarding the transactions contemplated by this Agreement, which shall not indicate the existence of any material impediment to the issuance

of a TPPPA or PPPA to any Acquired Campus extending such Acquired Campus' certification to participate in the Title IV Programs following the Closing; *provided*, that no such material impediment shall be deemed to arise from any of (i) a requirement that Studio and/or any Acquired Campus post one or more letters of credit that in the aggregate do not exceed twenty five percent (25%) of the funds received by the Acquired Campuses under the Title IV Programs for the Acquired Campuses' last completed fiscal year; (ii) the imposition of any growth restrictions regarding the implementation of new or revised academic programs or the addition of new educational locations and/or (iii) a requirement that Studio and/or its Subsidiaries provide a guaranty or assume joint and several liability for any outstanding or future Title IV Program liabilities of any Acquired Campus.

"Pre-Closing Educational Consents" means those Educational Consents identified as such on Schedule 4.7(b).

"Pre-Closing Period" means the period commencing on the date of this Agreement and (a) with respect to South University ending on the date that is 120 days following the execution and delivery of the EAPA with respect to South University and (b) with respect to DCEH, ending on the date which is the later of the date on which DCEH no longer has any obligations under the Technology Services and License Agreement and the date of the Last Final Core Closing and (c) with respect to the Argosy University System and the South University System, the later of the Last Final Core Closing with respect thereto and the date of termination of the Managed Services Agreement with respect thereto.

"Prior Acquisition Agreement" means the agreement or agreements pursuant to which DCEH and its Subsidiaries acquired the assets of Education Management, including the Specified Campuses and each document, instrument and certificate entered into or delivered in connection with such agreement or agreements.

"Privacy Laws" means all international, federal, state, provincial and local Laws, rules, regulations, directives and governmental requirements which govern the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disposal, destruction, disclosure or transfer of Personal Information and all such Laws governing security breach notification, penalties and compliance with orders in connection with any of the foregoing, including, but not limited to, the Children's Online Privacy Protection Act, the California Online Privacy Protection Act, the Video Privacy Protection Act, the EU Data Protection Directive, PCI-DSS, the CAN-SPAM Act and Canada's Anti-Spam Legislation, the Health Insurance Portability and Accountability Act of 1996, as amended, and the EU Cookie Directive.

"Private Educational Loan" means any student loan provided by a lender that is not made, insured or guaranteed under Title IV, or by the institution itself, and is issued expressly for postsecondary educational expenses.

"Proceeding" means any claim, charge, complaint, grievance, inquiry, audit, investigation, action, suit, litigation or proceeding by or before (or could come before) or brought on behalf of any Governmental Authority, Educational Agency or arbitrator.

"Process" or "Processing" means to collect, access, use, process, modify, copy, analyze, disclose, transmit, transfer, sell, rent, host, store, retain, delete or destroy.

"Program Participant" has the meaning set forth in Section 4.15(c).

"Program Participation Agreement" means a Program Participation Agreement issued by the DOE to a Specified Campus, including on a provisional basis.

"Receivership" has the meaning set forth in Section 4.6(a).

"Related Persons" means, with respect to any Person, such Person's (a) direct and indirect equityholders, directors, officers, trustees, managers, and Affiliates; (b) any direct and indirect equityholders, directors, officers, trustees, managers, and controlling Affiliates of the persons set forth in clause (a); and (c) any Family Member of any natural person described in clause (a) or (b).  For the avoidance of doubt, Dream Center Education Management, LLC is a Related Person of DCEH and its Subsidiaries.

"Reorganization Plan" has the meaning set forth in Section 4.10.

"Reorganization" has the meaning set forth in Section 4.10.

"Representative" means, with respect to any Person, any director, officer or employee of such Person, or any financial advisor, accountant, legal counsel, consultant or other authorized agent or representative retained by such Person.

"Restricted Area" has the meaning set forth in Section 4.9(b).

"Restricted Period" has the meaning set forth in Section 4.9(b).

"Retained Liabilities" has the meaning set forth in the EAPA.

