*EXECUTION VERSION*

EQUITY AND ASSET PURCHASE AGREEMENT

BY AND AMONG

EDUCATION PRINCIPLE FOUNDATION,

THE ARTS INSTITUTE INTERNATIONAL, LLC,

DREAM CENTER SOUTH UNIVERSITY, LLC

AND

DREAM CENTER EDUCATION HOLDINGS, LLC

DATED AS OF JANUARY __, 2019



{01282670-1}

TABLE OF CONTENTS

Page

ARTICLE I EQUITY AND ASSET PURCHASES; CLOSINGS ..................................2
    1.1    Equity and Assets Purchase ...............................................................2
    1.2    Closing ................................................................................................3
    1.3    Closing Deliveries of Seller ...............................................................3
    1.4    Closing Deliveries of the Purchasers .................................................5
    1.5    Withholding ........................................................................................5
    1.6    Rights Held in Trust ...........................................................................5

ARTICLE II [RESERVED] ....................................................................................5

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ................6
    3.1    Organization and Corporate Power .....................................................6
    3.2    Capitalization; Subsidiaries ................................................................6
    3.3    Authorization; No Breach ...................................................................7
    3.4    Accounts Receivable ..........................................................................7
    3.5    Assets; Title to Equity Interests .........................................................7
    3.6    Tax Matters .........................................................................................8
    3.7    Contracts and Commitments ...............................................................8
    3.8    Intellectual Property Rights ..............................................................10
    3.9    Cyber Security and IT ......................................................................12
    3.10   Privacy and Data ..............................................................................13
    3.11   Litigation ..........................................................................................14
    3.12   Brokerage .........................................................................................15
    3.13   Permits .............................................................................................15
    3.14   Environmental and Safety Matters ...................................................15
    3.15   Real Property ....................................................................................16
    3.16   Inventory ..........................................................................................16
    3.17   Suppliers; Students ...........................................................................16
    3.18   Bank Accounts ..................................................................................17
    3.19   Books and Records ...........................................................................17
    3.20   Sexual Harassment ...........................................................................17
    3.21   No Undisclosed Liabilities; No Indebtedness ..................................18
    3.22   Affirmation of Representations and Warranties ...............................18
    3.22   Disclosure ........................................................................................18

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...........18
    4.1    Organization, Power and Authority ..................................................18
    4.2    Authorization; No Breach .................................................................18
    4.3    Litigation ..........................................................................................19

ARTICLE V INDEMNIFICATION .......................................................................19
    5.1    Indemnification Rights of the Parties ...............................................19

ARTICLE VI POST-CLOSING COVENANTS .......................................................19
    6.1    General ..............................................................................................19

{01282670-1}

| | 6.2 | Accounts Receivable | 19 |
|---|---|---|---|
| | 6.3 | Certain Intellectual Property Matters | 20 |
| | 6.4 | Consent Judgment Compliance | 20 |
| | 6.5 | Delivery of Schedules | 21 |

ARTICLE VII DEFINITIONS ................................................................. 21

ARTICLE VIII MISCELLANEOUS .......................................................... 30

| | 8.1 | Transfer Taxes | 30 |
|---|---|---|---|
| | 8.2 | Fees and Expenses | 30 |
| | 8.3 | Obligations | 30 |
| | 8.4 | Remedies | 30 |
| | 8.5 | Amendments; Extension; Waivers | 31 |
| | 8.6 | Successors and Assigns | 32 |
| | 8.7 | Severability | 32 |
| | 8.8 | Counterparts | 32 |
| | 8.9 | Interpretation | 32 |
| | 8.10 | Entire Agreement | 33 |
| | 8.11 | Third-Party Beneficiaries | 33 |
| | 8.12 | Schedules and Exhibits | 34 |
| | 8.13 | Governing Law; Jurisdiction and Venue; Waiver of Jury Trial. | 34 |
| | 8.14 | Notices | 34 |
| | 8.15 | Public Disclosure | 35 |

EXHIBITS

| Exhibit A | - | Specified Campuses; Excluded Campuses |
|---|---|---|
| Exhibit B | - | Bill of Sale |
| Exhibit C | - | Uncertificated Equity Interest Power |

SCHEDULES

| Schedule 3.2 | - | Capitalization |
|---|---|---|
| Schedule 3.3 | - | Authorization; No Breach |
| Schedule 3.5 | - | Assets |
| Schedule 3.7 | - | Contracts and Commitments |
| Schedule 3.8 | - | Intellectual Property Rights |
| Schedule 3.9(a) | - | Cyber Security and IT |
| Schedule 3.10(a) | - | Processing of Personal Information |
| Schedule 3.11 | - | Litigation |
| Schedule 3.12 | - | Brokerage |
| Schedule 3.13 | - | Permits |
| Schedule 3.15 | - | Real Property |
| Schedule 3.17(a) | - | Suppliers |
| Schedule 3.17(b) | - | Students |
| Schedule 3.18 | - | Bank Accounts |
| Schedule 3.20 | - | Sexual Harassment |
| Schedule 3.21 | - | Absence of Undisclosed Liabilities |

## EQUITY AND ASSET PURCHASE AGREEMENT

THIS EQUITY AND ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of January __, 2019, is made by and among EDUCATION PRINCIPLE FOUNDATION, a Delaware not for profit corporation (the "Foundation"), DREAM CENTER SOUTH UNIVERSITY, LLC, an Arizona not-for-profit limited liability company ("South" and collectively with all of its Subsidiaries (including the Specified Campuses and the Excluded Campuses), the "South University System"), The Arts Institutes International, LLC, an Arizona not-for-profit limited liability company ("AII" and collectively with all of its Subsidiaries (including the Specified Campuses and the Excluded Campuses), the "Ai University System" and AII together with the Foundation and South, the "Purchasers") and DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona not-for-profit limited liability company ("Seller"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in ARTICLE VII.[1]

### RECITALS

A.     Contemporaneously with the execution and delivery of this Agreement: (1) Studio Enterprise Manager, LLC, a Delaware limited liability company ("Studio"), Seller, the South University System, Argosy Education Group, LLC, a California not-for-profit limited liability company ("AEG"), Dream Center Argosy University of California, LLC, a California not-for-profit limited liability company ("Argosy" and collectively with AEG and all of their respective campuses, the "Argosy University System"), the Ai University System, and the other parties listed on the signature pages thereto (collectively, the "Other Dream Parties" and together with Seller, South, Argosy, AEG and AII, the "Dream Parties") are entering into an Amended and Restated Framework Agreement, dated as of the date hereof (the "Framework Agreement") and (2) Studio and Seller are entering into a Transition Services and License Agreement (the "Transition Service and License Agreement").

B.     Pursuant to the Framework Agreement, Studio has the right to purchase or to cause its designee to purchase certain assets of Seller which are used exclusively in the Business of the University Systems and equity interests held by Seller of each of AII, South and Argosy.

C.     Studio has designated (a) the Foundation to purchase the Equity Interests of AII and South (the "Transferred Interests"); *provided* that prior to such purchase, each of AII and South shall transfer to DCEH the Equity Interests of each Subsidiary of AII and South set forth on Exhibit A under the heading "Excluded Campuses" (the "Excluded Campuses"); (b) AII to purchase the Business Assets which relate solely to, are used exclusively by or are held for use exclusively by the Ai University System (collectively, the "AII Transferred Assets"); and (c) South to purchase the Business Assets which relate solely to, are used exclusively by or are held for use exclusively by the South University System (collectively, the "South Transferred Assets" and together with the AII Transferred Assets and the Transferred Interests, the "Transferred Assets"); *provided* that it is understood and agreed that (a) the Transferred Assets shall not include any of the Shared IT Systems and (b) the Transferred Assets will be deemed to include Business Assets

---

[1] To be decided whether the equity interests of Argosy will be transferred pursuant to this Agreement.

that are used by Seller and its Affiliates for purposes of the Teach-Outs pursuant to the terms of the License Agreement (i.e., such Business Assets will be deemed to "relate solely to, are used exclusively by or are held for use exclusively by" a University System notwithstanding such remaining Teach-Out use by Seller and its Affiliates), and (c) if Transferred Assets covered by (b) are used by both University Systems, Studio may with the consent (not to be unreasonably conditioned withheld, conditioned or delayed) of AII and South designate either AII or South as the purchaser of such Business Asset).

D.    Each Purchaser desires to purchase from Seller, and Seller desires to transfer, assign and convey to Purchaser, Transferred Assets to be purchased by such Purchaser, in each case subject to the terms and conditions set forth herein.

E.    This Agreement is entered pursuant to the Framework Agreement and to the extent that any of the provisions of this Agreement differ from or are in conflict with the provisions of the Framework Agreement, the provisions of the Framework Agreement shall control.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I
EQUITY AND ASSET PURCHASES; CLOSINGS

1.1    Equity and Assets Purchase.  On the date hereof, subject to the terms and conditions set forth herein:

(a) the Foundation shall purchase and acquire from Seller and Seller shall grant, sell, convey, assign, transfer, and deliver to the Foundation, all of Seller's right, title and interest in, to and under the Transferred Interests free and clear of any Liens, for consideration equal to one dollar ($1.00) payable in cash;

(b) AII shall purchase and acquire from Seller or its Affiliates and Seller shall or shall cause its Affiliates to, grant, sell, convey, assign, transfer, and deliver to AII, all of Seller's right, title and interest in, to and under the AII Transferred Assets (which shall include all Accounts Receivable of or related to the Ai University System held by Seller and its Affiliates (including the Excluded Campuses)) free and clear of any Liens, for consideration equal to one dollar ($1.00) payable in cash and assumption of the AII Assumed Liabilities; *provided*, that the transfer of the AII Transferred Assets to AII shall be subject to the assignment of the Assigned Receivables (as defined in the Framework Agreement) to Studio pursuant to Section 4.33 of the Framework Agreement; and

(c) South shall purchase and acquire from Seller or its Affiliates and Seller shall or shall cause its Affiliates to grant, sell, convey, assign, transfer, and deliver to such Purchaser, all of Seller's right, title and interest in, to and under the South Transferred Assets free and clear of any Liens, for a purchase price equal to one dollar ($1.00) payable in cash and assumption of the South Assumed Liabilities;

For the avoidance of doubt, no Purchaser will assume, or have any responsibility, however, with respect to any Retained Liability.

1.2 <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") will take place at 10:00 a.m. local time at the offices of Covington & Burling LLP, 620 Eighth Avenue, New York, NY, 10018, unless another time and place is mutually agreed upon in writing by the Purchasers and Seller, on the date hereof (the "<u>Closing Date</u>"). The effective time of the Closing is 12:01 a.m. on Closing Date (the "<u>Effective Time</u>").

1.3 <u>Closing Deliveries of Seller</u>. At the Closing, Seller shall deliver the following documents, certificates, instruments, assets and properties:

(a) At the Closing, Seller shall deliver to AII:

(i) actual possession of the AII Transferred Assets;

(ii) a bill of sale in the form set forth on <u>EXHIBIT B</u> hereto for the AII Transferred Assets and such other good and sufficient instruments of sale, conveyance, transfer and assignment as may be required to vest in AII all right, title and interest of Seller in and to the AII Transferred Assets, free and clear of all Liens other than Permitted Liens;

(iii) copies of all Consents required in connection (including any Pre-Closing Educational Consents) with the transfer of such AII Transferred Assets pursuant to this Agreement, if any;

(iv) Lien releases with respect to all Liens on the AII Transferred Assets;

(v) to the extent any AII Transferred Assets constitute Bank Accounts, those consents, bank signatory cards or other approvals (if any) necessary in order to (i) permit any Persons specified by AII to control, effective immediately following the Closing, the Bank Accounts, and (ii) remove the authority or approval of all Signatories (unless AII directs Seller to allow any of the signatories to remain authorized to sign for the Bank Accounts) to control or access, immediately following the Closing and thereafter, the Bank Accounts; and

(vi) all other documents (including a bill of sale, intellectual property assignment agreements, and other customary transfer documents), instruments and writings required to be delivered by AII at or prior to the Closing pursuant to, and relating to the transactions contemplated by, this Agreement or as AII may otherwise reasonably request, but solely with respect to the AII Transferred Assets.

