# MANAGED SERVICES AGREEMENT

This Managed Services Agreement (this "<u>Agreement</u>") is made as of January [--], 2019 (the "<u>Effective Date</u>") by and among STUDIO ENTERPRISE MANAGER, LLC, a Delaware limited liability company ("<u>Studio</u>") and DREAM CENTER SOUTH UNIVERSITY, LLC, an Arizona not-for-profit limited liability company (the "<u>University</u>" and, together with Studio, each a "<u>Party</u>" and together the "<u>Parties</u>"), to provide specified services to the University.

WHEREAS, the University is an institution of higher education duly authorized by applicable state and federal authorities to deliver programs of instruction leading to academic degrees institutionally accredited by the Southern Association of Colleges and Schools (the "<u>University Accreditor</u>");

WHEREAS, on or about the date hereof Studio has entered into a Transition Services and License Agreement (the "<u>TSLA</u>") with Dream Center Education Holdings, LLC, an Arizona not-for-profit limited liability company ("<u>DCEH</u>");

WHEREAS, each Party understands that Studio's obligation to provide the Services hereunder is subject to DCEH complying with its obligations under the TSLA and the University complying with its obligations under this Agreement;

WHEREAS, Studio has prior experience in, and a successful track record of, providing services to and supporting an accredited institution of higher education;

WHEREAS, the University wishes to engage Studio to provide certain Non-Core Services (as defined herein) in support of its academic mission and purposes;

WHEREAS, the Parties wish to memorialize the terms and conditions upon which Services (as defined herein) are provided by Studio to the University;

WHEREAS, all applicable Boards of the University have determined that Studio has the requisite experience, expertise and capacity to provide the Non-Core Services in support of its academic mission and purposes and that the terms and conditions of this Agreement are fair to the University and provide reasonable value under the circumstances;

WHEREAS, all applicable Boards of the University have reviewed and approved the terms of this Agreement; and

WHEREAS, this Agreement is being executed in connection with and pursuant to that certain Interim Framework Agreement (the "<u>IFWA</u>") dated as December 26, 2018, by and among Studio, DCEH, the University, Candlewood Special Situations Master Fund II, L.P., a Delaware limited partnership, Flagler Master Fund SPC, LTD, a Cayman Islands segregated portfolio company, for and on behalf of the Class B segregated portfolio and the other Persons set forth on the signature pages thereto.



EXHIBIT

F

NOW THEREFORE, the Parties agree as follows:

## 1. Scope of Services; Definitions.

**1.1 Institutional Functions.** The University performs its mission in the following primary areas: (i) Academic (determination of curriculum, establishment and application of academic standards, establishment of criteria for the award of academic credentials and the award of such credentials, provision of instruction, student academic advising, establishment of criteria for the engagement of faculty and for their engagement, oversight and training, and maintenance of necessary and appropriate state authorization and institutional and professional accreditations); (ii) Financial Aid; (iii) Marketing Support Services (marketing and brand development, advertising, admissions, lead development); (iv) Corporate Technology and Other Services; and (v) Other Support Services (student support, career development, industry alignment).

**1.2 Services.** Subject to DCEH meeting its obligations under the TSLA, Studio will provide, or cause to be provided, to the University, the operational support services for the functions described in items (iii), (iv) and (v) of Section 1.1, in furtherance of the University's mission and goals, all to the extent described in the Statement of Work (collectively, the "Services"), it being anticipated that Studio will provide the Services in items (iii), (iv), and (v) of Section 1.1 from the Effective Date in accordance with a mutually agreed transition plan, while the University will remain responsible at all times for each of the functions in items (i) and (ii) of Section 1.1, which will be deemed "Core Services". Nothing in this Agreement will be construed as obligating Studio to provide any Services, or the University to request or receive any Services, except as specified in the Statement of Work (as defined herein). To the extent that any Educational Agency notifies the University of concerns regarding the scope of the Services to be provided by Studio, the Parties agree to immediately amend the terms of the Statement of Work to fully comply with the Educational Agency's requirements.

**1.3 Services Not Provided; Reservation of all Academic Functions.** Notwithstanding any provision in this Agreement to the contrary, the Parties agree that the University will retain each and every one of the functions that are necessary attributes of a duly authorized and accredited institution of higher education, including all Core Services. The University will at all times operate in accordance with its established academic policies and procedures and in a manner consistent with the requirements of the applicable Educational Agencies. The Services provided under this Agreement are limited to those expressly set forth in the Statement of Work.

**1.4 Reservation of Academic Control and Setting of Performance Standards.** Studio will provide the Services in accordance with such service levels, standards and policies as is necessary to comply in all material respects with the applicable requirements of the Educational Agencies for the Services. The University will remain responsible for providing confirmation of the University's adherence to the requirements of Educational Agencies upon their request.

**1.5 Statement of Work.** The statement of work setting forth the Services that Studio will provide to the University is attached hereto as EXHIBIT A (the "Statement of Work" or

"SOW"). Subject to the rights of the University set forth in the fourth and fifth sentences of this Section 1.5, the Statement of Work can be amended in writing by Studio and the University at any time; *provided* that there shall be at least ninety (90) days' notice prior to the initiation of any such material change in the Services, including any reductions or additions to the Services agreed to under any such amendment. Studio may make minor changes to the Services set forth in the Statement of Work; *provided* that such changes (i) do not require the University to change its software, policies, or procedures in any material respect, (ii) do not have a material adverse impact on the functionality, interoperability, performance, reliability, security or resource efficiency of any of the Services, (iii) do not materially reduce the scope of the Services, and (iv) are otherwise consistent with this Agreement. Subject to Section 5.7, during the Initial Term, the University shall be permitted to reduce the amount of Services that it desires Studio to provide under this Agreement; *provided* that any such reduction in the amount of Services shall not reduce the Minimum Service Margin that is due to Studio for the remainder of the Initial Term (but may, for the avoidance of doubt, reduce the TSA Fee in accordance with the terms of the TSLA). To the extent that any Educational Agency notifies the University of concerns regarding the scope of the Services to be provided by Studio, the University and Studio agree to immediately amend the terms of the Statement of Work to which they are party to fully comply with the Educational Agency's requirements. If a change to the Services would violate any of clauses (i) - (iv) above, Studio will provide to the University a written proposal describing in reasonable detail the extent to which such change will affect the Services, and Studio will make such change only after obtaining written approval from the applicable Boards of the University.

**1.6    Validity**. This Agreement shall be effective upon the execution and delivery of this Agreement by (a) an Authorized Representative of Studio and (b) an Authorized Representative of the University. The Statement of Work shall be effective upon the execution and delivery of this Agreement by the Parties hereto.

**1.7    Services Management**. The University will appoint and designate a Person or Persons who will have responsibility for the day-to-day management and coordination of the Services and who will engage in the activities required of the University set forth in the Statement of Work (each, a "University Manager"). Studio will appoint and designate a Person or Persons who will have responsibility for the day-to-day management and coordination of the Services and who will engage in or cause to be engaged in the activities required of Studio set forth in the Statement of Work (each, a "Studio Manager"). The University Manager and the Studio Manager shall cooperate and coordinate with each other regarding the day-to-day management and coordination of the Services and completion of the activities set forth in the Statement of Work.

**1.8    General Definitions**. Unless otherwise defined herein, all capitalized terms used in this Agreement are defined as set forth in Appendix I (Definitions) attached hereto.

**2.    Periodic Review.** Each Studio Manager and each University Manager will periodically review (but not less frequently than quarterly) the delivery of Services and will report, as appropriate, to their respective Presidents and Boards on the performance of the activities conducted or requested and delivery of the Services provided pursuant to this Agreement. As part of the Services and subject to the Service Fee, Studio will, upon request of the University, prepare such analyses and reports as may be reasonably requested to assess and evaluate the

effectiveness and quality of the Services provided hereunder, which analysis and reports the University will use for informational purposes only. In addition, upon reasonable notice to Studio, the University may elect to assess Studio's performance of the Services provided pursuant to this Agreement.

**3.     Studio's Responsibilities.**

**3.1     Regulatory Matters.** Studio expressly acknowledges its affirmative obligation to conduct its affairs on behalf of the University in carrying out its obligations under this Agreement in a manner intended to be in accordance with applicable standards of the higher education community, the requirements of the Educational Agencies and applicable provisions of the Final Consent Judgments, dated November 16, 2015, against Education Management Corporation (for such period of time as such Final Consent Judgments remain binding upon any postsecondary institution which had been owned by Education Management Corporation ("EMC")), a copy of an exemplar of such Final Consent Judgments is attached hereto as EXHIBIT B (the "EMC Consent Judgement"). The University may provide directions to Studio as to their perspective on and experience with such standards. In furtherance thereof, and not by limitation, Studio warrants, represents, and covenants that:

(a)     Studio's use and maintenance of any educational records containing personally identifiable student information that is provided to it by the University pursuant to this Agreement remains subject to the oversight and control of the University. Studio is familiar with, and will use commercially reasonable efforts to comply in all material respects with, all applicable Laws pertaining to student educational records and privacy, including the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g and subsequent codes, and its implementing regulations at 34 C.F.R. Part 99, and the Gramm Leach Bliley Financial Modernization Act, 15 U.S.C. §§ 6801-6803 (collectively, the "Privacy Laws and Regulations"). Studio will timely notify the University in the event it receives notice of any Proceeding concerning the privacy of student information received by it from the University. Studio will use commercially reasonable efforts to include a provision substantively similar to this section in any contract with any Studio Subcontractor to which it provides any information of the University protected by the Privacy Laws and Regulations. Studio will use commercially reasonable efforts to require a representation, warranty and covenant similar to this section by any Studio Subcontractor to which it provides any information protected by the Privacy Laws and Regulations. Studio will not divulge any protected student information to any Subcontractor without prior notice to and written consent of the University (which consent will not be unreasonably withheld, conditioned or delayed); *provided, however*, that this requirement shall not restrict Studio from divulging protected student information in accordance with applicable Law or to a Studio Subcontractor for the purpose of providing the Services pursuant to this Agreement where Studio has included a provision substantively similar to this section in its contract with the Studio Subcontractor.

(b)     In the event this Agreement is terminated, Studio will use commercially reasonable efforts to promptly deliver to the University all data regarding prospective students, applicants and students provided to it by the University under this Agreement.