"Scholarship Limit" has the meaning set forth in Section 4.15(a).

"Second Lien Guaranty" has the meaning set forth in the IFWA.

"Security Incidents" means (i) any unauthorized access, acquisition, interruption, alteration or modification, disclosure, loss, theft, corruption or other unauthorized Processing of Personal Information, (ii) inadvertent, unauthorized, and/or unlawful sale, disclosure, or rental of Personal Information, or (iii) any other unauthorized access to, acquisition of, interruption of, alteration or modification of, loss of, theft of, corruption of, or use of the Dream Computer Systems.

"Shared IT Services" has the meaning set forth in the Transition Services and License Agreement.

"Shared IT System Access Rights" has the meaning set forth in Section 2.19(b).

"Shared IT Systems" has the meaning set forth in the Transition Services and License Agreement.

"South Credit Agreement" means that certain $25,000,000 Senior Secured Credit and Guaranty Agreement, dated on or about the date hereof, by and among South, certain Subsidiaries of South, the South Lenders and U.S. Bank National Association as collateral agent thereunder.

"South Indebtedness Period" means with respect to the period beginning on the date hereof and ending on the date when no payment obligations (other than contingent reimbursement and indemnification obligations) remain outstanding in respect of the aggregate principle amount as of the

date hereof under the South Credit Agreement.

"South Lenders" means the lenders party to the South Credit Agreement from time to time.

"South MSA" means the Managed Services Agreement to which South is a party.

"South University" means the campuses operated by Dream Center South University, LLC, an Arizona not-for-profit limited liability company, and its, direct and indirect, wholly owned Subsidiaries.

"Specified Campuses" means each campus or other Subsidiary of South, Argosy and AII, other than an Excluded Campus; *provided* that the Specified Campuses set forth on Annex A, which may be amended by Studio in its sole discretion, are the Specified Campuses as of the date hereof.

"State Educational Agency" means any state or local educational licensing body that provides a license or authorization necessary for an Specified Campus or any campus, branch, additional location or other facility thereof to provide postsecondary education in that state, or which administers Financial Assistance Programs in that state, including the California Bureau for Private Postsecondary Education (or any predecessor agency thereto) and the California Student Aid Commission.

"Statement of Work" has the meaning set forth in each Managed Services Agreement.

"Studio Employee Scholarship" has the meaning set forth in Section 4.15(b).

"Studio Indemnified Parties" has the meaning set forth in Section 6.2.

"Studio Offeree" has the meaning set forth in Section 4.12.

"Studio" has the meaning set forth in the preamble.

"Subject Subsequent Non-Core Closing Campus(es)" has the meaning set forth in Section 1.2.

"Sublease" has the meaning set forth in Recital C.2.

"Subsequent Non-Core Closing Campus" has the meaning set forth in Section 1.1.

"Subsequent Non-Core Closing Date" has the meaning set forth in Section 1.2.

"Subsequent Non-Core Closing Transactions" has the meaning set forth in Section 1.8.

"Subsequent Non-Core Closings" has the meaning set forth in Section 1.2.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (a) such Person or any other subsidiary of such Person is a general partner (excluding such partnerships where such Person or any subsidiary of such Person does not have a majority of the voting interest in such partnership) or (b) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries; *provided*, that with respect to the Dream Parties, for the purposes of ARTICLE II (other than Section 2.8), no Person shall be deemed a Subsidiary of a Dream Party other than a Person who has since the Compliance Date (i) directly or indirectly owned or

controlled a Specified Campus or assets which are used by a Specified Campus, (ii) employed any employee which provides services to a Specified Campus or sponsored Employee Benefit Plan or (iii) has any liability for which a Dream Party could be liable; *provided, further*, that unless otherwise specified the term "Subsidiary" shall refer only to those Persons that are Subsidiaries of a Person as of the date of determination thereof (it being understood and agreed that following the the Change of Control with respect to the University Systems that is contemplated to occur as of the date of the Agreement pursuant to the EAPA, such University Systems shall no longer be Subsidiaries of DCEH and its Affiliates); *provided* further that notwithstanding the foregoing, for the purposes of ARTICLE II, each University System shall be deemed a Subsidiary of DCEH.