(b) At the Closing, Seller shall deliver to South:

(i) actual possession of the South Transferred Assets;

(ii) copies of all Consents required in connection (including any Pre-Closing Educational Consents) with the transfer of such South Transferred Assets pursuant to this Agreement, if any;

(iii)    Lien releases with respect to all Liens on the South Transferred Assets;

(iv)    to the extent any South Transferred Assets constitute Bank Accounts, those consents, bank signatory cards or other approvals (if any) necessary in order to (i) permit any Persons specified by South to control, effective immediately following the Closing, the Bank Accounts, and (ii) remove the authority or approval of all Signatories (unless South directs Seller to allow any of the signatories to remain authorized to sign for the Bank Accounts) to control or access, immediately following the Closing and thereafter, the Bank Accounts; and

(v)    all other documents (including a bill of sale, intellectual property assignment agreements, and other customary transfer documents), instruments and writings required to be delivered by South at or prior to the Closing pursuant to, and relating to the transactions contemplated by, this Agreement or as South may otherwise reasonably request, but solely with respect to the South Transferred Assets.

(c)    At the Closing, Seller shall deliver to the Foundation:

(i)    a Uncertificated Equity Interest Power, duly executed in blank by DCEH with respect to the Transferred Interest of AII;

(ii)    an Uncertificated Equity Interest Power, duly executed in blank by DCEH with respect to the Transferred Interest of South;

(iii)    an Uncertificated Equity Interest Power, duly executed by applicable Transferring Parent of the Equity Interest of each Excluded Parent and evidencing transfer of such Excluded Parent to DCEH;

(iv)    such other documents and instruments as are requested by the Foundation to effectuate a transfer of any assets, liabilities, Subsidiaries or employees from the applicable University System which is subject to such Equity Transfer and which Studio has elected, in its sole discretion, will not be included in such Equity Transfer;

(v)    copies of all Consents required in connection (including any Pre-Closing Educational Consents) with the transfer of such Transferred Interests pursuant to this Agreement, if any; and

(vi)    Lien releases with respect to all Liens on the Transferred Interests and the assets, properties and Subsidiaries of each of AII and South; *provided* that Seller shall not be required to deliver any Lien releases with respect Liens granted on Subsidiaries of South in connection with the South Credit Agreement.

(d)    At the Closing, Seller shall deliver to each Purchaser:

(i)    a statement of Seller dated as of each Closing Date in the form described in Treasury Regulations Section 1.1445-2 certifying under penalties of perjury

that Seller is exempt from withholding under Section 1445 of the Code with respect to the transfer of the Transferred Interests and Transferred Assets; and

        (ii)    a written consent of the general partner or managers, as applicable, and the holders of the Equity Interests of Seller approving this Agreement and the transactions contemplated hereby.

    1.4 <u>Closing Deliveries of the Purchasers</u>.  At the Closing, (a) each Purchaser shall deliver or cause to be delivered the cash amount payable by such Purchaser pursuant to <u>Section 1.1</u> and (b) each of AII and South shall assume the applicable Assumed Liabilities.

    1.5    <u>Withholding</u>.  If any of the payments made by the Purchasers pursuant to this Agreement is subject to withholding Taxes under applicable Laws of any jurisdiction for which Seller is liable under applicable Law, the applicable Purchaser shall deduct and withhold the amount of such Taxes, and such amounts payable to Seller shall be reduced by the amount of Taxes deducted and withheld.  Any such withholding Taxes required under applicable Law to be paid or withheld shall be an expense of, and borne solely by, Seller.  The applicable Purchaser will provide reasonable assistance to Seller to enable Seller to recover such Taxes as permitted by applicable Law.  Each party shall reasonably cooperate and take all commercially reasonable actions to minimize any such withholding Taxes.

    1.6    <u>Rights Held in Trust</u>.  Notwithstanding anything contained herein, this Agreement shall not constitute an agreement to assign any Transferred Asset if an attempted assignment of such contract or agreement, without the consent of a third-party or parties, would constitute a breach thereof, in the case of a Contract or in any material adverse way affect the rights of Seller (or the Purchasers following the Closing) thereunder or with respect thereto.  Seller shall, and shall cause its Affiliates to, use its reasonable best efforts to obtain the consent to the assignment of any such Transferred Asset to the applicable Purchaser of such Transferred Asset in all cases in which such consent is required for assignment or transfer.  If any such consent has not been obtained prior to the Closing, Seller agrees to hold the benefit of the applicable Transferred Asset in trust for the applicable Purchaser and to cooperate with such Purchaser in any reasonable arrangements designed to provide all benefits thereunder to such Purchaser, including enforcement for the benefit of such Purchaser of any and all rights under such contract or agreement against the other party or parties thereto arising out of the cancellation of such contract or agreement by such other party or parties or otherwise.  In the event that at or prior to the Closing Seller fails to deliver any item required to be delivered by Purchaser pursuant to <u>Section 1.3</u>, Seller shall deliver such item promptly following the Closing.

ARTICLE II
[RESERVED]

*[This <u>Article II</u> is intentionally blank.]*

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to each Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby represents and warrants to each Purchaser as follows:

3.1     Organization and Corporate Power.  Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, incorporation or formation, and is qualified to do business in every jurisdiction in which the ownership of its properties or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to result in a DCEH Material Adverse Effect.  Seller possesses all requisite power and authority necessary to own and operate its properties, to carry on its business as now conducted and presently proposed to be conducted, to execute and deliver this Agreement and all other agreements and instruments contemplated hereby and to carry out the transactions contemplated by this Agreement.  The Purchasers have been furnished with true, correct and complete copies of the organizational documents of Seller as amended and in effect on the date of this Agreement.

3.2     Capitalization; Subsidiaries.  All of the outstanding Equity Interests of Seller is held beneficially and of record by The Dream Center Foundation, an Arizona not-for-profit corporation, free and clear of any Liens other than Permitted Liens.  The Subsidiaries and Investments of AII and South are as set forth on Schedule 3.2 and except as set forth on Schedule 3.2, none of AII, South or their respective Subsidiaries owns or has the right or obligation to acquire any Equity Interests of any Person or any other Investments.  All of the outstanding Equity Interests of AII, South and their respective Subsidiaries are duly authorized, validly issued, fully-paid and non-assessable and are held beneficially and of record by the equityholders thereof as set forth on Schedule 3.2, free and clear of any Liens other than Permitted Liens.  Except as set forth on Schedule 3.2, none of AII, South and their respective Subsidiaries has any outstanding (a) Equity Interests or other securities convertible into, or exchangeable or exercisable for, any of its Equity Interests or containing any profit participation features, nor any rights or options to subscribe for or to purchase its Equity Interests or (b) any equity appreciation rights, profit participation rights or phantom equity or similar plans or rights.  There are no (a) outstanding obligations of any of AII, South and their respective Subsidiaries (contingent or otherwise) to repurchase or otherwise acquire or retire any of its Equity Interests or any warrants, options or other rights to acquire its Equity Interests or (b) voting trusts, proxies or other agreements among any equityholders of AII, South and their respective Subsidiaries or any other Person with respect to the voting or transfer of any Equity Interests of AII, South and their respective Subsidiaries. None of the Equity Interests of AII, South or any Excluded Parent are certificated.  The Equity Interests of each Excluded Parent are 100% owned by the Person set forth on Exhibit A as the "Transferring Parent" with respect thereto.  As of the Closing and immediately thereafter, (i) one hundred percent (100%) of the outstanding Transferred Interest will be held by the Foundation and will be duly authorized and validly issued, fully paid and non-assessable and free and clear of any Liens, other than Permitted Liens and (ii) 100% of the Equity Interests of the Excluded Campuses will be held by Seller.

3.3     Authorization; No Breach.

(a)     Seller's execution, delivery and performance of this Agreement and all other agreements and instruments contemplated hereby to which Seller is a party have been duly authorized by each member of Seller.  This Agreement constitutes a valid and binding obligation of Seller, enforceable in accordance with its terms, and all other agreements and instruments contemplated hereby to which Seller is a party, when executed and delivered by Seller, shall each constitute a valid and binding obligation of Seller, in each case, enforceable in accordance with its terms, in each case, subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b)     Except as set forth on Schedule 3.3, the execution and delivery by Seller of this Agreement and all other agreements and instruments contemplated hereby to which Seller is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by Seller does not and shall not (i) result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon the Transferred Assets pursuant to, (iv) give any third-party the right to modify, terminate or accelerate any obligation or the right to receive any payment or additional rights under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Person or any Governmental Authority pursuant to, (A) the certificate of incorporation or bylaws, or equivalent organizational documents of Seller, (B) any Law to which Seller or any of the Transferred Assets is subject, or (C) any agreement, contract, lease, license, instrument or other arrangement to which Seller is a party or subject to (each, a "Consent").

3.4     Accounts Receivable.  All accounts receivable of or in respect of the Ai University System or the South University System (a) are valid obligations which arose in the ordinary course of business and which are not subject to valid setoffs or counterclaims, and (b) are collectible in the ordinary course of business with commercially reasonable collection practices, subject to any bad debt reserve established in accordance with GAAP and expressly set forth in the Financial Statements.

3.5     Assets; Title to Equity Interests; Specified Campuses.

(a) Schedule 3.5 sets forth a list of the Business Assets.  Except as set forth on Schedule 3.5, Seller has good and valid title to, or a valid leasehold interest in, or a valid license to use, the properties and assets, tangible or intangible, constituting the AII Transferred Assets and the South Transferred Assets free and clear of all Liens other than Permitted Liens.  Seller owns, has a valid leasehold interest in, or has a valid license to use, the Transferred Assets.  The AII Transferred Assets and the South Transferred Assets are free from any material defects, have been maintained in accordance with normal industry practice, are in an operating condition and repair (subject to normal wear and tear) reasonably adequate and suitable for the purposes for which such assets and properties are presently used.

(b) As of immediately prior to the Closing, (i) the Transferred Interests constitute all of the issued and outstanding Equity Interest of AI and South, (ii) the Transferred Interests are owned of record and beneficially by Seller, and (iii) Seller had good, valid and marketable title to such Transferred Interests, free and clear of all Liens, other than Permitted Liens.

(c) Each Specified Campus is owned by the Person set forth opposite such Specified Campus's name on Exhibit A. Other than assets, properties and employees which are held by DCEH and the subject of the AII Transferred Assets or the South Transferred Assets or the Transition Services and License Agreement, each of the AII University System and the South University have sufficient assets, properties and employees to conduct their respective Businesses as currently conducted.

3.6     Tax Matters. There are no Liens for Taxes upon any of the Transferred Assets. No claim has been made by a taxing authority in a jurisdiction that Seller, AII, South or any of their respective Subsidiaries is or may be subject to Tax assessed by such jurisdiction with respect to which Seller, AII, South or such Subsidiary, as applicable, has not filed a Tax Return. Each of Seller, AII, South and their respective Subsidiaries has timely filed all Tax Returns required to be filed by such Person and has timely paid all Taxes required to be paid by such Person. All Tax Returns filed by Seller, AII, South or any of their respective Subsidiaries is true and complete in all material respects. None of AII, South or their respective Subsidiaries has any liability for or with respect to any Excluded Taxes. None of the Transferred Assets constitutes property leased to a tax-exempt entity within the meaning of Section 168(h) of the Code. Each of AII, South and their respective Subsidiaries is and has been since its date of incorporation, formation or organization (as applicable) exempt from (a) U.S. federal income taxes as an organization described in Section 501(c)(3) of the Code and (b) state and local income taxes pursuant to corresponding applicable state and local Law.