(c)    Studio is familiar with applicable Laws regarding the compensation of Persons directly or indirectly engaged in student recruiting activities by or on behalf of postsecondary educational institutions, as set forth in the HEA at 20 U.S.C. Section 1094(a)(20) and subsequent codes, and in regulations promulgated by the U.S. Department of Education at 34 C.F.R. Section 668.14(b)(22), and any successor code or regulation (collectively, the "Incentive Compensation Laws and Regulations"). To the extent applicable to the provision of Services provided by Studio under this Agreement, Studio will use commercially reasonable efforts to comply in all material respects with the Incentive Compensation Laws and Regulations. Studio and the University will promptly notify each other in the event either Party receives notice of any investigation, inquiry or proceeding from an Educational Agency concerning the compensation of its employees or those of any Studio Subcontractors engaged in providing services pertaining to student recruiting or the award of financial aid in connection with this Agreement. Studio will use commercially reasonable efforts to require a provision substantively similar to this section in any contract with any Studio Subcontractor which provides any services for Studio in connection with this Agreement that may be covered by the Incentive Compensation Law and Regulations.

(d)    To the extent applicable to the provision of Services provided by Studio to the University under this Agreement, Studio will use commercially reasonable efforts to comply in all material respects with applicable state and federal laws and regulations governing advertising, electronic communications and solicitations, and telemarketing including Section 5 of the FTC Act (15 U.S.C. Section 45), the CAN-SPAM Act (15 U.S.C. Sections 7701-7713), the Telemarketing Consumer Fraud and Abuse Prevention Act (15 U.S.C. Sections 1601-1608), the Federal Trade Commission Telemarketing Sales Rule (16 C.F.R. 310.1, et seq.), the Federal Communications Commission telemarketing regulations (47 C.F.R. 64.1200 et seq.), and the U.S. Department of Education regulations pertaining to misrepresentation set forth at 34 CFR Section 668 Subpart F (collectively, the "Marketing Laws and Regulations"). Studio will use commercially reasonable efforts to require a provision substantively similar to this section in any contract with any Studio Subcontractor, including any Studio Subcontractor which provides any marketing or advertising related services for Studio as part of the Services under this Agreement.

3.2    **Service Standards.** Studio agrees that it will use commercially reasonable efforts to provide or cause to be provided the Services in an ethical, professional, workmanlike manner and in all material respects in accordance with the Statement of Work, the Laws identified in Section 3.1 and any other applicable Laws and relevant evolving state of the industry standard. It is acknowledged that Studio's performance of the Services and compliance with the representations, warranties, covenants and other standards required by this Agreement are dependent on the performance by the University and its Affiliates of their respective obligations under this Agreement and the other Transaction Documents and the performance of DCEH and its Affiliates of their respective obligations under the TSLA, the IFWA and the other Transaction Documents to which each is a party (and pursuant to the other documents and transactions entered into by DCEH pursuant to, or as contemplated by the TSLA, the IFWA and the such other Transaction Documents) and Studio will not be in breach of this Agreement if its failure to perform its obligations under this Agreement or the other Transaction Documents is due in whole or substantial part to the failure of the University or its Affiliates or DCEH or its Affiliates to perform such obligations. Studio will (i) provide to the University reasonable access to and use of Studio's facilities and personnel as necessary to enable the University to receive the Services;

and (ii) cooperate with the University as reasonably requested by the University in connection with the provision of the Services under the Statement of Work.

**3.3    Advice, Reports, Data and Products.**  Studio will be entitled to rely upon data, information and instructions provided by the University in connection with Services provided by Studio.  Studio will not have any liability for any error resulting in whole or substantial part from incorrect data or information provided by the University or its Affiliates or representatives in connection with the Services.

**3.4    Use of Third Parties to Provide Services.**  Studio may perform its obligations through its Affiliates or through the use of Studio Subcontractors subject to the terms hereof. Subject to <u>Section 3.2</u>, Studio will not be relieved of its obligations under this Agreement by use of Affiliates or Studio Subcontractors; *provided, however,* in no event will Studio be responsible for any failure by DCEH to comply with its obligations under the TSLA or the University's failure to perform the Core Services or its obligations under this Agreement.  If Studio intends to engage a Studio Subcontractor that would meet the definition of "third party servicer" as defined by 34 C.F.R. § 668.25, the University will be required to contract directly with such Studio Subcontractor pursuant to federal regulation and such Studio Subcontractor will be required to meet all the requirements set forth in 34 C.F.R. § 668.25, but Studio will be obligated to (a) oversee the performance of such Studio Subcontractor, subject to any oversight responsibilities that are not permitted to be delegated to Studio, (b) ensure that such Studio Subcontractor meets the requirements of this Agreement and (c) pay all fees of such Studio Subcontractor for Non-Core Services provided under such contract.  For the avoidance of doubt, Studio will in all cases retain responsibility for the provision of the Services set forth in the SOW by any Studio Subcontractor other than DCEH under the TSLA.  The University acknowledges and agrees that Studio would not be able to provide the Services hereunder without entering into the TSLA with DCEH and that Studio is willing to do so at the request of the University and therefore Studio shall not be liable whatsoever for any Losses of the University related to any uncured breach by DCEH of any of its contractual obligations under the TSLA, except to the extent such Losses are solely the result of Studio's knowing and intentional fraud or willful misconduct.

**4.    University Responsibilities.**

**4.1    Regulatory Matters.**  The University expressly acknowledges its affirmative obligation to conduct its affairs in accordance with applicable standards of the higher education community, the requirements of the Educational Agencies and applicable provisions of the EMC Consent Judgment (for such period of time as the EMC Consent Judgment remains binding upon any postsecondary institution which had been owned by EMC as of November 2015).   In furtherance thereof, and not by limitation, the University warrants, represents, and covenants that:

(a)    Such Party shall comply in all material respects with, all applicable laws and regulations, including the Privacy Laws and Regulations, the Incentive Compensation Laws and Regulations, the Marketing Laws and Regulations.  Such Party will timely notify Studio in the event it receives notice of any investigation, inquiry or proceeding from an Educational Agency.

(b)     Such Party has the necessary authority, has provided any required notices, and has secured any required authorizations, consents, or agreements under all applicable Laws pertaining to student educational records and privacy, including as may be required under the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g and subsequent codes, and its implementing regulations at 34 C.F.R. Part 99, and the Gramm Leach Bliley Financial Modernization Act, 15 U.S.C. §§ 6801-6803, for any disclosures of educational records containing personally identifiable student information to Studio pursuant to this Agreement. Such Party shall inform Studio of any applicable requirements, conditions, or restrictions on the use, maintenance, or disclosure of such information that are imposed by any such notices, authorizations, consents, or agreements.

**4.2     University's Responsibility to Operate in Normal Course and Provide Services not Included in this Agreement.**     Other than any Services performed by Studio, its Affiliates, or any Studio Subcontractors under this Agreement, including under the Statement of Work, the University will remain fully responsible for ensuring the performance of all other functions associated with the existing operations of the University, whether through institutional staff or agreements with affiliates or third parties, in compliance with all applicable Laws.

**4.3     Certain Actions of the University.**     The University shall, and shall cause its respective Affiliates to (a) operate the University and provide the Core Services in accordance with the terms of this Agreement, and (b) comply in all material respects with all applicable Laws.

**4.4     Access to Assets and Properties.**     During the Term, the University shall provide Studio and its Affiliates and their respective officers, directors, employees, agents, advisors and representatives with full use of, and full access to, such assets and properties of the University and its Affiliates as may be necessary or desirable for Studio to perform the Services hereunder, including under the Statement of Work.

**4.5     Quarterly Budget.**     On the Effective Date and thereafter no less than ten (10) Business Days prior to the start of each calendar quarter, the University shall provide Studio (and the South Lenders during the Indebtedness Period) with an acceptable Quarterly Budget that demonstrates that the University has sufficient Cash Receipts to pay the Projected Non-Core Expenses for the ensuing calendar quarter as well as appropriate funding for all required operations including the ongoing delivery of academic and other Core Services outside the scope of this Agreement and the Statement of Work.  During the Indebtedness Period, the Quarterly Budget shall be deemed to be "acceptable" for the purposes of the prior sentence only if such Quarterly Budget is approved by the South Lenders in writing (which may be via email).

**5.     Fees.**

**5.1     Service Fee.**     Studio will be paid a monthly fee in advance equal to the Projected Non-Core Expenses (subject to the True-up Amount, if any).   The Service Margin plus Late Charges shall be due and payable upon the earlier of (a) the end of the Initial Term or (b) termination of this Agreement and shall be paid in accordance with Sections 7.3, 7.4 and 7.5, as applicable.  During the Initial Term, the University shall pay its costs and expenses in the following order of priority:  (A) Core Expenses, (B) the payment of debt service on the South

Secured Debt, (C) Non-Core Expenses (other than the TSA Fee), (D) the TSA Fee, and (E) the Service Margin; *provided*, that to the extent that the University fails to pay Studio for any of the Non-Core Expenses (including the TSA Fee), or the Service Margin when due, such amounts will be subject to Late Charges. For the avoidance of doubt, in no event shall Studio be required to fund any shortfall in the expenses of the University described in clauses (A), (B), (C) or (D) of the preceding sentence if the Cash Receipts of the University are not sufficient to pay such expenses; *provided, however,* the University shall not be required to pay any fees or expenses, including the TSA Fee or Service Margin, that is not directly related to Services provided to the University. Studio agrees to negotiate in good faith at a later date with respect to the payment by the University of the Service Margin to assist the University in complying with its financial responsibility composite score.

**5.2     Service Fee Adjustments.** The Service Fee can only be modified in a writing executed and delivered by an Authorized Representative of each of Studio and the University; *provided, however,* during the Initial Term, the determination of the amount of Services that are to be performed by Studio (and the corresponding Non-Core Expenses other than the TSA Fee which may only be adjusted in accordance with the TSLA) shall be approved by the applicable Boards of the University, subject to approval of the South Lenders during the Indebtedness Period, but in no event shall such determination of Non-Core Expenses result in the total Service Margin to be paid for any month under this Agreement to be less than the Minimum Service Margin; *provided, however,* if the University and Studio agree to extend the Term of this Agreement beyond the Initial Term, then the Non-Core Expenses for such extended term, unless otherwise agreed by the University and Studio, subject to approval of the South Lenders during the Indebtedness Period, will be based on the actual Non-Core Expenses related to the Services approved by the applicable Boards of the University, subject to approval of the South Lenders during the Indebtedness Period.

**5.3     Transaction Taxes.** Unless otherwise agreed to in writing by the Parties, any transfer, excise, franchise, property, documentary, sales, use, stamp, registration, recording, value added, goods and services, harmonized sales, and other such similar taxes and fees (including any penalties and interest) ("Transaction Taxes") imposed in connection with Services performed under this Agreement will be borne by the University. If Studio or any of its Affiliates remits any Transaction Taxes, the University agrees to promptly reimburse Studio for such Transaction Taxes.