"Substantial Control" means the term "substantial control" as that term is defined in 34 C.F.R. §668.174(c)(3).

"Tax Returns" means any return, information report or filing with respect to Taxes, including any schedules attached thereto and including any amendment thereof.

"Tax" or, collectively, "Taxes" means any and all federal, state, local and foreign taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, capital stock, license, registration, withholding, payroll, recapture, employment, unemployment, escheat, environmental, windfall profit, excise, property, alternative or add-on minimum taxes as well as public imposts, fees and social security charges (including but not limited to health, unemployment and pension insurance), together with all interest, penalties and additions imposed with respect to such amounts, and any penalties for any failure to file, or timely or properly file, any Tax Return.

"Teach-Out Tuition Discount" means the existing Teach-Out commitments made by any Dream Party prior to the date hereof and disclosed to Studio to students to provide a 50% scholarship tuition discount in connection with their transfer from a closing Affiliate institution of the Dream Parties to an Acquired Campus regardless of whether such transfer occurs prior to or after the Core Closing.

"Teach-Out" means the continuing provision of academic services to students following the announcement of a campus closure until such students can graduate/complete their program of study or transfer to a comparable academic program through an affiliated or unrelated institution.

"Technology" means any or all of the following, but not the patent, trademark, copyright, trade secret or other similar intellectual property rights therein or associated therewith: (i) published and unpublished works of authorship, including audiovisual works, collective works, computer programs, software, source code, object code, compilations, databases, derivative works, literary works, maskworks, and sound recordings; (ii) inventions and discoveries, including articles of manufacture, business methods, compositions of matter, improvements, machines, methods, and processes and new uses for any of the preceding items; (iii) words, names, symbols, devices, designs, and other designations, and combinations of the preceding items, used to identify or distinguish a business, good, group, product, or service or to indicate a form of certification, including logos, product designs, and product features; and (iv) information that is not generally known or readily ascertainable through proper means, whether tangible or intangible, including algorithms, customer lists, ideas, designs, formulas, know-how, methods, processes, programs, prototypes, systems, and techniques.

"Title IV Programs" means the programs of federal student financial assistance administered

pursuant to Title IV.

"Title IV" means Title IV of the HEA.

"TPPPA" means a temporary provisional PPA issued to the Acquired Campus after Closing, and countersigned or to be countersigned by or on behalf of the Secretary of the DOE, for the purposes continuing the certification of the Acquired Campus to participate in the Title IV Programs on an interim basis following the Final Core Closing.

"Transaction Documents" means (a) this Agreement, (b) any Asset Purchase Agreement (including the Ai Asset Purchase Agreement), (c) any Managed Services Agreement, (d) the Lease Assignment and Assumption Agreements, if any, (e) the Subleases, if any, (f) the License Agreement, (g) the Resignation and Release Letter, (h) the IP Assignment, (i) the IFWA, (j) the Transition Services and License Agreement, (k) [reserved], (l) the EAPA, (m) the uncertificated equity interest powers delivered pursuant to this agreement, the EAPA or any other agreement contemplated by this Agreement, (n) each bill of sale and assignment and assumption agreement executed and delivered pursuant to this Agreement, the EAPA, the Ai Asset Purchase Agreement or any other Transaction Document, (o) the Restrictive Covenant Agreement, and (p) the documents, instruments and certificates entered into or delivered by any Party in connection with any of the foregoing items (a) through (o).

"Transaction Expenses" means, to the extent unpaid as of immediately prior to any Closing, the sum of the fees, costs and expenses incurred by the Dream Parties in connection with the process for the transactions contemplated hereby payable to any Person, including any fees, costs and expenses payable to (i) legal counsel to the Dream Parties in connection with the transactions contemplated hereby and (ii) any outside accountants or other advisors engaged by the Dream Parties in connection with the transactions contemplated hereby.

"Transfer Taxes" has the meaning set forth in Section 4.23.

"Transferred Employee" has the meaning set forth in Section 4.12.