3.7     Contracts and Commitments.

(a)     Except as expressly contemplated by this Agreement or as set forth on Schedule 3.7, (x) no member of the Ai University System or the South University System is, and (y) with respect to the Ai University System or the South University System, Seller is not, a party to or bound by any written or oral:

(i)     pension, profit sharing, stock option, employee stock purchase or other plan or arrangement providing for deferred or other compensation to employees or any other employee benefit plan, arrangement or practice, whether formal or informal;

(ii)     collective bargaining agreement or any other contract with any labor union, or severance agreements, programs, policies or arrangements;

(iii)     management agreement, consulting agreement, employee leasing agreement or contract for the employment or services of any officer, individual employee, independent contractor, consultant or other Person on a full-time, part-time, consulting or other basis (A) providing annual cash or other compensation in excess of $100,000, (B) providing for the payment of any cash or other compensation or benefits upon the consummation of the transactions contemplated hereby, or (C) otherwise restricting its

ability to terminate the employment or services of any employee, independent contractor, or consultant at any time for any lawful reason or for no reason without penalty or liability;

(iv)    contract or agreement involving any Governmental Authority;

(v)    agreement or indenture relating to borrowed money or other Indebtedness or mortgaging, pledging or otherwise placing a Lien on any material asset or material group of assets or any letter of credit arrangements, or any guarantee therefore;

(vi)    lease or agreement under which any such Person is a (A) lessee of or holds or operates any personal property, owned by any other party, except for any lease of personal property under which the aggregate annual rental payments do not exceed $25,000 or (B) lessor of or permits any third-party to hold or operate any property, real or personal, owned or controlled by Seller;

(vii)    other contract or group of related contracts with the same party or group of affiliated parties continuing over a period of more than six months from the date or dates thereof, not terminable by such Person upon 30 days' or less notice without penalty or involving more than $25,000;

(viii)    agreements relating to the ownership of, Investments in or loans and advances to any Person (other than advances to employees in the Ordinary Course of Business), including Investments in joint ventures and minority equity investments;

(ix)    royalty agreements or inbound or outbound license agreements, or any other agreements (including settlement agreement and agreements containing covenants not to sue) with respect to any Intellectual Property Rights (other than licenses for unmodified, commercially-available, off-the-shelf software involving a replacement cost and/or aggregate annual license and maintenance fees of less than $5,000 and confidentiality agreements entered into in the Ordinary Course of Business);

(x)    contract that contains any provision pursuant to which such Person is obligated to indemnify or make any indemnification payments to any Person (other than pursuant to Contracts entered into in the Ordinary Course of Business);

(xi)    contract pursuant to which such Person is required to indemnify or make indemnification payments to any other Person (other than pursuant to Contracts entered into in the ordinary course of business);

(xii)    power of attorney or other similar agreement or grant of agency;

(xiii)    all Leases;

(xiv)    settlement or similar agreement pursuant to which such Person is required to pay consideration after the date of this Agreement;

(xv)    all PPAs;

(xvi)   contract or agreement prohibiting it from freely engaging in any business or competing anywhere in the world, including any nondisclosure or confidentiality agreements; or

(xvii)   other agreement which is material to the operations and business prospects of such Person or involves a consideration in excess of $25,000 annually, whether or not in the Ordinary Course of Business.

(b)     All of the contracts, agreements and instruments set forth or required to be set forth on Schedule 3.7 (the "Material Contracts") are valid, binding and enforceable as to the applicable of Seller or the member of Ai University System or the South University System party thereto, and to Seller's Knowledge, as to the other parties thereto, in accordance with their respective terms.  Each of the Material Contracts shall be in full force and effect without penalty in accordance with their terms upon consummation of the transactions contemplated hereby.  The applicable of Seller or the member of Ai University System or the South University System party thereto has performed all obligations required to be performed by it and is not in default under or in breach of nor in receipt of any claim of default or breach under any Material Contract; no event has occurred which with the passage of time or the giving of notice or both would result in a default, breach or event of noncompliance by the applicable of Seller or the member of Ai University System or the South University System party thereto under any Material Contract; and Seller has no Knowledge of any breach or cancellation or anticipated breach or cancellation by the other parties to any Material Contract.

(c)     The Purchasers have been, or will prior to January 31, 2019 be, supplied with a true and correct copy of each written Material Contract, together with all amendments, waivers or other changes thereto (all of which amendments, waivers or other changes thereto are described on Schedule 3.7).

3.8     Intellectual Property Rights.

(a)     Schedule 3.8 contains a complete and accurate list of all of the following that are owned, used or held for use by Seller in the conduct of the Business of the Ai University System or the South University System or owned, used or held for use by any member of the Ai University System or the South University System:  (i) registered Intellectual Property Rights (including Internet domain names), (ii) pending patent applications or other applications for registration of other Intellectual Property Rights, (iii)  all computer software and cloud services (other than commercially-available, off-the-shelf software with a replacement cost and/or aggregate annual license and maintenance fees of less than $5,000) that is (A) used only at the Ai University System or only at the South University System, or (B) used only by Seller, (iv) all Shared IT Systems as that term is defined in the Transition Services and License Agreement (other than commercially-available, off-the-shelf software with a replacement cost and/or aggregate annual license and maintenance fees of less than $5,000), (v) curricula, teaching processes, texts, course materials and other Curricular Materials and Curricular Know-How and other documents that are considered material to the operation of the Ai University System or the South University System, (vi) social media accounts and domain names, (vii) material unregistered Marks, (viii) material unregistered copyrights, (ix) databases of Business Data, including those that hold only data of the Ai University System or the South University System and those that are Shared

IT Systems administered by Seller which hold both data of the Ai University System or the South University System and data for other institutions, and (x) any other material Intellectual Property Rights.

(b) Seller or the applicable University System owns and possesses, free and clear of all Liens other than Permitted Liens, all right, title and interest in and to, or have the right to use pursuant to a valid and enforceable written license or service agreement set forth on Schedule 3.7, all Intellectual Property Rights used in, held for use in, or necessary for the operation of the Business as presently conducted and as presently proposed to be conducted (together with all other Intellectual Property Rights owned or purported to be owned by Seller, collectively, the "Seller Intellectual Property Rights"); provided, for avoidance of doubt, that each of the Ai University System and the South University hold only non-exclusive rights under service agreements or arrangements with Seller to use on a shared service basis the Shared IT Systems under the administration of those systems by Seller and no member of the Ai University System and the South University holds any other rights with respect to such Shared IT Systems, including without limitation any rights concerning source code or object code. All of Seller Intellectual Property Rights are valid, subsisting and enforceable, and none of the Seller Intellectual Property Rights have been misused. To Seller's Knowledge, no loss of any of the Seller Intellectual Property Rights is threatened, pending or reasonably foreseeable. Seller has taken all commercially reasonable or necessary action to maintain, protect and enforce the Seller Intellectual Property Rights.

(c) Except as set forth on Schedule 3.8, (i) there are no claims pending or, to Seller's Knowledge, that have been brought in the last six (6) years, or to Seller's Knowledge threatened, contesting the validity, use, ownership or enforceability of any of Seller Intellectual Property Rights, and, to Seller's Knowledge, there is no reasonable basis for any such claim, (ii) the Seller Intellectual Property Rights, since the Compliance Date, have not infringed, misappropriated or conflicted with, and the operation of the Business or use of the Seller Intellectual Property Rights does not infringe, misappropriate or conflict with, any Intellectual Property Rights of other Persons, and no Seller has received any notice regarding any of the foregoing (including, any demand or offer to license any Intellectual Property Rights from any other Person), and (iii) to Seller's Knowledge, no third-party has, and since the Compliance Date, Seller has alleged that any other Person has, infringed, misappropriated or conflicted with any of the Seller Intellectual Property Rights. The transactions contemplated by this Agreement shall not impair the right, title or interest of Seller in and to the Seller Intellectual Property Rights, and all of the Seller Intellectual Property Rights will be owned or available for use by the applicable Purchaser immediately after the applicable Closing (or pursuant to and upon the execution of the IP Assignment, the License Agreement or the Transition Services and License Agreement, as applicable) on terms and conditions identical to those under which the Seller owned or used the Seller Intellectual Property Rights immediately prior to such applicable Closing (or pursuant to and upon the execution of the IP Assignment, the License Agreement, or the Transition Services and License Agreement, as applicable), provided that immediate access to the Shared IT Systems may be available in accordance with the terms of the Transition Services and License Agreement only through the existing system connections utilized by Seller's employees at the Specified Campuses, pending the completion of system changes needed to allow direct access by the Purchasers' or their Affiliates' personnel (the "Temporary System Access Requirements") and following such transitional period Seller shall ensure that the Purchasers and their Affiliates have

the full right and ability to access, use and otherwise exploit the Shared IT Systems through system connections as requested by the Purchasers. It is expressly understood and agreed by the Purchasers that the Shared IT Systems set forth on Schedule 3.8, as made available to the applicable Purchaser, shall consist of three categories of agreements: (i) agreements for which Purchaser shall hold the position of an end user, (ii) agreements for which Purchaser shall have administrator rights; and (iii) agreements for which Purchaser shall have the right to request certain reports pursuant to an service level agreement or "SLA" in addition to the associated Shared IT Services, in each case ((i)-(iii)) consistent with the rights, access permissions and reports the Dream Parties receive as of the date of this Agreement. Sellers agree to give written notice to Purchaser no less than 120 days in advance of any expiration date for any of the agreements related to or comprising the Shared IT Systems or associated Shared IT Services. Each Purchaser agrees that it is responsible for establishing its own replacement agreement with a vendor of its own choice with the cooperation of Seller to the extent set forth in Section 5 of the Transition Services and License Agreement. The Seller Intellectual Property Rights are not subject to any outstanding consent, settlement, decree, order, injunction, judgment or ruling restricting the use thereof; *provided* that certain provisions in the EMC Consent Judgments impose restrictions on the use that Seller may make of its communication systems in communications with prospective students.

(d)     The computer software, information technology services (including cloud services), hardware, firmware, networks and related systems (collectively, "Computer Systems") owned, licensed or leased by Seller, including for the avoidance of doubt the Shared IT Services, are sufficient for Seller's and the applicable Purchaser's current and anticipated future needs with respect to its Specified Campuses, and, in the last twelve (12) months, there have been no material failures, crashes, security breaches or other adverse events affecting such Computer Systems.

(e)     No Seller has any reason to believe and no facts or circumstances exist, to suggest that it does not have full right and authority to transfer to the Purchasers all Business Data in the possession of Seller; or that the execution of this Agreement and the consummation of the transactions contemplated hereby (including under the Transition Services and License Agreement) requires Seller to seek any consent from any employee, student, supplier, service provider or other third-party; the execution of this Agreement and the consummation of the transactions contemplated hereby, subject to the Temporary System Access Requirements, will not impose any restrictions upon any Purchaser's ability to Process such Business Data in the manner that Seller Processed such or similar Business Data prior to the applicable Closing (or prior to the execution of the Transition Services and License Agreement, as applicable).

3.9     Cyber Security and IT.

(a)     To Sellers' Knowledge, none of the Seller Software or Seller Products contains any virus, malware, Trojan horse, worm or other software routines or hardware components designed or intended to permit unauthorized access to, unauthorized acquisition of, or disable, erase or otherwise harm software, hardware or data. Seller has implemented commonly accepted industry standard processes and procedures to mitigate against the likelihood of any of the foregoing.

(b)     Except as set forth on Schedule 3.9(b), since the Compliance Date, there have not been any actual or alleged Security Incidents or claims or investigations (including, but

not limited to, investigations by regulatory authorities or any data protection authorities) related to Security Incidents, and there are no facts or circumstances which could reasonably serve as the basis for any such allegations, investigations, or claims. There are no material data security, information security or other technological vulnerabilities with respect to the Seller IT Systems, and no Seller or any of its Affiliates have been notified by any third-party (including by "white hat" hackers) of any such vulnerabilities, that (i) are unpatched or otherwise unresolved and (ii) could (A) adversely impact the operation of Seller IT Systems or (B) cause a Security Incident. Neither Seller nor any of Seller's Affiliates have previously notified, have obligations to notify, or been previously required to notify, any person of any Security Incident. Neither Seller nor any of Seller's Affiliates have received any notice of any claims, investigations (including, but not limited to, investigations by regulatory authorities or any data protection authorities), or alleged violations of Privacy Laws with respect to Personal Information possessed by or otherwise subject to the control of Seller or its Affiliates, and, to Seller's Knowledge, there are no facts or circumstances which could form the basis for any such claim.

(c)     To Sellers' Knowledge, in the past six (6) years, there has been no failure or breakdown of, unauthorized access to, theft or loss or unauthorized acquisition of, or unauthorized use of, any Seller IT System that has resulted in a material disruption or material interruption in the operation of the Business.