**5.4     Withholding Taxes.** If any applicable law requires a Party or its Subsidiaries (the "Withholding Party") to withhold or deduct taxes (other than Transaction Taxes) from any payments due under this Agreement (the Party, its Subsidiary, Subcontractor, or other third party to whom such payments are due, the "Withheld Party"), then: (a) the Withholding Party will make the deductions in accordance with applicable Law; and (b) the Withholding Party will pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law and deliver appropriate evidence of such payment to the Withheld Party. The Withholding Party will provide the Withheld Party originals of withholding receipts on a timely basis after such withholding. Amounts withheld pursuant to this section will be treated for all purposes of this Agreement as having been paid to the Withheld Party. The Withholding Party will, at the request of the Withheld Party, make such filings and take such other actions as may be reasonably requested in order to recover for the Withheld Party any taxes withheld or paid by the

Withholding Party to the relevant governmental authority or allow for an exemption from or reduction of withholding.

5.5    **Payment.** The University will pay the Projected Non-Core Expenses monthly in advance on the first day of each month of the Term in cash by wire transfer of immediately available funds to the account specified by Studio. If the first day of any month during the Term falls on a Saturday, Sunday or bank holiday, then the payment of the Projected Non-Core Expenses shall be made on the next calendar day immediately thereafter that is not a Saturday, Sunday or bank holiday. Studio will provide the University with a calculation of the True-up Amount within fifteen (15) days after the end of each month and the University shall have until the end of such month to dispute any amounts contained therein as provided below (the "True-up Dispute Period"). To the extent that the True-up Amount for any particular month is negative (*i.e.,* the Projected Non-Core Expenses paid to Studio for such month was more than the actual Non-Core Expenses for such month), then the next monthly payment of the Projected Non-Core Expenses due to Studio (*i.e.,* the month beginning at the end of the True-up Dispute Period) shall be reduced by such True-up Amount. To the extent the that True-up Amount for any month is positive (*i.e.,* the Projected Non-Core Expenses paid to Studio for such month was less than the actual Non-Core Expenses for such month), then the next payment of the Projected Non-Core Expenses due to Studio (*i.e.,* the month beginning at the end of the True-up Dispute Period) shall be increased by such True-up Amount. In the event of a dispute arising out of the calculation of the Service Fee, the Projected Non-Core Expenses, the Non-Core Expenses or the True-up Amount, the University will deliver a written statement to Studio listing each disputed item in reasonable detail. The Parties shall seek to resolve all such disputes expeditiously and in good faith. Studio shall continue to perform the Services as set forth in the Statement of Work in accordance with this Agreement pending resolution of any dispute; *provided* that such dispute is resolved within thirty (30) days after receipt of such notice from the University.

5.6    **Certain Notices.** Each Party shall promptly (and in any event within three (3) days following the occurrence thereof) notify each other Party if any event which would give rise to termination or a right of termination pursuant to Section 7 has occurred. Studio shall promptly (and in any event within three (3) days following the occurrence thereof) provide the University, and South Lenders during the Indebtedness Period, with any material notices it receives from DCEH pursuant to the TSLA.

5.7    **IFWA; TSLA.** The University shall comply with the terms of the IFWA. The University acknowledges and agrees that the TSLA is a shared services agreement and that, if that University fails to purchase its portion of such shared services for the Initial Term (through the payment of Non-Core Expenses that correspond to the University's allocated share of the TSA Fee), DCEH may not be able to continue to provide the shared services to the other universities that also receive such shared services which could materially adversely affect such universities and subject DCEH and potentially Studio to Losses. As such, the University agrees to purchase its portion of the shared services pursuant to the terms of this Agreement and the TSLA (through the payment of Non-Core Expenses that correspond to the University's allocated share of the TSA Fee) for the Initial Term , notwithstanding any termination of this Agreement for any reason other than a material uncured failure of DCEH to perform its obligations under the TSLA, and any reduction in such shared services shall only be made in accordance with the

terms of the TSLA, which, during the Indebtedness Period, shall require the consent of the South Lenders as set forth in the TSLA.

**5.8     Alternative Services.**  If, at any time during the Term or the period of one (1) year following the Initial Term (the "Tail Period"), the University receives a bona fide offer from an unaffiliated third party (other than DCEH or its Affiliates) (a "Third Party Provider"), whether or not such offer was solicited by the University, for services comparable to the Services (a "Competing Offer"), the University may engage such Third Party Provider to provide such services, in the event that both of the following occur: (a) the University notifies Studio in writing of such Competing Offer, including (i) a complete copy of such Competing Offer, (ii) a description in reasonable detail of all material terms thereof including the identity of such Third Party Provider and (iii) the University's assessment of whether the University views any such material terms as superior to the terms of this Agreement (the "Competing Offer Notice") and (b) within twenty (20) Business Days of receipt of such Competing Offer Notice, Studio has not agreed to match any material terms of such Competing Offer set forth in the Competing Offer Notice, and in such event this Agreement shall deemed to be Terminated without Cause by the University pursuant to Section 7.2(a) effective sixty (60) days thereafter. In the event that Studio matches the Competing Offer, the Parties shall amend and renew this Agreement to reflect such change in terms.

**5.9     Additional Campuses and Subsidiaries.**  In the event that the University creates additional campuses or Subsidiaries during the Term, such campuses and Subsidiaries shall receive Services hereunder.  The amount of Services and related Non-Core Expenses shall be adjusted to reflect such additional campuses and Subsidiaries which receive Services pursuant to this Section 5.9.

**6.     Confidentiality and Disclosure.**

**6.1     Definition of Confidential Information.**  In the course of providing or receiving Services, each Party may disclose ("Disclosing Party") its Confidential Information to the other Party ("Receiving Party").

**6.2     Non-Disclosure, Limitation on Use.**  The Receiving Party will not disclose to a third party (which, for the avoidance of doubt, does not include any Affiliate of Studio or any employees of  any Studio or of any Affiliate of Studio) any of the Disclosing Party's Confidential Information, and no Receiving Party or its Affiliates will use the Disclosing Party's Confidential Information for any purpose other than in connection with the provision or receipt of the Services. Notwithstanding the foregoing, the Receiving Party may disclose the Disclosing Party's Confidential Information to the Receiving Party's (a) Subsidiaries, Subcontractors, and other third parties as may be necessary to provide or receive the Services under this Agreement; and  (b) Affiliates, officers, directors, employees, accountants, attorneys, financing sources, agents and representatives who need to know such information in connection with the Receiving Party's performance of its obligations under this Agreement; *provided* that, in each case, the confidentiality of which shall be maintained in accordance with Section 6 of this Agreement. Notwithstanding anything to the contrary contained herein, the Receiving Party may use the Disclosing Party's Confidential Information in connection with the transactions contemplated by the IFWA and the TSLA.

## 7. Term and Termination.

**7.1    Term.** This Agreement shall begin on the Effective Date and continue for one (1) year ("Initial Term") unless terminated in accordance with Section 7.2; *provided*, that this Agreement may be renewed by the Parties for any additional term agreed by the Parties (each a "Renewal Term" and collectively with the Initial Term, the "Term").

**7.2    Termination.** Subject to Section 7.8, this Agreement may be terminated as follows:

(a)    by a Party delivering 60 days' prior written notice to the other Parties thereto (a "Termination Without Cause");

(b)    automatically at the end of the Initial Term if the University does not offer to enter into a Renewal Term with Studio (a "University Nonrenewal");

(c)    automatically at the end of the Initial Term if the University offers to enter into a Renewal Term with Studio and Studio declines to enter into such Renewal Term (a "Studio Nonrenewal");

(d)    effective as of the end of the last day of any Renewal Term, by a Party delivering written notice to the other Parties at least one hundred and eighty (180) days prior to end of such Renewal Term;

(e)    by Studio delivering written notice to the University (each, a "Termination by Studio for Cause"), other than in the case of clause (iv) which shall be automatic as set forth therein:

(i)    if the University fails to pay any amount when due hereunder, not including any amount under dispute pursuant to the terms of Section 5.5, which failure is not cured within fifteen (15) days after written notice thereof from Studio stating its intention to terminate this Agreement by reason thereof;

(ii)    if the University violates any covenant, agreement, representation or warranty contained herein in any material respect or defaults or fails to perform any of its obligations or agreements hereunder in any material respect, including a Material Regulatory Violation, which violation, default or failure continues for fifteen (15) Business Days after written notice thereof from Studio stating its intention to terminate this Agreement by reason thereof;

(iii)    in the event of any knowing and intentional fraud or willful misconduct of the University or any of its officers, directors, trustees or employees, in each case with respect to the obligations of University set forth in this Agreement, if such knowing and intentional fraud or willful misconduct is not cured within five (5) Business Days after written notice thereof from Studio stating its intention to terminate this Agreement by reason thereof;

(iv)    automatically and immediately in the event of a Bankruptcy involving the University or any of its Affiliates; *provided* that Studio shall have the right, in its

sole discretion, to cause this Agreement to survive any such Bankruptcy by delivering written notice to the University within thirty (30) days following the date on which Studio is notified of such Bankruptcy that this Agreement has not been terminated, and in the event Studio delivers such a notice, this Agreement shall be deemed to have not terminated in connection with such Bankruptcy;

(v)     if the University ceases to be exempt from federal income tax pursuant to Section 501(c)(3) of the Code or any applicable state income tax Laws if not cured within thirty (30) days after written notice thereof from Studio stating its intention to terminate this Agreement by reason thereof;

(vi)     if the University loses any program approval or accreditation required to operate the University or otherwise becomes ineligible to receive funding pursuant to participate in Financial Assistance Programs or receive funding any other material funding source, such as the Veterans Administration, if such loss or ineligibility is not cured within five (5) Business Days after written notice thereof from Studio stating its intention to terminate this Agreement by reason thereof;

(vii)     [reserved]; or

(viii)     in the event of a direct or indirect Change of Control of the University or any Subsidiary or campus of the University without the prior written consent of Studio and such termination shall be effective upon delivery of written notice thereof from Studio stating its intention to terminate this Agreement by reason thereof;

(f)     by the University delivering written notice to Studio (each, a "Termination by University for Cause"), other than in the case of clause (iii) which shall be automatic as set forth therein:

(i)     if Studio violates any covenant, agreement, representation or warranty contained herein in any material respect or defaults or fails to perform any of its obligations or agreements hereunder in any material respect, including a Material Regulatory Violation, which violation, default or failure continues for fifteen (15) Business Days after written notice thereof from the University stating its intention to terminate this Agreement by reason thereof;

(ii)     in the event of any knowing and intentional fraud or willful misconduct of Studio or its officers, directors or employees, in each case with respect to the services to be provided by Studio pursuant to this Agreement, if such fraud or willful misconduct is not cured within five (5) Business Days after written notice thereof from the University stating its intention that this Agreement terminate by reason thereof; or

(iii)     automatically and immediately in the event of a Bankruptcy involving Studio or any of its Affiliates; *provided*, that University shall have the right, in its sole discretion, to cause this Agreement to survive any such Bankruptcy by delivering written notice to Studio within thirty (30) days following the date on which University is notified of such Bankruptcy that this Agreement has not been terminated, and in the event University delivers

such a notice, this Agreement shall be deemed to have not terminated in connection with such Bankruptcy.