"Transition Services and License Agreement" has the meaning set forth in Recital C.3.

"Transition Services" means, with respect to any Specified Campus, the "Services" as defined in the Transition Services and License Agreement.

"UCC" means the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of New York; *provided*, that, to the extent that the Code is used to define any term herein or in any Transaction Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; *provided further*, that in the event that, by reason of mandatory provisions of Law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Studio's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"United States" means the United States of America.

"University Systems" means South University, the Argosy University System and the Ai

University System.

"WARN Act" means the Worker Adjustment Retraining and Notification Act of 1988, as amended, and any similar state or local Law.

## EXHIBIT A
## Form of Managed Services Agreement

## EXHIBIT B
### Form of Asset Purchase Agreement

**EXHIBIT C**
**Form of Sublease Agreement**

**EXHIBIT D**
**Form of IP Assignment**

**EXHIBIT E**
**Form of Restrictive Covenant Agreement**

## EXHIBIT F
## Form of License Agreement

<u>**EXHIBIT G**</u>
<u>**Form of Transition Services and License Agreement**</u>

**EXHIBIT H**
**Form of Uncertificated Equity Interest Powers**

**UNCERTIFICATED EQUITY INTEREST POWER**

**FOR VALUE RECEIVED**, the undersigned, DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona not-for-profit limited liability company ("Transferor"), does hereby sell, assign and transfer to _____(name of transferee), a _____ (state of transferee) not-for-profit _____ (entity type of transferee) ("Transferee") all of its Equity Interests (as hereinafter defined) of [DREAM CENTER SOUTH UNIVERSITY, LLC, an Arizona not-for-profit limited liability company][DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC, a California not-for-profit limited liability company][THE ARTS INSTITUTES INTERNATIONAL, LLC, an Arizona not-for-profit limited liability company] ("Issuer"), standing in the name of Transferor on the books of said Issuer (the "Transferred Interest"). Transferor does hereby irrevocably constitute and appoint Transferee, as attorney, to transfer the Equity Interest in said Issuer with full power of substitution in the premises. Transferor represents and warrants to Transferee the following: (a) the Transferred Interest represented hereby represents 100% of the issued and outstanding Equity Interest of the Issuer, (b) the Transferred Interest is uncertificated and (c) Transferor has good, valid, and marketable title to the Transferred Interests, free and clear of all liens, pledges, hypothecation, mortgage, deed of trust security interest, rights of first offer or refusal, preemptive rights or other similar encumbrances (whether voluntarily incurred or arising by operation of law or otherwise), and is the record and beneficial owners thereof. The term "Equity Interest" means any security, share, unit, partnership interest, membership interest, ownership interest, equity interest, option, warrant, participation, "equity security" (as such term is defined in Rule 3(a)11-1 of the General Rules and Regulations of the Securities Exchange Act of 1934, as amended, or any similar statute then in effect, promulgated by the Securities and Exchange Commission and any successor thereto) or analogous interest (regardless of how designated) of or in a corporation, partnership, limited partnership, limited liability company, limited liability partnership, business trust or other entity, of whatever nature, type, series or class, whether voting or nonvoting, certificated or uncertificated, common or preferred, and all rights and privileges incident thereto.

Dated: _____          **TRANSFEROR:**

                                          **DREAM CENTER EDUCATION HOLDINGS, LLC**

                                          By: _____
                                          Name: _____
                                          Its: _____

**EXHIBIT I**
**Form of Resignation and Release Agreement**

**EXHIBIT J**
**Form of Bill of Sale, Assignment and Assumption Agreement**

## Schedule A-3
## Parties to Restrictive Covenant Agreements

Brent Richardson
Randall Barton
John Crowley
Chad Garrett
Denis Yevstifyev
Claude Brown
Chris Richardson

## Schedule 1.7(f)
## Closing Consideration

One dollar ($1.00) per Specified Campus.

**Schedule 4.1(a)**
**Ordinary Course Exceptions – Relationships**

None.

**Schedule 4.1(b)**
**Ordinary Course Exceptions – Operations**

None.