(d)     The Seller IT Systems of Seller are reasonably adequate for the Business and operations of Seller as currently conducted and are sufficient in all material respects for the current needs of the Business and operations of Seller and the Purchasers and the Purchasers' Affiliates. Seller has taken or caused to be taken reasonable precautions designed to keep all Seller IT Systems (A) free from any material defect, bug, vulnerability, virus or programming, design or documentation error or corruption or material defect, and (B) functional and operating in a reasonable and efficient business manner. Seller, through its Availability and Recovery Program and its Enterprise Backup Overview and Strategy Plan, true and accurate copies of which have been made available to Purchaser, has fully implemented commercially reasonable incident response, disaster recovery, and business continuity plans and procedures to cover all material Seller IT Systems, Personal Information, and any other information utilized in the Business or operations of Seller. None of the Seller IT Systems has experienced any material failures, breakdowns or continued substandard performance in the past twelve (12) months that has caused substantial disruption or substantial interruption in Seller's use thereof or to the Business or operations of Seller.

3.10    Privacy and Data.

(a)     Seller and its Affiliates have at all times since the Compliance Date (i) complied in all material respects with all applicable Privacy Laws, regulatory and self-regulatory guidelines, published interpretations by Governmental Authorities of such Privacy Laws and guidelines, and all similar consumer protection Laws relating to the Processing of Personal Information that is possessed by or otherwise subject to the control of Seller or their Affiliates; and (ii) complied in all material respects with all of the Seller Privacy Policies, Terms of Use, or similar documents, including (A) any notice to or consent from the provider of Personal Information, and (B) any existing contractual commitment made by Seller or its Affiliates with respect to such Personal Information. Schedule 3.10(a) sets forth all voluntary and/or self-

regulatory guidelines established by third parties (other than Privacy Laws or laws generally) to which Seller or any of its Affiliates has agreed to abide by concerning the Processing of Personal Information.

(b)     Neither Seller nor any of its Affiliates has received notice of any claims, investigations, allegations, or been charged with, the violation of Privacy Laws.  Neither Seller nor any of its Affiliates is under investigation with respect to any violation of any such Privacy Laws and, to Sellers' Knowledge, there are no facts or circumstances which could form the basis for any such violation.  No Seller has any reason to believe and no facts or circumstances exist to suggest that it and its Affiliates do not have full right and authority to transfer all Personal Information in the possession of Seller or its Affiliates for use in the same manner and for the same purposes as used by Seller and its Affiliates; that the execution of this Agreement and the consummation of the transactions contemplated hereby violates any of the Seller Privacy Policies or contractual commitment made by Seller or its Affiliates nor requires Seller nor any of its Affiliates to seek any consent from, any employee, customer, supplier, service provider or other third-party under any Seller Privacy Policy or contractual commitment made by Seller or its Affiliates.  No Seller Privacy Policy or contractual commitment made by Seller or its Affiliates will impose any restrictions upon any Purchaser's ability to Process such Personal Information in the same manner that Seller and each of its Affiliates have Processed such or similar Personal Information prior to the Closing (or the execution of the Transition Services and License Agreement, as applicable).

(c)     Seller and its Affiliates, since the Compliance Date, has contractually obligated all third-party service providers, outsourcers, or similar processors of Personal Information collected, held, or controlled by Seller or its Affiliates to (i) comply with applicable Privacy Laws with respect to Personal Information, (ii) take reasonable steps to protect and secure Personal Information from unauthorized access, acquisition, modification, or disclosure, (iii) restrict Processing of Personal Information to those authorized or required under the servicing, outsourcing, processing, or similar arrangement and (iv) certify or guarantee the return or adequate disposal or destruction of Personal Information.  Seller and its Affiliates have taken reasonable measures to ensure that all such third-party service providers, outsourcers, or similar processors of such Personal Information have complied with their contractual obligations, including periodically auditing such third-party service providers, outsourcers, processors, or other users of Personal Information to ensure compliance.

(d)     Except for disclosures of information required by law (including Privacy Laws), authorized by the provider of Personal Information, or as set forth in Schedule 3.7 as a Material Contract, neither Seller nor its Affiliates has shared, sold, rented or otherwise made available, and does not share, sell, rent or otherwise make available, to third parties any Personal Information.

3.11    Litigation.  Except as set forth on Schedule 3.11, there are no, and there have been no, Proceedings pending or, to Seller's Knowledge, threatened against or affecting Seller or any member of the Ai University System and the South University, at law or in equity, or before (or that could come before) or by any Governmental Authority (including any Proceedings with respect to the transactions contemplated by this Agreement).  To Seller's Knowledge, there is no reasonable basis for any of the foregoing.  Seller is insured with respect to each of the matters set

forth on <u>Schedule 3.11</u>. Other than the EMC Consent Judgement, none of Seller or any member of the Ai University System and the South University is subject to any judgment, order or decree of any Governmental Authority.

3.12     <u>Brokerage</u>.  Except as set forth on <u>Schedule 3.12</u>, there are no claims or agreements for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement to which any member of the Ai University System or the South University System or Seller is a party or subject to.  All items listed on <u>Schedule 3.12</u> shall be the sole responsibility of Seller.

3.13     <u>Permits</u>.  A list of all Permits used or held for use by, owned or held by, or with respect to the Business of the Ai University System and the South University is set forth on <u>Schedule 3.13</u>.  With respect to the Permits set forth or required to be set forth on <u>Schedule 3.13</u>: (a) such Permits constitute the sole Permits required for the conduct of such Business and the ownership or occupation of properties with respect to the Business, (b) no notices have been received by Seller or any of its Affiliates alleging the failure to hold any Permit required for the conduct of such Business, (c) Seller, each member of the Ai University System and the South University and their respective Affiliates are in compliance in all material respects with all terms and conditions of such Permits, (d) there has been no material change in the facts or circumstances reported or assumed in any application for or granting of any Permits; *provided* that the failure to meet any financial projections included in any application made on or after the Compliance Date for any Educational Approval alone shall not be a breach of this representation (but for the avoidance of doubt the facts, events, circumstances, conditions or changes underlying such failure shall be taken into account when determining whether there has been a breach of this representation), and (e) to the extent such Permits are transferred in connection with a Closing, such Permits will be available for use by the Purchasers after such Closing on the same basis as such were available to Seller or such member of the Ai University System and the South University immediately prior to such Closing.

3.14     <u>Environmental and Safety Matters</u>.

(a)     Seller and each member of the Ai University System and the South University System have at all times complied and is in compliance, in all material respects, with all Environmental, Health and Safety Requirements, which compliance has included obtaining and complying, in all material respects, at all times with all permits, licenses, certificates, accreditations and other authorizations required pursuant to Environmental, Health and Safety Requirements for the occupation of the Leased Real Property and the operation of the Business.

(b)     Neither Seller nor any member of the Ai University System or the South University System has received any notice or information regarding any actual or alleged violations of, or any liabilities or potential liabilities (including any investigative, corrective or remedial obligations) under, Environmental, Health and Safety Requirements.

(c)     Neither Seller nor any member of the Ai University System or the South University System has assumed, undertaken, provided an indemnity with respect to, or otherwise become subject to any liability (including any investigative, corrective or remedial obligation) of

any other Person relating to Environmental, Health or Safety Requirements or Hazardous Substances.

(d)     Seller has provided, or will prior to January 31, 2019 provide, to the Purchasers all environmental audits, assessments, reports and other material environmental, health and safety documents relating to the past and current properties, facilities and operations of the Business of the Ai University System and the South University (including the Leased Real Property and any other Transferred Assets) that are in the possession of Seller, the Ai University System and the South University or under any of their reasonable control.

3.15   Real Property.  Schedule 3.15 sets forth the address of each Leased Real Property, and a true, correct and complete list, of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto).  Seller has delivered to Purchaser a true and complete copy of each such Lease, and in the case of any oral Lease, a written summary of the material terms of such Lease.  Except as set forth in Schedule 3.15, with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) the possession and quiet enjoyment of the real property under such Lease by the applicable of Seller or the member of the Ai University System or the South University party thereto has been disturbed, and to Seller's Knowledge, there are no disputes with respect to such Lease; (iii) none of Seller or any member of the Ai University System or the South University or, to Sellers' Knowledge, any other party to the Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease; (iv) none of Seller or any member of the Ai University System or the South University owes, or will owe in the future, any brokerage commissions or finder's fees with respect to such Lease; (v) none of Seller or any member of the Ai University System and the South University has collaterally assigned or granted any other security interest in such Lease or any interest therein; (vi) none of Seller or any member of the Ai University System and the South University has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (vii) there are no Liens other than Permitted Liens on the estate or interest created by such Lease; and (viii) the assignment of such Lease to Purchaser pursuant to this Agreement does not require the consent of any other party to such Lease, will not result in the termination of such Lease, will not result in a breach of or default under such Lease, or otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing.

3.16   Inventory.  All of the Inventory of Seller and of each member of the Ai University System and the South University, whether or not reflected on the Financial Statements, consists of a quality and quantity usable in the ordinary course of the Business, and is reasonably fit for the purpose for which it was procured.  None of the Inventory is obsolete, damaged or discontinued.

3.17   Suppliers; Students.

(a)     Schedule 3.17(a) sets forth a list of the names and addresses of the top ten suppliers of with respect to each member of the Ai University System or the South University by dollar volume of expenses for the twelve-month period ended September 30, 2018.  Except as set forth on Schedule 3.17(a), none of Seller or any member of the Ai University System or the South

University has received, during the twelve months preceding the Closing Date, notice indicating that, and none of Seller or any member of the Ai University System or the South University has any reason to believe that, any such supplier listed on <u>Schedule 3.17(a)</u> will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to, payment, purchasing or supplying (as the case may be) materials, products or services from or to the applicable Business (whether as a result of the consummation of the transactions contemplated hereby or otherwise). Except as set forth on <u>Schedule 3.17(a)</u>, none of Seller or any member of the Ai University System or the South University imports supplies from outside of the United States.

(b) <u>Schedule 3.17(b)</u> sets forth a list of the names of each student enrolled in the Ai University System or the South University System, in each case as of October 31, 2018.

3.18 <u>Bank Accounts</u>. <u>Schedule 3.18</u> sets forth (a) the name of each financial institution with which the Ai University System or the South University System or Seller with respect to the Ai University System or the South University System has borrowing or investment agreements, deposit or checking accounts or safe deposit boxes or in which revenue related to the Business is or may be deposited or expenses of the Business are or may be paid and (b) the types of those arrangements and accounts, including, as applicable, names in which accounts or boxes are held, the account or box numbers and the name of each Person authorized to draw thereon or have access thereto (the accounts described in <u>Schedule 3.18</u>, the "<u>Bank Accounts</u>", and such Persons so authorized with respect thereto, the "<u>Signatories</u>").

3.19 <u>Books and Records</u>. The minute books and membership interest record books of each member of the Ai University System and the South University System, all of which have been delivered to Purchaser, are each complete and correct in all material respects and have been maintained in accordance with sound business practices. The minute books of each member of the Ai University System and the South University System contain materially accurate and complete records of all meetings, and actions taken by written consent of, the members of such Person, the Board of such Person and any committees thereof, and, no meeting, or action taken by written consent, of any such members of such Person, the Board of Seller or committee has been held for which minutes have not been prepared and are not contained in such minute books. All of those books and records will be in the possession of the applicable member of the Ai University System or the South University System at such Closing (other than, for the avoidance of doubt, any books and records that constitute Excluded Assets).

3.20 <u>Sexual Harassment</u>. Except as set forth on <u>Schedule 3.20</u>, none of Seller or any member of the Ai University System or the South University System or any of their respective Affiliates is party to a settlement agreement with a current or former officer, employee, student, instructor or independent contractor of such Person or any of its Affiliates resolving allegations of sexual harassment or sexual misconduct by either (a) a director, manager, trustee or officer of such Person or any of its Affiliates or (b) an employee of such Person or any of its Affiliates. There are no, and there have not been any, actions of any type pending or, to Seller's Knowledge, threatened, against Seller or any member of the Ai University System or the South University System, in each case, involving allegations of sexual harassment or sexual misconduct by (i) any member of the senior management team of such Person or its Affiliates or (ii) any employee of such Person or any of its Affiliates in a managerial or executive position.