Notwithstanding anything to the contrary contained in Section 7.2(e), Studio shall have the right, in its sole discretion, to cause this Agreement to survive any event that would give rise to the Termination for Cause by Studio in Section 7.2(e) by delivering written notice to the University within thirty (30) days following the date on which Studio is notified of such event, that this Agreement has not been terminated. If Studio delivers such notice, this Agreement shall be deemed to have not been terminated in connection with such event.

### 7.3    Effect of Termination.

(a)    Upon termination of this Agreement, the University will be liable for (i) all Service Fees earned by Studio for Services performed prior to the effective date of such termination and (ii) all reasonable and documented costs incurred or to be incurred by Studio after the effective date of such termination to wind down the Services, including lease and contract termination fees and employee severance (collectively, the "Wind-Down Costs") if this Agreement is terminated (x) by the University pursuant to Section 7.2(a) or (y) by Studio pursuant to Section 7.2(e). Upon termination of this Agreement, Studio will immediately cease performing Services hereunder, subject to Studio's obligations to provide Services Transfer Assistance under Section 7.8. The provisions of Sections 8, 9, and 10 and any other provisions that must survive to effectuate their intended purposes will survive any termination or expiration of this Agreement.

(b)    If Studio elects to terminate this Agreement pursuant to Section 7.2(a) and the University provides Studio with written notice, within forty-five (45) days after Studio provided written notice of its election to terminate this Agreement, a Teach-Out is required as a result of Studio's termination of this Agreement, then Studio agrees to suspend the termination of this Agreement until the Teach-Out is complete, subject to and in accordance with Section 7.10.

The provisions of Sections 5.7 and 5.8 shall survive any termination of this Agreement in accordance with its terms.

### 7.4    Payments upon Termination; Renewal.

(a)    If this Agreement is terminated prior to the expiration of the Initial Term as a result of (i) a Termination by Studio for Cause or (ii) a Termination without Cause by the University, as the case may be, all unpaid Service Fees (including the Service Margin) plus Wind-Down Costs, if applicable, and Late Charges under this Agreement shall be immediately due and payable, plus Studio shall be paid the amount of the Service Margin that Studio would have earned for the remainder of the Initial Term based on the average monthly Service Margin payable for the partial term then ended, plus Late Charges thereon until paid; *provided, however,* that any payments of unpaid Service Margin plus Wind-Down Costs, if applicable, and Late Charges under this Agreement that are due to Studio pursuant to this Agreement shall be subordinate in priority to the full repayment of the South Secured Debt (other than contingent reimbursement and indemnification obligations) and, unless the South Lenders agree otherwise, may not be accelerated by Studio or paid during the Indebtedness Period unless the South

Lenders agree to waive the acceleration of the South Secured Debt in connection with such termination of this Agreement.

(b)     If this Agreement is terminated as a result of (i) a Termination by University for Cause or (ii) a University Nonrenewal, all unpaid Service Fees (including the Service Margin) plus Wind-Down Costs, if applicable, and Late Charges, shall be immediately due and payable; *provided, however,* that any payments of unpaid Service Margin plus Wind-Down Costs, if applicable, and Late Charges that are due to Studio pursuant to this Agreement shall be subordinate in priority to the full repayment of the South Secured Debt (other than contingent reimbursement and indemnification obligations) and, unless the South Lenders agree otherwise, may not be accelerated by Studio or paid during the Indebtedness Period unless the South Lenders agree to waive the acceleration of the South Secured Debt in connection with such termination of this Agreement.

(c)     If this Agreement is terminated as a result of a Termination without Cause by Studio, all unpaid Service Fees (including the Service Margin) plus Wind-Down Costs, if applicable, and Late Charges under this Agreement shall be immediately due and payable; *provided, however,* that any payments of unpaid Service Margin plus Wind-Down Costs, if applicable, and Late Charges that are due to Studio pursuant to this Agreement shall be subordinate in priority to the full repayment of the South Secured Debt (other than contingent reimbursement and indemnification obligations) and, unless the South Lenders agree otherwise, may not be accelerated by Studio or paid during the Indebtedness Period.

(d)     In the event of (i) a Renewal of this Agreement or (ii) a Studio Nonrenewal, all unpaid Service Fees (including the Service Margin) plus Wind-Down Costs, if applicable, and Late Charges under this Agreement shall be immediately due and payable; *provided, however,* that any payments of unpaid Service Margin plus Wind-Down Costs, if applicable, and Late Charges that are due to Studio pursuant to this Agreement shall be subordinate in priority to the full repayment of the South Secured Debt (other than contingent reimbursement and indemnification obligations) and, unless the South Lenders agree otherwise, may not be accelerated by Studio or paid during the Indebtedness Period, except that Studio and the South Lenders shall share equally in the amounts payable by University as a mandatory prepayment from Consolidated Excess Cash Flow (as defined in the South Credit Agreement) under the South Credit Agreement until Studio receives the full amount of the unpaid Service Margin plus Wind-Down Costs, if applicable, and Late Charges that are due to Studio under this Agreement.

**7.5     Payments upon a Change of Control.**

(a)     In the event of termination of this Agreement pursuant to Section 7.2(e)(viii) in connection with a Change of Control (other than to Studio or that is caused by Studio), Studio shall be paid (without duplication of any amounts due and payable pursuant to Section 7.4) the amount of the Service Margin that Studio would have earned for the remainder of the Initial Term based on the average monthly Service Margin payable for the partial term then ended, with Late Charges thereon until paid; *provided, however,* Studio agrees that the average monthly Service Margin for such calculation shall be equal to the Minimum Monthly Margin; and, *provided, further,* that any payments to Studio pursuant to this Section 7.5(a) shall

be subordinate in priority to the repayment of the South Secured Debt (other than contingent reimbursement and indemnification obligations) and, unless the South Lenders agree otherwise, may not be accelerated by Studio or paid during the Indebtedness Period unless the South Lenders agree to waive the acceleration of the South Secured Debt as a result of the occurrence of such Change of Control.

(b)     In the event of termination of this Agreement pursuant to Section 7.2(e)(viii) in connection with a Change of Control to Studio or caused by Studio, Studio shall be paid (without duplication of any amounts due and payable pursuant to Section 7.4) the amount of the Service Margin that Studio would have earned for the remainder of the Initial Term based on the average monthly Service Margin payable for the partial term then ended, with Late Charges thereon until paid; *provided, however,* that any payments to Studio pursuant to this Section 7.5(b) shall be subordinate in priority to the full repayment of the South Secured Debt (other than contingent reimbursement and indemnification obligations) and, unless the South Lenders agree otherwise, and may not be accelerated by Studio or paid during the Indebtedness Period.

(c)     Notwithstanding anything to the contrary in this Agreement, a Change of Control shall not be deemed to occur as a result in the change of any director of the Boards of the University who has been approved by Studio and the South Lenders.

**7.6     Right of First Refusal on Change of Control.** The University hereby grants Studio the right of first refusal (i.e., the right to match the terms) on any Change of Control transaction involving the University (including for the avoidance of doubt any Change of Control involving any of its Subsidiaries or campuses). The University hereby represents and warrants to Studio that it has not granted any right of first refusal, option, right of first offer, right of exclusivity or similar right to any Person which are similar to the rights contained in, which if complied with would cause a breach of, or the terms of which conflict with, the immediately preceding sentence. If the University receives a bona fide offer from an unaffiliated third party (other than DCEH or its Affiliates) (a "Third Party Purchaser") for a Change of Control transaction (a "Change of Control Offer") that the University intends to accept, the University shall (a) notify Studio in writing of such Change of Control Offer within ten (10) days after receipt thereof by the University, including (i) a complete copy of such Change of Control Offer, and (ii) a description in reasonable detail of all material terms thereof, including the identity of the Third Party Purchaser (the "Change of Control Offer Notice"). Studio shall notify the University within twenty (20) Business Days of receipt of such Change of Control Offer Notice, indicating whether or not Studio agrees to match such Change of Control Offer set forth in the Change of Control Offer Notice. In the event that Studio matches the Change of Control Offer, the Parties shall consummate the Change of Control on the same terms (unless the Parties agree otherwise) as the Change of Control Offer, as soon as reasonably practicable, but in no event more than ninety (90) days after Studio notified the University of its intention to match the Change of Control Offer and the Parties obtained the last of all necessary Educational Approvals and third party consents (the "Qualification Period"). If Studio notifies the University in writing of its intention not to match the Change of Control Offer or Studio fails to respond to the Change of Control Offer Notice within twenty (20) Business Days of receipt of such Change of Control Offer Notice, then the University is free to consummate the Change of Control with the Third Party Purchaser, on the same terms as the Change of Control Offer, as soon as reasonably

practicable, but in no event any later than the end of the Qualification Period; *provided, however,* if such Change of Control is not consummated within the Qualification Period, then any Change of Control shall again be subject to Studio's right of first refusal set forth in this Section 7.6. Notwithstanding the foregoing, the University has the right but not obligation to enter into any Change of Control transaction upon the receipt of a Change of Control Offer, and nothing set forth in this Section 7.6 shall require the University to agree to enter into or consummate a Change of Control transaction.

**7.7     No Double Counting.**   In the event Studio enters into any managed services agreement with the University pursuant to Section 5.8 above, then any amount of Service Margin actually paid to Studio pursuant to Section 7.4(a) or Section 7.5 above for the period commencing on the termination date or the date of such Change of Control, as the case may be, through the end of the Initial Term (the "Termination Period") shall be credited dollar-for-dollar against the service and other fees payable to Studio for the Termination Period under any managed services agreement entered into by Studio pursuant to the right of first refusal set forth in Section 5.8 above.

**7.8     Services Transfer Assistance.**   In connection with the expiration or termination of this Agreement, Studio will, at the request of the University and subject to payment of any Service Fees owing in accordance with the terms of this Agreement, cooperate with the University to assist in the orderly transfer of the Services to another service provider or to the University (the "Services Transfer Assistance"), including without limitation, the continued performances of the Services during such transition period. For the avoidance of doubt, Studio will, upon payment of such Service Fees, continue to provide the requested Services for as long as the University determines that such Services are required to effectuate such transition. To the extent that the University requests Services Transfer Assistance in addition to such Services that Studio provides during such transition period, the University shall pay Studio its Fully Burdened Costs for such additional Services Transfer Assistance plus Service Margin thereon.