### Schedule 4.7(b)
### Pre-Closing Educational Consents

Prior to the execution and delivery of any Statement of Work to each Managed Services Agreement and/or Non-Core Closing, evidence that the following conditions have been met, and/or consents have been provided to Studio:

1. For each Specified Campus, verification of submission of an overview of the Framework Agreement, Managed Services Agreement, and Master Asset Purchase Agreement to the Department of Education and applicable Accrediting Bodies for their review, and none of the DOE or the applicable Accrediting Bodies has indicated that the Non-Core Closings and performance of services under the Managed Services Agreements will violate any Educational Agency statute, regulation or standard, nor will the proposed structure trigger a change of ownership or control for which Educational Approval would be required.

2. For each Specified Campus, written evidence that DCEH has notified the DOE regarding the Receivership filing and DOE has responded indicating that the Receivership (a) will not create a change of ownership/control under applicable Education Law; (b) will not cause DOE to place the Specified Campus on Heightened Cash Monitoring Level 2 (HCM2) or other cash restriction beyond that to which DCEH and the Specified Campus are subject as of December 5, 2018; (c) will not trigger a requirement that DCEH or the Specified Campus post an additional Letter of Credit to the DOE; (d) will not cause DOE to initiate an emergency action, or an action to limit, suspend or terminate DCEH's or the Specified Campus participation in the Federal Student Aid program; and (e) will not cause DOE to take any action that would create a material adverse effect on the operation of the Specified Campus.

3. For each Specified Campus, written evidence that DCEH has notified its institutional Accrediting Body regarding the Receivership filing and the corresponding Accrediting Body (a) has indicated that the Receivership will not create a substantive or structural change, including a change of ownership or control, for which prior approval is necessary; (b) has not indicated an intent to, or initiated an action to, place the institution on Show Cause, Probation, or to otherwise taken action to suspend or terminate accreditation of the Specified Campus; and (c) have not indicated an intent to, or taken any action that would create a material adverse effect on the operation of the Specified Campus.

4. For each Specified Campus, written evidence that DCEH has notified each Specified Campus's applicable state Educational Agency regarding the Receivership filing and the corresponding Agency(s) (a) has indicated that the Receivership will not create a substantive or structural change, including a change of ownership or control, for which prior approval is necessary; and (b) has not indicated an intent to take any negative action that would create a material adverse effect on the operation of the Specified Campus.

5. For Art Institute - Las Vegas only, Educational Agency approval for redesignation of

the Las Vegas branch campus/additional location as the main campus prior to the closure of the Art Institute - Phoenix campus on December 18, 2018 in accordance with the Reorganization Plan.

<u>Prior to any Core Closing, all Specified Campuses must receive</u>:

1. An acceptable response, in Studio's sole discretion, from the DOE to the Pre-Acquisition Review application(s).

2. DOE approval of Dream Center Educational Holdings, LLC's (DCEH) pending application for a Change of Ownership and conversion to Non-Profit status.

3. Educational Agency approval of DCEH's Reorganization Plan, including a Studio-acceptable realignment of Specified Campus main/additional location/branch designations.

4. The following educational consents, notices, approvals and/or waivers:

| **Specified Campus** | **OPEID** | **Educational Agency - State** | **Accrediting Body - Institutional** | **Accrediting Body - Programmatic** | **Educational Agency - Other** |
|---|---|---|---|---|---|
| The Art Institute of California—Hollywood, a campus of Argosy University | 021799 - 38 | | Current accreditor: Western States Commission on Universities and Colleges (WSCUC)<br><br>(Approval of applicable post-Reorganization Accrediting Body (Southern Association of Colleges and Schools (SACS) or Northwest Commission on Colleges and Universities (NWCCU)) | American Culinary Federation (ACF) (Approval) | U.S. Department of Homeland Security, U.S. Immigration, Customs & Enforcement (DHS/ICE) (Approval) |