3.21    <u>No Undisclosed Liabilities; No Indebtedness</u>. Except as set forth on <u>Schedule 3.21</u>, neither the Ai University System nor the South University System has any liability other than (a) liabilities set forth on the liabilities side of the Most Recent Balance Sheet (excluding any notes thereto), (b) liabilities expressly contemplated by this Agreement or the other Transaction Documents, (c) Liabilities which have arisen after the date of the Most Recent Balance Sheet in the ordinary course of business, or (d) obligations pursuant to any Material Contract or any Contract not required to be set forth on <u>Schedule 3.7</u>, none of which with respect to clauses (c) and (d) above is a liability resulting from breach of contract, breach of warranty, product liability claim, tort, infringement, claim, Proceeding, violation of Law or environmental liability or clean-up obligation.  Except for Indebtedness of the South University System pursuant to the South Credit Agreement, no University System has any outstanding Indebtedness.

3.22    <u>Affirmation of Representations and Warranties</u>.   Seller affirms that each representation and warranty made in Article II of the Framework Agreement is true and correct in all material respects as of the date hereof (except for those representations and warranties which address matters only as of a particular date, which shall have been true and correct as of such particular date).

3.22    <u>Disclosure</u>.  The representations and warranties contained in this <u>ARTICLE III</u>, as supplemented by applicable schedules, do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this <u>ARTICLE III</u> not misleading.

ARTICLE IV
<u>REPRESENTATIONS AND WARRANTIES OF THE PURCHASER</u>

As a material inducement to Seller to enter into this Agreement and consummate the transactions contemplated hereby, each Purchaser hereby represents and warrants to Seller, solely with respect to itself and not with respect to any other Purchaser, as of the date of this Agreement and as of each Closing Date as follows:

4.1    <u>Organization, Power and Authority</u>.  Such Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Such Purchaser possesses all requisite corporate and authority necessary to carry out the transactions contemplated by this Agreement.

4.2    <u>Authorization; No Breach</u>.

(a)    The execution, delivery and performance of this Agreement and all other agreements or instruments contemplated hereby to which such Purchaser is a party or by which the Purchaser is bound have been duly authorized by such Purchaser.  This Agreement and all other agreements contemplated hereby to which such Purchaser is a party, when executed and delivered by such Purchaser in accordance with the terms hereof, shall each constitute a valid and binding obligation of such Purchaser, enforceable in accordance with its terms, in each case subject to the effect of any applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b)     The execution, delivery and performance by such Purchaser of this Agreement and all other agreements contemplated hereby to which such Purchaser is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by such Purchaser, do not and shall not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) give any third-party the right to modify, terminate or accelerate any obligation under, (iv) result in a violation of, or (v) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority pursuant to, (A) the organizational documents of the Purchaser, (B) any Law to which such Purchaser is subject, or (C) any material agreement, instrument, order, judgment or decree to which such Purchaser is subject.

4.3     <u>Litigation</u>.   There are no Proceedings pending or, to the Knowledge of such Purchaser, threatened against or affecting such Purchaser in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with the transactions contemplated hereby.

ARTICLE V
INDEMNIFICATION

5.1     <u>Indemnification Rights of the Parties</u>.  The rights of the parties to indemnification in connection with the transactions contemplated by this Agreement are as set forth in the Framework Agreement.  Without limiting the foregoing, Article VI of the Framework Agreement shall govern the indemnification rights of the Studio Indemnified Parties as if Article VI of the Framework Agreement was set forth herein.

ARTICLE VI
POST-CLOSING COVENANTS

Each of the parties hereto agrees as follows with respect to the period following each Closing:

6.1     <u>General</u>.  In case at any time after any Closing any further action is necessary to carry out the purposes of this Agreement, each of the parties hereto will take such further action (including (i) the execution and delivery of such further instruments and documents, and (ii) taking any further action required pursuant to <u>Section 4.6</u> of the Framework Agreement) as any other party reasonably may request, all at the sole cost and expense of the requesting party (unless the requesting party is entitled to indemnification therefore under the Framework Agreement).  Seller acknowledges and agrees that the Purchasers will be entitled to possession of all documents, books, records (including tax records), agreements, and Business Data of any sort relating to Transferred Assets and Assumed Liabilities.

6.2     <u>Accounts Receivable</u>.  Seller agrees each Purchaser shall have the right after the Closing to endorse all payments received by such Purchaser and which relate to such Purchaser's Business in respect of any of the accounts receivable included in the Transferred Assets in the name of Seller and to deposit the same into such Purchaser's bank accounts.  Seller agrees that it

shall promptly deliver to the applicable Purchaser all payments received by Seller after the Closing in respect of any of the accounts receivable.

6.3    <u>Certain Intellectual Property Matters</u>.

(a)    If any party discovers or identifies, or if any party uses, at any time, any Intellectual Property Rights that are owned or purported to be owned by Seller or any of its Affiliates that has been previously or currently is primarily used in or primarily held for use for the conduct or operation of the Business of the Ai University System or the South University System but was not transferred to the Purchasers (or their Affiliates, as applicable) prior to or at the time of the Closing, then, provided that the applicable Purchaser, upon identifying Seller rights that were not previously transferred to the Purchasers, provides prompt notice of same to Seller or its Affiliates: (i)  Seller agrees to (or cause its appropriate Affiliate to) transfer such Intellectual Property Rights to the applicable Purchaser (or an Affiliate of such Purchaser, as applicable), *provided* that with respect to any Intellectual Property Rights which are used by both University Systems, Studio shall designate the recipient of such Intellectual Property Rights in consultation with AII and South; and (ii) Seller acknowledges and agrees that, without limiting any other provision of this Agreement, upon the completion of such transfer, its obligations under this Agreement shall apply to any such Intellectual Property Rights, *provided* that, for avoidance of doubt, Shared IT Systems are not subject to the provisions of this <u>Section 6.3(a)</u> for so long as they remain Shared IT Systems.

(b)    To the extent that any Seller Intellectual Property Rights are neither (i) assigned to a Purchaser and its Affiliates nor (ii) licensed to a Purchaser (pursuant to the IP Assignment or pursuant to the Transition Services and License Agreement), then in each case ((i) and (ii)) Seller (on behalf of itself and its Affiliates) hereby grants, and hereby causes its Affiliates to grant, to the applicable Purchaser and its Affiliates, a non-exclusive, perpetual, irrevocable, royalty-free, fully paid-up, worldwide right and license to use and otherwise exploit, solely in connection with its Business, any and all Seller Intellectual Property Rights that may be useful for the conduct or operation of such Business and provided further, for avoidance of doubt, that Shared IT Systems are not subject to the provisions of this <u>Section 6.3(b)</u> for so long as they remain Shared IT Systems.  Such right and license may be sublicensed and assigned or otherwise transferred by the Purchasers and any of their Affiliates (or by any successors or permitted assigns) (including the right to grant further sublicenses through multiple tiers of sublicensees) with respect to any items of such Seller Intellectual Property Rights, but only in connection with the conduct or operation of the Business.

6.4    <u>Consent Judgment Compliance</u>.

(a)    At all times required under the EMC Consent Judgements, Seller and its Affiliates agree to fully comply with all obligations and conditions set forth in the EMC Consent Judgment.

(b)    From and after the Closing, to the extent that the EMC Consent Judgment remains applicable to any campus of the Ai University System or the South University System, Purchaser agrees to comply with all obligations and conditions set forth in the EMC Consent

Judgment which are applicable to the Ai University System or the South University System for such period of time as the EMC Consent Judgment remains in effect.

6.5    Delivery of Schedules.  Seller shall deliver to the Purchasers no later than January 31, 2019 (or such later date that the Purchasers may determine in their sole discretion) all of the schedules contemplated to be delivered under this Agreement (including the schedules to each Bill of Sale) and the other Transaction Documents and each such schedule shall be acceptable to the Purchasers, in their sole discretion.  In the event that any Purchaser is not satisfied with the schedules delivered pursuant to this Section 6.5 (as such schedules relate to the Transferred Assets purchased by such Seller) or Seller fails to deliver such schedules, such Purchaser may terminate this Agreement and/or any other document or instrument delivered pursuant to this Agreement with respect to itself or, to the extent permitted by applicable Law, such transactions consummated pursuant to this Agreement with respect to itself, in each case without any liability or obligation of any Purchaser, Studio or their respective Affiliates to any DCEH or its Affiliates or any other Person with respect thereto.  The schedules delivered pursuant to this Section 6.5 shall, to the extent possible, be organized by University System and further organized by campus or other entity with each University System.

ARTICLE VII
DEFINITIONS

For the purposes hereof, the following terms have the meanings set forth below:

"Accounts Receivable" means all accounts receivable (including trade accounts receivable and all trade debts due or accruing due to any member of the Ai University System, the South University System or Seller in respect of the Ai University System, the South University System and the full benefit of all security therefore) and notes receivable.

"Affiliate" has the meaning set forth in the Framework Agreement.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"AII" has the meaning set forth in the preamble to this Agreement.

"AII Assumed Liabilities" means the Assumed Liabilities related to the AII Transferred Assets.

"AII Transferred Assets" has the meaning set forth in Recital C to this Agreement.

"Art Grant" has the meaning set forth in the Framework Agreement.

"Assumed Liabilities" means only (a) the executory obligations of a Purchaser (as assignee of Seller) arising after the consummation of the transactions contemplated hereby pursuant to any Material Contract or any Contract not required to be set forth on Schedule 3.7 and which is actually assigned to such Purchaser (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement, claim, lawsuit, violation of Law, or environmental liability or clean-up obligation) and (b) without duplication of any obligations set forth in the Framework

Agreement, the executory obligations of each Purchaser arising after the date hereof pursuant to any Art Grants, Teach-Out Tuition Discounts, Employee Scholarships and Dream Center Scholarships granted to students and Program Participants at the Specified Campuses of AII and South (which, for the avoidance of doubt, shall constitute solely obligations to honor any such grants, tuition discounts and scholarships, including reflecting the grant on student accounts for each term they remain eligible throughout their enrollment, but shall in no case constitute financial obligations of such Purchaser to disburse any cash amounts to any recipients of scholarships beyond the tuition reduction).

"Bank Accounts" has the meaning set forth in Section 3.18.

"Business Assets" all right, title, and interest in and to all of the assets owned, used or held for use by Seller or its Affiliates with respect to the business of the South University System or the AII University System, including all of their respective (a) Personal Property, (b) Seller Intellectual Property Rights and Other Intellectual Property Rights, (c) agreements, contracts and rights thereunder (including those set forth on Schedule 3.7), (d) Governmental Approvals, (e) Business Data and Other Written Materials, (f) Accounts Receivable, (g) Goodwill, (h) the sponsorship of and all assets maintained pursuant to or in connection with any Assumed Employee Benefit Plan, (i) all Inventory, (j) all restricted cash relating to the advertising fund and/or co-op fund maintained by the Business, and (k) any Computer systems used in financial aid management and administration, any Curricular Materials, Curricular Know-How, any accounts receivable, student records, in each case related to (i) academic functions (instruction, advising, tutoring, faculty oversight and training) and (ii) financial aid functions.  For the avoidance of doubt and notwithstanding anything to the contrary contained herein, Business Assets include the assets of Seller or its Affiliates with respect to the Excluded Campuses.

"Business Data" means all data or information, in any format, collected, generated, or used in the conduct of the Business or necessary for the conduct of the Business, including all financial data related to the Business and all student data contained in any databases that are used in or necessary for the conduct of the Business.

"Business Day" has the meaning set forth in the Framework Agreement.

"Business" means the business of the Ai University System and/or the South University System, as applicable, as it is conducted and a the applicable Purchaser (or such Purchaser's designees, successors or assigns) determine to conduct it in the future.

"Change of Control" has the meaning set forth in the Framework Agreement.

"Closing" has the meaning set forth in Section 1.2.

"Closing Consideration" has the meaning set forth in the Framework Agreement.

"Closing Date" has the meaning set forth in Section 1.2.

"Code" has the meaning set forth in the Framework Agreement.

"Collateral" has the meaning set forth in the Framework Agreement.

"Compliance Date" has the meaning set forth in the Framework Agreement.

"Computer Systems" has the meaning set forth in Section 3.8(d).

"Consents" has the meaning set forth in Section 3.3(b).

"Contract" has the meaning set forth in the Framework Agreement.