**7.9     Damages.**

(a)     **Indemnification by the University**.  The University shall indemnify, defend and hold harmless Studio and its Affiliates, and each of their respective officers, trustees, directors, employees, equity holders, members, managers, agents, attorneys and representatives (each a "Studio Indemnified Party") from and against any and all claims, liabilities, losses, damages, costs and expenses (collectively "Losses") incurred by such Studio Indemnified Party as a result of, related to or in connection with this Agreement (including the Statement of Work), or the performance by Studio of its obligations hereunder, including (i) Losses as a result of being deemed a "disqualified person" within the meaning of Sections 4958(f)(1) and 4946(a)(1) of the Code, (ii) Losses related to any uncured breach by the University of any of its contractual obligations under this Agreement, or (iii) Losses arising from or related to any knowing and intentional fraud or willful misconduct by the University or its Affiliates; *provided* that the obligations of the University hereunder shall be relieved to the extent (and solely to the extent) that any such Losses arise out of Studio's breach of its contractual obligations under this Agreement or its knowing and intentional fraud or willful misconduct in connection with its performance under this Agreement.

(b) **Indemnification by Studio.** Studio will indemnify, defend and hold harmless the University Sytem, and its officers, trustees, directors, employees, equity holders, members, managers, agents, attorneys and representatives (each an "University Indemnified Party") from and against any and all Losses incurred by any University Indemnified Party as a result of, related to any uncured intentional breach by Studio of any of its contractual obligations under this Agreement or any knowing and intentional fraud or willful misconduct of Studio; *provided* that the obligations of Studio shall be relieved to the extent (and solely to the extent) that any such Losses arise out of (i) the University's breach of its contractual obligations under this Agreement, including the performance of the Core Services, or the University's knowing and intentional fraud or willful misconduct in connection with its performance under this Agreement or any document, instrument or certificate delivered in connection with this Agreement or the transactions contemplated hereby or thereby, or (ii) DCEH's material breach of the TSLA which is not cured within the applicable cure period.

(c) **Disclaimer of Certain Damages.** NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT BUT SUBJECT TO THE IMMEDIATELY FOLLOWING SENTENCE, NO PARTY, NOR ITS AFFILIATES, OFFICERS, DIRECTORS, TRUSTEES, EMPLOYEES, AGENTS, SUBCONTRACTORS OR SUPPLIERS, WILL BE LIABLE TO OR THROUGH THE OTHER PARTIES OR THEIR RESPECTIVE SUBSIDIARIES FOR ANY PUNITIVE, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS, LOST REVENUE, FAILURE TO REALIZE EXPECTED SAVINGS) SUSTAINED OR INCURRED IN CONNECTION WITH THE PERFORMANCE OR NONPERFORMANCE OF SERVICES UNDER THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), WARRANTY, OR OTHERWISE AND WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE. THE FOREGOING SHALL NOT LIMIT ANY SUCH DAMAGES TO THE EXTENT SUCH DAMAGES ARE PAYABLE BY A PARTY TO A THIRD PARTY.

(d) **Damages Cap.** In no event will Studio's aggregate liability under this Agreement for any damages whatsoever exceed an amount equal to the Service Margin actually received by Studio pursuant to this Agreement for the twelve-month period immediately prior to the date that the claim is made by the University for Losses, *provided* that this limitation shall not apply to any claim for knowing and intentional fraud by Studio.

**7.10    Teach-Out Assistance.** If Studio elects to terminate this Agreement pursuant to Section 7.2(a) and such termination results in a Teach-Out, Studio will continue to provide such portion of the Services included in the Statement of Work as may be required by the University pursuant to the terms of the written Teach-Out agreement approved by the applicable Educational Agencies until the Teach-Out is complete, and the University shall pay Studio the Service Fee for such Services that Studio provides during the Teach-Out period; *provided, however,* that in no event shall Studio be required to fund any expenses related to the Teach-Out, including for Core Services, Services or the TSLA.

8. **Representations and Warranties.**

   8.1 **Mutual Representations.** Each Party represents, warrants and covenants solely as to itself and not with respect to any other Party as follows:

   (a) **Contracts.** Its entry into and performance of this Agreement will not violate or constitute a material breach of any of its contractual obligations with third Parties.

   (b) **Laws.** It will, and will cause its Subsidiaries and Subcontractors to, comply in all material respects with all applicable federal, state, local and foreign laws and regulations to the extent related to its responsibilities under this Agreement.

   (c) **Controlling Person Liabilities.** To the knowledge of such Party, neither such Party nor any Person that exercises substantial control over such Party (as the term "substantial control" is defined in 34 C.F.R. § 668.174(c)(3)), or member of such Person's family (as the term "family" is defined in 34 C.F.R. § 668.174(c)(4)), alone or together, (i) exercises or has exercised substantial control over another school or third-party servicer (as that term is defined in 34 C.F.R. § 668.2) that owes a liability for a violation of a Title IV Program requirement or (ii) owes a liability for a Title IV Program violation.

   (d) **Criminal Title IV Adjudications.** Neither such Party, its Affiliates nor, to the knowledge of such Party, any of such Party's or its Affiliates' employees, have pled guilty to, pled nolo contendere to or been found guilty of, a crime involving the acquisition, use or expenditure of funds under the Title IV Programs or been judicially determined to have committed fraud involving funds under the Title IV Programs.

   (e) **Bankruptcy.** Such Party, or any Person or entity that exercises substantial control over such Party or, to the knowledge of such Party, any member of any such Person's family, has filed for relief in Bankruptcy or had entered against it an order for relief in Bankruptcy.

   (f) **Authority.** Such Party has and will have all requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated hereby and thereby.

   (g) **Corporate Action.** The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Party.

   (h) **Valid and Binding Obligation.** This Agreement has been duly executed and delivered by such Party and (assuming the due authorization, execution, and delivery hereof and thereof by the other Party) is a valid and binding obligation of such Party, enforceable against it in accordance with its terms.

   GENERAL DISCLAIMER. THE ABOVE REPRESENTATIONS AND WARRANTIES OF THE PARTIES ARE IN LIEU OF ALL OTHER EXPRESS OR IMPLIED WARRANTIES, INCLUDING IMPLIED WARRANTIES OF

MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT.

**8.2    Additional Representations, Warranties and Covenants of the University.** The University further represents, warrants and covenants as follows:

(a)    No material filings, notices, reports, consents, registrations, approvals, permits or authorizations are required to be made with or obtained from any Educational Agency by the University in connection with the execution, delivery and performance by the University of this Agreement, except those that the failure to make or obtain, as applicable, would not reasonably be expected to have a material impact on the operations of the University.

(b)    There are no program reviews or other compliance reviews or audits conducted by DOE or other applicable Educational Agencies that are open as of the date of this Agreement.

(c)    Since October 17, 2017, and, to the knowledge of the University, from January 1, 2017 to October 16, 2017:

(i)    the University has maintained all material approvals from Educational Agencies necessary to the business of the University, including approvals necessary to offer its educational programs and operate its locations, except for those approvals which the failure to have maintained would not reasonably be expected to have a material impact on the operations of the University;

(ii)    the University has been in material compliance with all applicable laws and regulations pertaining to its participation in any Financial Assistance Program, except to the extent that failure to comply would not reasonably be expected to have a material impact on the operations of the University; and

(iii)    the University has been a party to, and in compliance in all material respects with, a valid and effective PPA or PPPA.

(d)    There are no Proceedings pending, nor, to the University's knowledge, threatened, to revoke, withdraw, suspend, materially limit, or place on probation any Educational Approval, or to require the University to show cause why any Educational Approval should not be revoked.

(e)    Neither the University nor any of its Subsidiaries or Affiliates is a party to any managed services agreement, bundled services, transition services, technology services (or similar agreement) pursuant to which the University or such Subsidiary or Affiliate of the University receives services of the type contemplated by this Agreement or the TSLA.

(f)    The University has obtained the written approval of the South Lenders (as such term is defined in the IFWA) to enter into this Agreement and no other approval of its lenders is required in connection with this Agreement or the other Transaction Documents, or the transactions contemplated hereby or thereby.

## 9. Meetings and Complaints.

**9.1 Status Meetings.** Each Studio Manager and each University Manager will meet from time to time (but no less frequently than annually) to discuss ongoing issues related to performance of the Services and planned or anticipated activities and changes with respect to the Services.

**9.2 Complaints.** In the event that any University faculty, staff or students raise complaints pertaining to the provision of Services by Studio to the University in accordance with the University's complaint policy, any such complaints shall be reviewed pursuant to the procedures set forth in such policy. In the event the University Manager deems any complaints valid, he or she shall promptly inform the applicable Studio Manager of such complaints and the parties shall reasonably cooperate to address and resolve any documented concerns.

## 10. General.

**10.1 Responsibility for Employees.** Notwithstanding any provision in this Agreement or to the contrary, each Party will be responsible for the management, direction and control of its employees. Each Party will be responsible for all federal, state, and local taxes and assessments related to its employees, such as taxes associated with social security, unemployment compensation, and workers' compensation.

**10.2 Force Majeure.** No Party will be liable for any default or delay in the performance of its obligations hereunder if and to the extent that such default or delay arises out of any of the following causes beyond its reasonable control: acts of God, acts of war, earthquakes, fires, cable cuts, catastrophic network element failures, floods, terrorism, riots, civil disorders or rebellions, strikes, lockouts and labor disputes.

**10.3 Waiver.** Failure of any Party to insist on performance of any term or condition of this Agreement or to exercise any right or privilege hereunder will not be construed as a continuing or future waiver of such term, condition, right or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available. No waiver of any provision of this Agreement shall be effective unless made in writing and executed by the applicable Party giving such waiver.

**10.4 Severability.** If any provision of this Agreement is held invalid or unenforceable, such provision will be deemed deleted from this Agreement and will be replaced by a valid and enforceable provision which so far as possible achieves the same objectives as the severed provision was intended to achieve, and the remaining provisions of this Agreement will continue in full force and effect.

**10.5 Counterparts.** This Agreement, and any amendments thereto may be executed in separate counterparts by the Parties. Each such counterpart when so executed will be deemed an original, but all such counterparts together will constitute the same instrument. A facsimile, telecopy, .pdf or other reproduction of this Agreement may be executed by one or more Parties, and an executed copy of this Agreement may be delivered by one or more Parties by email, facsimile or similar instantaneous electronic transmission device pursuant to which the signature of or on behalf of such Party can be seen, and such execution and delivery shall be considered

valid, binding and effective for all purposes as of the date hereof. At the request of a Party, the other Parties agree to execute an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

**10.6    Governing Law; Jurisdiction and Venue; Waiver of Jury Trial.**

(a)    **Governing Law.**  This Agreement, and all Proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement and the Transaction Documents or the actions of the Parties hereto in the negotiation, administration, performance and enforcement hereof and thereof, shall be governed by and construed in accordance with the internal substantive Laws of the State of Delaware, without giving effect to any choice or conflict of Laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

(b)    **Jurisdiction and Venue.**  Each of the parties hereto submits to the exclusive jurisdiction and venue of the Delaware Chancery Courts located in Wilmington, Delaware, or, if such court shall not have jurisdiction, any state or federal court sitting in Wilmington, Delaware, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceedings may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each of the Parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in Section 10.9, such service to become effective ten (10) days after such mailing.