| Specified Campus | OPEID | Educational Agency - State | Accrediting Body - Institutional | Accrediting Body - Programmatic | Educational Agency - Other |
|---|---|---|---|---|---|
| The Art Institute of California—San Diego, a campus of Argosy University | 021799 - 47 | | Current accreditor: WSCUC<br><br>(Approval of applicable post-Reorganization Accrediting Body SACS or NWCCU) | ACF (Approval) | DHS/ICE (Approval) |
| Miami International University of Art & Design | 008878 | Florida Commission for Independent Education (CIE) (Approval) | SACS (Approval) | ACF (Approval) | DHS/ICE (Approval)<br><br>Florida Department of Education Effective Access to Student Education (EASE) (Approval)<br><br>Florida Department of Education – Office of Student Financial Assistance (FL- OSFA) (Notification) |
| The Art Institute of Tampa, a branch of Miami International University of Art & Design | 008878 - 05 | CIE (Approval) | SACS (Approval) | ACF (Approval) | DHS/ICE (Approval)<br><br>EASE (Approval)<br><br>FL-OSFA (Notification) |

| Specified Campus | OPEID | Educational Agency - State | Accrediting Body - Institutional | Accrediting Body - Programmatic | Educational Agency - Other |
|---|---|---|---|---|---|
| The Art Institute of Dallas, a branch of Miami International University of Art & Design | 008878 - 07 | Texas Higher Education Coordinating Board (THECB) (Approval) Texas Workforce Commission (TWC) (Notification and, if required, Approval) | SACS (Approval) | ACF (Approval) | DHS/ICE (Approval) |
| The Art Institute of Atlanta | 009270 | Georgia Nonpublic Postsecondary Education Commission (GNPEC) (Application submitted) | SACS (Approval) | ACF (Approval) | DHS/ICE (Approval) |
| The Art Institute of Virginia Beach, a branch of The Art Institute of Atlanta | 009270 - 07 | Virginia State Council of Higher Education (SCHEV) (Approval) | SACS (Approval) | ACF (Approval) | DHS/ICE (Approval) Virginia Department of Veterans Services (Notification, and if required, Approval) |
| The Art Institute of Houston | 021171 | THECB (Approval) TWC (Notification and, if required, Approval) | SACS (Approval) | ACF (Approval) | DHS/ICE (Approval) |

| Specified Campus | OPEID | Educational Agency - State | Accrediting Body - Institutional | Accrediting Body - Programmatic | Educational Agency - Other |
|---|---|---|---|---|---|
| The Art Institute of Austin, a branch of The Art Institute of Houston | 021171 - 02 | THECB (Approval) TWC (Notification and, if required, Approval) | SACS (Approval) | | DHS/ICE (Approval) |
| The Art Institute of San Antonio, a branch of The Art Institute of Houston | 021171 - 04 | THECB (Approval) TWC (Notification and, if required, Approval) | SACS (Approval) | ACF (Approval) | DHS/ICE (Approval) |
| The Art Institute of Las Vegas, a branch of The Art Institute of Phoenix | 040513 - 03 | | Accrediting Council of Independent Colleges and Schools (ACICS) (Approval of Change of Ownership Part I application) | ACF (Approval) | DHS/ICE (Approval) |

| Specified Campus | OPEID | Educational Agency - State | Accrediting Body - Institutional | Accrediting Body - Programmatic | Educational Agency - Other |
|---|---|---|---|---|---|
| The Art Institute of Seattle | 022913 | Washington Student Achievement Council (WSAC) (Approval) | NWCCU (Approval) | ACF (Approval) | DHS/ICE (Approval)<br><br>Washington Student Achievement Council – State Approving Agency for Veterans Education and Training (Approval)<br><br>Washington Workforce Training & Education Board (Application) |

## <u>Schedule 4.7(d)</u>
## <u>Post-Closing Educational Consents</u>

For Core Closings, the following post-closing educational consents area required:

1. DOE Approval of Change of Ownership, including issuance of TPPPA/PPPA (all campuses).

2. The following educational consents, notices, approvals and/or waivers:

| Specific Campus | OPEID | Educational Agency - State | Accrediting Body - Institutional | Accrediting Body - Programmatic | Educational Agency - Other |
|---|---|---|---|---|---|
| The Art Institute of California—Hollywood, a campus of Argosy University | 021799 - 38 | California Bureau of Private Postsecondary Education (BPPE) (Notification) | WSCUC (Notification) | Council for Interior Design Accreditation (CIDA) (Notification) | California Student Aid Commission (CSAC) (Notification, and if required, approval)<br><br>U.S. Department of Defense (DOD) (Notification)<br><br>California State Approving Agency for Veterans Education (CSAAVE) (Notification)<br><br>Student Exchange and Visitor Program (SEVP) (Approval) |

| | | | | | |
|---|---|---|---|---|---|
| **The Art Institute of California— San Diego, a campus of Argosy University** | **021799 - 47** | **BPPE (Notification)** | | **CIDA (Notification)** | **CSAC (Notification, and if required, approval)** **DOD (Notification)** **CSAAVE (Notification)** **SEVP (Approval)** |
| **Miami International University of Art & Design** | **008878** | | | **CIDA (Notification)** | **DOD (Notification)** **SEVP (Approval)** **Florida Department of Veterans Affairs, Bureau of State Approval for Veterans Training (FL-VA) (Notification)** |
| **The Art Institute of Tampa, a branch of Miami International University of Art & Design** | **008878 - 05** | | | **CIDA (Notification)** | **DOD (Notification)** **SEVP (Approval)** **FL-VA (Notification)** |

| | | | | | |
|---|---|---|---|---|---|
| **The Art Institute of Dallas, a branch of Miami International University of Art & Design** | **008878 - 07** | | | **CIDA (Notification)** | **DOD (Notification)**<br><br>**SEVP (Approval)**<br><br>**Texas Veterans Commission (TVC) (Approval)** |
| **The Art Institute of Atlanta** | **009270** | **GNPEC (Approval)** | | **CIDA (Notification)** | **DOD (Notification)**<br><br>**SEVP (Approval)**<br><br>**Georgia Department of Veterans Services Education and Training (GAVSET) (Notification)**<br><br>**Georgia Student Finance Commission (Notification)** |
| **The Art Institute of Virginia Beach, a branch of The Art Institute of Atlanta** | **009270 - 07** | | | | **DOD (Notification)**<br><br>**SEVP (Approval)** |

| | | | | | |
|---|---|---|---|---|---|
| **The Art Institute of Houston** | **021171** | | | **CIDA (Notification)** | **DOD (Notification)** <br><br> **SEVP (Approval)** <br><br> **TVC (Approval)** |
| **The Art Institute of Austin, a branch of The Art Institute of Houston** | **021171 - 02** | | | **CIDA (Notification)** | **DOD (Notification)** <br><br> **SEVP (Approval)** <br><br> **TVC (Approval)** |
| **The Art Institute of San Antonio, a branch of The Art Institute of Houston** | **021171 - 04** | | | **CIDA (Notification)** | **DOD (Notification)** <br><br> **SEVP (Approval)** <br><br> **TVC (Approval)** |
| **The Art Institute of Las Vegas, a branch of The Art Institute of Phoenix** | **040513 - 03** | **Nevada Commission on Postsecondary Education (CPE) (Approval)** | **ACICS (Approval of Change of Ownership Part II application)** | **CIDA (Notification)** | **DOD (Notification)** <br><br> **SEVP (Approval)** <br><br> **CPE-Veterans Approving Agency (Notification)** |
| **The Art Institute of Seattle** | **022913** | **WSAC (Notification and Temporary Authorization)** | | **CIDA (Notification)** | **DOD (Notification)** <br><br> **SEVP (Approval)** |

**Schedule 4.10**
**Reorganization**


The Consolidated Restructuring Strategy dated as of October 10, 2018 (the "Certification Date") has been approved and adopted by the Board of Directors of DCEH and the Board of Directors of Dream Center Foundation, which may be amended to reflect the transactions contemplated by this Framework Agreement.  The Reorganization Plan is in various stages of implementation, but various aspects have not yet been consummated and Studio has received the documents, instruments, and certificates evidencing such Reorganization Plan and DCEH will continue to provide all updates or amendments to such Reorganization Plan and corresponding documents, instruments and certificates.