"Curricular Know-How" has the meaning set forth in the License Agreement.

"Curricular Materials" has the meaning set forth in the License Agreement.

"DCEH Indemnified Parties" has the meaning set forth in the Framework Agreement.

"DCEH Material Adverse Effect" has the meaning set forth in the Framework Agreement.

"Dream Center Scholarship" has the meaning set forth in the Framework Agreement.

"Dream Employee Scholarship" has the meaning set forth in the Framework Agreement.

"Dream Intellectual Property Rights" has the meaning set forth in the Framework Agreement.

"Dream Parties" has the meaning set forth in Recital A to this Agreement.

"Educational Approval" has the meaning set forth in the Framework Agreement.

"Effective Time" has the meaning set forth in Section 1.2.

"EMC Consent Judgment" has the meaning set forth in the Managed Services Agreement.

"EMC Refund Liabilities" has the meaning set forth in the definition of "Retained Liabilities".

"Employee Benefit Plan" means each "Employee Benefit Plan" (as defined in the Framework Agreement) that is (i) maintained, sponsored, contributed to (or required to be contributed to) by (A) any of Seller, the Ai University System or the South University System, (B) any member of the Ai University System or the South University System, or (C) any other Person, in each case on behalf of any employee of or service provider to Seller, the Ai University System or the South University System; or (ii) with respect to which Seller, the Ai University System or the South University System or any of their respective ERISA Affiliates have any current or potential liability or obligation.

"Environmental, Health and Safety Requirements" means, whenever in effect, all Laws and all judicial and administrative orders and determinations, in each case concerning public health or safety, worker health or safety, pollution, or protection of the environment.

"Equity Interest" means any share, capital stock, partnership, member or similar interest in any Person, and any option, warrant, right or security (including debt securities) convertible, exchangeable or exercisable therefore.

"ERISA Affiliate" has the meaning set forth in the Framework Agreement.

"ERISA" has the meaning set forth in the Framework Agreement.

"Excluded Assets" means (a) the qualifications to conduct business as a foreign business entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, equity interest transfer books, and other documents relating to the organization, maintenance, and existence of Seller as a limited liability company, (b) any of the rights of Seller under this Agreement and the instruments and certificates delivered in connection with this Agreement, (c) agreements or other documents related to Indebtedness of Seller, (d) any books, records, correspondence, other documents and litigation files and the right to receive mail and other communications addressed to Seller which, in each case, relate to items (a) or (b) above or the Retained Liabilities, (e) cash (other than the restricted cash relating to the advertising fund and/or co-op fund maintained by the Business), (f) any assets maintained pursuant to or in connection with any Employee Benefit Plan, (g) all personnel files for employees or former employees (except personnel files regarding Transferred Employees) and (h) the Excluded Campuses.

"Excluded Campuses" has the meaning set forth in Recital C to this Agreement.

"Excluded Parent" has the meaning set forth on Exhibit A hereto.

"Excluded Taxes" means (i) any Taxes for which Seller or any of its respective Affiliates (other than AII, South and the respective Subsidiaries that are Transferred Assets) is liable, (ii) any Taxes in respect of the any of the Transferred Assets and Taxes for which AII, Studio and their respective Subsidiaries that are transferred hereunder are liable that relate, in each case, to Tax periods (or any portions thereof) ending on or before the Closing Date, (iii) any Taxes for which AII, Studio and their respective Subsidiaries are liable as a transferee, successor or by contract; (iv) any Taxes relating to the Excluded Assets or Retained Liabilities for any Tax period; (v) any Taxes for which any of AII, Studio or their respective Subsidiaries are liable because of a breach of any representation set forth in Section 3.6 and (vi) any Transfer Taxes for which Seller is responsible pursuant to Section 8.1; *provided* that with respect to any Taxes described in clause (ii) that relate to a Tax period that begins on or before and ends after the Closing Date, the amount of any property, ad valorem or similar Taxes or of any item determined on a time basis shall be apportioned to the Tax period ending on the Closing Date on a basis of daily pro-rating, and in the case of any other Taxes, the amount allocable to the portion of the Tax period ending on the Closing Date shall be computed on a closing-of-the-books basis as if such Tax period ended as of the end of the day on the Closing Date.

"Financial Statements" has the meaning set forth in the Framework Agreement.

"Foundation" has the meaning set forth in Recital C to this Agreement.

"Framework Agreement" has the meaning set forth in Recital A to this Agreement.

"GAAP" has the meaning set forth in the Framework Agreement.

"Goodwill" means all goodwill associated with the Business (including, the exclusive right of each Purchaser to represent itself as carrying on the Business in succession of Seller and all records and information relating to the suppliers, customers and employees of and consultants to the Business and all pertinent files, catalogues and promotional materials relating to the Business).

"Governmental Approval" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority.

"Governmental Authority" has the meaning set forth in the Framework Agreement.

"Hazardous Substance(s)" means any substance, material or waste that is characterized, classified or designated under any Environmental, Health and Safety Requirements as hazardous, toxic, a pollutant, or radioactive, including petroleum, asbestos, noise, odor and toxic mold, or for which liability or standards of conduct may be imposed under any Environmental, Health and Safety Requirements.

"Indebtedness" has the meaning set forth in the Framework Agreement.

"Inventory" means assets that are materials or supplies to be used in the rendering of services with respect to the Business.

"Investment" as applied to any Person means (i) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, stock, securities or ownership interest (including partnership interests and joint venture interests) of any other Person and (ii) any capital contribution by such Person to any other Person.

"IP Assignment" has the meaning set forth in the Framework Agreement.

"Knowledge" has the meaning set forth in the Framework Agreement.

"Law" has the meaning set forth in the Framework Agreement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interests in real property held by Seller with respect to the Ai University System or the South University System.

"Leases" means all leases, subleases, licenses, concessions and other agreements pursuant to which Seller holds any Leased Real Property which is used in the operation of the Business, including the right to all security deposits and other amounts and instruments deposited by or on behalf of Seller thereunder.

"liability" has the meaning set forth in the Framework Agreement.

"License Agreement" has the meaning set forth in the Framework Agreement.

"Lien" or "Liens" means any mortgage, pledge, security interest, right of first refusal, option, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against Seller, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute (other than to reflect ownership by a third-party of property leased to Seller under a lease which is not in the nature of a conditional sale or title retention agreement), or any subordination arrangement in favor of another Person.

"Managed Services Agreement" has the meaning set forth in the Framework Agreement.

"Marks" has the meaning set forth in the Framework Agreement.

"Material Contracts" has the meaning set forth in Section 3.7(b) of this Agreement.

"Most Recent Balance Sheet" has the meaning set forth in the Framework Agreement.

"ordinary course" and "ordinary course of business" have the meaning set forth in the Framework Agreement.

"Other Intellectual Property Rights" means any licenses, sublicenses and other rights granted and obtained with respect to Seller Intellectual Property Rights, and rights thereunder, including rights to collect royalties, products and proceeds, rights to sue and remedies against past, present and future infringements or misappropriations thereof or conflicts therewith, rights to recover damages or lost profits in connection therewith, and other rights to protection or enforcement of interests therein under the Laws of all jurisdictions.

"Other Written Materials" means any books, records, ledgers, files, documents, correspondence, lists, plates, architectural plans, drawings, and specifications, creative materials, advertising and promotional materials, studies, reports, and other printed or written materials.

"Permit" has the meaning set forth in the Framework Agreement. For the avoidance of doubt, Permits include the Educational Approvals.

"Permitted Liens" has the meaning set forth in the Framework Agreement.

"Person" has the meaning set forth in the Framework Agreement.

"Personal Information" has the meaning set forth in the Framework Agreement.

"Personal Property" means all tangible personal property (including leasehold improvements, office equipment, supplies, furniture, fixtures, computers, computer hardware) located at or used by a Specified Campus.

"PPA" has the meaning set forth in the Framework Agreement.

"Pre-Closing Educational Consents" has the meaning set forth in the Framework Agreement.

"Pre-Closing Period" has the meaning set forth in the Framework Agreement.

"Privacy Laws" has the meaning set forth in the Framework Agreement.

"Proceeding" has the meaning set forth in the Framework Agreement.

"Process" or "Processing" has the meaning set forth in the Framework Agreement.

"Purchase Price" has the meaning set forth in Section 1.1 of this Agreement.

"Purchasers" has the meaning set forth in the preamble to this Agreement.

"Reorganization" has the meaning set forth in the Framework Agreement.

"Representatives" has the meaning set forth in the Framework Agreement.

"Retained Liabilities" means any liability or obligation of any kind, nature or character of Seller not expressly included within the definition of Assumed Liabilities, whether presently in existence or arising hereafter, including: (a) Indebtedness of Seller, (b) any liability for or on account of any Excluded Taxes, (c) any liability for costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby, (d) any liability of Seller under this Agreement or any other instrument or agreement entered into in connection herewith, (e) any liability related to any checks outstanding, (f) any liability arising in connection with the actual or prospective employment or service with, or termination of employment or service from, Seller or any Person, (g) any liability arising in connection with any Employee Benefit Plan, (h) obligations of Seller with respect to (i) any single employer plan or other pension plan that is subject to Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code, (ii) any multiemployer plan (within the meaning Section 3(37) of ERISA), (iii) any "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the Code), or (iv) any "multiple employer welfare arrangement" (within the meaning of Section 3(40) of ERISA), (j) any liability that is or may be imposed on Seller due to its status as an ERISA Affiliate of any other entity, (k) any obligation of Seller with respect to wages, remuneration, compensation (including any equity grants, transaction bonuses, success fees, change of control payments or other similar obligations arising in connection with the transaction contemplated by this Agreement), benefits, severance or other accrued obligations (i) associated with any employee or other service provider of any Company who does not become a Transferred Employee (or any dependent or beneficiary thereof), and (ii) with respect to any Transferred Employee, arising on or prior to the date such employee began employment as a Transferred Employee, (l) any claim of an unfair labor practice, or any claim under any state unemployment compensation or worker's compensation Law or regulation or under any federal or state employment Law or other Law or regulation relating to employment, discrimination, classification or other matters relating to any employee or other service provider, in any case, with respect to (i) any employee or other service provider of any Company who does not become a Transferred Employee (or any dependent or beneficiary thereof), and (ii) any Transferred Employee, to the extent arising on or prior to the date such employee began employment as a Transferred Employee, (m) obligations for "earn out" payments or payments in respect of the deferred purchase price for goods or services, (n) any liability arising under or relating to Environmental, Health and Safety Requirements, (o) any liability arising under or relating to the Lease which is not assumed by Purchaser, in its sole discretion, (p) any liabilities of

Seller relating to any Excluded Assets or (q) any liability arising in connection with any refunds of tuition and fees that may be due by any Dream Party or any of its Affiliates now or in the future to any Student pursuant to paragraphs 104 and 105 of the EMC Consent Judgment (the "EMC Refund Liabilities"), the fees and expenses of any monitor appointed in connection with the EMC Consent Judgement or any other liabilities in connection with the EMC Consent Judgement arising from or related to facts, events, conditions, actions or circumstances arising or occurring prior to the date hereof.

"Security Incidents" means (i) any unauthorized access, acquisition, interruption, alteration or modification, disclosure, loss, theft, corruption or other unauthorized Processing of Personal Information, (ii) inadvertent, unauthorized, and/or unlawful sale, disclosure, or rental of Personal Information, or (iii) any other unauthorized access to, acquisition of, interruption of, alteration or modification of, loss of, theft of, corruption of, or use of the Seller IT Systems.

"Seller Intellectual Property Rights" has the meaning set forth in Section 3.8(b).

"Seller IT Systems" means all information technology and computer systems (including Seller Software, information technology infrastructure and assets and telecommunication hardware and other equipment) used by or for the benefit of Seller, including those relating to the transmission, storage, maintenance, organization, presentation, generation, Processing or analysis of all data and information collected, generated, or used in the conduct of the Business.

"Seller Privacy Policies" means each external or internal, past or present privacy policy of Seller or any of its Affiliates, including any policy, procedure, or statement relating to: (a) the privacy of users of Seller website, application, or Seller Software; (b) the collection, storage, disclosure, and transfer of any Personal Information; and (c) any employee information.