(c)    **Waiver of Jury Trial.**  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

**10.7    Assignment.**  No Party will assign (by operation of law or otherwise) any right or obligation under this Agreement without the other applicable Party's prior written consent. Any attempted assignment without such consent will be void.  Subject to the foregoing, this Agreement, including Section 10.6 hereof, will be binding upon and will inure to the benefit of the Parties' respective successors and permitted assigns, including any change pursuant to the proposed restructure that would result in a new branch/main designation and a new Office of Postsecondary Education Identification number (OPEID).  Notwithstanding the foregoing, (a) Studio may assign this Agreement, or any portion of its obligations hereunder to its Affiliates, (b) Studio may assign its rights under this Agreement as collateral to its or its Affiliates financing sources and (c) Studio may assign this Agreement in connection with a Change in Control of Studio, in the case of (c) above, upon thirty (30) days prior written notice to the University and subject to any Educational Agency notifications.

**10.8   Not a Sale or Lease of Personal Property.**   Nothing in this Agreement, or its schedules, exhibits or attachments, or in the Statement of Work will be construed to constitute a sale or lease of personal property, regardless of character or classification, nor should all or a portion of the Service Fee described herein be considered payment for a sale or lease of personal property.

**10.9   Notices.**   Any notice required to be given hereunder shall be sufficient if in writing and sent by E-mail transmission (provided that any notice received by E-mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (local time of the recipient) shall be deemed to have been received at 9:00 a.m. (local time of the recipient) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.9):

    (a)    if to the University, to:

South University-University Administration
709 Mall Boulevard
Savannah, GA  31406-4805
E-Mail:  syoho@southuniversity.edu
Attention: Steven K. Yoho, PhD, Interim Chancellor

with copy (which shall not constitute notice) to:

Rouse Frets White Goss Gentile & Rhodes, LLC
1100 Walnut Street, Suite 2900
Kansas City, Missouri 64106
E-mail: rholt@rousepc.com
Attention:  Ronald L. Holt

    (b)    if to Studio, to:

1201 West 5th Street, Ste. T410
Los Angeles, CA 90017
E-mail: bryan@studioenterprise.com
Attention: Bryan Newman, CEO

with copy (which shall not constitute notice) to:

Cooley LLP
4401 Eastgate Mall
San Diego, CA  92121-1909
E-mail: kleecarey@cooley.com
Attention:  Katherine (Kate) Lee Carey

and:

Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
Email: jpotash@cov.com and awollensack@cov.com
Attention: Jeffrey Potash and Amy Wollensack

**10.10  No Third Party Beneficiaries, Releases of Related Persons.**  The Parties do not intend, nor will any clause be interpreted, to create for any third party any obligations to or benefit from Studio or the University.  Notwithstanding the foregoing, (a) the Studio Indemnified Parties are express third party beneficiaries of <u>Section 7.9(a)</u> of this Agreement and (b) during the Indebtedness Period, the South Lenders are express third party beneficiaries of each provision of this Agreement which references them specifically and is intended for their benefit. The University member acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, other than any Affiliate who becomes an assignee of Studio under this Agreement, in no event shall any of Studio's Related Persons have any liability related to this Agreement, the certificates, documents and instruments entered into or delivered in connection with this Agreement or the transactions contemplated herein or therein, including by way of piercing the corporate, limited liability company or partnership veil or other similar theories of liability.   The University hereby unconditionally and irrevocably releases Studio's Related Persons from any and all claims, causes of actions, damages, liabilities, whether known or unknown, now existing or hereinafter arising, in connection with, related to or arising or resulting from this Agreement and the Services provided hereunder.

**10.11  Obligations.**  The obligations of Studio and its permitted assigns under this Agreement are several and not joint.  In no event shall Studio or its permitted assigns be responsible or liable for any breach of, inaccuracy in or failure to comply with any representation, warranty or covenant by any other Party under this Agreement or otherwise.  In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto.   The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

**10.12  Other Documents.**  On or after the date of this Agreement, the Parties will execute and deliver or cause to be executed and delivered such further documents as may reasonably be required for the purposes of assuring and confirming the rights hereby created or for facilitating the performance of the terms of this Agreement.

**10.13  Interpretation.**

(a)  Unless otherwise indicated, all references herein to Articles, Sections or Annexes, shall be deemed to refer to Articles, Sections or Annexes of or to this Agreement, as applicable.

(b)     Unless otherwise indicated, the words "include," "includes" and "including," when used herein, shall be deemed in each case to be followed by the words "without limitation."

(c)     The word "or" is not exclusive;

(d)     The words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(e)     The table of contents and headings set forth in this Agreement are for convenience of reference purposes only and shall not affect or be deemed to affect in any way the meaning or interpretation of this Agreement or any term or provision hereof.

(f)     Unless otherwise indicated, all references herein to the Subsidiaries of a Person shall be deemed to include all direct and indirect Subsidiaries of such Person unless otherwise indicated or the context otherwise requires.

(g)     Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

(h)     References to "$" and "dollars" are to the currency of the United States of America.

(i)     Any dollar or percentage thresholds set forth herein shall not be used as a benchmark for the determination of what is or is not "material," or a "material adverse effect" under this Agreement.

(j)     When used herein, the word "extent" and the phrase "to the extent" means the degree to which a subject or other thing extends, and such word or phrase shall not simply mean "if."

(k)     Any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws.

(l)     Unless "Business Days" are expressly specified, all references to "days" are to calendar days.

(m)     The Parties hereto agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

**10.14  No Joint Venture.**   Nothing in this Agreement, or in any other Transaction Document, expressed or implied, is intended to or shall constitute the parties hereto partners or participants in a joint venture.

**10.15  Title and Headings.**  The titles and captions in this Agreement are for reference purposes only, and shall not in any way define, limit, extend or describe the scope of this Agreement or otherwise affect the meaning or interpretation of this Agreement.

**10.16  Expenses.**  Except as may otherwise be expressly set forth herein or in any other Transaction Document, all fees and expenses incurred in connection with the authorization, preparation, negotiation, execution and performance of this Agreement and the potential consummation of the transactions contemplated hereby shall be the obligation of the respective party incurring such fees and expenses.

**10.17  Amendments.**  This Agreement, including the Statement of Work, any other exhibits, appendices, schedules, or attachments hereto, may be amended or modified in whole or in part only by a writing signed and delivered by Studio, the University and, during the Indebtedness Period, the South Lenders.

**10.18  Entire Agreement.**  The terms contained in this Agreement, the Statement of Work and any schedules, appendices, exhibits or other attachments, which are incorporated (including any updated versions thereof) into this Agreement by this reference and the other Transaction Documents, constitute the entire agreement between the Parties with respect to the subject matter hereof, superseding all prior understandings, proposals and other communications, oral or written, with respect to the subject matter hereof.  In the event of any inconsistency between this Agreement and the IFWA, this Agreement shall control.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
     Name:
     Title:


DREAM CENTER SOUTH UNIVERSITY, LLC

By: _____
     Name:
     Title:

# APPENDIX I – DEFINITIONS

The following terms have the meanings set forth below:

"Accrediting Body" means any non-governmental entity, including institutional and specialized accrediting agencies, which engage in the granting or withholding of accreditation of postsecondary educational institutions or programs in accordance with standards relating to the performance, operations, financial condition or academic standards of such institutions, including the University Accreditor.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with such other Person. For purposes of the immediately preceding sentence, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Allocated Capital Expenditures" means the quarterly allocation of the University's annual budgeted capital expenditures as set forth in an approved Quarterly Budget.

"Authorized Representative" means a Person authorized to sign this Agreement pursuant to a Party's delegation of authority policy in effect at the time of signing or otherwise in accordance with its internal control documentation.

"Bankruptcy" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"), (c) has an involuntary petition filed against it under the Bankruptcy Code, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, Law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) has a trustee, receiver or liquidator appointed with respect to such Person or of all or any substantial part of its properties.

"Board" means, with respect to any Person, the board of trustees, board of managers, board of directors or similar governing body of such Person.

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions located in New York, New York and Los Angeles, California are permitted or required by Law to remain closed.

"Cash Receipts" means, for the applicable period, all cash received by or on behalf of the University or its Affiliates.

"Change of Control" means any of the following: (a) a "change of control", "change in control" or words of similar import as defined or determined by any Educational Agency as

constituting a regulatory event; (b) changes to the Board of a Person or its Affiliates that result in a change to 25% or more of the voting members of the Board of a Person or its Affiliates in any rolling, 12-month period; (c) a change in the number of voting members of the Board of such Person or its Affiliates in any rolling, 12-month period that will allow a group of directors to exercise control who could not exercise control before the change; (d) a transaction pursuant to which an unaffiliated third-party becomes the "beneficial owner", directly or indirectly, of securities of another Person representing 50% or more of the voting power of such Person's then outstanding securities; (e) a transaction effected as a consolidation, share exchange, reorganization or merger of a Person that results in the equity holders of such Person immediately prior to such event not owning at least a majority of the voting power of the resulting entity's securities outstanding immediately following such event; (f) a sale, license, lease or other disposition of a material portion of a Person's assets; (g) a liquidation, dissolution or other winding up of such Person or any of its Subsidiaries; or (h) a transfer of assets that comprises a substantial portion of the educational business of a Title IV eligible institution, except where the transfer consists exclusively in the granting of a security interest in those assets.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means: (a) all confidential and proprietary information (in oral, written, electronic, or other form) of, or relating to, a Disclosing Party, including information relating to its business and operations, employees, plans, strategies, assets, liabilities, and future, current, and prospective students and applicants; and (b) the terms and conditions of this Agreement.

"Core Expenses" means, for the applicable period, all cash expenses paid by or on behalf of the University for Core Services, but only to the extent that such costs are related to obligations, agreements and employees actually employed directly by and paid by the University; *provided* that in no event shall such expenses include any amounts payable with respect to any Bankruptcy Proceeding involving the University or DCEH.

"Core Services" has the meaning set forth in Section 1.2.

"DOE" means United States Department of Education and any successor agency administering student financial assistance under Title IV.

"Educational Agency" means any entity or organization, whether governmental, government chartered, tribal, private, or quasi-private, that engages in granting or withholding Educational Approvals, administers Financial Assistance Programs to or for students of, or otherwise regulates postsecondary schools or programs, in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such schools and programs, including the DOE, any Accrediting Body and any State Educational Agency.