Subsequent to the Certification Date, DCEH continues to explore a number of restructuring alternatives for the three university systems (South, Argosy and Art Institute).  As disclosed in the Reorganization Plan, DCEH has been in negotiations with its lenders, the Department of Education, its accreditation agencies and state regulators, and various other interested parties, involving several potential restructuring options, including the transactions contemplated by the Framework Agreement and those disclosed in the Reorganization Plan.  In addition, in order to effect one or more of the contemplated restructuring alternatives, DCEH also is exploring a potential receivership of some or all of the three university systems.

[Reorganization Plan Attached]

<u>**Schedule 4.12**</u>
<u>**Studio Offerees**</u>

<u>**Studio has the option (but not the obligation) to hire the following employees**</u>
1.    Eldon Monday
2.    Deena Echols
3.    Kristin Frank
4.    Amy Lee
5.    Trevor Garret
6.    Steve Planey
7.    Jane Chastain
8.    Sarah Johnson
9.    80% of the campus level personnel performing Non-Core Services

## Schedule 4.13
## Maintenance of Employees

**DCEH shall retain these employees during the Pre-Closing Period with respect to the applicable University System:**

1.    Claude Brown
2.    Ellen Mclaughlin
3.    Dianne Rouda
4.    Leslie Baughman
5.    Stanley Spewock
6.    Latoya Williams
7.    John Osborne
8.    Shelby Gugel
9.    Denis Yevstifeyev
10.   Chris Malizia
11.   Linda Hunter
12.   Lea Marshall
13.   Lisa Blye
14.   Sally Latifi
15.   Tabitha Dillon
16.   David Hendricksen
17.   Diana Rouda
18.   Shayna Reese
19.   Evilu Pridgeon
20.   Melinda Lester
21.   Brian Richie
22.   Matt Madrid
23.   Eldon Monday
24.   Kristin Frank
25.   Amy Lee
26.   Trevor Garret
27.   Mark Lucero
28.   Sarah Johnson
29.   Steve Planey

### Schedule 4.23
### Transfer Taxes

None.

**Schedule 5.2(h)(ii)**
**Consents, Notice, Approvals & Waivers**

1.  Consent and Authorization Agreement for Lien Release by the Lenders under (a) the Senior Secured Credit and Guaranty Agreement, dated as of October 17, 2017 (as amended, modified, supplemented or restated prior to the date hereof, the "Existing Credit Agreement"), among Dream Center Education Holdings, LLC, The Arts Institutes International, LLC, Dream Center South University, LLC, Dream Center Argosy University of California, LLC, Dream Center Education Management, LLC (collectively, the "Borrowers"), The Dream Center Foundation ("Parent"), certain subsidiaries of the Borrowers, as Guarantors, the Lenders party thereto from time to time, and U.S. Bank National Association, as administrative agent and collateral agent (in such capacities, the "Agent"), and (b) the Intercreditor Agreement, dated as of October 17, 2017 (as amended, modified, supplemented or restated prior to the date hereof, the "Intercreditor Agreement") by and among Agent, U.S. Bank National Association, as administrative agent and collateral agent for the L/C Secured Parties (as defined in the Intercreditor Agreement) (in such capacities, the "Second Priority Representative"), Parent and the Subsidiaries of Parent party thereto.

2.  Verification of submission of an overview of the Framework Agreement, form Managed Services Agreement, and form Asset Purchase Agreement to the Department of Education and applicable Accrediting Agencies for their review, and the DOE and each applicable Accrediting Body have not indicated that the Non-Core Closings and performance of services under the Managed Services Agreements will violate any Educational Agency statute, regulation or standard, nor will the proposed structure trigger a change of ownership or control for which Regulatory Approval would be required.

3.  In the event of the occurrence of the Receivership, the consent, approval and assumption of the Transaction Documents by the Federal Receiver and as pursuant to a court order with such changes and amendments as mutually agreed by the Federal Receiver and Studio.