"Seller Products" means products and services, including Seller Software, which have been or are currently offered, distributed or under development in any respect by Seller.

"Seller Software" means all computer software, cloud software, databases, websites, or applications (including all source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded and all documentation associated with any of the foregoing) owned or purportedly owned by Seller, licensed by Seller from third parties, or otherwise used or held for use in the Business.

"Seller" has the meaning set forth in the preamble to this Agreement.

"Shared IT Services" has the meaning set forth in the Transition Services and License Agreement.

"Shared IT Systems" has the meaning set forth in the Transition Services and License Agreement.

"Signatories" has the meaning set forth in Section 3.18.

"South" has the meaning set forth in the preamble to this Agreement.

"South Assumed Liabilities" means the Assumed Liabilities related to the South Transferred Assets.

"South Credit Agreement" means that certain $25,000,000 Senior Secured Credit and Guaranty Agreement, dated on or about the date hereof, by and among South, certain Subsidiaries of South, the various lenders party thereto and U.S. Bank National Association as collateral agent thereunder.

"South Transferred Assets" has the meaning set forth in Recital C to this Agreement.

"Specified Campuses" means the campuses and Subsidiaries set forth under the heading "Specified Campuses" on Exhibit A; *provided* that Specified Campuses shall not include any campus or Subsidiary which is an Excluded Campus.

"Student" has the meaning set forth in the EMC Consent Judgment.

"Studio Indemnified Parties" has the meaning set forth in the Framework Agreement.

"Studio" has the meaning set forth in Recital A to this Agreement.

"Subsidiary" has the meaning set forth in the Framework Agreement.

"Tax Return" has the meaning set forth in the Framework Agreement.

"Tax" or "Taxes" have the meaning set forth in the Framework Agreement.

"Teach-Out Tuition Discount" has the meaning set forth in the Framework Agreement.

"Teach-Out" has the meaning set forth in the Framework Agreement.

"Transaction Documents" has the meaning set forth in the Framework Agreement.

"Transfer Taxes" has the meaning set forth in the Framework Agreement.

"Transferred Assets" has the meaning set forth in Recital C to this Agreement.

"Transferred Employee" has the meaning set forth in the Framework Agreement.

"Transferred Interests" has the meaning set forth in Recital C to this Agreement.

"Transition Services and License Agreement" has the meaning set forth in Recital A to this Agreement.

"Treasury Regulation" means the United States Treasury Regulations promulgated under the Code, and any reference to any particular Treasury Regulation section shall be interpreted to include any final or temporary revision of or successor to that section regardless of how numbered or classified.

"<u>Uncertificated Equity Interest Power</u>" has means each Uncertificated Unit Power delivered pursuant to this Agreement, which shall be in the form set forth on <u>Exhibit C</u>.

"<u>University System</u>" the Ai University System or the South University System, as the case may be.

ARTICLE VIII
MISCELLANEOUS

8.1    <u>Transfer Taxes</u>.  Seller and its respective Affiliates (other than AII, South or their respective Affiliates that are transferred hereunder) shall be responsible for all Transfer Taxes in accordance with <u>Section 4.23</u> of the Framework Agreement.

8.2    <u>Fees and Expenses</u>.  Except as may otherwise be expressly set forth herein or in any other Transaction Document, all fees and expenses incurred in connection with the authorization, preparation, negotiation, execution and performance of this Agreement and the potential consummation of the transactions contemplated hereby shall be the obligation of the respective party incurring such fees and expenses, *provided that*, for avoidance of doubt, all fees associated with regulatory applications and notices shall be the responsibility of the applicable Purchaser as provided in <u>Section 4.6</u> of the Framework Agreement.

8.3    <u>Obligations</u>.  The obligations of the Purchasers under this Agreement are several and not joint.  In no event shall any Purchaser (a) be responsible or liable for any breach of, inaccuracy in or failure to comply with any representation, warranty or covenant by another Purchaser under this Agreement or otherwise or (b) have any liability or obligation to any Person under this Agreement except (and subject to the terms of this Agreement and the Framework Agreement) to Seller with respect to a Specified Campus.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto.  The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

8.4    <u>Remedies</u>.

(a)    Except as otherwise provided herein, any and all remedies available at law or in equity, whether or not herein expressly conferred upon a party, will be deemed cumulative with and not be exclusive of any other remedy conferred hereby, or by Law or in equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

(b)    The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the transactions contemplated by this Agreement) in

accordance with its specified terms or otherwise breach such provisions. Accordingly, the Parties acknowledge and agree that the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with any such order or injunction.

(c)     The Parties hereto further agree that (i) by seeking the remedies provided for in this Section 8.4, a party shall not in any respect waive its right to seek any other form of relief that may be available to a party under this Agreement (including monetary damages) in the event that this Agreement has been terminated or in the event that the remedies provided for in this Section 8.4 are not available or otherwise are not granted, and (ii) nothing set forth in this Section 8.4 shall require any party hereto to institute any proceeding for (or limit any party's right to institute any proceeding for) specific performance under this Section 8.4 prior or as a condition to exercising any termination right (and pursuing damages after such termination), nor shall the commencement of any Proceeding pursuant to this Section 8.4 or anything set forth in this Section 8.4 restrict or limit any party's right to terminate this Agreement or pursue any other remedies under this Agreement that may be available then or thereafter.

8.5     Amendments; Extension; Waivers.

(a)     This Agreement may be amended or modified in whole or in part only by a writing signed and delivered by Seller and the Foundation.

(b)     The Foundation may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of Seller, (ii) waive any breaches of or inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.

(c)     Seller may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations of the Purchasers, (ii) waive any breaches of or inaccuracies in the representations and warranties made to Seller contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.

(d)     Any agreement on the part of any party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party. Notwithstanding the foregoing, failure of any party to insist on performance of any term or condition of this Agreement or to exercise any right or privilege hereunder will not be construed as a continuing or future waiver of such term, condition, right or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

8.6     <u>Successors and Assigns</u>.  Seller may not assign (including by operation of law) either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the Purchasers, which, with respect to any proposed assignment made in connection with the Reorganization, shall not be unreasonably withheld.  No Purchaser may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Seller; *provided* that notwithstanding the foregoing, each Purchaser may without the prior written approval of Seller (a) assign this Agreement or any rights, interests or obligations hereunder to any of its Affiliates or in connection with any Change of Control of any Purchaser and (b) assign its rights but not its obligations hereunder as collateral in respect of any Indebtedness of any Purchaser or its Affiliates.  Any purported assignment of this Agreement, or any rights or obligations hereunder, which does not comply with this <u>Section 8.6</u> shall be void. Subject to the provisions of this <u>Section 8.6</u>, this Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

8.7     <u>Severability</u>.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto.  The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

8.8     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by E-mail of a .pdf attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

8.9     <u>Interpretation</u>.

(a)     Unless otherwise indicated, all references herein to Articles, Sections, Exhibits or Schedules, shall be deemed to refer to Articles, Sections, Exhibits or Schedules of or to this Agreement, as applicable.

(b)     Unless otherwise indicated, the words "include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation."

(c)     The word "or" is not exclusive.

(d)     The table of contents and headings set forth in this Agreement are for convenience of reference purposes only and shall not affect or be deemed to affect in any way the meaning or interpretation of this Agreement or any term or provision hereof.

(e)     Any capitalized terms used in any Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement.

(f)     Unless otherwise indicated, all references herein to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person unless otherwise indicated or the context otherwise requires.

(g)     Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

(h)     References to "$" and "dollars" are to the currency of the United States of America.

(i)     Any dollar or percentage thresholds set forth herein shall not be used as a benchmark for the determination of what is or is not "material," or "DCEH Material Adverse Effect" under this Agreement.

(j)     When used herein, the word "extent" and the phrase "to the extent" means the degree to which a subject or other thing extends, and such word or phrase shall not simply mean "if."

(k)     Any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws.

(l)     Unless "Business Days" are expressly specified, all references to "days" are to calendar days.

(m)     The parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

(n)     The words "member of a University System", "University System member" or words of similar import refer to the applicable of AII or South and its respective Subsidiaries, each of which is a member of the applicable University System.

8.10    Entire Agreement.  This Agreement (including the Schedules and the Exhibits hereto which are expressly made part of this Agreement), the Framework Agreement, and the agreements and documents referred to herein and therein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way.  In the event of any conflict between this Agreement and the Framework Agreement, the provisions of the Framework Agreement shall control.

8.11    Third-Party Beneficiaries.  This Agreement is not intended to, and shall not, confer upon any other Person any rights or remedies hereunder; *provided* that the Studio Indemnified Parties are express third-party beneficiaries of ARTICLE V of this Agreement and Studio is an express third-party beneficiary of each and every provision of this Agreement intended for its benefit or conferring upon it a right.  The representations and warranties in this Agreement are the

product of negotiations among the parties hereto and are for the sole benefit of the parties hereto. Any inaccuracies in such representations and warranties are subject to waiver by the parties hereto in accordance with <u>Section 8.5(a)</u> without notice or liability to any other Person. The representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any of the parties hereto. Accordingly, Persons other than the parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

      8.12    <u>Schedules and Exhibits</u>. All Schedules and Exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

      8.13    <u>Governing Law; Jurisdiction and Venue; Waiver of Jury Trial</u>.

      (a)    This Agreement, and all Proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the actions of the parties hereto in the negotiation, administration, performance and enforcement hereof, shall be governed by and construed in accordance with the internal substantive Laws of the State of Delaware, without giving effect to any choice or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of California.

      (b)    Each of the Parties hereto submits to the exclusive jurisdiction and venue of the Delaware Chancery Courts located in Wilmington, Delaware, or, if such court shall not have jurisdiction, any state or federal court sitting in Wilmington, Delaware, in any action or proceeding arising out of or relating to this Agreement or any other Transaction Document and agrees that all claims in respect of the action or proceedings may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each of the Parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in <u>Section 8.14</u>, such service to become effective ten (10) days after such mailing.

      (c)    EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

      8.14    <u>Notices</u>. Any notice required to be given hereunder shall be sufficient if in writing and sent by E-mail transmission (provided that any notice received by E-mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (local time of the recipient) shall be deemed to have been received at 9:00 a.m. (local time of the recipient) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows (or

at such other address for a party as shall be specified in a notice given in accordance with this Section 8.14):

>> If to Seller:
>>
>>> Dream Center Education Holdings, LLC
>>> 1400 Penn Avenue
>>> Pittsburgh, PA 15222
>>> E-Mail:  rbarton4953@gmail.com
>>> Attention:  Randall K. Barton, Executive Chairman
>>
>>> with copy (which shall not constitute notice) to:
>>
>>> 1100 Walnut Street, Suite 2900
>>> Kansas City, Missouri 64106
>>> E-mail: rholt@rousepc.com
>>> Attention:  Ronald L. Holt
>>
>> If to any Purchaser:
>>
>>> 1201 West 5th Street, Ste. T410
>>> Los Angeles, CA 90017
>>> E-mail: bryan@studioenterprises.com
>>> Attention: Bryan Newman, CEO
>>
>>> with copies (which shall not constitute notice to the Purchasers) to:
>>
>>> Cooley LLP
>>> 4401 Eastgate Mall
>>> San Diego, CA 92121-1909
>>> Email: kleecarey@cooley.com
>>> Attention:  Katherine (Kate) Carey
>>
>>> and:
>>
>>> Covington & Burling LLP
>>> 620 Eighth Avenue
>>> New York, NY 10018
>>> Email:  jpotash@cov.com; awollensack@cov.com
>>> Attention:  Jeffrey Potash and Amy Wollensack

8.15    Public Disclosure.  Each party hereto agrees that it shall, and shall cause its Affiliates and Representatives not to, make any press release or public announcement regarding the subject matter of this Agreement or the transactions contemplated hereby without advance approval thereof by the other party, except as may be required by applicable Law.  If any such press release or public announcement is required by applicable Law to be made by a party or any of its Affiliates, prior to making such announcements, the Person making such announcement will

deliver a draft of such announcement to the Foundation and shall give the other party a reasonable opportunity to comment thereon and will consider such comments in good faith.  The Parties agree that the provisions of this Section 8.15 shall survive the last Closing and shall not (a) restrict any Affiliate of any party hereto which is a private equity or other investment fund from disclosing the transactions contemplated by this Agreement to its current or prospective investors or in providing general information about the subject matter of this Agreement in connection with its fund raising, marketing, informational or reporting activities or (b) restrict any party from enforcing its rights under this Agreement or defending any claims in connection herewith.