"Educational Approval" means any license, permit, consent, franchise, approval, authorization, certificate, or accreditation issued or required to be issued by an Educational Agency to the University with respect to any aspect of the University's operations subject to the oversight of such Educational Agency, including any such approval for the University to

participate in any Financial Assistance Program, but excluding any such approvals or permits with respect to the activities of recruiters or individual employees or agents of the University.

"Family Member" means as to any individual, any parent, spouse, child, spouse of a child, brother, sister or other immediate family member of such individual (whether by blood, marriage or adoption), and each trust or other entity created for the benefit of one or more of such Persons and/or the estates of any such Person.

"Financial Assistance Programs" means each Title IV Program, including any Title IV Program pursuant to which Title IV Program funding has been provided to or on behalf of any University students; and any other government-sponsored or private program of student financial assistance other than the Title IV Programs pursuant to which student financial assistance, grants or loans were provided to or on behalf of the University students and such funds constituted at least 2% of the University's tuition and fee revenues during any fiscal year.

"Fiscal Year" means the 365-day period beginning on July 1 of each calendar year.

"Fully Burdened Costs" means the fully burdened costs incurred or borne by a Party, including all out-of-pocket expenses, any direct and indirect labor costs (including the cost of employee benefits, taxes and other labor costs), reasonable allocations of overhead expenses and third-party costs and expenses and the cost of goods sold.

"Governmental Authority" means any government, any governmental or regulatory entity or body, department, commission, board, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, and whether local or foreign.

"HEA" means the Higher Education Act of 1965, 20 U.S.C. § 1001 et seq., as amended, or any successor statute thereto.

"Indebtedness Period" means the period beginning on the date hereof and ending on the date when no payment obligations (other than contingent reimbursement and indemnification obligations) remains outstanding in respect of the South Secured Debt; *provided* that the University shall promptly notify Studio when the Indebtedness Period has ended and provide Studio with documentation demonstrating the repayment in full of the South Secured Debt obligations.

"Late Charges" means, in the event that any portion of the Service Fee, Service Margin or Wind-Down Costs is not paid on the due date, such unpaid portion shall accrue interest at an interest rate equal to 6% per annum, compounded monthly, until paid in full, unless otherwise provided in this Agreement.

"Law" means any applicable law, statute, treaty, constitution, principle of common law, ordinance, code, rule, regulation, Order or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority, as amended, unless expressly specified otherwise herein.

"Margin Rate" means 15%.

"Material Regulatory Violation" means any violation of any Law or accrediting standard of an Educational Agency that substantially and adversely impacts the ability of the University to continue operating or creates a material financial liability.

"Minimum Service Margin" means $1,000,000 per month during the Initial Term.

"Non-Core Expenses" means, for the applicable period, the Fully Burdened Costs of the Services incurred or paid by Studio on behalf of the University, including the TSA Fee payable by Studio to DCEH under the TSLA; *provided* that, subject to applicable Law, maintenance of applicable privilege and compliance with confidentiality obligations, Studio shall provide the University with any documents or information reasonably requested by the University to support its calculation of the Non-Core Expenses; *provided further* that during the Indebtedness Period the Non-Core Expenses shall be subject to the approval of the University and the South Lenders.

"Non-Core Services" means all Services other than Core Services that are to be performed by Studio under this Agreement, including by Studio Subcontractors and DCEH under the TSLA.

"Order" means any order, judgment, decision, decree, injunction, pronouncement, ruling, writ or assessment of, by or on behalf of any Governmental Authority (whether temporary, preliminary or permanent) or arbitrator.

"Person" means any individual, corporation, partnership, association, limited liability company, trust, estate or other similar business entity or organization, including a Governmental Authority.

"PPA" means a program participation agreement issued to a postsecondary educational institution and countersigned or to be countersigned by or on behalf of the secretary of the DOE, evidencing certification of that institution to participate in the Title IV Programs.

"PPPA" means a provisional PPA issued to the University, and countersigned or to be countersigned by or on behalf of the secretary of the DOE, for the purposes of certifying the University to continue its Title IV Program participation following consummation of the transactions contemplated by this Agreement.

"Proceeding" means any claim, charge, complaint, grievance, inquiry, audit, investigation, action, suit, litigation or proceeding by or before (or could come before) or brought on behalf of any Governmental Authority, Educational Agency or arbitrator.

"Projected Cash Receipts" means, for the applicable period, the University's good faith estimate of all Cash Receipts.

"Projected Core Expenses" means, for the applicable period, the University's good faith estimate of all cash expenditures for Core Services of the University; in no event shall these amounts be burdened by costs and fees payable with respect to the Receivership.

"Projected Non-Core Expenses" means, for the applicable period, Studio's good faith estimate of the projected Non-Core Expenses to be incurred or paid by Studio on behalf the University in connection with the provision of the Services.

"Projected TSA Fee" means, during the applicable period, Studio's good faith estimate of the projected TSA Fee to be incurred or paid by Studio on behalf the University in connection with the provision of the Services.

"Quarterly Budget" means the budget jointly prepared in good faith by the University and Studio that includes an itemized list of all Projected Cash Receipts, Projected Core Expenses, Projected Non-Core Expenses, Allocated Capital Expenditures, and the Projected TSA Fee for each month of the applicable calendar quarter based on actual contractual obligations, historical income and cost data and the University's and Studio's good faith estimates of projected income and costs for the applicable period.

"Related Persons" means, with respect to any Person, such Person's (a) direct and indirect equity holders, directors, officers, trustees, managers, and Affiliates; (b) any direct and indirect equity holders, directors, officers, trustees, managers, and controlling Affiliates of the persons set forth in clause (a); and (c) any Family Member of any natural person described in clause (a) or (b).

"Service Fee" means, for the applicable period, the product of (a) the Non-Core Expenses period plus (b) the Service Margin, for the Services provided by Studio to, or paid on behalf of, the University, as calculated by Studio in its reasonable discretion.

"Service Margin" means, for the applicable period, an amount calculated as the product (i) the Non-Core Expenses multiplied by (ii) Margin Rate; *provided* that during the Initial Term the Service Margin shall not be less than the Minimum Service Margin.

"State Educational Agency" means, for the applicable period, any state or local educational licensing body that provides a license or authorization necessary for the University or any Subsidiary, campus, branch, additional location or other facility thereof to provide postsecondary education in that state, or which administers Financial Assistance Programs in that state.

"South Credit Agreement" means that certain Senior Secured Credit and Guaranty Agreement, dated as of [●], by and among the University, certain guarantors and lenders party thereto, and U.S. Bank National Association, as collateral agent.

"South Lenders" means the lenders from time to time party to the South Credit Agreement; *provided* that any consents or approvals to be provided by the South Lenders in connection with this Agreement shall be provided in accordance with the terms of the South Credit Agreement (including in accordance with any voting or amendment provisions contained therein).

"South Secured Debt" means the "Obligations" as such term is defined in the South Credit Agreement.

"Studio Subcontractor" means any Subcontractors, agents, or third party engaged by Studio to provide Non-Core Services, including DCEH, in connection with the Agreement.

"Subcontractor" means any subcontractor, excluding vendors or suppliers used in the ordinary course of business consistent past practices.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (a) such Person or any other subsidiary of such Person is a general partner (excluding such partnerships where such Person or any subsidiary of such Person does not have a majority of the voting interest in such partnership) or (b) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries.

"Teach-Out" means the continuing provision of academic services to students following the announcement of a campus closure until such students can graduate/complete their program of study or transfer to a comparable academic program through an affiliated or unrelated institution.

"Title IV Programs" means the programs of federal student financial assistance administered pursuant to Title IV.

"Title IV" means Title IV of the HEA.

"Transaction Documents" means this Agreement, the IFWA and any other document, instrument or agreement executed or delivered in connection with this Agreement, the IFWA or the transactions contemplated hereby or thereby which is: (a) executed and delivered by Studio or its Affiliates, on the one hand and the University or its Affiliates on the other hand (including any such document, instrument or agreement including other parties thereto), (b) delivered to Studio or its Affiliates by the University or its Affiliates or (c) delivered to the University by Studio.

"True-up Amount" means, for the applicable period, (a) the Non-Core Expenses minus (b) the Projected Non-Core Expenses.

"TSA Fee" shall have the meaning set forth in the TSLA.

**EXHIBIT A**

**STATEMENT OF WORK**

This Statement of Work incorporates by reference the Managed Services Agreement, executed between Studio Enterprise Manager, LLC, a Delaware limited liability company ("Studio") and Dream Center South University, LLC, an Arizona not-for-profit limited liability company (the "University") on January 1, 2019 (the "Managed Services Agreement"). Unless otherwise defined, all capitalized terms used in this Statement of Work are defined as set forth in the Managed Services Agreement.

For clarity, all Services to be performed by Studio specified in this Statement of Work will be considered Non-Core Services. Core Services will be provided by the University at a level commensurate with the prevailing industry standards. Notwithstanding anything to the contrary contained herein, the obligations of Studio under this Statement of Work are to use commercially reasonable efforts to perform the Services specified herein in accordance with the terms of the Managed Services Agreement. Studio's obligation to provide such Services is subject to the University and its Affiliates meeting their obligations under the Managed Services Agreement and the other Transaction Documents and DCEH complying with its obligations under the TSLA. For avoidance of doubt, Studio's Services under this SOW exclude any "Technology Used by the Business" (as defined in the TSLA) and other services which DCEH fails to provide pursuant to the TSLA. To the extent that any Educational Agency notifies the University of concerns regarding the scope of the Services to be provided by Studio, the Parties agree to immediately amend the terms of this Statement of Work to fully comply with the Educational Agency's requirements.

1. **FINANCE AND GENERAL SERVICES**

    (a) **Corporate Technology and Other Services**. Studio shall provide the following Services to the University: Internet access, telephony, Customer Relations Management (CRM), Student Information System (SIS), Student Portal, and Desktop/Helpdesk Support.

    (b) **Finance**.

        (i) Assist the University with preparing an annual budget using a budget calendar that is determined by the University. For purposes of clarity, Studio acknowledges and agrees that the University shall have sole and final authority with respect to adoption of an annual budget.

        (ii) Use its purchasing department upon request by the University personnel to secure products and services for the University and will review vendor contracts provided by the University's personnel. The University will use Studio's procurement system. Studio will maintain, train, and assist the University's personnel in the use of such system.

(c)     **Facilities**.

      (i)     Provide to the University access to training opportunities (through internship or other hands-on training programs) at business and industry facilities. Use of these off-campus facilities will be subject to Educational Agency approval, where required.

      (ii)    Provide maintenance and upkeep of campus facilities.