*[Remainder of Page Intentionally Left Blank; Signature Page to Follow]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

DREAM CENTER EDUCATION HOLDINGS, LLC

By: _____
     Name:
     Title:

**EDUCATION PRINCIPLE FOUNDATION**

By: _____
     Name:
     Title:

**DREAM CENTER SOUTH UNIVERSITY, LLC**

By: _____
      Name:
      Title:

THE ARTS INSTITUTES INTERNATIONAL, LLC

By: _____
      Name:
      Title:

## EXHIBIT A

## Specified Campuses

| Specified Campus | University System | Legal Entity |
|---|---|---|
| Ai Atlanta | Ai University System | DC Art Institute of Atlanta, LLC |
| Ai Virginia Beach | Ai University System | DC Art Institute of Virginia Beach, LLC |
| Ai Tampa | Ai University System | DC Art Institute of Tampa, LLC |
| Ai Miami | Ai University System | DC Miami International University of Art & Design, LLC |
| Ai Dallas | Ai University System | DC Art Institute of Dallas, LLC |
| Ai Houston | Ai University System | The Art Institute of Houston, LLC |
| Ai San Antonio | Ai University System | DC Art Institute of San Antonio, LLC |
| Ai Austin | Ai University System | DC Art Institute of Austin, LLC |
| N/A | Ai University System | AiH Restaurant, LLC |
| N/A | Ai University System | DC AiD Restaurant, LLC |
| N/A | Ai University System | AiTampa Restaurant, LLC |
| South University - Savannah | South University System | South University Savannah, LLC |
| South University - Montgomery | South University System | South University of Alabama, LLC |
| South University - Tampa | South University System | DC South University Florida, LLC |
| South University - West Palm Beach | South University System | DC South University Florida, LLC |
| South University - Austin | South University System | DC South Education - Texas, LLC |
| South University - Richmond | South University System | DC South University of Virginia, LLC |
| South University - Virginia Beach | South University System | DC South University of Virginia, LLC |
| South University - Columbia | South University System | South University of Carolina, LLC |
| South University - Atlanta (teaching site) | South University System | South University Savannah, LLC |

Exhibit A - Page 2

| Specified Campus | University System | Legal Entity |
|---|---|---|
| South University - Orlando (teaching site) | South University System | DC South University Florida, LLC |
| N/A | South University System | South University Research II LLC |
| South University - Highpoint | South University System | DC South University of North Carolina, LLC |

## Excluded Campuses*

| Excluded Campus | University System | Legal Entity | Transferring Parent |
|---|---|---|---|
| Ai Charleston | Ai University System | DC Art Institute of Charleston, LLC | DC Art Institute of Atlanta, LLC |
| Ai Washington | Ai University System | DC Art Institute of Washington, LLC | DC Art Institute of Atlanta, LLC |
| Ai Nashville | Ai University System | The Art Institute of Tennessee - Nashville, LLC | DC Art Institute of Atlanta, LLC |
| Ai Colorado | Ai University System | The Art Institute of Colorado, LLC | AII |
| Ai Phoenix | Ai University System | DC Art Institute of Phoenix, LLC | AII |
| Ai Portland | Ai University System | The Art Institute of Portland, LLC | AII |
| Ai Pittsburgh | Ai University System | The Art Institute of Pittsburgh, DC, LLC | AII |
| Ai Philadelphia | Ai University System | The Art Institute of Philadelphia, DC, LLC | AII |
| Ai Fort Lauderdale | Ai University System | DC Art Institute of Fort Lauderdale, LLC | AII |
| Ai Illinois | Ai University System | The Illinois Institute of Art, LLC | AII |
| Ai Michigan | Ai University System | The Art Institute of Michigan, LLC | N/A |
| Ai Schaumburg | Ai University System | The Illinois Institute of Art at Schaumburg, LLC | N/A |

Exhibit A - Page 3

| Excluded Campus | University System | Legal Entity | Transferring Parent |
|---|---|---|---|
| N/A | Ai University System | DC Art Institute of Michigan, LLC | N/A |
| Ai Las Vegas | Ai University System | The Art Institute of Las Vegas, LLC | N/A |
| Ai Indianapolis | Ai University System | The Art Institute of Indianapolis, LLC | N/A |
| Ai Charlotte | Ai University System | The DC Art Institute of Charlotte, LLC | DC Miami International University of Art & Design, LLC |
| Ai Raleigh-Durham | Ai University System | The DC Art Institute of Raleigh-Durham, LLC | N/A |
| N/A | Ai University System | AiIN Restaurant, LLC | N/A |
| N/A | Ai University System | AiTN Restaurant, LLC | N/A |
| Ai Seattle | Ai University System | The Art Institute of Seattle, LLC | The Arts Institutes International, LLC |
| South University - Novi | South University System | South University of Michigan, LLC | South University Savannah, LLCSouth |
| South University - Cleveland | South University System | South University of Ohio, LLC | South University Savannah, LLCSouth |
| N/A | South University System | DC South Michigan | South University Savannah, LLC |

*Green shading denotes the legal entity which much be transferred to remove the Excluded Campus and its Subsidiaries from the University System and such legal entities is herein referred to as "Excluded Parent".

**EXHIBIT B**

FORM OF BILL OF SALE

BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of [●], by and between Dream Center Education Holdings, LLC, a Arizona not-for-profit limited liability company, as Seller ("Seller"), and **[The Arts Institute International, LLC/Dream Center South University, LLC]**, an Arizona not-for-profit limited liability company, as Purchaser ("Purchaser").

WHEREAS, Seller and Purchaser have entered into that certain Equity and Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), pursuant to which, among other things, Seller has agreed to sell, transfer, assign and convey to Purchaser all of Seller's right, title and interest in and to certain assets (the "Assets") set forth in Exhibit A hereto. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and obligations set forth herein and in the Purchase Agreement and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as set forth below.

Section 1.  Sale and Assignment of Assets. Upon the terms of and subject to the conditions set forth in the Asset Purchase Agreement and this Agreement, Seller hereby sells, transfers, assigns and conveys to Purchaser, and Purchaser hereby accepts free and clear of all Liens other than Permitted Liens, as of the Effective Date, all of Seller's right, title and interest in and to the **[AII Transferred Assets/South Transferred Assets]**.

Section 2.  Assumed Liabilities. Upon the terms of and subject to the conditions set forth in the Asset Purchase Agreement and this Agreement, Seller hereby sells, transfers, assigns and conveys to Purchaser, and Purchaser hereby assumes, and agrees to pay, perform and discharge, as of the Effective Date, all of Seller's right, title and interest in and to the **[AII Assumed Liabilities/South Assumed Liabilities]**.

Section 3.  Excluded Assets. The parties hereto hereby agree that none of the Excluded Assets are sold, transferred, assigned or conveyed hereby and that all of the Excluded Assets are retained by Seller.

Section 4.  Purchase Agreement. This is the "Bill of Sale" referred to in the Purchase Agreement. This Agreement is made pursuant to, and is subject to the terms of, the Purchase Agreement and no term or provision of this Agreement shall be deemed to supersede, modify, replace, amend, rescind, waive, narrow or broaden any term or provision of the Purchase Agreement. Notwithstanding anything to the contrary set forth herein, if there is any conflict between the terms and conditions of this Agreement and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Purchase Agreement shall control.

Section 5  Notice. Purchaser and Seller mutually agree that each party shall timely give such written notice of the assignment provided under this Agreement as may be required under any of the executory contracts included in the **[AI Assumed Liabilities/South Assumed Liabilities]**, excluding any such notice otherwise to be furnished from Purchaser to Seller and vice

versa and also excluding any such notice to students who are parties to enrollment agreements. Purchaser and Seller also agree to furnish each other party with copies of any such notices.

Section 6.  <u>Further Assurances</u>.  If any further action is necessary, proper or desirable to carry out any purpose of this Agreement, then each party shall take such further action (including the execution and delivery of further documents) as any other party reasonably requests to carry out such purpose. The foregoing shall be at the expense of such requesting party, except to the extent such requesting party is entitled to indemnification therefor or to the extent the Asset Purchase Agreement otherwise allocates such expense to any other party.

Section 7.  <u>Successors and Assigns; No Third Party Rights</u>.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by, the parties hereto and their respective permitted successors and assigns in accordance with the terms of the Asset Purchase Agreement. This Agreement is for the sole benefit of the parties hereto and their respective permitted successors and assigns and not for the benefit of any third party.

Section 8.  <u>Governing Law</u>.  This Agreement shall be governed by and construed and interpreted in accordance with the Laws of the State of Delaware, without regard to the conflicts of Laws principles thereof to the extent that such principles would require or permit the application of the Laws of a jurisdiction other than the State of Delaware.  All disputes arising out of this Agreement shall be subject to <u>Section 8.13</u> of the Asset Purchase Agreement.

Section 9.  <u>Amendments</u>.  This Agreement may be amended, modified, superseded or canceled only by an instrument in writing signed by an officer of each of the parties hereto.

Section 10.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Copies of executed counterparts transmitted by email with PDF attachment shall be considered original executed counterparts.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by their respective representatives thereunto duly authorized as of the date first above written.


SELLER:

**DREAM CENTER EDUCATION HOLDINGS, LLC**


By:_____
    Name:
    Title:

EXHIBIT B - Page 4

PURCHASER:

**[THE ARTS INSTITUTE INTERNATIONAL, LLC/DREAM CENTER SOUTH UNIVERSITY, LLC]**

By:_____
    Name:
    Title:

EXHIBIT B - Page 5

# **EXHIBIT A**

## ASSETS

**[DCEH:  Please provide.]**

## EXHIBIT C
## Form of Uncertificated Equity Interest Powers

### UNCERTIFICATED EQUITY INTEREST POWER

**FOR VALUE RECEIVED**, the undersigned, **[DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona not-for-profit limited liability company/Transferring Parent]** ("Transferor"), does hereby sell, assign and transfer to _____ (name of transferee), a _____ (state of transferee) not-for-profit _____ (entity type of transferee) ("Transferee") all of its Equity Interests (as hereinafter defined) of **[DREAM CENTER SOUTH UNIVERSITY, LLC, an Arizona not-for-profit limited liability company]/THE ARTS INSTITUTES INTERNATIONAL, LLC, an Arizona not-for-profit limited liability company/Excluded Parent]** ("Issuer"), standing in the name of Transferor on the books of said Issuer (the "Transferred Interest"). Transferor does hereby irrevocably constitute and appoint Transferee, as attorney, to transfer the Equity Interest in said Issuer with full power of substitution in the premises. The term "Equity Interest" means any security, share, unit, partnership interest, membership interest, ownership interest, equity interest, option, warrant, participation, "equity security" (as such term is defined in Rule 3(a)11-1 of the General Rules and Regulations of the Securities Exchange Act of 1934, as amended, or any similar statute then in effect, promulgated by the Securities and Exchange Commission and any successor thereto) or analogous interest (regardless of how designated) of or in a corporation, partnership, limited partnership, limited liability company, limited liability partnership, business trust or other entity, of whatever nature, type, series or class, whether voting or nonvoting, certificated or uncertificated, common or preferred, and all rights and privileges incident thereto.

Dated: _____

**TRANSFEROR:**

**[DREAM CENTER EDUCATION HOLDINGS, LLC/Transferring Parent]**

By: _____
Name: _____
Its: _____

EDUCATION PRINCIPLE FOUNDATION

By: _____

Name: Morris Beyda

Title:

*[Signature Page to Equity and Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

DREAM CENTER EDUCATION HOLDINGS, LLC

By: _Randall K Barton_

Name: RANDALL K BARTON

Title: Chairman & CDO

*[Signature Page to Equity and Asset Purchase Agreement]*

DREAM CENTER SOUTH UNIVERSITY, LLC

By: _Randull K Burton_

Name: RANDALL K. BARTON

Title: Manager

THE ARTS INSTITUTES INTERNATIONAL, LLC

By: _Randall K. Barton_

Name: RANDALL K. BARTON

Title: _Manager_