      (iii)   Studio, at Studio's sole option, will either (A) enter into an assignment of the existing lease(s) for the Subsidiaries or campuses of the University and, to the extent required by applicable law, Studio and the University shall enter into a sublease agreement for the existing lease for such Subsidiaries or campuses of the University; (B) enter into a sublease of the existing lease(s) for such Subsidiaries or campuses of the University, or (C) leave the existing lease for such Subsidiaries or campuses of the University as is until such time as Studio elects to take assignment of such lease.

      (iv)    In the event that a lease for any Subsidiary or campus of the University is assigned or subleased to Studio, then Studio shall pay the occupancy costs pursuant to such lease or sublease and such occupancy costs of such lease or sublease will included in the Projected Non-Core Expenses and Non-Core Expenses, as applicable, for as long as and to the extent that Studio actually continues to pay such rent.

      (v)     If Studio elects not to take an assignment or sublease of the existing lease, the University shall pay the occupancy costs pursuant to such lease and such occupancy costs shall be included in the Projected Core Expenses and Core Expenses, as applicable, for as long as and to the extent that the University actually continues to pay such rent.

(d)     **Professional Development**.

      (i)     Provide and/or coordinate training and development opportunities for non-academic functions for staff and administrators.

(e)     **Book Store**.

      (i)     Manage the University's bookstores (both residential and digital) including inventory control, purchasing and management.

2.     **PROGRAM ANALYSIS, MARKETING, AND NEW INQUIRY GENERATION**

(a)     **Program Planning**.

      (i)     Conduct competitive analysis of programs that the University offers relative to the communities it serves.

(ii)     Provide Program positioning in the marketplace to reach the desired student profile.

(b)    **Brand Protection**.

(i)     Collaborate with the University to develop styles and standards for use of the University's Branding Plan.

(ii)    Release Marketing Assets only if the University's Branding Plan is followed.

(iii)    Provide public relations services to include collaborating with the University on the:

(A)    Creation of master narrative

(B)    Planned press releases, opinions and editorials, and advertorials when appropriate

(C)    Student promotion

(D)    Crisis management

(c)    **New Student Inquiry Generation**.

(i)     Develop marketing plan to reach and attract prospective students who meet the University's admissions criteria.

(ii)    Develop strategies for new student inquiry generation.

(iii)    In order to accomplish the intent of this Section, Studio may use any of the following means, at its discretion:

(A)    Provide website SEO design, social media design (detailed further below), email campaign design, PPC, and any other traditional channels.

(B)    Use the University's brand and Marketing Assets for keyword buys and in copy promotion through search channels and other necessary marketing avenues.

(C)    Develop and leverage relationships with high schools, community colleges and other academic partners to identify prospective students who meet the University's admissions criteria.

(D)    Engage in public and community relations and events to increase the awareness of the University in targeted markets.

(E)    Use traditional print, billboard, banners, radio, or television to generate inquiries.

(iv)     Studio shall assume responsibility and control of all University branded web sites, social media accounts (including Facebook, Instagram, Twitter, YouTube, Snapchat, Yelp and LinkedIn), and Google accounts (including Ad Words, Bid Manager, Search Console, My Business, DoubleClick, Analytics, but excluding the Google technology stack), alumni communities, alumni databases, high school lead databases, domain name administrator rights, landing pages, media buys for the University.

(v)     Responsibility for setting admission policy and for content of communications remains with the University but Studio shall assume responsibility for accuracy in delivery of communications.

(d)     **Social Media Strategies**.  In order to maximize the University's social media presence, Studio may do any of the following, at its reasonable discretion:

(i)     Leverage existing content providers and maximize resources with Studio and marketing partners to grow the University's social media presence.

(ii)     Position for success by auditing the University's web site, discovering the ideal profile for the University's students, creating and publishing marketing assets based on the ideal profiles, and provide improvements to the University web site functionality.

(iii)     Develop a broad content production strategy for the University.

(iv)     Meet with faculty, librarians, deans, and key staff to teach the basics of content production and social media publishing.

(v)     Agree upon strategies with the University's leadership, including social media production assignments for Programs, social media contests, faculty publishing strategies, library resources strategies, social media class representatives, and partnerships with other entities that have an affinity with the University.  Establish a detailed system of coordinating, collecting, editing, scheduling, and publishing content through resources provided by Studio and marketing partners while leveraging available Ai resources.

(vi)     While responsibility for accuracy of content remains with the University and Studio shall assume responsibility for accuracy in delivery of communications.

(e)     **Business to Business Marketing Strategies**.  In order to maximize the University's business to business marketing options, Studio may, at its reasonable discretion, do any of the following:

(i)     Provide oversight, management, and subject matter expertise to assist, train, and hire personnel in developing a comprehensive business to business ("**B2B**") marketing strategy.

(ii)     Deploy digital marketing strategies in conjunction with the comprehensive B2B marketing strategy to generate new student inquiries for the Programs.

(iii)    Present the University to Studio national accounts.

(f)    **Program Website Development and Management**.

(i)     Develop and optimize landing pages, the University's online websites, and other digital marketing collateral to generate interest in the University's and fully comply with regulatory and/or accreditation requirements regarding public disclosures.

(ii)    Manage the maintenance and hosting of any digital access based on the mutual agreement of Studio and the University.

(iii)   Be granted visibility, access, and secure credentials to the University's server accounts, databases, and log files that are important for report generation and analysis as well as the effective management of said resources.

(iv)    Receive from the University access to domain and/or sub domain or folder on the University's ".edu" site for marketing site development or other marketing purposes.

(v)     Responsibility for the accuracy of content remains with the University, but responsibility for the accuracy in delivery of the content to web pages shall be assumed by Studio.

(g)    **Analytics and Reporting**.

(i)     Coordinate with the University to produce detailed reports and analytics that provide a detailed understanding of how each marketing channel is performing.

(ii)    Be granted visibility, access, and secure credentials to all route existing reporting, analytics dashboards and database sources in order to obtain all information required to effectively generate analytical reporting.

(h)    **Inquiry Routing**.

(i)     Coordinate with the University to identify and agree upon the appropriate technical solutions required to adequately route and track all new student inquiries through the marketing strategy developed herein, including analytics to guide process improvement.

(ii)    Be provided by the University reasonable access to its resources in order to ensure that the needed connections are completed and provided appropriately.

3.    **ENROLLMENT MANAGEMENT THROUGH APPLICATION**

   (a)    **Centralized Call Center**.

        (i)    Work to integrate all pertinent systems and staff between call center and the University.

   (b)    **Enrollment Management**.

        (i)    ***Student Inquiry Management***—Utilize best practices relative to inquiry rotation and distribution to optimize student application results.

        (ii)    ***Inbound/Outbound Calls***—Make every attempt to contact all new student inquiries regardless of channel promptly and effectively within the hours of call center operations.

        (iii)    ***Email Communication***—Develop and maintain a CRM/email nurturing system capable of tracking email communications and reporting success rates.

        (iv)    Obtain Application and all related documents from the prospective students.

        (v)    Manage the student admission application process and direct the funnel from Inquiry to Application.

        (vi)    Communicate with and integrate Studio and the University's staff and systems together to ensure transparency and clear lines of communication.

        (vii)    Perform all other services necessary to effectively provide application management services to the University.

        (viii)    Responsibility for setting admission policy and making all admissions decisions remains with the University

   (c)    **Technology**.

        (i)    Subject to the TSLA, utilize CRM system for the purpose of student acquisition, inquiry management, email nurturing, and reporting.

        (ii)    Subject to the TSLA, operate and maintain a contact center solution (telephony) and CRM capable of reporting on contact strategies and pipeline performance to Studio, including toll-free numbers.

        (iii)    Subject to the TSLA, maintain existing hardware and software for Studio staff to operate computers, phones, and systems to service the University and students.

4. **STUDENT LIFE-CYCLE SUPPORT SERVICES**

    (a)    **Financial Planning Services**.

        (i)    Assist University staff in their communications with new incoming applicants regarding student finance needs, provide students instruction/counsel, overcome and resolve financing issues, and recommend a comprehensive financial plan to complete their education in a timely manner.

        (ii)    Assist University staff in guiding students in collecting supporting documents and walk students through the process of applying for all possible financial assistance.

        (iii)    Assist University staff in providing exceptional customer service and assist students in all aspects of their financial planning and student account through all communication means.

        (iv)    Assist University staff in securing verification documents from the applicable students for submission to the University's financial aid servicing team.

        (v)    Assist University staff in completing financial clearance process for each applicant.

        (vi)    Review student file documentation prepared by University staff to ensure accuracy and completeness and assist with providing student billing information.

        (vii)    Track activities in a measurable manner for reporting purposes.

        (viii)    The University shall maintain responsibility for administering participation in the Title IV, HEA programs, including the student aid application and packaging process, draw down, disbursement and reconciliation of federal funds, cash management and return to Title IV calculations.

        (ix)    At the University's request, Studio may engage one or more qualified third-party servicers for purposes of administering, through manual or automated processing, any aspect of the University's participation in any Title IV, HEA program. Any such contract shall be approved and executed between the University and the servicer pursuant to federal regulation, and Studio shall manage the relationship with the servicer on the University's behalf.

    (b)    **Student Mentoring Services (post-enrollment)**.

        (i)    Provide full-service coaching responsibilities.

        (ii)    Answer all class-related questions, including questions related to textbooks and available course resources (e.g., library and tutoring recommendations to the University's faculty).

(iii)    Maintain and facilitate communication with faculty throughout each course in order to assist with early alert and retention, with recommendations for students to include one-on-one sessions with instructor or other retention methods.

(iv)    Address at-risk alerts, such as non-attendance and low grades, and work with the student, the University, and faculty to aid in the student getting back on a path to future success.

(v)    Guide students toward career options by helping students to use development materials and become aware of local and national employment opportunities such as:

    (A)    Creation of career planning documents

    (B)    Creation of professional resume

    (C)    Creation of portfolio of student works

    (D)    Identifying industry partners and employment opportunities

(c)    <u>**Use of University Equipment**</u>.

(i)    During the term of this SOW, the University agrees that Studio may utilize any office equipment, networks, office space and related work materials housed at the University for purposes of providing the Services outlined in the SOW.

**Notwithstanding anything to the contrary that might be inferred by this Statement of Work, the University will have final approval over all catalogs, promotional materials, website content and other marketing products. In addition, the University is solely responsible for all admissions decisions, grading, discipline and other academic matters regarding students and all financial aid decisions and processes.**

**EXHIBIT B**

**EMC CONSENT JUDGMENT**

**(See attached)**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
Name:
Title:


DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC

By: _____
Name:
Title:


ARGOSY EDUCATION GROUP, LLC

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
    Name:
    Title:


DREAM CENTER SOUTH UNIVERSITY, LLC

By: _Randall K Burton_
    Name: RANDALL R. BARTON
    Title: Manager

*[Signature Page to Managed Services Agreement]*