# TRANSITION SERVICES
# AND LICENSE AGREEMENT

This TRANSITION SERVICES AND LICENSE AGREEMENT (this "Agreement"), is made and entered into as of January [--], 2019 (the "Effective Date") by and among STUDIO ENTERPRISE MANAGER, LLC, a Delaware limited liability company ("Studio"), and DREAM CENTER EDUCATION HOLDINGS, LLC, an Arizona not-for-profit limited liability company ("DCEH"). Studio and DCEH may be referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, Studio has entered into certain Managed Services Agreements (collectively, the "Managed Services Agreements"), each dated as of the date hereof, with each of DREAM CENTER SOUTH UNIVERSITY, LLC, an Arizona not-for-profit limited liability company ("South" and collectively with all of its Subsidiaries and campuses immediately following the Change of Control with respect to South, "South University"), ARGOSY EDUCATION GROUP, LLC, a California not-for-profit limited liability company ("AEG"), DREAM CENTER ARGOSY UNIVERSITY OF CALIFORNIA, LLC, a California not-for-profit limited liability company ("Argosy" and collectively with AEG and all of their respective campuses, the "Argosy University System"), THE ARTS INSTITUTES INTERNATIONAL, LLC, an Arizona not-for-profit limited liability company ("Ai" and collectively with all of its Subsidiaries and campuses immediately following the Change of Control with respect to Ai, the "Ai University System" and South University, the Argosy University System and the Ai University System together, the "University Systems");

WHEREAS, on December 22, 2018, Studio, DCEH, the Ai University System and certain Subsidiaries, Affiliates and Related Persons of the aforementioned Parties entered into a Framework Agreement (as amended, restated or otherwise modified from time to time, the "Framework Agreement"), a Master Bundled Services Agreement (as amended, restated or otherwise modified from time to time, the "Bundled Services Agreement"), a Technology License and Services Agreement (as amended, restated or otherwise modified from time to time, the "Technology License and Service Agreement"), a Master Asset Purchase Agreement (as amended, restated or otherwise modified from time to time, the "Ai Asset Purchase Agreement"), a License Agreement (as amended, restated or otherwise modified from time to time, the "Ai License"), a Grant Back License Agreement (as amended, restated or otherwise modified from time to time, the "Ai Grant Back License") and a Restrictive Covenant Agreement (as amended, restated or otherwise modified from time to time, the "Restrictive Covenant Agreement" and collectively with the Framework Agreement, Bundled Services Agreement, Technology License and Services Agreement, Ai Asset Purchase Agreement, Ai License and Ai Grant Back License, the "Ai Transaction Documents");

WHEREAS, this Agreement is being executed in connection with and pursuant to that certain Interim Framework Agreement (the "IFWA") dated as December 26, 2018, by and among Studio, DCEH, the University, Candlewood Special Situations Master Fund II, L.P., a Cayman Islands limited partnership, Flagler Master Fund SPC, LTD, a Cayman Islands segregated portfolio company, for and on behalf of the Class B segregated portfolio and the other Persons set forth on the signature pages thereto;

ALL-STATE LEGAL® EXHIBIT I

**WHEREAS**, prior to the date hereof, the University Systems were Affiliates of DCEH and received certain services from DCEH (the "Managed Services");

**WHEREAS**, following the date hereof, pursuant to the respective Managed Services Agreements, Studio and its Subsidiaries and Affiliates will provide the Managed Services to the University Systems;

**WHEREAS**, in order to perform the Managed Services pursuant to the Managed Services Agreements, Studio will subcontract certain of the Managed Services from DCEH;

**WHEREAS**, Studio and its Subsidiaries and Affiliates will need the full right and ability to Use certain software and other Technology or to receive certain Managed Services from DCEH, in connection with performing the Managed Services under the Managed Services Agreements;

**WHEREAS**, DCEH desires to convey to Studio and its Subsidiaries and Affiliates the full right and ability to Use such software and other Technology and to receive certain Managed Services, all as delineated more fully herein; and

**WHEREAS**, this Agreement is an integral component of the transactions consummated pursuant to the Managed Services Agreements.

**NOW, THEREFORE**, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto hereby agree as follows:

**ARTICLE I**
**Definitions**

Capitalized terms that appear in this Agreement are used with the meanings set forth in Exhibit 1 (attached hereto and incorporated herein by reference), or otherwise where such term is first identified and set off by quotation marks.

**ARTICLE II**
**Transition Services**

**2.1    Transition Services.**

(a)    Transition Services.  DCEH agrees to provide, or to cause its Affiliates to provide, the certain transition services set forth on Schedule A attached hereto and such other Managed Services as may be required for Studio to perform its obligations under the Managed Services Agreements (the "Transition Services") for the periods set forth on Schedule A.

(b)    Standard of Services.  DCEH agrees that it will provide or cause to be provided the Services in an ethical, professional, workmanlike manner and in all material respects in accordance with this Agreement, the Laws identified in Schedule B and relevant evolving state of the industry standard.  In addition, DCEH agrees that its provision of the

Services shall be made in accordance with all standards applicable to Studio under the Managed Services Agreements.

      (c)    <u>Confidentiality</u>. DCEH agrees to be bound by the provisions of Section 6 of each Managed Services Agreement, as a "Receiving Party" thereunder with respect to any Confidential Information received by DCEH as a result of performing the Services.

      (d)    <u>Dedicated Employees</u>. DCEH shall cause each Person set forth in <u>Schedule C</u>, as may be updated by Studio from time to time (the "<u>Dedicated Employees</u>") to dedicate 100% of its working time and attention to the provision of the Transition Services with respect to the Ai University System for so long as such persons are employed by DCEH. DCEH shall cooperate with Studio to transition the employment of the Dedicated Employees to the Ai University System or to Studio or its Affiliates, in each case as specified by Studio.

      (e)    <u>Access to Assets and Properties</u>. DCEH shall provide Studio and its Affiliates, and each University System and its Affiliates, and each of their respective officers, directors, employees, agents, advisors and representatives with full use of, and full access to, the assets and properties of DCEH and its Affiliates as may be necessary or desirable for Studio to perform the Services under the Managed Services Agreements.

      (f)    <u>Reliance on Services</u>. DCEH acknowledges and agrees that it has been provided with a copy of each Managed Services Agreement. DCEH understands and agrees that in entering into such Managed Services Agreement, Studio was relying on this Agreement and the performance by DCEH of its obligations hereunder. DCEH acknowledges and agrees that Studio is entitled to rely upon its covenants and agreements as set forth herein in entering into the Managed Services Agreements.

    **2.2**    **Transition Services Fees**. In consideration of providing the Transition Services, Studio shall pay or cause to be paid to DCEH or its designee the monthly fees set forth on <u>Schedule A</u> (the "<u>TSA Fee</u>"), payable within ten (10) Business Days after the end of each month of the Term; *provided* that, for any month of the Term, to the extent that the amount of Service Fees paid to Studio by any University System pursuant to the applicable Master Services Agreement is not sufficient for Studio to pay for all Non-Core Expenses (other than the TSA Fee) of such University System (the amount of such shortfall, the "<u>TSA Fee Shortfall</u>"), then the TSA Fee payable to DCEH for such month shall be reduced by the amount of the TSA Fee Shortfall for such month, which shall accrue and become payable to DCEH only when the amount of Service Fees paid to Studio by such University System exceeds the amount of all Non-Core Expenses (other than the TSA Fee) of such University System then due and payable for such period, and then such TSA Fee Shortfall shall only be payable to the extent of such excess. For the avoidance of doubt, in no event shall Studio or any of its Affiliates be required to fund any TSA Fee Shortfall.

    **2.3**    **Termination of Bundled Services Agreement and Technology License and Services Agreement**. The Parties hereto agree that this Agreement supersedes the Bundled Services Agreement and the Technology License and Services Agreement (the "<u>Prior Agreements</u>") and that no Person shall have any liability or obligation under the Prior Agreements, it being understood that no goods were conveyed or services performed under such

Prior Agreements. Notwithstanding the foregoing, no Party to the Prior Agreements shall be relieved from any liability related to any breach of such Agreement by such Party prior to the date of execution and delivery of this Agreement.

ARTICLE III
**Technology License and Services**

**3.1    Proprietary Technology License.** DCEH (on behalf of itself and its Affiliates) hereby grants to the Studio Entities, a world-wide, fully paid-up, royalty-free, perpetual, non-exclusive, irrevocable, sublicensable (through multiple levels), transferrable (to the Studio Entities' present and future Affiliates and as permitted in Section 8.7 (Assignment)) license to Use, by and through Authorized Users, the Proprietary Technology (and all Intellectual Property Rights therein), to conduct the Business, both as the Business is now conducted and as the Studio Entities (or the Studio Entities' designees, successors or assigns) determine to conduct the Business in the future; *provided, however,* such license to Use shall not include the right to license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose, permit timesharing or service bureau use, or otherwise commercially exploit or make the Proprietary Technology available to any third-party other than as expressly permitted under the terms of this Agreement or any Master Services Agreement. To the extent that any Proprietary Technology is owned or controlled by any Affiliate of DCEH, DCEH represents and warrants that such Affiliate has the rights to grant the foregoing license. DCEH shall (and will cause its Affiliates to), at the Studio Entities' request and expense, execute and deliver such instruments and take such other reasonable actions as may be requested by the Studio Entities to perfect and maintain the Studio Entities' rights in the Proprietary Technology which are granted under this Agreement. Other than the existing limits imposed pursuant to any Third-Party Agreement that is necessary to operate the Proprietary Technology, there are no limits on the number of Authorized Users for the Proprietary Technology.

**3.2    Agreement to Provide Existing Services.** Without limiting any other obligation herein, DCEH shall provide the Studio Entities, at all times during the Term, with access to: (a) all of the services (the "Shared IT Services") that it provides now to the University Systems with respect to the Shared IT Systems, including access and Use of those Shared IT Systems set forth on Exhibit 7 and (b) all of the services (the "Other Third-Party IT Services") that it provides now to the University Systems with respect to Third-Party Materials other than Shared IT Systems, including access and Use of such Third-Party Materials, in each case ((a) and (b)) in consideration of the TSA Fee and not at any incremental cost or expense to the Studio Entities. It is expressly understood and agreed by Studio that the Shared IT Systems and the Other Third-Party IT Services shall consist of three categories of agreements: (i) agreements for which the Studio Entities shall hold the position of an end user, (ii) agreements for which the Studio Entities shall have administrator rights; and (iii) agreements for which the Studio Entities shall have the right to request certain reports pursuant to a service level agreement or "SLA" in addition to the associated Shared IT Services, in each case ((i)-(iii)) consistent with the rights, access permissions and reports DCEH receive on the Effective Date. The foregoing Shared IT Services and the Other Third-Party IT Services shall be provided on the fee basis specified in the previously mentioned Schedule A hereto.

**3.3   Authorized Users**.  DCEH hereby authorizes the Studio Entities and their Affiliates (including present and future Affiliates) to access and Use the Shared IT Services and the Other Third-Party IT Services, by and through Authorized Users and such authorization is granted under any Intellectual Property Rights held by DCEH.  During the Term, the number of Authorized Users for the Shared IT Services and the Other Third-Party IT Services shall be no less than currently authorized for each University System and, if the Studio Entities request additional Authorized Users, the cost of such additional Authorized Users shall be borne by the Studio Entities.  DCEH shall provide the Studio Entities with training, passwords, network links, connections, assistance, hardware, and other items and materials necessary and sufficient to enable the Studio Entities to access and utilize the Shared IT Systems and to receive Shared IT Services, including those detailed in Schedule A, and to receive the Other Third-Party IT Services (and access and utilize the Third-Party Materials underlying such Other Third-Party IT Services).  The Shared IT Services and, to the extent applicable, the Other Third-Party IT Services, shall be provided on the fee basis specified in the previously mentioned Schedule A.  During the Term, DCEH shall ensure that (x) the Studio Entities have access to the current versions of (1) Shared IT Systems and (2) Third-Party Materials underlying the Other Third-Party IT Services, and (y) that the Shared IT Services and Other Third-Party IT Services are free of material defects, and can be used consistent with how they are currently used by the University Systems.

**3.4   Third-Party Agreements; Assistance**.  Without limiting DCEH's obligations hereunder, DCEH agrees to provide written notice to the Studio Entities no less than 120 days prior to the expiration date of each Third-Party Agreement held by DCEH.  The Studio Entities shall give written notice to DCEH no less than 60 days prior to the expiration date of such Third-Party Agreement as to whether the Studio Entities desire to (a) obtain their own Contract for such Third-Party Agreement or (b) continue to receive the Shared IT Services and the Other Third-Party IT Services, as applicable, under such Third-Party Agreement on the fee basis specified in the previously mentioned Schedule A, in which case DCEH shall renew such Third-Party Agreement.  If the Studio Entities notify DCEH that the Studio Entities wish to obtain their own Contract, then DCEH will provide reasonable assistance in the negotiations with the third-party vendor under such Third-Party Agreement and the Studio Entities shall bear any fees and expenses associated with obtaining such separate Contract.

**3.5   Delivery of Technology Used by the Business and Studio Data**.

(a)   Delivery of Proprietary Software Materials.  The Studio Entities will set up an account with Microsoft Team Foundation Server ("TFS") and, within seven (7) Business Days after the Studio Entities set up such an account, pursuant to the license granted in Section 3.1, DCEH will provide the Studio Entities with access to all of the Proprietary Software Materials via TFS, and will not take any action or omit to take any action that would prevent the Studio Entities from having continuous access to the Proprietary Software Materials via TFS during the Term.  DCEH shall ensure that, at all times, the Proprietary Software Materials include, for each item of Proprietary Software, the Source Code and the Object Code, and a full working copy of such Proprietary Software that is executable and loadable in an operating environment identical to or substantially the same as the one now utilized by DCEH, and that is sufficient for purposes of understanding, operating, hosting, supporting, maintaining, modifying, developing Updates to, integrating other technology with, and otherwise Using all such

Proprietary Software. The Studio Entities agree that the Source Code and the Object Code are provided to them solely to assure their ability to enjoy the full benefit of the license granted in Section 3.1 and the Studio Entities agree that they shall not provide a copy of the Source Code or Object Code to any Person other than a Representative of the Studio Entities and then only for the purposes of the license granted in Section 3.1. The Studio Entities will not pay for any efforts to create such Proprietary Software Materials or to create a version or segregation of such Proprietary Software Materials from any other software or materials of DCEH or its Affiliates; *provided, however,* if the Studio Entities request any Developed Technology, the Studio Entities shall pay for such Developed Technology at the rate of $61.50 per person per hour (the "Hourly Rate"). For avoidance of doubt, except as is required to be included in the Proprietary Software Materials delivered by TFS, DCEH is not required to maintain with Studio a duplicate standalone fully operational environment (e.g., servers and other hardware) that is continuously running the Proprietary Software nor are they required to build an operating environment that duplicates the one now utilized by DCEH. DCEH shall update the Proprietary Software Materials on TFS every thirty (30) days to ensure that the Proprietary Software Materials represent the latest version of the Proprietary Software and a fully Useable copy of each item of Proprietary Software. DCEH shall ensure that the services of sufficient Authorized Personnel are available to the Studio Entities and the Studio Entities' designees and provide sufficient information to the Studio Entities so that the Studio Entities and their designees are informed and instructed on how to prepare an executable copy of, operate, host, support, maintain and otherwise Use each item of Proprietary Software (together with any Termination Assistance Services provided in the event that the Studio Entities terminate this Agreement without cause, but excluding in all cases any Shared IT Services, the "DCEH IT Support Services"), subject to Section 3.9. To the maximum extent permitted by Law, DCEH shall and hereby does waive any restrictions under contract or by operation of law that would prohibit their Authorized Personnel's performance under this Section 3.5 and shall cause their Authorized Personnel to do the same, as applicable.

(b)     Delivery of Studio Data to the Studio Entities. DCEH, as soon as is reasonably practicable following the Effective Date and in any case within ten (10) Business Days, shall deliver to the Studio Entities a complete, accurate, and up-to-date copy of the Studio Data, electronically or by other means, as reasonably requested by the Studio Entities in writing, promptly following the Studio Entities' request. Every thirty (30) days, DCEH shall provide an accurate, complete and up-to-date copy of the Studio Data that is maintained by DCEH on the Shared IT Systems in a format reasonably specified by the Studio Entities.

(c)     Access to Other Technology. To the extent not covered by Sections 3.5(a) and Section 3.5(b), DCEH agrees to provide access to all other Technology Used by the Business as necessary for the Studio Entities to conduct the Business and hereby authorizes the Studio Entities to access and Use such Technology Used by the Business, consistent with how it is accessed and Used on the Effective Date (and, with respect to the Developed Technology, how it is Used after the Effective Date). It is expressly understood and agreed by Studio that such Technology Used by the Business shall consist of three categories of agreements: (i) agreements for which the Studio Entities shall hold the position of an end user, (ii) agreements for which the Studio Entities shall have administrator rights; and (iii) agreements for which the Studio Entities shall have the right to request certain reports pursuant to a service level agreement or "SLA" in addition to the associated Shared IT Services, in each case ((i)-(iii)) consistent with the rights,

access permissions and reports DCEH receives on the Effective Date (and, with respect to Developed Technology, consistent with the rights, access permissions and reports received after the Effective Date). Without limiting DCEH's other obligations under this Agreement, DCEH shall provide to the Studio Entities all necessary passwords, network links, connections, assistance, hardware, and other items and materials necessary and sufficient to enable the Studio Entities to access and Use the Technology Used by the Business to the full extent permitted by this Agreement, promptly following the Studio Entities' request. Without limiting the foregoing, as soon as reasonably practicable following and in any case within thirty (30) days following the Effective Date of this Agreement, DCEH shall transfer to the Studio Entities full and unencumbered access to and administrative rights with respect to all domain names and social media accounts used in, held for use in, or necessary for the operation of the Business as it is currently conducted; *provided*, that the Parties together shall ensure that all links between any national Art Institute social media account and any social media account for Ai Pittsburgh and Ai Online have been deactivated and provided further that the Studio Entities shall comply with Section 2 of the Ai Grant Back License. To the extent not covered by Sections 3.5(a) and Section 3.5(b), DCEH shall ensure that, at all times during the Term following the delivery of or provision of access to Third-Party Materials, the Studio Entities have a copy of, or access to a copy of, a complete, fully Use-able copy of such Technology Used by the Business that is: (i) free of material defects, and (ii) to the extent applicable, executable and loadable, and which can be used for purposes of conducting or providing maintenance, support, hosting, integrations, Updates and other modifications (including by bug fixing), and otherwise to the full extent permitted by this Agreement.

(d) <u>Responsibility for Maintenance</u>. DCEH is solely responsible for providing, maintaining, and supporting all infrastructure, personnel, Technology and other resources, and for obtaining any third Person licenses (other than those the Studio Entities determine to independently obtain which shall be at the expense of the Studio Parties) in connection therewith, necessary for DCEH to provide, and the Studio Entities to enjoy services under or Use of (as provided for herein), the Technology Used by the Business and Services in accordance with this Agreement.

(e) <u>Services and Processing</u>. DCEH shall, and will cause its Authorized Personnel to, perform all Services and Process all Studio Data from a facility or location that, unless otherwise agreed by the Studio Entities in writing: (i) is located in the United States, and (ii) complies with the DSE and the rest of this Agreement.

(f) <u>Restrictions on Changes</u>. DCEH will not (and will ensure that its Affiliates do not) make any material adverse change to the Technology Used by the Business without the Studio Entities' prior written consent; *provided that* DCEH may make any changes, upgrades and improvements that improve the current level of service or Use with prior written notice to the Studio Entities so long as (a) the Studio Entities are offered the option to Use such changes, upgrades and improvements, and (b) the amount of the TSA Fee does not increase on account of such changes, upgrades, and improvements. At the Studio Entities' request, DCEH will suspend or terminate the access of any Authorized User or of any employee or agent of DCEH or any of its Affiliates for cause to any Technology Used by the Business in accordance with the Studio Entities' instructions. The Studio Entities will not incur any liability to DCEH or its Affiliates by virtue of such request.

**3.6** **Integrations**. To the extent the Studio Entities request, DCEH shall, at the expense of the Studio Parties, provide the Studio Entities all assistance that DCEH and its Affiliates have the resources and knowledge to provide, and that is reasonably necessary, to: (a) establish and operate technical connections between the Technology Used by the Business and any other Studio Systems (or other Technology Used by the Business) as requested by the Studio Entities to enable the interoperability between same, (b) integrate data provided by third Persons or by the Studio Entities with the Technology Used by the Business (in which case, all such data will be deemed Studio Data owned by the Studio Entities) and (c) enable third Persons (other than the Studio Entities or their Affiliates, or its or their employees or agents) to operate the Technology Used by the Business or provide technology, goods or services to the Studio Entities or its Affiliates, including by providing such Persons sufficient access to, use of and support for the Software Used by the Business, *provided that*, in no event shall Proprietary Technology be provided to any Person who is not a Representative of the Studio Entities subject to Section 4.2 (clauses (a)-(c) above, the "Integration Services"). For avoidance of doubt, any Integration Services requested by the Studio Entities shall be provided under the DCEH Support Services Terms at the Hourly Rate. This Section 3.6 does not limit DCEH's obligation to deliver Software for integrations pursuant to Section 3.5.

**3.7** **Acceptance Testing**. Upon receipt of any Technology Used by the Business (or any Updates to any Technology Used by the Business), the Studio Entities may perform acceptance testing of such Technology Used by the Business to determine whether such Technology Used by the Business is free of Performance Deficiencies. The Studio Entities shall have the right to notify DCEH of any Performance Deficiencies within thirty (30) days of receipt of each item of Technology Used by the Business. "Performance Deficiencies" denotes any way in which the Technology Used by the Business does not meet the Studio Entities' reasonable expectations consistent with the performance as of the Effective Date and, if the testing is with respect to any Updates, the performance of the Technology Used by the Business immediately prior to any such Updates. DCEH will correct any performance deficiencies within ten (10) days of the Studio Entities' notice of non-conformance and will provide the Studio Entities with access to the corrected Technology Used by the Business ("Resubmitted Technology Used by the Business") within such ten (10) day period. The Studio Entities shall have the right to perform acceptance testing, in accordance with this Section 3.7, of any Resubmitted Technology Used by the Business that DCEH purports has been corrected, and the Studio Entities shall have the right to require that the procedures of this Section 3.7 continue to apply with respect to any such Resubmitted Technology Used by the Business. Acceptance of a Technology Used by the Business will occur when the Studio Entities provide written notice to DCEH that the Studio Entities accept such Technology Used by the Business ("Acceptance"). If the Studio Entities fail to provide their Acceptance or rejection of a Technology Used by the Business within the Acceptance Testing Period, as applicable, DCEH will provide written notice of such failure to the Studio Entities ("Escalation Notice") and the Technology Used by the Business shall be deemed rejected. Neither the Studio Entities' failure to assert any deficiency during any acceptance testing nor the Studio Entities' Acceptance of any Technology Used by the Business shall constitute a waiver of the right to later assert any deficiency as a breach of warranty, or a waiver of any of the Studio Entities' other rights or remedies.

**3.8** **Training**. DCEH shall provide, at no charge, training: (a) on all Uses of the Technology Used by the Business permitted hereunder and (b) as needed to enable the Studio

Entities and their designees to understand and Use the Studio Data, in each case ((a) and (b)) at such reasonable times and locations as the Studio Entities request so that the Studio Entities and their designees are sufficiently informed and instructed on how to Use the Technology Used by the Business (including, with regards to Software Used by the Business, to maintain, support, host, operate, and integrate other technology with, and otherwise Use such Software Used by the Business) and the Studio Data. The Parties agree to utilize the 'train the trainer' concept as much as possible, and the Studio Entities agree to provide designees who, after receiving training from DCEH, will be qualified to provide training to other employees of the Studio Entities; *provided* that DCEH shall provide training consistent with the training that each University System has historically received, as well as records to verify that (i) such training is consistent with levels historically provided and (ii) sufficient to enable the Studio Entities' designees to train other employees of the Studio Entities.

3.9 **Support**. Without limiting DCEH's obligations under <u>Section 3.8</u>, DCEH shall provide the Studio Entities with all reasonable support necessary and sufficient for the Studio Entities to Use the Technology Used by the Business and Studio Data in accordance with and to the full extent contemplated and permitted by this Agreement, continuously throughout the Term, and so that the Technology Used by the Business and Studio Data continues to operate and remain free of all material defects. Any such support necessary to correct any defects will be provided at no charge. Any other support provided pursuant to this paragraph will be provided in accordance with the DCEH Support Services Terms. Upon request by the Studio Entities, DCEH shall provide the DCEH IT Support Services at no charge for a maximum of forty (40) hours per month for the period of nine (9) months following the Effective Date (the "<u>Initial Service Period</u>"); for any DCEH IT Support Services provided in excess of forty (40) hours in any month or following the expiration of the Initial Service Period, the Studio Entities shall make payment to DCEH at the Hourly Rate. The terms in this paragraph concerning the extent of charge for IT Support Services (the "<u>DCEH Support Services Terms</u>") shall apply, on an aggregate basis, to all DCEH IT Support Services requested by the Studio Entities and provided by DCEH pursuant to this Agreement. For avoidance of doubt, DCEH IT Support Services shall not be construed to include the basic training provided pursuant to <u>Section 3.8</u> hereof, which will be provided for no additional consideration beyond amounts payable in respect of the TSA Fees.

3.10 **Scheduled Maintenance**. Unless the Parties agree otherwise in writing, DCEH will perform all maintenance, other than emergency maintenance, between the hours of 2 AM and 5 AM Eastern Time and with forty-eight (48) hours advance notice to the Studio Entities. Without limiting any of DCEH's other obligations under this Agreement (and subject to the Service Threshold below), DCEH may perform emergency maintenance outside of scheduled maintenance windows in the event such maintenance is reasonably and urgently required to protect the integrity, availability, safety, or security of any Technology Used by the Business, Studio Data or Studio System. In the event that DCEH determines that such emergency maintenance is required, DCEH shall notify the Studio Entities of such maintenance as soon as reasonably possible.

3.11 **Business Continuity and Disaster Recovery**. DCEH shall throughout the Term maintain a business continuity and disaster recovery plan as currently maintained by DCEH and provide information to the Studio Entities about such plan promptly following the Studio

Entities' request for such information. DCEH shall implement such plan in the event of any unplanned interruption or other issue affecting the Technology Used by the Business.

**3.12 Service Levels**.

(a) <u>Proprietary Technology</u>. With respect to Proprietary Technology, DCEH will ensure that such Proprietary Technology continues to perform consistent with current performance standards.

(b) <u>Third-Party Technology</u>. Without limiting DCEH's other obligations under this Agreement, DCEH shall ensure all Technology Used by the Business provided by third Persons other than DCEH's Affiliates is available in accordance with the service levels set forth in the applicable agreement between DCEH and such third Person.

(c) <u>Updates</u>. During the Term, and subject to <u>Section 3.10</u>, DCEH shall provide the Studio Entities, at no additional charge, all Updates to the Technology Used by the Business that: (a) are necessary to correct bugs or other problems with the Technology Used by the Business, or (b) which are otherwise developed and available (except that, with respect to Updates developed by third Persons who are not Affiliates of DCEH, DCEH shall only be obligated to provide Updates to which (i) DCEH or its Affiliates have access, or (ii) which are available to DCEH or its Affiliates free of charge).

ARTICLE IV
**Other Covenants of the Parties**

**4.1 Consideration; Withholding Taxes**.

(a) <u>Consideration</u>. DCEH is entering into this Agreement in consideration for the amounts set forth in <u>Schedule A</u>, which shall be paid on the terms set forth herein and therein.

(b) <u>Withholding Taxes</u>. DCEH shall deliver to the Studio Entities an IRS Form W-9 (or applicable successor form), validly executed by DCEH. If any of the payments made or deemed to have been made by the Studio Entities pursuant to this Agreement are subject to withholding Taxes under applicable Laws of any jurisdiction for which DCEH is liable under applicable Law, the Studio Entities shall deduct and withhold the amount of such Taxes, and such amounts deducted or withheld shall be treated as having been paid to DCEH for all purposes of this Agreement. Any such withholding Taxes required under applicable Law to be paid or withheld shall be an expense of, and borne solely by, DCEH. The Studio Entities shall provide reasonable assistance to DCEH to enable DCEH to recover such Taxes as permitted by applicable Law. The Parties shall reasonably cooperate and take all commercially reasonable actions to minimize any such withholding Taxes.

**4.2 Confidentiality**. Each Party (the "<u>Receiving Party</u>") may use and disclose the other Party's (the "<u>Disclosing Party</u>") Confidential Information in order to exercise the Receiving Party's or its Affiliates' rights or perform its obligations under this Agreement, provided that the Receiving Party (a) only discloses such Confidential Information to its Representatives, (b) informs such Representatives of the confidential nature of such Confidential

Information and (c) requires such Representatives to hold in confidence all such Confidential Information and to use it only for the purpose of exercising the Receiving Party's or the Receiving Party's Affiliates' rights or performing the Receiving Party's obligations under this Agreement. Notwithstanding anything to the contrary contained herein, each Receiving Party may disclose Confidential Information to any University Systems in connection with the provision of Managed Services to such University System in accordance with a Managed Service Agreement. The Parties shall comply in all respects with the terms set forth in the DSE (Exhibit 3) which is attached hereto and incorporated herein by reference. The Receiving Party will use at least the same degree of care to protect the Disclosing Party's Confidential Information as the Receiving Party uses to protect the Receiving Party's own Confidential Information of like nature, but will use at least reasonable care. DCEH will (and will cause its Affiliates to) prevent the unauthorized access to or disclosure of the Confidential Information of Studio (including any Studio Data which is Confidential Information). A Receiving Party may disclose the Confidential Information of the Disclosing Party in response to a valid court order or other governmental action, provided that: (i) to the extent legally permissible, the Disclosing Party is notified in writing prior to disclosure of such Confidential Information and given reasonable opportunity to obtain a protective order and (ii) the Receiving Party assists in any attempt to limit or prevent the disclosure of such Confidential Information.

**4.3    Data**.

(a)    <u>Permission to Use Student Data</u>. On the Effective Date of this Agreement, DCEH hereby grants the Studio Entities permission to Use the Student Data.

(b)    <u>Ownership</u>. The Studio Entities own and shall own all right, title and interest in and to, including all copyrights, database rights, and other Intellectual Property Rights in and to, the Studio Data, the Studio Entities' other Confidential Information and Studio Systems (the Studio Data, other Confidential Information of Studio and Studio Systems, and all rights in and to such Studio Data, Confidential Information and Studio Systems, collectively, the "Studio Property"); *provided, however* that any Student Data regarding the past, present or future students of a University System shall be subject to the rights of such University System with respect thereto. In furtherance of the foregoing, the creation and distribution of any and all Studio Property by or on behalf of DCEH or its Authorized Personnel will be done under the direction of, and for the benefit of, the Studio Entities and will be, to the maximum extent permitted by law, a "work made for hire" under the U.S. Copyright Act, with respect to which the Studio Entities will be deemed the author and owner of all such Studio Property (other than Student Data). To the extent any copyrights are not a work made for hire, and with respect to all other rights (including all Intellectual Property Rights) in and to the Studio Property, DCEH (on behalf of itself and its Affiliates) shall and hereby does irrevocably and unconditionally assign and transfer to the Studio Entities any right, title and interest of DCEH (or any of its Affiliates) have or may obtain in or to such Studio Property (whether now in existence or hereafter created), including any associated rights of renewal and all reversionary interests thereof, without further consideration; *provided, however,* that the assignment of Student Data regarding the past, present or future students of a University System is subject to the rights of such University System with respect to such Student Data. DCEH shall secure any necessary right, title or interest from DCEH's Affiliates and any third Person as necessary to assign and transfer such right, title and interest. DCEH shall (and will cause each of its Affiliates to), at the Studio Entities' request and

expense, execute and deliver such instruments and take such other reasonable actions as may be requested by the Studio Entities to perfect, prosecute, maintain or otherwise protect the Studio Entities' rights in the Studio Property or otherwise to carry out the purpose contemplated in this Section 4.3. With respect to the Developed Technology, DCEH herby grants to the Studio Parties a world-wide, fully paid-up, royalty-free, perpetual, non-exclusive, irrevocable, sublicensable (solely to Affiliates and to each University System), non-transferrable license to Use, by and through Authorized Users, such Developed Technology in connection with the Studio Parties' operation of their business, as it is now conducted and as they hereafter determine to conduct it, subject to Section 4.2 (Confidentiality). To the extent that DCEH is transferring or providing access to any Personal Data to the Studio Entities, or will collect Personal Data for or on behalf of the Studio Entities in connection with the Services, then DCEH represents, warrants, and covenants that DCEH and its Affiliates have each provided all necessary information and notices to any required individuals and other Persons and obtained all necessary consents, approvals, and authorizations to provide such Personal Data to the Studio Entities and that the transfer of such Personal Data is authorized pursuant to applicable Law.

(c) Permission. Studio hereby grants, and will cause the Studio Entities to grant, to DCEH during the Term a limited, fully paid-up, royalty-free, non-transferrable, non-exclusive limited permission under the Studio Entities' rights (with the right to grant further permissions solely to Authorized Personnel) to Process the Studio Data solely for the purpose of providing the Technology Used by the Business to the Studio Entities and in accordance with this Agreement, including the restrictions on use and disclosure in Section 4.3(d) and Section 4.2 (Confidentiality). As between the Parties hereto, the Studio Data remains solely owned by the Studio Entities even when incorporated into the Technology Used by the Business, and neither DCEH nor its Authorized Personnel shall obtain any right, title, or interest in or to the Studio Property; *provided* that Student Data regarding the past, present or future students of any University System is subject to the rights of such University System with respect to such Student Data.

(d) Restrictions on Use. DCEH will not, and will ensure that other Persons do not, without the express prior written consent of the Studio Entities: (a) Use any Studio Data except as necessary to provide Technology Used by the Business to the Studio Entities in accordance with this Agreement; (b) disclose any Studio Data to any Person except to Authorized Personnel in accordance with Section 4.2 (Confidentiality); (c) Use any Studio Data for the benefit of any Person other than the Studio Entities or the Studio Entities' Affiliates; (d) Process any data in connection with this Agreement that is subject to health or privacy or security Laws or which is otherwise considered biometric data or which the Studio Entities identify in writing as sensitive; (e) combine the Studio Data with any third Person's trademarks, service marks or other designations of origin; or (f) alter, manipulate or misrepresent Studio Data, or present Studio Data in a false or misleading light. Notwithstanding items (a), (b) and (c) of this paragraph, with respect to any Student Data pertaining to students of any University System, each Party acknowledges that such Student Data is subject to the rights of such University System, which remains responsible for performing Core Services and such University System may use such Student Data for purposes authorized by education Laws and consistent with Laws, including health or privacy Laws. DCEH covenants not to use the Student Data in any manner that would violate any Laws during the Term.

**4.4     Maintenance of Assets and Properties; Certain Restricted Actions**.  DCEH covenants and agrees that it shall maintain its respective assets, properties and Contracts and shall use commercially reasonable efforts to retain its employees and business relationships to the extent reasonably necessary to perform the Services hereunder and to otherwise fulfill their obligations under this Agreement.  In no event shall DCEH undergo a Change of Control or initiate, permit to continue a Bankruptcy, fail to maintain its properties, assets and Contracts, or fail to retain its employees or other business relationships if such Change of Control, Bankruptcy or failure could reasonably be expected to cause any interruption to, or change in, the Services provided hereunder or otherwise interfere with DCEH's ability to perform its obligations under this Agreement.

## ARTICLE V

**Representations and WarrantiesMutual Representations**.  Each Party represents, warrants and covenants to the other Parties that:

(a)     Such Party has the full corporate power, right and authority to enter into this Agreement and perform its obligations hereunder.

(b)     The execution of this Agreement by such Party and the performance by such Party of its obligations and duties hereunder does not conflict with any agreement to which such Party is a party or by which it is bound.

(c)     This Agreement is a binding obligation upon such Party and, when executed by both Parties, is enforceable against such Party in accordance with its terms.

(d)     Such Party will comply with Laws in performing its obligations under the Agreement.

**5.2     Representations and Warranties of DCEH**.  DCEH further represents, warrants and covenants to Studio that:

(a)     The Technology Used by the Business, subject to all Proprietary Software being hosted by the Studio Entities on an operating environment identical to or substantially the same as the one now utilized by DCEH, will operate continuously during the Term, and the Studio Data will be provided, free of material defects and degradation, and both the Technology Used by the Business and Studio Data will otherwise comply with and conform with Law and any applicable Documentation.

(b)     The Services and the Technology Used by the Business will be provided in a timely and professional manner that equals or exceeds industry standards, using sufficient resources and sufficient Authorized Personnel who possess the skill, knowledge and experience to effectively carry out this Agreement.

(c)     With respect to any actions taken by DCEH pursuant to this Agreement, no Studio System or other Studio Property is or will become subject, in whole or in part, to any terms of any agreement or license for Open Source Components or any "copyleft" obligations by virtue of the provision of, or the Studio Entities', their Affiliates', or any of their users', access to or other use of, the Services or Technology Used by the Business.

(d)     DCEH will not, and will ensure that its Affiliates do not, suspend or disrupt the Technology Used by the Business or access to or use of the Technology Used by the Business or Studio Data, even if they allege that Studio has breached this Agreement or another agreement between the Parties.

(e)     All of the Third-Party Agreements are valid, binding and enforceable as to DCEH and, to DCEH's knowledge, the other parties thereto, in accordance with their respective terms.

(f)     Each of the Third-Party Agreements will be in full force and effect without penalty in accordance with their terms upon consummation of the transactions contemplated hereby.

(g)     DCEH and its Affiliates have performed all obligations, in all material respects, required to be performed by each of them, and are not in default under or in breach of nor in receipt of any claim of default or breach under, any Third-Party Agreement;

(h)     No event has occurred which with the passage of time or the giving of notice or both would result in a default, breach or event of noncompliance by DCEH or any of its Affiliates under any Third-Party Agreement.

(i)     DCEH has no Knowledge of any breach or cancellation or anticipated breach or cancellation by the other parties to any Third-Party Agreement.

(j)     The Studio Entities have been supplied with a true and correct copy of each written Third-Party Agreement, together with all amendments, waivers or other changes thereto.

(k)     There will be no Liens involving the Technology Used by the Business at any time during the Term other than those in effect as of the Effective Date.

(l)     DCEH and its Affiliates, will, continuously throughout the Term, own and possess or have the right to use pursuant to a valid and enforceable written license or service agreement all Technology Used by the Business, and have all authorizations, rights and licenses necessary to grant the rights and licenses herein.

**5.3     Continuing Accuracy of DCEH Representations**.   DCEH shall obtain and maintain, at their cost, all necessary authorizations, rights, licenses or other Contracts to ensure the continuing accuracy of Section 5.2(l).

**ARTICLE VI**
**Indemnification**

**6.1     Indemnification by DCEH**.   DCEH will indemnify, defend and hold harmless the Studio Entities, the University Systems, and each of the Studio Entities' and the University Systems' Affiliates, together with each Studio Entity's, each University System's, each University System Affiliate's and each Studio Entity's Affiliate's respective officers, directors, trustees, employees, equity holders, members, managers, agents, Authorized Users, attorneys,

representatives, permitted successors and permitted assigns, (each, including the Studio Entities, an "Studio Indemnitee") from and against any and all Losses incurred by any Studio Indemnitee including such Losses arising out of or resulting from any demand, suit, action, investigation, allegation, complaint or any other proceeding asserted by any third party (each, a "Third Party Claim") made, brought or asserted by any third Person (including any Claim brought against Studio by another Studio Indemnitee, and any Claim brought by a governmental agency, entity or organization): (i) arising out of or resulting from the actual or alleged negligence, gross negligence, willful misconduct by or on behalf of DCEH, Authorized Personnel, or any other actual or apparent agent of DCEH, (ii) arising out of or resulting from DCEH's actual or alleged breach of this Agreement (including any representation, warranty or covenant), (iii) that any Services or Technology Used by the Business (including the use thereof), or the exercise by the Studio Entities of any right granted to them pursuant this Agreement, infringe, misappropriate, or otherwise violate any third Person's Intellectual Property Rights, (iv) arising out of or resulting from a Data Security Breach, including any Remediation Efforts associated therewith or (v) otherwise incurred by any Studio Indemnified Party in connection with this Agreement or the Services provided hereunder; *provided* that the obligations of DCEH hereunder shall be relieved to the extent (and solely to the extent) that any such Losses arise out of a Studio Indemnitee's material uncured breach of its contractual obligations under this Agreement or its knowing and intentional fraud in connection with its performance under this Agreement.

  **6.2 Indemnification Procedures for Third Party**. Studio shall: (i) notify DCEH within thirty (30) days of receiving notice of any Third Party Claim which it seeks indemnification in writing ("Indemnified Third Party Claim"); (ii) give DCEH exclusive control and authority over the defense and settlement of such Indemnified Third Party Claim (provided that DCEH shall not settle any Third Party Claim unless (A) the applicable settlement does not entail an admission of fault or guilt by the Studio Indemnitees, (B) the sole relief provided is monetary damages that are paid by DCEH, and (C) the applicable settlement includes, as an unconditional term, the claimant's or the plaintiff's release of the Studio Indemnitees from all liability in respect of the Indemnified Third Party Claim); (iii) not enter into any settlement or compromise of any such Indemnified Third Party Claim without DCEH's prior written consent, which shall not be unreasonably withheld, conditioned or delayed; and (iv) provide reasonable assistance as required in connection with such Indemnified Third Party Claim, or as requested by DCEH, in each case, at DCEH's expense, which expense, for the avoidance of doubt and not by way of limitation, shall include reasonable attorneys' fees and other costs incurred by the Studio Indemnitees in connection with such assistance. The Studio Indemnitees' failure to perform any obligations under this Section 6.2 will not relieve DCEH of their obligations under this ARTICLE VI except to the extent (and solely to the extent) that DCEH can demonstrate that such failure has materially prejudiced their ability to fulfill their indemnification obligations. Notwithstanding the foregoing, the Studio Indemnitees may join in the defense of an Indemnified Third Party Claim with their own counsel at their own expense; provided, that DCEH shall bear the expense of such counsel to the extent provided in this Section 6.2. The obligations of DCEH set forth in this paragraph shall be relieved to the extent (and solely to the extent) that any such Indemnified Third Party Claim arises out of a Studio Indemnitee's material uncured breach of its contractual obligations under this Agreement or its knowing and intentional fraud in connection with its performance under this Agreement.

**6.3     Infringement Remedies.**  In addition to DCEH's obligations in Section 6.1 and except as provided below, in the event the Services or Technology Used by the Business or any part of the Services or Technology Used by the Business become, or in DCEH's reasonable opinion, is likely to become, the subject of a Third Party Claim that such Services, Technology Used by the Business, or part of the Services or Technology Used by the Business ("Affected Component") infringes, misappropriates or otherwise violates the Intellectual Property Rights of any third Person, DCEH will, at its option and expense, either: (i) procure for the Studio Entities and their Authorized Users the right to continue use of such Affected Component or (ii) replace or modify such Affected Component so as to make it non-infringing or to avoid such misappropriation or violation while providing equivalent functionality and features.  If DCEH does not accomplish any of the foregoing within a reasonable time, then Studio may terminate this Agreement with respect to the particular Affected Component that is the subject of such Third Party Claim, and such failure will be deemed a material breach of this Agreement by DCEH.  For the avoidance of doubt, the Studio Entities shall be under no obligation to cease or modify their use of any Affected Component unless and until DCEH performs alternative (ii) or provides the Studio Entities with written notice that it cannot perform alternative (i) or (ii) and that cessation or modification of the Affected Components is required in connection therewith.  For the avoidance of doubt, the remedies set forth in this Section 6.3 are without prejudice to the Studio Entities' other rights and remedies under this Agreement.

**6.4     Framework Agreement Indemnification.**  The Parties acknowledge and agree that the provisions of Article VI of the Framework Agreement shall apply to this Agreement.  In the event of any conflict between Article VI of the Framework Agreement and this ARTICLE VI, the provisions of Article VI of the Framework Agreement shall apply.

ARTICLE VII
**Term; Termination**

**7.1     Term.**  The term of this Agreement begins on the Effective Date and, unless terminated earlier pursuant to any of the Agreement's express provisions, will continue in effect until termination of all of the Managed Services Agreements or, with respect with the Shared IT Systems and any request made by the Studio Entities for continuation of the provision of such Shared IT Systems, beyond the termination of the Managed Services Agreements for as long as needed but only if the Parties reach agreement on the terms for such extension (the "Term").

**7.2     Termination.**  In addition to any other express termination right set forth in this Agreement:

(a)     Studio may terminate this Agreement, in whole or in part, for convenience, for any reason or no reason, effective on notice to DCEH.

(b)     Each of the parties may terminate this Agreement if the other party is in breach of any material provision of this Agreement in any material respect and fails to cure such breach within thirty (30) days after receipt of written notice of such breach.

**7.3     Effect of Termination.**  Termination of this agreement shall not relieve the Studio Entities of their obligation to pay any outstanding TSA Fees for services utilized prior to

termination, subject to any TSA Shortfall pursuant to Section 2.2. Upon expiration or earlier termination of this Agreement, DCEH shall (a) promptly cease use of all Confidential Information of Studio, (b) at no further cost to the Studio Entities, comply with the DCEH's obligations under the DSE, and (c) after complying with its obligations under this Agreement with respect to the return and transfer of such Studio Data, permanently destroy all portions of Studio Data that contain student data related to the University Systems and shall certify the same in writing to Studio.

    **7.4**    **Termination Assistance Services**. DCEH will (and will cause its Affiliates to) provide Termination Assistance Services during the Termination Assistance Period to the Studio Entities and the Studio Parties shall be required to pay for such Termination Assistance Services in accordance with the DCEH Support Services Terms, *provided*, that if this Agreement is terminated by the Studio Entities pursuant to Section 7.2(b), such Termination Assistance Services shall be provided by DCEH at no cost to Studio.

    **7.5**    **Survival**. The expiration or termination of this Agreement shall not relieve either Party of any obligations that may have accrued prior to the Agreement Termination Date. All provisions that by their nature should survive the Termination Date shall survive, including Sections 2.1, 4.1(b), 4.3(a), 4.3(b), 4.3(d), 7.3, 7.4 and this 7.5, and ARTICLE VI, ARTICLE VIII and the DSE.

**ARTICLE VIII**
**Miscellaneous**

    **8.1**    **DCEH Authorized Personnel**. DCEH may not engage any Person other than its Affiliates, DCEH's employees or the employees of its Affiliates to provide Services or Technology Used by the Business, without Studio's express prior written consent, which shall not be unreasonably withheld. Exhibit 4 sets forth a complete list of Persons, other than DCEH's Affiliates, DCEH's employees and DCEH's and its Affiliates' employees, which Studio expressly approves (each approved Person, an "Approved Contractor"), together with a description of such Approved Contractor's approved functions. DCEH is solely responsible and shall be liable for the acts and omissions of Authorized Personnel as if such Authorized Personnel are DCEH, and any such act or omission shall be deemed the act or omission of DCEH for which DCEH will be liable in accordance with this Agreement. DCEH shall ensure that Authorized Personnel comply with this Agreement and Law in performing hereunder, as if such Authorized Personnel were themselves DCEH. DCEH, at the request of the Studio Entities for any lawful reason, will remove, and if necessary, replace any Authorized Personnel assigned to perform Services for the Studio Entities.

    **8.2**    **Responsibility for Employees**. Notwithstanding any provision in this Agreement or to the contrary, each Party will be responsible for the management, direction and control of its employees. Each Party will be responsible for all federal, state, and local taxes and assessments related to its employees, such as taxes associated with social security, unemployment compensation, and workers' compensation.

    **8.3**    **Waiver**. Failure of either Party to insist on performance of any term or condition of this Agreement or to exercise any right or privilege hereunder will not be construed as a

continuing or future waiver of such term, condition, right or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**8.4** **Severability**. In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto. The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

**8.5** **Counterparts**. This Agreement, and any amendments thereto may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other party, it being understood that all Parties need not sign the same counterpart. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission or by E-mail of a .pdf attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

**8.6** **Governing Law; Jurisdiction and Venue; Waiver of Jury Trial**.

(a) <u>Governing Law</u>. This Agreement, and all Proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement and the Transaction Documents or the actions of the Parties hereto in the negotiation, administration, performance and enforcement hereof and thereof, shall be governed by and construed in accordance with the internal substantive Laws of the State of Delaware, without giving effect to any choice or conflict of Laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

(b) <u>Jurisdiction and Venue</u>. Each of the Parties hereto submits to the exclusive jurisdiction and venue of the Delaware Chancery Courts located in Wilmington, Delaware, or, if such court shall not have jurisdiction, any state or federal court sitting in Wilmington, Delaware, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceedings may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each of the Parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in <u>Section 8.8</u>, such service to become effective ten (10) days after such mailing.

(c) <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT

OR ANY TRANSACTION DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

**8.7    Assignment.**  Neither Party will assign (by operation of law or otherwise) any right or obligation under this Agreement without (x) the other Party's prior written consent, which shall not be unreasonably withheld, and (y) the consent of the South Lenders during the Indebtedness Period, which shall not be unreasonably withheld; *provided, however*; that the foregoing restriction shall not limit the sublicense, assignment, or other transferability of specific rights and licenses granted to the Studio Entities as expressly stated in this Agreement.  Any attempted assignment in violation of the preceding sentence will be void.  Subject to the foregoing, this Agreement and all rights and obligations hereunder, will be binding upon and will inure to the benefit of the Parties' respective successors and permitted assigns, including any change pursuant to the proposed restructure that would result in a new branch/main designation and a new Office of Postsecondary Education Identification number (OPEID).  Notwithstanding the foregoing, (a) in the event that the Studio Entities establish an Affiliate or Subsidiary (as defined in the Bundled Services Agreement) that would benefit from the Services or Technology Used by the Business hereunder, Studio may assign this Agreement and all rights and obligations hereunder to such Affiliate or Subsidiary, (b) Studio may assign this Agreement and all rights and obligations hereunder as collateral to its financing sources and (c) Studio may assign this Agreement and all rights and obligations hereunder in connection with a Change of Control of any Studio Entity, in each case of (c) above, upon thirty (30) days prior written notice to DCEH.  Notwithstanding the first sentence of this Section 8.7, DCEH may assign its rights and obligations under this Agreement to Servco, upon thirty (30) days prior written notice to Studio and subject to any Educational Agency notifications or approvals.  In the event that DCEH assigns this Agreement to Servco, the Parties agree that, (i) for the avoidance of doubt, all rights and licenses granted to the Studio Entities shall continue hereunder, (ii) DCEH shall remain responsible for and liable for any breach of this Agreement, and (iii) the Studio Entities will not be responsible for any fees, costs or expenses associated with such assignment (or incurred as a result of such an assignment).

**8.8    Notices.**  Any notice required to be given hereunder shall be sufficient if in writing and sent by E-mail transmission (provided that any notice received by E-mail or otherwise at the addressee's location on any Business Day after 5:00 p.m. (local time of the recipient) shall be deemed to have been received at 9:00 a.m. (local time of the recipient) on the next Business Day), by reliable overnight delivery service (with proof of service), hand delivery or certified or registered mail (return receipt requested and first-class postage prepaid), addressed as follows (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.8):

(a)    if to DCEH, to:

Dream Center Education Holdings, LLC
1400 Penn Avenue
Pittsburgh, PA 15222
E-Mail:  rbarton4953@gmail.com
Attention:  Randall K. Barton, Executive Chairman

with copy (which shall not constitute notice) to:

Rouse Frets White Goss Gentile & Rhodes, LLC
1100 Walnut Street, Suite 2900
Kansas City, Missouri 64106
E-mail: rholt@rousepc.com
Attention: Ronald L. Holt

(b)   if to Studio, to:

1201 West 5th Street, Ste. T410
Los Angeles, CA 90017
E-mail: bryan@studioenterprise.com
Attention: Bryan Newman, CEO

with copies (which shall not constitute notice) to:

Cooley LLP
4401 Eastgate Mall
San Diego, CA 92121-1909
E-mail: kleecarey@cooley.com
Attention: Katherine (Kate) Lee Carey

and:

Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
E-mail: jpotash@cov.com; awollensack@cov.com
Attention: Jeffrey Potash and Amy Wollensack

**8.9** **Further Assurances**. On or after the date of this Agreement, the Parties will execute and deliver or cause to be executed and delivered such further documents and take such further actions as may reasonably be required for the purposes of assuring and confirming the rights hereby created or granted hereunder or for otherwise facilitating the performance of the terms of the Agreement.

**8.10** **Interpretation**. All headings herein are not to be considered in the construction or interpretation of any provision of this Agreement. Throughout this Agreement, (i) nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable, (ii) the words "includes" or "including" means "including without limitation" and are intended to introduce a non-exclusive set of examples, (iii) the word "or" is not exclusive and (iv) the words "hereof," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not any particular section or article in which such words appear. All references to "dollars" or "$" are to the lawful currency of the United States. Unless "business days" are expressly specified, all references to "days" are to calendar days. All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement. This Agreement was drafted with the joint

participation of both Parties and will be construed neither against nor in favor of either, but rather in accordance with the fair meaning thereof. In the event of any apparent conflicts or inconsistencies between this Agreement and any schedules, exhibits or other attachments to it, to the extent possible such provisions will be interpreted so as to make them consistent, and if such is not possible, the provisions of this Agreement will prevail; *provided, however*, that in the event of a conflict between the DSE and this Agreement, the DSE will prevail. To the extent that the Studio Entities are obligated to pay any costs, fees or expenses under this Agreement, or to the extent that any action or obligation hereunder is undertaken by DCEH at the Studio Entities' cost and expense (or at their sole cost and expense), such costs, fees and expenses shall be read to mean reasonable, documented and pre-approved out-of-pocket costs incurred by DCEH. Notwithstanding anything herein to the contrary, the Studio Entities will not be responsible for internal costs incurred by DCEH or its Affiliates.

**8.11 No Joint Venture; Relationship of Parties**. Nothing in this Agreement, expressed or implied, is intended to or shall constitute the Parties hereto partners or participants in a joint venture. DCEH acknowledge that the Studio Entities' relationship with DCEH under this Agreement is not exclusive and that nothing in this Agreement will be construed as a requirements contract or require the Studio Entities to procure any minimum level of Services or Technology Used by the Business from DCEH or any of its Affiliates. Notwithstanding anything to the contrary herein, this Agreement will not prevent the Studio Entities from obtaining from any other Person or providing to itself any services, technology, Intellectual Property Rights, or other items, including in each case those that are the same as or similar to the Services or Technology Used by the Business.

**8.12 Title and Headings**. The titles and captions in this Agreement are for reference purposes only, and shall not in any way define, limit, extend or describe the scope of this Agreement or otherwise affect the meaning or interpretation of this Agreement.

**8.13 Expenses**. Except as may otherwise be expressly set forth herein or in any other Transaction Document, all fees and expenses incurred in connection with the authorization, preparation, negotiation, execution and performance of this Agreement and the potential consummation of the transactions contemplated hereby shall be the obligation of the respective party incurring such fees and expenses.

**8.14 Amendments**. This Agreement, including any exhibits, appendices, schedules, or attachments hereto, may be amended or modified in whole or in part only by a writing signed and delivered by each of Studio and DCEH and, during the Indebtedness Period, the South Lenders. To the extent that any Educational Agency notifies any University System, DCEH or Studio of concerns regarding the terms of this Agreement, DCEH and Studio agree to immediately amend the terms of this Agreement to fully comply with the Educational Agency's requirements.

**8.15 Entire Agreement**. The terms contained in this Agreement, and any schedules, appendices, exhibits or other attachments, which are incorporated (including any updated versions thereof) into the Agreement by this reference, constitute the entire agreement between the Parties with respect to the subject matter hereof, superseding all prior understandings, proposals and other communications, oral or written, with respect to the subject matter hereof. In

the event of any conflict between this Agreement and the IFWA, the provisions of the IFWA shall control. This Agreement shall be deemed a "Transaction Document" for purposes of the Framework Agreement and except as set forth herein, the provisions of the Ai Transaction Documents shall survive the execution and delivery of this Agreement.

**8.16** **Section 365(n) of the Bankruptcy Code.** All rights and licenses granted under or pursuant to this Agreement by DCEH to the Studio Entities (including the rights and licenses to the Software Used by the Business, SaaS Services Used by the Business, and other Technology Used by the Business) are, and shall otherwise be deemed to be, for purposes of Section 365(n) of Bankruptcy Code, licenses of the right to "intellectual property" as defined under Section 101 of the Bankruptcy Code. The Parties agree that the Studio Entities, as licensees of such rights under this Agreement, shall retain and may fully exercise all of their rights and elections under the Bankruptcy Code, including without limitation, Section 365(n) of the Bankruptcy Code. The Parties further agree that, in the event a bankruptcy case is filed by or against DCEH under the Bankruptcy Code, the Studio Entities shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property that is licensed by DCEH and all embodiments of such intellectual property, which, if not already in the Studio Entities' possession, shall be promptly delivered to the Studio Entities: (a) following the Studio Entities' written request therefor, upon any such commencement of a bankruptcy case by or against DCEH, unless DCEH elects to continue to perform all of its obligations under this Agreement, or (b) if not delivered under clause (a) above, upon written request therefor by the Studio Entities in the event of the rejection of this Agreement under Section 365 of the Bankruptcy Code.

**8.17** **Injunctive Relief.** The Parties recognize that a breach of this Agreement by DCEH may give rise to irreparable injury to the Studio Entities such that remedies other than injunctive or other equitable relief may not be adequate. In the event of such a breach, the Parties agree that the Studio Entities have the right to seek, from an appropriate court, equitable relief, including in the form of injunctive relief, and the Parties hereby waive any requirement for the securing or posting of any bond or the showing that actual monetary damages will not afford an adequate remedy in connection with seeking such relief.

**8.18** **Third-Party Beneficiaries; Releases of Related Persons.** The Studio Indemnitees are third-party beneficiaries of this Agreement. During the Indebtedness Period, the South Lenders are express third party beneficiaries of each provision of this Agreement which references them specifically and is intended for their benefit. DCEH acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, other than any Related Person who becomes an assignee of Studio under this Agreement, in no event shall any of the Studio Entities' Related Persons have any liability related to this Agreement, the certificates, documents and instruments entered into or delivered in connection with this Agreement or the transactions contemplated herein or therein, including by way of piercing the corporate, limited liability company or partnership veil or other similar theories of liability. DCEH, on behalf of itself and its Related Persons, herby unconditionally and irrevocably release the Studio Entities' Related Persons from any and all claims, causes of actions, damages, liabilities, whether known or unknown, now existing or hereinafter arising, in connection with, related to or arising or resulting from this Agreement.

**8.19** **Information**. DCEH will furnish true, accurate and complete information to the Studio Entities regarding the Technology Used by the Business and Services, as the Studio Entities may reasonably request from time to time.

**8.20** **Publicity**. Each the Parties may not, without the express prior approval of the other Party, directly or indirectly, and without regard to when or for what reason this Agreement shall terminate, communicate with any member of the press, including representations of both print and electronic media, regarding any aspect of this Agreement, including the relationships established herein. Each the Parties may not, without the express prior approval of the South Lenders, directly or indirectly, and without regard to when or for what reason this Agreement shall terminate, communicate with any member of the press, including representations of both print and electronic media, regarding the involvement of the South Lenders with respect to any aspect of this Agreement.

**8.21** **Obligations**. In the event that any provision of this Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the intent of the Parties hereto. The Parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

*[Remainder of Page Intentionally Left Blank - Signature Page to Follow]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
    Name:
    Title:


DREAM CENTER EDUCATION HOLDINGS, LLC

By: _____
    Name:
    Title:

# EXHIBIT 1

# DEFINITIONS

"Abandonment" means, with respect to any item of hardware or communications equipment constituting Technology Used by the Business, that DCEH (or its successors in interest) which, as of the Effective Date, had been making use of the item, have ceased all use of the item for an extended period of time and have objectively manifested an intention to make no further use of the item.

"Accrediting Body" means any non-governmental entity, including institutional and specialized accrediting agencies, which engage in the granting or withholding of accreditation of postsecondary educational institutions or programs in accordance with standards relating to the performance, operations, financial condition or academic standards of such institutions, including the Southern Association of Colleges and Schools, the Northwest Commission on Colleges and Universities, WASC Senior Commission of Colleges and Schools, and the Accrediting Council of Independent Colleges and Schools.

"Agreement Termination Date" means the later to occur of the: (A) date of termination or expiration of this Agreement or (B) date of termination or expiration of the Termination Assistance Period, if applicable.

"Bankruptcy" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"), (c) has an involuntary petition filed against it under the Bankruptcy Code, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, Law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) has a trustee, receiver or liquidator appointed with respect to such Person or of all or any substantial part of its properties.

"Authorized Personnel" means DCEH's Affiliates, DCEH's employees, DCEH's Affiliate's employees, and Approved Contractors that are providing Services or Technology Used by the Business under the terms of this Agreement.

"Authorized User" means any Person that any of the Studio Entities (or the Studio Entities' affiliates (present or future) or successors or assigns) authorizes to access or Use any of the Technology Used by the Business.

"Business" means, collectively, the businesses of the University Systems, as they are currently conducted and as such University Systems (or such University Systems' designees, successors or assigns) determine to conduct them in the future.

"Business Data" means all data or information, in any format, collected, generated, or used in the conduct of the Business or necessary for the conduct of such Business, including all

financial data related to such Business and all student data contained in any databases that are used in or necessary for the conduct of such Business.

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions located in New York, New York and Los Angeles, California are permitted or required by Law to remain closed.

"Change of Control" means any of the following: (a) a "change of control", "change in control" or words of similar import as defined or determined by any Educational Agency as constituting a regulatory event; (b) changes to the Board of a Person or its Affiliates that result in a change to 25% or more of the voting members of the Board of a Person or its Affiliates in any rolling, 12-month period; (c) a change in the number of voting members of the Board of such Person or its Affiliates in any rolling, 12-month period that will allow a group of directors to exercise control who could not exercise control before the change; (d) a transaction pursuant to which an unaffiliated third-party becomes the "beneficial owner", directly or indirectly, of securities of another Person representing 50% or more of the voting power of such Person's then outstanding securities; (e) a transaction effected as a consolidation, share exchange, reorganization or merger of a Person that results in the equity holders of such Person immediately prior to such event not owning at least a majority of the voting power of the resulting entity's securities outstanding immediately following such event; (f) a sale, license, lease or other disposition of a material portion of a Person's assets; (g) a liquidation, dissolution or other winding up of such Person or any of its Subsidiaries; or (h) a transfer of assets that comprises a substantial portion of the educational business of a Title IV eligible institution, except where the transfer consists exclusively in the granting of a security interest in those assets.

"Confidential Information" means, with respect to a Disclosing Party, any confidential or proprietary information of such Disclosing Party or its Affiliates that is either marked as being "Confidential" or "Proprietary" or under the circumstances of disclosure should reasonably be considered as confidential or proprietary. Confidential Information of both Parties includes the terms (but not the existence) of this Agreement. The Studio Confidential Information includes Studio Data, and any other Personal Data that DCEH or the Authorized Personnel may have access to under this Agreement. Confidential Information does not include information (other than Studio Data) that (a) is in or enters the public domain without breach of this Agreement through no fault of the Receiving Party; (b) the Receiving Party was lawfully in possession of without any obligation of confidentiality or nondisclosure prior to Receiving it from the Disclosing Party; (c) the Receiving Party can demonstrate was developed by the Receiving Party or its Affiliates independently and without use of or reference to the Disclosing Party's Confidential Information; or (d) the Receiving Party receives from a third Person without restriction on disclosure and without breach of a nondisclosure obligation.

"Contract" means any written or oral contract, subcontract, note, bond, mortgage, indenture, lease, sublease, license, sublicense, undertaking or other legally binding agreement.

"Core Services" shall have the meaning in the applicable Managed Services Agreement.

"Data Security Breach" means, in connection with the Services or Technology Used by the Business, (a) the loss or misuse (by any means) of the Studio Confidential Information;

(b) the inadvertent, unauthorized, or unlawful disclosure, access, alteration, corruption, transfer, sale, rental, destruction, use or other Processing of the Studio Confidential Information; or (c) any other act or omission that compromises or may compromise the security, confidentiality, availability, or integrity of the Studio Confidential Information or Studio Systems.

"Developed Technology" means any Technology which is developed with the assistance of Authorized Personnel of DCEH during the Term and which becomes Technology Used by the Business.

"Documentation" means, with respect to a particular computer program, database or cloud service, all user manuals, handbooks, and installation guides relating to such computer program, database or cloud service, in any form or media, that describe the functionality, components, features, or requirements of such computer program, database or cloud service, including any aspect of the installation, configuration, integration, operation, or use of the computer program, database or cloud service.

"DOE" means the United States Department of Education and any successor agency administering student financial assistance under Title IV.

"Educational Agency" means any entity or organization, whether governmental, government chartered, tribal, private, or quasi-private, that engages in granting or withholding Educational Approvals, administers Financial Assistance Programs to or for students of, or otherwise regulates postsecondary schools or programs, in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such schools and programs, including the DOE and any Accrediting Body or State Educational Agency.

"Educational Approval" means any license, permit, consent, franchise, approval, authorization, certificate, or accreditation issued or required to be issued by an Educational Agency with respect to any aspect of a postsecondary schools' or programs' operations subject to the oversight of such Educational Agency, including any such approval for such school or program to participate in any Financial Assistance Program, but excluding any such approvals or permits with respect to the activities of recruiters or individual employees or agents of such school or program.

"Fully Burdened Costs" means a Party's fully burdened costs incurred or borne by such Party, including all out-of-pocket expenses, any direct and indirect labor costs (including the cost of employee benefits, taxes and other labor costs), reasonable allocations of overhead expenses and third-party costs and expenses and the cost of goods sold.

"Governmental Authority" means any government, any governmental or regulatory entity or body, department, commission, board, agency or instrumentality, and any court, tribunal or judicial body, in each case whether federal, state, county, provincial, and whether local or foreign.

"Indebtedness Period" shall have the meaning in the Managed Services Agreement for South University.

"Intellectual Property Rights" means any and all of the following in any jurisdiction throughout the world: (a) all inventions (whether or not patentable or reduced to practice), patents, patent applications and patent disclosures as well as any reissues, continuations, continuations-in-part, divisionals, revisions, extensions or reexaminations thereof, (b) trademarks, service marks, trade dress, trade names, slogans, designs, logos, internet domain names, corporate names and all other indicia of origin (and all translations, adaptations, derivations, and combinations of the foregoing), together with all of the goodwill associated with the foregoing (collectively, "Marks"), (c all copyrights and other works of authorship, mask works and moral rights, (d) registrations, applications and renewals for any of the foregoing (as applicable), (e) computer software (including source code and object code), data, data bases and documentation thereof, and (f) trade secrets and other confidential information (including ideas, formulas, compositions, inventions, know-how, manufacturing and production and other processes, techniques and methods, research and development information, drawings, specifications, designs, plans, proposals, technical data, business and marketing plans and customer and supplier lists and related information), (g) all other intellectual property and proprietary rights and (h) all tangible embodiments of the foregoing (in whatever form or medium).

"Law" means any applicable law, statute, treaty, constitution, principle of common law, ordinance, code, rule, regulation, Order or other legal requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority, as amended, unless expressly specified otherwise herein.

"Losses" means any loss, liability, action, cause of action, cost, damage or expense, tax, penalty, or fine, in each case whether or not arising out of third-party claims including interest, penalties, attorneys', consultants' and experts' fees and expenses (including such attorneys', consultants' and experts' fees and expenses incurred in connection the enforcement of a party's rights) and all amounts paid in investigation, defense or settlement of any of the foregoing.

"Non-Core Expenses" shall have the meaning in the applicable Managed Services Agreement.

"Object Code" means the form of software code for a computer program resulting from the translation or Processing of Source Code by a computer into machine language in a form that is not convenient for human understanding of the program logic but is fully compiled and executable by a computer.

"Open Source Component" means any software component licensed under a Contract meeting the Open Source Definition as promulgated by the Open Source Initiative or the Free Software Definition as promulgated by the Free Software Foundation.

"Order" means any order, judgment, decision, decree, injunction, pronouncement, ruling, writ or assessment of, by or on behalf of any Governmental Authority (whether temporary, preliminary or permanent) or arbitrator.

"Personal Data" means any information that, alone or in combination, is linked or linkable to an identifiable natural person or that is otherwise considered personally identifiable information or personal data under applicable Law.

"Processing" (including its cognate, "Process") means any operation or set of operations that is performed upon data, whether or not by automatic means, including collection, recording, organization, storage, access, adaptation, alteration, retrieval, consultation, use, disclosure, dissemination, making available, alignment, combination, blocking, deleting, erasure, and destruction.

"Proprietary Software" means the Software for all Proprietary Technology that constitutes software, and, to the extent not covered by the foregoing, any integrations constituting Proprietary Technology. Proprietary Software includes, for the avoidance of doubt, Software for Shared IT Systems to the extent such Software constitutes Proprietary Technology.

"Proprietary Technology" means any Technology Used by the Business which is owned by, or developed by or on behalf of, DCEH or any of its Affiliates.

"Related Person" means a Person's current, former and future equity holders, controlling Persons, directors, managers, officers, employees, agents, representatives, Affiliates, members, managers, general or limited partners, or assignees (or any former, current or future equity holder, controlling Person, director, officer, employee, agent, representative, Affiliate, member, manager, general or limited partner, or assignee of any of the foregoing).

"Representatives" means, with respect to Studio, the Studio Entities, any of their Affiliates, and any of the Studio Entities' then-current (or their Affiliates' then-current) employees, agents, contractors (including subcontractors), service providers and representatives; and means, with respect to DCEH, Authorized Personnel.

"SaaS Services" means cloud services, including but not limited to software as a service, platform as a service, infrastructure as a service, and database as a service.

"SaaS Services Used by the Business" means all of the SaaS Services Used in, held for Use in, or necessary for the operation of the Business as it is currently conducted, including the SaaS Services on Exhibit 5 and the Shared IT Services.

"Servco" means any successor entity of DCEH that owns the Technology Used by the Business.

"Services" means the performance of DCEH's obligations under this Agreement, including the professional services provided pursuant to this Agreement, and including (a) Managed Services, (b) Integration Services, (c) Termination Assistance Services, (d) any support services provided with respect to any Technology Used by the Business, (e) the Processing of Studio Data under this Agreement and (f) the Transition Services. The Services shall be deemed to include all services, equipment and other materials that are: (x) an inherent, incidental, necessary or a customary part of such Service, or (y) ordinarily or foreseeably required for the proper performance of such Service.

"Service Fees" shall have the meaning in the applicable Managed Services Agreement.

"Shared IT Systems" means Technology owned by DCEH and made available by DCEH on a non-exclusive, restrictive access, shared service basis to any University System, on the one hand, and any of the following, on the other hand: (a) any other University System, (b) Ai Pittsburgh, either on ground or Ai Online or (c) any other institutions operated by DCEH which are the subject of a Teach-Out.

"South Lenders" shall have the meaning in the Managed Services Agreement for South University. Any consents or approvals to be provided by the South Lenders in connection with this Agreement shall be provided in accordance with the terms of the South Credit Agreement (as defined in the Managed Service Agreement for South University), including in accordance with any voting or amendment provisions contained therein.

"Proprietary Software Materials" means for each item of Proprietary Software, the Source Code and the Object Code. For the avoidance of doubt, the Proprietary Software Materials include fully compiled versions of all Proprietary Software.

"Representative" means, with respect to any Person, any director, officer or employee of such Person, or any financial advisor, accountant, legal counsel, consultant or other authorized agent or representative retained by such Person.

"Software" means, with respect to a particular computer program, the Source Code and Object Code for such computer program.

"Software Used by the Business" means all of the Software Used in, held for Use in, or necessary for the operation of the Business as it is currently conducted, and all Updates developed or otherwise made thereto, including the Software on Exhibit 5.

"Source Code" means (i) the human readable source code for a computer program, in the programming language in which such computer program was written, together with (ii) all existing related flow charts and other documentation, in each case ((i) and (ii)) of a level sufficient to enable a programmer reasonably fluent in such programming language to prepare an executable copy of the computer program and otherwise understand, operate, host, support, maintain, modify, enhance, develop Updates to, integrate other technology with, and otherwise Use such computer program, and including all existing and future: (a) source code comments and technical documentation, data, files, algorithms, notes, existing architecture, existing design documents and existing diagrams, and other existing operation and existing end use documentation, (b) identification and description of and a copy of output or data files from authoring tools, (c) configuration information regarding the production environment including the operating system configuration, (d) technical information and documentation regarding build history, regression test results, test coverage and other test data as available, (e) source code for the creation of all databases used by the computer program (i.e., to create the database schema, indexes and stored procedures) and technical information for each database where applicable, (f) source code required to insert any reference or look-up data required by the computer program into the databases as available; (g) instructions, notes, references, programs, application programming interfaces, and other materials for creating, building, and Using an executable copy

of the computer program as exists, (h) description of the operational environment, (i) trouble-ticket databases or equivalent, (j) tools, methods, scripts, processes, algorithms, technologies or routines used for development and testing or otherwise in connection with the computer program within the legal limitations of such software licenses, and (k) without limiting the obligation to provide a complete copy of the source code for the computer program, a comprehensive list of all third Person dependencies (including with respect to third Person software, versions of such third Person software), and all third Person tools used for development and testing in each case ((a) through (k)), that is necessary to prepare an executable copy of the computer program and otherwise understand, operate, host, support, maintain, modify, enhance, develop Updates to, integrate other technology with, and otherwise Use such computer program or which has been Used for such purposes.

"Student Data" means student data that is contained within the Studio Data.

"Studio Data" means (a) Business Data, and (b) any information, data, and other content, in any form or medium, that is Processed by the Technology Used by the Business under or in connection with this Agreement. For avoidance of doubt, Studio Data does not include any data contained in any Shared IT System that is not related to any of the University Systems or their respective current and former Businesses, or operations, employees or students.

"Studio Entities" refers to Studio and its Subsidiaries and Affiliates, and the University Systems designated by Studio or its Subsidiaries and Affiliates (solely for the purpose for which it is so designated).

"Studio System" the systems, software, facilities, or platforms owned, leased, licensed, or operated by or on behalf of any of the Studio Entities, other than those which are provided by DCEH pursuant to this Agreement.

"Subcontractor" means any subcontractor, excluding vendors or suppliers used in the ordinary course of business consistent past practices.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (a) such Person or any other subsidiary of such Person is a general partner (excluding such partnerships where such Person or any subsidiary of such Person does not have a majority of the voting interest in such partnership) or (b) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors, board of trustees, board of managers or similar governing body with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its subsidiaries.

"Teach-Out" means the continuing provision of academic services to students following the announcement of a campus closure until such students can graduate/complete their program of study or transfer to a comparable academic program through an affiliated or unrelated institution.

"Technology" means information technology, hardware and computer systems, including those relating to the transmission, storage, maintenance, organization, presentation, generation, Processing or analysis of all data and information collected, generated, or used in the conduct of

the Business. Technology includes: (a) software, integrations, cloud services, databases, websites, domain names, applications, telecommunications solutions, other information technology infrastructure and assets, hardware and other information technology or communications equipment and (b) all related source code, object code, firmware, development tools, files, records and data, and all media on which any of the foregoing is recorded and all documentation associated with the foregoing.

"Technology Used by the Business" means the SaaS Services Used by the Business and Software Used by the Business, and any other Technology Used in, held for Use in, or necessary for the operation of the Business, including for the avoidance of doubt all Shared IT Systems and Shared IT Services as well as the Other Third-Party IT Services and the Third-Party Support.

"Termination Assistance Period" means a period not exceeding one hundred eighty (180) days in duration, commencing and ending on dates designated in advance by Studio, in which the Termination Assistance Services are provided.

"Termination Assistance Services" means (a) DCEH's cooperation with Studio or any other Person designated by Studio in order to enable the Studio Entities to transition away from the Technology Used by the Business, to facilitate the transition of the services hereunder to the Studio Entities or another Person or Persons, or to transfer responsibility for such services or the Studio Confidential Information to the Studio Entities or a third Person, in a manner designated by the Studio Entities, and (b) any new services requested by the Studio Entities to transfer responsibility for providing services or Technology Used by the Business to the Studio Entities or a third Person.

"Third-Party Agreement" means any Contract between DCEH and a third Person pursuant to which such third Person agrees to provide or license any Third-Party Materials, and any Contracts for Third-Party Support. Third-Party Agreements include those agreements listed on Exhibit 6.

"Third-Party Materials" means Technology Used by the Business which consists of Technology or other materials that are in each case owned or controlled by a Person other than DCEH.

"Third-Party Support" means maintenance, support, telecommunications or other professional services, in each case which pertain to the Technology Used by the Business.

"Title IV" means Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1001 et seq., as amended, or any successor statute thereto.

"Title IV Programs" means the programs of federal student financial assistance administered pursuant to Title IV.

"Updates" means updates, upgrades, new versions, new releases, enhancements, improvements and other modifications to a computer program.

"Use" means to (a) access, load, execute, compile, manipulate, use, Process, store, purge, transmit, receive, display, copy, connect, communicate with, interface with, maintain, modify,

adapt, translate, enhance and create derivative works, anywhere in the world and (b) make, have made, distribute, import and export, anywhere in the world.

# EXHIBIT 2

**[Exhibit 2 is intentionally omitted.]**

# EXHIBIT 3

## Data Security Exhibit

This Data Security Exhibit ("<u>DSE</u>") establishes minimum information security and data protection standards and related requirements for DCEH in connection with the Agreement.

1.    **Confidentiality and Integrity.**

(a)    DCEH shall preserve the integrity and accuracy of the Studio Confidential Information, including by updating, revising, correcting, or deleting the Studio Confidential Information as directed by the Studio Entities or, upon the Studio Entities' prior approval, by any individual to whom Personal Data relates. DCEH shall notify the Studio Entities in writing within five (5) calendar days of receipt of any communication from any individual relating to Personal Data about that individual and shall further provide all reasonable assistance to the Studio Entities (or, at the Studio Entities' request, the Studio Entities' Affiliates) in responding to all such communications.

(b)    DCEH shall notify the Studio Entities promptly of the receipt of any communication, complaint, enforcement action, or other inquiry from or by any legal or regulatory authority relating to the Processing by DCEH or its Authorized Personnel of Personal Data, and DCEH shall further provide all reasonable assistance to the Studio Entities (or, at the Studio Entities' request, the Studio Entities' Affiliates) in responding to all such inquiries that relate to the Processing of Personal Data.

(c)    DCEH shall retain the Studio Confidential Information only for as long as necessary to perform the Services or provide the Technology Used by the Business, or as required by Law. Upon expiration or termination of the Agreement, or at any time upon the Studio Entities' request, DCEH shall immediately return or securely destroy (as requested by the Studio Entities) all the Studio Confidential Information in accordance with the Studio Entities' instructions (and procure from any Authorized Personnel such return or secure destruction of all the Studio Confidential Information) and provide a certification of such return or destruction to the Studio Entities. In the event that DCEH determine, in its reasonable discretion, that returning or destroying the Studio Confidential Information is infeasible on the date required pursuant to this Section (the "<u>Return Date</u>") or Law prevents or precludes the return or destruction of any such the Studio Confidential Information by DCEH on the Return Date, then DCEH shall notify the Studio Entities in writing of the reason for not returning or destroying such the Studio Confidential Information on the Return Date. In such case, (i) DCEH shall return or destroy (as instructed by the Studio Entities) the Studio Confidential Information as soon as possible after the Return Date, and (ii) DCEH shall not Process such the Studio Confidential Information without the Studio Entities' express prior written consent after the Return Date.

2.    **Security.**

(a)    DCEH shall implement and maintain a written information security program that incorporates administrative, technical, and physical safeguards that ensure the security, confidentiality, and integrity of Studio Confidential Information and which program is

in compliance with Law. DCEH will ensure that such safeguards are reasonable protections in light of the type and amount of Studio Confidential Information being Processed by DCEH, state of art and industry standards, and that such safeguards do, at a minimum, protect Studio Confidential Information against reasonably anticipated threats or hazards, including from unauthorized access, loss, destruction, use, modification, or disclosure. Upon the Studio Entities' request, DCEH shall provide the Studio Entities with a written certification that they have implemented such a written information security program.

(b)    Without limitation to any other obligation, DCEH shall implement industry-standard encryption methods to protect Studio Confidential Information when appropriate and in any case (i) at rest and when transferred, communicated, or otherwise transmitted electronically outside of DCEH's systems; (ii) in connection with remote access connectivity involving Studio Confidential Information; (iii) to the extent any portable devices are used to Process Studio Confidential Information; and (iv) in any circumstances required under Law. For purposes of this requirement, encryption shall mean "the transformation of data through the use of an algorithmic process into a form in which there is a low probability of assigning meaning without use of a confidential process or key or securing the information by another method that renders the data elements unreadable or unusable."

(c)    Without limiting DCEH's other obligations under the Agreement (including Section 8.1), DCEH shall limit access to Studio Confidential Information to Authorized Personnel and ensure that Authorized Personnel with access to Studio Confidential Information are advised of and comply with (i) DCEH's written information security program; and (ii) provisions relating to the privacy and security of Studio Confidential Information under this DSE, and are trained regarding the handling of Studio Confidential Information in accordance with (i) and (ii).

(d)    DCEH shall provide to the Studio Entities' written notice of any Data Security Breach promptly and in no event later than twenty-four (24) hours following the occurrence of such Data Security Breach. Such notice shall summarize in reasonable detail the circumstances of the Data Security Breach, including the date and time period during which the Data Security Breach is believed to have occurred, the impact of such Data Security Breach upon the Studio Entities and its Affiliates, a description of any Studio Confidential Information affected by the Data Security Breach, and, if applicable, individuals whose Personal Data is affected by such Data Security Breach, including an estimate of the number of individuals affected and a description of the Personal Data involved, and any corrective action to be taken by DCEH, including any steps to reduce the risk of harm to affected individuals. DCEH shall maintain appropriate documentation of each Data Security Breach, provide regular updates to the Studio Entities as material additional information becomes available, and reasonably cooperate with any requests from the Studio Entities for additional information regarding the Data Security Breach.

(e)    In the event of any Data Security Breach, DCEH shall also:

(i)    undertake an investigation of such Data Security Breach and reasonably cooperate with the Studio Entities in connection with such investigation,

including by providing the Studio Entities with a summary of the results of DCEH's investigation;

(ii)     Not make any public announcements relating to such Data Security Breach without Studio's prior written approval, which shall not be unreasonably withheld;

(iii)     Take all necessary and appropriate corrective action, at the expense of DCEH, to prevent a recurrence of such Data Security Breach; and

(iv)     Take, or at Studio's request, assist the Studio Entities in taking all remediation efforts, including remediation efforts that are required by Law as a consequence of any Data Security Breach or that have been required by any governmental authority in similar circumstances, regardless of whether Law explicitly imposes such remediation obligations on DCEH or the Studio Entities. Such remediation efforts may include (A) development and delivery of notices to individuals whose Personal Data may have been affected; (B) establishment of a toll-free telephone number or numbers where affected individuals may receive assistance and information; (C) provision of free credit reports, credit monitoring and repair, or identity monitoring/repair/restoration/insurance for affected individuals; (D) reimbursement for the costs of placing a freeze on a consumer credit file and likewise for the costs of unfreezing the same consumer credit file; (E) investigation and resolution of the causes and impacts of the Data Security Breach; (F) external communications with respect to corrective actions or other matters pertaining to the Data Security Breach; and (G) such other measures that the Studio Entities determine are reasonable and commensurate with the nature and level of severity of the Data Security Breach (collectively, "Remediation Efforts"). DCEH shall be solely responsible for the costs and expenses of all Remediation Efforts and all other actions undertaken pursuant to Section 2(e) of this DSE, in each case, whether undertaken by any of DCEH, any Affiliate of DCEH, or the Studio Entities, and without limiting the foregoing, DCEH shall promptly reimburse the Studio Entities for all costs and expenses reasonably incurred by the Studio Entities or their Affiliates in connection with the Data Security Breach, including costs and expenses incurred in connection with Remediation Efforts or otherwise in connection with Section 2(e) of this DSE.

(v)     DCEH hereby represents, warrants and covenants that it will use highest industry standards to scan and filter for harmful surreptitious code, such as viruses, malware, spyware and worms ("Viruses"), and otherwise ensure that no form of Viruses are introduced by any means into any Studio System as a result of the Studio Entities' or any of their Affiliates' Use of the Services or Technology Used by the Business. Without limiting DCEH's representations, warranties, or obligations elsewhere in this Agreement, if a Virus is found to have been introduced into any Studio Systems by the Services or Technology Used by the Business, DCEH shall promptly notify the Studio Entities of the introduction and, at no additional charge to the Studio Entities, assist the Studio Entities (and, if applicable, their Affiliates) in eradicating the Virus and eliminating its effects, and if the Virus causes an interruption of the Services or Technology Used by the Business, a loss of operational efficiency, or loss of any Studio

System, DCEH will take all necessary steps to repair any damage done by the Virus, including undertaking remediation efforts at no cost or loss to the Studio Entities or any of its Affiliates.

3.  **Protection of Payment Data.**

(a)  Without limitation to any other provision of the Agreement (including of this DSE):

(i)  DCEH are responsible for the protection of bank account numbers, credit or debit card account numbers and other payment card data and related information ("Payment Data") that DCEH or the Authorized Personnel Processes in connection with the Services or Technology Used by the Business. Without limitation to the foregoing, DCEH shall implement and maintain proper security measures for the protection of Payment Data and shall maintain compliance with the most current version of the Payment Card Industry Data Security Standard ("PCI DSS"), developed and published jointly by American Express, Discover, MasterCard, and Visa ("Payment Card Brands"), in addition to any other Payment Data security Laws, regulations, or standards that may come into effect.

(ii)  For so long as DCEH or its Authorized Personnel Process Payment Data in connection with the provision of the Services or Technology Used by the Business, DCEH (or its Authorized Personnel, as applicable) shall provide the Studio Entities with an annual written certification of their compliance with the PCI DSS, as well as such other Payment Data security rules that may be in effect at the time. For purposes of this requirement, either a self-assessment and certification from DCEH (or its Authorized Personnel, as applicable) or a report from a third-party that regularly conducts assessments of compliance with the PCI DSS verifying that DCEH and its Authorized Personnel, as applicable, are in compliance shall suffice for the "certification." If, at any point during the provision of the Services or Technology Used by the Business, DCEH becomes aware that DCEH or its Authorized Personnel are not in compliance with the PCI DSS, DCEH shall immediately notify the Studio Entities and provide its plan for coming into compliance as soon as reasonably possible.

(iii)  In the event of any Data Security Breach affecting Personal Data that includes the theft, loss, or potential compromise of Payment Data, then in addition to complying with their other obligations contained in this DSE, DCEH shall provide (and will cause its Authorized Personnel to provide) access to their premises, books, logs and records to a designee of the Payment Card Brands, as may be required by the Payment Card Brands, to the extent necessary to perform a thorough security review and to validate DCEH's and its Authorized Personnel's compliance with the PCI DSS. At the Studio Entities' request, DCEH and its Authorized Personnel will share with the Studio Entities information related to its or the Payment Card Brands' investigation of the Data Security Breach, including forensic reports and system audits.

4.  This Section 4 of this DSE is in addition to and not in lieu of the rights set forth in the body of the Agreement.

(a)     Upon the Studio Entities' request, and at the Studio Entities' expense, DCEH and its Authorized Personnel shall each obtain and provide copies of an independent evaluation in the form of a Service Organization Control ("SOC") 2 Type II audit, covering the preceding twelve (12) month period and the relevant scope of systems, applications, Services, and Technology Used by the Business. If DCEH or its Authorized Personnel fail to obtain and provide copies of the audit described in the prior sentence for an applicable period, or in the event of a Data Security Breach, DCEH acknowledges and agrees that the Studio Entities shall have the right to request that the DCEH or its Authorized Personnel engage a third-party selected by the Studio Entities, at the Studio Entities' cost, to conduct an independent audit of DCEH's or its Authorized Personnel's privacy and security practices, and DCEH and its Authorized Personnel shall comply with such request, and the selected third-party shall promptly deliver to the Studio Entities the resulting audit report and other materials upon its completion.

5.     To the extent that any audit conducted pursuant to this Agreement identifies alleged risks or threats or nonconformance to generally accepted trade practice in the industry or other breach of the DSE (each a "Security Issue"), DCEH, within ten (10) days of receipt of such written notification, shall either (a) correct such Security Issues or provide the Studio Entities with a plan acceptable to the Studio Entities for remediating the Security Issues and timely implement such plan or (b) obtain and provide to the Studio Entities an opinion of a qualified independent expert regarding such audit determination of Security Issues, after which the parties shall confer to reach agreement upon the extent and nature of any Security Issues and the plan for remediation of such issues.

6.     **Survival.**

(a)     Sections 1 through 7 of this DSE shall survive the expiration or termination of the Agreement.

7.     **Governance and Order of Precedence.**

(a)     This DSE shall be governed by the laws of the District of Columbia.

(b)     To the extent not inconsistent herewith, the applicable provisions of the Agreement shall apply to this DSE. In the event of a conflict between this DSE and the Agreement, the terms of this DSE shall control and govern.

# EXHIBIT 4

## Approved Contractors

**The following are approved contractors, with approved functions denoted in parenthesis, which are currently working on projects for DCEH:**

1. Avtex Solutions LLC (CRM Development)
2. Valore Partners (Software Development)
3. Alliance Global (IT Quality Assurance)
4. EPAM (Marketing Web Quality Assurance)
5. Beacon Hill (Marketing Web Quality Assurance and Web Development)
6. Bails and Associates (Lawson support assistance)
7. Campus Management (CampusVue support assistance)
8. Yash Technologies (Off hours NOC & BI Tidal scheduling)
9. MDI (Data Integration/Informatica)
10. Blue Chip (Web Development)
11. Mastech (Network Ops support resource)
12. Xtivia (Remote DBA Escalated Support assistance)

# EXHIBIT 5

## Technology Used by the Business

### Shared IT Systems:

The following is a list of all Technology utilized by the University Systems which is not exclusive to them and which constitute Shared IT Systems. These Technologies are shared across the University Systems:

| Name | Description |
|------|-------------|
| Workstation | Desktop or laptop computer system to display, access and manipulate data. DCEH will also provide the Studio Entities access to and the ability to Use any Workstations constituting Technology Used by the Business. |
| Wireless Controller | Data center device used to manage remote campus and CS wireless access points |
| Wireless | Wireless access points to allow wireless computers and approved personal devices to access the corporate, student or public internet. |
| Webspace | The Ai Parties are moving their student web space in-house to Amazon ec2 Direct Admin Console. Faculty and staff may need to create their own personal website within their own sub domain for educational purposes. This is made possible by the Web Space System. |
| Waves Gold and Platinum + Tunes + 360 | Classroom Software - for audio editing and plugins |
| Wan Optimizations | Device used to improve performance between the remote campus and data center. |
| V-Ray Rendering Plugin for Maya | Classroom Software animation rendering |
| VPN Cisco | Software used to provide full network access to remote employees and contractors |
| Voyager / OPAC | .net Library Tracking |
| Vormetric | Encryption and key mgmt to protect PII data. At rest encryption only. |
| Vordel | XML Gateway which provides SSO and web service security |
| VMWare - Fusion and Workstation | Virtualization software |
| VitalSource | Online Classroom |
| Visix Axis SW Maintenance | Visix display systems at the campuses |

| | |
|---|---|
| Video Conferencing | Conference room and personal video call services. |
| Vectorworks | Classroom Software for 3D design |
| User Access Request | Generic Configuration Item for tracking requests/issues with general User Access Request items |
| USB Block | USB Block Exception Requests for staff. |
| UPS | Generic Configuration Item for tracking requests/issues with UPS devices within the Infrastructure |
| Universal Content Management (UCM) | Content Management System |
| Turnitin.com | Plagiarism checker for students. |
| Tripwire | Security and Audit Detection/Reporting |
| Trintech | 3rd party SAAS Reconciliation services for General Ledger |
| Trimble SketchUp Pro | Classroom Software |
| Transcript Request System (STS) | System used to manage transcript requests from students (both high school and college) |
| TrackIt Works | Equipment Cage Check-out application. |
| TOC (Transfer of Credits) | Provides a website for efficiently loading transfer credits into CampusVue |
| Tidal | Enterprise Scheduler |
| Thinkingstorm | On Demand tutoring provided to students via the online classroom. This is used by AIO, AI Ground Plus Students, AUO, and AUG. |
| Textbooks UI | Website that allows textbook information to be loaded into CampusVue in bulk. |
| Test Out | Online Courseware |
| Term Configuration Tool | Allows for customization of Term Descriptions and filtering of terms for the Student Financial Planning (SFP) tool |
| Telephony | Generic Configuration Item for tracking requests/issues with Telephony equipment within the Infrastructure |
| Telco Carrier | Public utility company that provides us with both data and voice services. AT&T, CenturyLink, XO are the most frequently used here. |
| Team Foundation Server | Team Foundation Server (TFS) - A Microsoft Source Code Management (SCM) and Project Tracking tool for software developers, which supports |

| | |
|---|---|
| | collaborative development of software within a team, and the tracking of changes to software source code revisions. |
| Tax Factory | tax calculation and payroll tax compliance solutions |
| Symantec Validation and ID Protection Service (VIP) | Multifactor Authentication System |
| Symantec Endpoint Protection | Antivirus protection. |
| Symantec Data Loss Protection (DLP) | Safeguards intellectual property and ensures compliance by protecting sensitive data wherever it lives—on premises, in the cloud, or at the endpoints. |
| Switch | Generic Configuration Item for tracking requests/issues with Switches within the Network |
| Student Payment Application (SPA) | User interface used by staff at The Center to accept payments from students via the SecureNet iframe |
| Student Orientation | Courseware product utilizing Adapt (purchased by Fulcrum) for Orientation courses and expanding its use to other courses. |
| Student Financial Planning | Student Financial Planning (SFP) is a web-based solution that provides students a financial plan to demonstrate affordability for their respective program. The application helps users provide financial plans for students. |
| Student Course Scheduling System (Student CSS) | Allows students to sign up for short courses |
| Student Body Flow (SBF) | Used by registrars to submit their student body flow reports to the CS finance group for disclosure purposes. |
| Stipend Generator | Data Transfer process and website allowing for data entry and transmission to Sallie Mae. Sallie Mae cuts checks to students and issues a remittance file, which is loaded back into the SIS |
| Sterling | This is an automated process that pulls data from third Person vendors, secure FTP site and posts the student payments in CampusVue. |
| State Grants | Dynamic application used for generating State Grants data files |
| Staff Learning System | Brightspace staff LMS |
| Sourcefire IDS | Intrusion Detection System |
| Solidworks 3D CAD | Classroom Software for 3D modeling |
| Socrates | Front end application for faculty to apply to be a teacher at our schools. |
| SOA | platform providing data/integration services for my campus portal and other applications |
| SmartyStreets | Address validations tool |

| | |
|---|---|
| SiteCore | Content Management System for Marketing Websites |
| SIS Custom Applications Landing Page | List of links to all of the custom applications created and managed by the Student Information Systems team |
| SharePoint | For anything related to: go.dcedh.org; my.dcedh.org and go3.dcedh.org (which has SSRS and BI) |
| SGUI (Student Group User Interface) | Website that allows advanced student group manipulations |
| SFA Custom Apps (Landing Page) | Student Financial Custom Applications landing page |
| ServiceNow | SaaS provider of IT Service Management. It will be used as Incident/Problem Tracking and Management, Knowledge Management, Change Management, and Service Requests. |
| SendWordNow | Emergency Notification System used to notify staff, faculty & students if an emergency situation occurs |
| Security Equipment | Generic Configuration Item for tracking requests/issues with Security Equipment within the Infrastructure |
| Security | All calls related to items the Security Team needs to be involved in. |
| Schedule Manager | Rebalances students in courses based on user selection. Helps the Center determine how many sections are needed for a course by term |
| Scanners | Generic Configuration Item for tracking requests/issues with Scanners |
| Router | Generic Configuration Item for tracking requests/issues with routers within the Network |
| RightFax | Centralized enterprise fax solution |
| RIC Process | Retail Installment Contract Process is an automated process that runs week days. It goes out and gets a file from third Person vendors, Tuition Options, processes it, stores data in CVInterface and updates data in CARS and CampusVue. |
| Rhino by McNeel | Classroom Software for 3D printing of Industrial design |
| Respondus | 3rd Party Course Management product that creates and manages exams - publishing directly with Brightspace |
| Rema Grad Team Application | Keeps track of Grad Team members and organizational relationships |
| RedHat | Linux OS for various DCEH servers |
| RACER | RACER stands for Regulatory Affairs & Compliance Electronic Records. It is an in-house web-based document repository that houses school accreditation documentation and data for the Regulatory Affairs department. RACER is used by all CS Regulatory Affairs & Compliance |

| | |
|---|---|
| | department members as well as School Presidents and associated staff. |
| Qlikview | Data Warehouse Dashboard and Reporting |
| Public Key Infrastructure (PKI) | Microsoft CA Public Key.  A public key infrastructure (PKI) consists of software and hardware elements that a trusted third Person can use to establish the integrity and ownership of a public key.  The trusted party, called a certification authority (CA), typically accomplishes this by issuing signed (encrypted) binary certificates that affirm the identity of the certificate subject and bind that identity to the public key contained in the certificate.  The CA signs the certificate by using its private key. It issues the corresponding public key to all interested parties in a self-signed CA certificate. |
| ProTools, ProTools HD, and Sibelius | Classroom Software for audio editing |
| ProofPoint | Email SPAM and A/V Gateway |
| Program Integrity | Program Integrity application provides the new program coordinators with the ability to map state restrictions to CampusVue program versions, as well as ability to create disclosures and disclaimers and Enrollment Agreements for regulatory and compliance purposes. |
| Program Course Management System (PCMS) | Program and course management for new courses; similar to Content Alert/Course Revision |
| Printers | Generic Configuration item to be used for Printer configuration/Issues |
| Presentation Technology | Technology used in the classroom environment or conference rooms to provide presentations. This includes Projectors, Conference lines, TVs, Switchers, Inputs, etc. |
| PlanView | Project Management Application |
| Pixologic Z Brush | Classroom Software Animation for 3D/2D texturing and painting |
| PerformLine | Speech Analytics Software |
| Password System (Center) | Manages passwords for all internal systems; except for those using AD |
| Palo Alto (Captive Portal) | System used to authenticate a user for Internet access on wired networks |
| Outlook | Microsoft Outlook is a personal information manager from Microsoft, available as a part of the Microsoft Office suite. Although often used mainly as an email application, it also includes a calendar, task manager, contact manager, note taking, journal, and web browsing. |
| OpenVoice | Citrix OpenVoice Conferencing is a reservation less audio-conferencing service that has a 500-participant limit and is accessible via a toll-free number.  The service also offers recording, the ability to manage |

| | |
|---|---|
| | conference calls via an online console and integrates with Outlook for easier scheduling. |
| OpenAthens by EBSCO | Allows for identity and access management for students to seamlessly access e-resources. The OpenAthens tool eliminates the EZProxy product for all brands. |
| Office365 - Skype | Collaborative functionality provided by the Office 365 Suite. This provides the ability to chat in live time with others using the Lync Online system. |
| Office365 - Power BI | Power BI reports are developed and then published to O365 Power BI to be consumed by our customers. There is also a process using a Gateway that will refresh the reports with updated data if a schedule is setup for the report. |
| Office365 - Outlook Online | Email functionality provided by the Office 365 Suite. This relates to the Outlook email client and Exchange online technology |
| Office365 - OneDrive | Office 365 Storage area for any documents/data |
| Office365 - Office Pro Plus | This is the installation pack for the Office 365 client tools such as Outlook, Word, Excel, PowerPoint, etc. |
| Nexpose | Vulnerability Scanning System |
| Network | Generic Configuration Item for tracking requests/issues with Network devices within the Infrastructure |
| NetQOS | Network Node Manager |
| MyGroups | Tool that allows users to create/manage their own distribution groups. |
| MyCampusPortal | Student and Faculty Portal |
| MSBI Reports | Web based reporting tool for employees to get reporting data. |
| Movie Magic Scheduling | Classroom Software for video development |
| Movie Magic Budgeting | Classroom Software for video development |
| Mobile Phone | Mobile/Cellular devices |
| Microsoft Azure SQL | a cloud computing service created by Microsoft for building, testing, deploying, and managing applications and services |
| Media Composer | Classroom Software for video editing |
| Maxon Cinema 4D Studio Bundle | Classroom Software in game art 3D development |
| Marketing Websites | Marketing Web Sites |

| | |
|---|---|
| Lynda.com | Tutorials that are integrated into the online classroom. |
| Luxion Keyshot Pro Lab Pack | Classroom Software for 3D movement |
| Load Balancer | Application load testing tool |
| Lawson | Asset Management, including human capital and finance system |
| Kronos | Time Management System |
| Komplete Suite | Classroom Software for audio instruction |
| iZotope Music Production Suite (Includes: RX, Ozone, Neutron, Nectar, VocalSmith, and Trash) | Classroom Software for audio production |
| InGenius Software | Application that connects phone systems to CRMs - Microsoft Dynamics, ServiceNow - with features like screen pop & click-to-call. |
| Informatica | Data Integration and ETL |
| Infor Expense Management | Travel & Entertainment Expense Vendor |
| Imperva | Database Access Management System |
| iModules Alumni Community | The objective of the iModules Data Integration project is to design and implement an automated solution to facilitate the outbound and inbound data exchange with the new iModules Encompass platform for all Ed Systems except Western State. The outbound data will be used to create and update alumni records for pending graduates, graduates and students who are on externship/internship. The inbound write-back will update student/graduate demographic information in the SIS. |
| ImageNow Upload Center | Allows documents to be uploaded without direct access of ImageNow |
| ImageNow | Document Imaging |
| Image Onsite | Bank of America Image Onsite |
| IDEA | Student rating of Instruction Survey's given to students to rate faculty effectiveness in a course. Most of the IDEA surveys are distributed via paper form in the classroom and then sent to IDEA to process the answers. Online does use a web system to do their surveys but the student/faculty/course information is manually uploaded by the EDW team. |
| IARM | IARM: The Identity Access and Role Management system. This system is used to create/terminate/re-hire employee accounts based on HR data |

| | |
|---|---|
| Hyperion | This application was developed for use by FA Advisors. Its use is to allow FA Planners to show new and continuing students costs, aid, and loan information over the length of their program of studies. |
| HVAC | Regarding the central Heating/Ventilation and Air Conditioning systems in the Data Center |
| HP Virtual User Generator (VuGen) | VuGen is also used for HP BSM. It records the scripts for Business Process Monitor (synthetic transactions). |
| HP uCMDB | Configuration Management Database, |
| HP Systems Insight Manager | System management tool designed to help manage HP servers. |
| HP SiteScope | Agent-less monitoring software focused on monitoring the availability and performance of distributed IT infrastructures, including Servers, Network devices and services, Applications and application components, operating systems and various IT enterprise components. |
| HP OpenView Performance Manager (OVPM) | trace running performance manager |
| HP OpenView Operations Manager (OVOW) | System monitoring |
| HP Network Node Manager (NNM) | software that helps unify fault, availability, and performance monitoring to improve network uptime and performance, and increase responsiveness to business needs |
| HP Device and Dependency Mapping | Organizes hardware and software assets across the enterprise. |
| HP Data Protector | Enterprise Backup Software |
| HP Business Service Management | manage the performance of enterprise applications, systems, networks and storage |
| HP Business Process Monitor (BPM) | software that uses synthetic transactions to identify performance issues before they affect web or mobile customers |
| HP ArcSight | ArcSight Logger, Enterprise Security Manager (ESM) and SmartConnectors. Security log collection and alerting system. |
| Holds Automation | Automation for the Non-Payment and Re-entry Policy Hold processes for CampusVue |
| Harmony and Story Board by ToonBoom | Classroom Software for animation |
| Halogen | HR System that offers a talent management suite that reinforces and drives higher employee performance across all talent programs - whether that is performance management, learning and development, succession planning, recruiting and onboarding, or compensation |
| Grasshopper | This is a replacement CI for Skype. This provides the ability to chat in live time with others using the Grasshopper. |

| | |
|---|---|
| Grad Team Affairs | Any tasks associated with the graduation team. |
| GoToMeeting | Video Conferencing |
| Gerber Accumark and Yunique PLM | Classroom Software for fashion design and product development |
| Genesys | A Telecom Solution that currently provides inbound routing for WCTs at OHE and Ai Ground |
| Foglight | Application monitoring solution that helps organizations monitor and control the performance of mission-critical enterprise applications. |
| Firewall | Device used to protect or separate network segments |
| Federal FA Repack Report Config | This application is used to configure Federal FA Repack Report parameters. |
| Faculty Session Prep | Used by Online Faculty to allow them to accept their courses as well as order any supplies (textbooks, software etc.) that they may need. |
| Faculty Course Import | It allows "The Center" faculty scheduling team to update CVue courses with the instructors that accept courses from invitations sent from the Course Scheduling Team. It needs to be updated in CVue for reporting purposes. |
| EZ Proxy | Library System |
| Exchange | Microsoft Exchange is an e-mail messaging system from Microsoft that runs on Windows servers. The server side is Microsoft Exchange Server and the featured client program is Microsoft Outlook, which includes contacts and calendaring. |
| Estimated Financial Impact Plan (EFIP) | The application sends student-specific financial data from CampusNexus Student to the CFPB via a student-specific url so that applicants can complete an exercise that shows them how much it will cost them to attend the school, how much they have to borrow to cover the costs that they can't pay out of pocket, and what it means for their future. |
| Erwin Data Modeler | Erwin Modeling provides a collaborative data modeling environment to manage enterprise data through an intuitive, graphical interface. With a centralized view of key data definitions, you can leverage information as a strategic asset and more efficiently manage your data resources to save time and money. |
| Erwin Data Governance | Erwin Data Governance is a SSAS data governance tool that will be used to store our enterprise Business Glossary, Data Dictionary, Business Rules and the relationships of our data. This tool can also be used to govern all of the processes to maintain data quality and security. |
| Enterprise Mass Storage | Enterprise Storage |
| Enterprise File Transfer | Enterprise file transfer system which ftp, pgp, or related data transfer of data between disparate systems such as data to/from external sources or between two internal sources. |

| | |
|---|---|
| Enterprise Data Warehouse (EDW) | Enterprise data repository which accepts data feeds from several of our operational systems and organizes the data for reporting and analysis. |
| Employee Portal | Related to Lawson ESS |
| eLibrary | Online library available via respective portal for students and faculty. |
| eLearning Content | Identification of this CI should be done via the URL - www.thecampuscommon.com. If an incorrect/missing content is found on these pages, then have the appropriate team make the necessary updates.

The responsible team is not in IT and therefore not in ServiceNow. During business hours - "_CS Webmasters" and off hours or paging - "_CS eLearning Content Page". |
| Education Collective by The Foundry (Nuke, CaraVR, Modo, Mari, and Katana) | Classroom Software for 3D rendering and effects |
| EdConnect | Department of Education application that is used to pull ISIR transaction files. |
| eBook | Used to upload eBook fees |
| Domain Name Service (DNS) [Classroom] | Domain Name Service |
| Domain Name Service (DNS) | Domain Name Service |
| DocuSign | DocuSign is a web-based application that allows staff to send documents to students to be signed electronically |
| Direct Loan Pell Reconciliation | Provides the interface to work on reconciliation cases for Direct loan and Pell loan. Through the tidal process the DOE loan data in loaded in this app's DB (SISInterface) and the app allows search, claim, reassign to supervisor, close and reporting functionalities to resolve the cases. |
| Digital Application | Online application for applicants to apply to come to school. Provides integration to CRM, CampusVue (eventually CARS), ImageNow, EchoSign, Program Integrity, RACER and SecureNet. |
| Degree Estimator | Degree Estimator is a web application used to calculate a potential student's estimated graduation date and estimated cost of an academic year. |
| Data Center | This will involve any issues with the management of the Data Center. This includes the application used to track data center configurations - Aperture Vista Data Suite is software that helps manage activities with the Data Center (power, cooling, space allocation, cabling, etc.). It is used primarily by the Data Center Manager; however, other staff members involved in related decision making are also users (Systems Administration, Network Provisioning & Support, and others). The product is owned by the IT Operations team, specifically, the Data Center |

| | |
|---|---|
| | Manager. |
| Cycling MAX MSP Audio Plugin | Classroom Software |
| Cvent | Service for high school students to take noncredit courses |
| Custom Authentication System (CAT) | AKA the Authentication Tool - Active Directory user access via Framework Authentication System that allows users to maintain specific applications within IT |
| Course Tracking System (CTS) | Provides ability to manage courses, textbooks, and degrees |
| Course Scheduling System (CSS) | System used by OHE to schedule facilitators to courses and terms, and for facilitators to accept/reject those assignments |
| Course Revision | Tracks Revisions for courses. It is used to track the progress of course revisions through the QA process. |
| Course Listing | Displays Program and Course Information for our online ed systems. |
| Core Network | Generic Configuration Item for tracking requests/issues with the Core/Datacenter network configurations within the Infrastructure |
| Contract Management | Manages requests, to enter into or renew a contract with a vendor. Provides the requester with an intake form and routes the form through the appropriate approver groups, such as Sourcing, IFO, Legal, Contract Administration etc., until the request is either fully approved/executed or rejected. The system also includes a document repository for storing contract correspondence and documents. Was known as Worksite and Autonomy is the software company (owned by HP) |
| Content Alert | 3 copies of this system. One for each brand SuO, AuO, and AiO. System used by program development to QA proposed changes and/or revisions to courses. Also includes a separate system for Alert admin. |
| CommonLine | NSLP uses CommonLine to streamline the electronic loan application process. CommonLine is used to transmit student loan applications to NSLP. CommonLine is a set of standard file formats and protocols for transmitting student loan applications. |
| Collections UI | Update Activities, Fund Sources and Student Account Statuses when a student's account is sent to an outside collection agency |
| CMS (Interwoven) | Content Management System |
| Citrix | Used when setting up a user with a Citrix account, problems with logging into Citrix, general Citrix questions (for example, how to access applications once logged in), and password resets. |
| Check Point Client Encryption | The Check Point Full Disk Encryption Software Blade provides automatic security for all information on endpoint hard drives, including user data, operating system files and temporary and erased files. For maximum data protection, multi-factor pre-boot authentication ensures user identity, while encryption prevents data loss from theft. |

| | |
|---|---|
| Celemony Melodyne | Classroom Software |
| Career Center (CSO) | Career Services application to support the placement of students |
| Capture One Pro by PhaseOne | Classroom Software used in the digital Photography program |
| CampusVue Portal | Faculty and Student Portal that is part of the CampusVue application. NOT the MyCampus Portal. |
| CampusVue | CampusVue SIS by Campus Management Inc. |
| Campus Facilities | For power issues and other issues, the ITOC currently handles that need to be visible to other teams but handled by the ITOC use the ST\CT of Network Admin\Lan-Wired and (others). |
| Campaign Dialer | Provides business with opportunity to load and dial specific leads based on calling campaigns uploaded to the Dialer. |
| Call Copy | Uptivity (Call Copy) Call Recording Application.  Takes screen scrape of activity during calls. |
| Call Compliance System | Used to track call monitoring issues across various functional areas |
| Calero (Call Detail Recording) | Installation of a new Telecommunications Expense Management (TEM) and Call Detail Report Application system to collect monthly telecom expenses and compare the internal collected data against the carrier provided data for allocation to the campuses.  This comparison will help us to achieve greater accuracy on the allocation of the phone bills as well as provide better data to the effectiveness of other projects. The existing TEM and CDR systems do not have the ability to provide the granularity needed to report on data at this level and the data integrated into one SaaS system (Calero). |
| BrightSpace | Learning Management System |
| Bridgestreet Housing | School-sponsored student housing application, placement and customer service/client management. |
| BMI (BROADCAST MUSIC INC) | Base Student Fee |
| Batch Add Activity UI | The Batch Add Activity UI is a tool that exists outside of CampusVue whereby the user can create batches of activities and insert student specific content/verbiage.  The user has the ability to upload student data for this tool either using a spreadsheet that contains student specific identifying data (systudentID) along with specific content for each student, or by using an existing student group in CampusVue. This UI will use the same functionality that exists within CampusVue for adding activities, however, it will allow the user to do it in batches rather than per individual student. |

| | |
|---|---|
| AWS Core Infrastructure | Amazon Web Services |
| AwardSpring Scholarship Vendor | Assists students in finding scholarships by matching them up with scholarships that match their student data |
| Avaya | Telephone and communications |
| Autodesk AECS and AEMS (Includes, AutoCAD, Maya, 3DS Max, Revit, Inventor, and Smoke) | Classroom Software |
| Assist | Application that makes data updates for CampusVue, CARS, Lawson, MyGroups, UARF, MCP, and Student Apps |
| ASCAP | Music licensing agreement that DCEH has for music being played in common areas- Basic License Fee |
| Aruba Clear Pass | Network admission control |
| Applied Voice Speech Technology (AVST) | Enterprise voice mail system |
| Applicant Tracking System ATS | Deltek Applicant Tracking System aka HRSmart is an HR application used to by recruiters to track New Hire candidates |
| Apple Logic Studio and Apple Remote Desktop | Classroom Software |
| Antares Auto-Tune | Classroom Software |
| Andersson Syntheyes | Classroom Software for movement tracking of animation and 3D game |
| Altiris (ACEM) | This application allows Desktop Services members to remotely install applications to user's PCs. |
| Allegorithmic Substance | Classroom Software |
| AIO Schedule (Current Schedule) | CurrentSchedule lists course schedules by department. For each course, it provides a seat availability snapshot from the AIPOD Course Schedule for CARS campuses. Without this report, campuses using CARS don't know which course/sections have available seat |
| Aerialink | Aerialink will be utilized to facilitate the messages between and the student's wireless carriers. |
| Adobe ETLA Creative Cloud | Classroom Software |
| Active Directory Services (Classroom) | Directory Authentication and Authorization Service |
| Active Directory Services (Admin) | Directory Authentication and Authorization Service |
| Active Directory Federation Services (ADFS) | Maintenance Window: Sundays 2 a.m. – 12 p.m. Release windows: Wednesday night 9 p.m. – Thursday 6 a.m. |

| | |
|---|---|
| ACME SBC | Session Border Controller (SBC) used for external SIP connections to the Voice Network |
| A/V Studio Equipment | Relating to campus Audio/Visual Studio Equipment |
| 1098-T | Reg application from CMC to generate 1098-T data. |
| SDK for Unreal Tournament by EPIC Games | Classroom software for game development |
| Dragon Naturally Speaking by Kurzweil | Software used to provide accommodation help students with disabilities |
| Microsoft Office 2016 and earlier versions | Workstation software |
| Reason by Propellerhead | Classroom software for audio production |
| Red Giant | Classroom Software for video production |
| Unity Product Suite by Unity Technologies | Classroom software for game development |
| Vicon Blade by Vicon | Classroom software for motion capture |
| Camworks by Geometric Technologies | Classroom software for Industrial Design |
| Muster Render Engine | Classroom software for rendering of animation |
| ClickDimensions | Marketing Analytics |
| DoNotCall | DNC database/system |
| FYSK - Facts You Should Know | |
| JetSpring | Webchat |
| Master Web Database | Core Marketing Web site DataMart |
| Neustar / Decision Navigator | Marketing lead management |
| PossibleNow | |
| QuinStreet | Marketing lead management |
| CRM (Star Portal) | Customer Relationship Management |

| Cisco Secure Access Control Server (ACS) | The Cisco Secure Access Control Server (ACS) Solution Engine is a dedicated, rack-mountable appliance for network access policy control |
|---|---|

### Other Software and SaaS Services:

This list sets forth specific products directly utilized by the Ai University System only. These would be excluded from the Shared IT Systems.

| Name | Description |
|---|---|
| Ableton Live Sound | Classroom Software |
| Adobe Captivate | Used by some instructors at SU for classroom instruction |
| DZED Dragonframe | Stop Motion software |
| Lectra Kaledo | Classroom Software for fashion design and product development |
| Hollywood Camera Work Shot Designer | Ai Video program to configure camera locations |
| RhinoCam by MecSoft | Classroom Software for 3D printing of Industrial design |
| Zayo Group -Dark Fiber | Dark Fiber between Ai Seattle's Physical Buildings for network connectivity between them |

# EXHIBIT 6

## Third-Party Agreements

All Contracts between DCEH and a third Person related to any Third-Party Materials or Third-Party Support, including:

1. Master Services Agreement between Calero Software, LLC and Education Management II, LLC, dated September 30, 2016.

2. Digital Master Services Agreement between Hewlett Packard Enterprise Company and Education Management Corporation, dated October 10, 2007.

3. Business Associate Agreement between Hewlett Packard Enterprise Company and Education Management II, LLC, dated February 25, 2016.

4. Services and Solutions Agreement between Xerox Corporation and Education Management, LLC, dated May 29, 2012.

5. Managed Services Agreement (70919118) between Xerox Corporation and Education Management, LLC, dated December 15, 2004, as amended by General Amendment, dated October 17, 2008.

6. Software and Website Agreement between Tuition Options LLC and Education Finance II LLC, dated February 26, 2013.

7. AWS Enterprise Customer Agreement between Amazon Web Services, Inc. and Education Management, LLC, dated April 23, 2013.

8. CampusCare Software Support Agreement between Campus Management Corp. and Education Management II, LLC, dated April 30, 2004, as amended by the Second Addendum, dated January 1, 2014, and the Third Addendum, dated June 2, 2016.

9. Professional Service Agreement between Campus Management Corp. and Education Management, LLC, dated April 30, 2004.

10. Software License Agreement between Campus Management Corp. and Education Management, LLC, dated April 30, 2004, as amended by Addendum, dated March 14, 2014.

11. Master Agreement between D2L Ltd. and EDMC II, dated September 23, 2014.

12. Perpetual license for Oracle Database software.

13. Agreement between Perceptive Software, LLC (n/l/a Lexmark Enterprise Software, LLC) and Education Management, LLC, dated June 30, 2011.

14. Subscription License and Services Agreements between Infor (US) Inc. and Education Management, LLC, dated December 21, 2012.

15. Platform Version Change Requirements Agreement between Infor (US) Inc., Business Software Inc. and Education Management, LLC, dated December 21, 2012.

16. Non-Exclusive License Agreement between Infor (US) Inc. and Education Management II, LLC, dated March 23, 1992, as amended by Addendum, dated November 7, 2016.

17. Non-Exclusive License Agreement between Infor (US) Inc. and Education Management II, LLC, dated December 1995.

18. Master Services Agreement between Infor (US) Inc. and Education Management II, LLC, dated August 17, 2005.

19. Business Associate Agreement between Infor (US) Inc. and Education Management II, LLC, dated August 20, 2010.

20. Subscription License and Services Agreement between Infor (US) Inc. Education Management Corporation, dated December 21, 2012.

21. Software Customer Agreement between Lawson Group and Education Management, LLC, dated March 23, 1992.

22. Master Services Agreement between Lawson Software Americas, Inc. and Education Management, LLC, dated August 17, 2005, as amended by Addendum, dated August 24, 2010.

23. Software Services Agreement for Web-Based Training between Infor (US) Inc. and Education Management II, LLC.

24. License to Use Information Software between Informatica Corporation and Education Management, LLC, dated December 30, 2008, as amended by First Amendment, dated June 25, 2010.

25. Software License Agreement between Informatica Corporation and Education Management, LLC, dated September 29, 2011.

26. FastTrack for Dynamic 365 Microsoft Fast Track Services Agreement between Microsoft Corporation and Education Management II, LLC, dated May 17, 2017.

27. All other relevant agreements in the data room, as of January 1, 2018, including those listed on Attachment 1 to this Exhibit 6.

## EXHIBIT 7

**Shared IT Systems**

**The list of Shared IT Systems on Exhibit 5 is incorporated herein by reference.**

## Schedule A

## Transition Services

**Transition Services Fee:** During the first year of the Term (the "Initial TSA Term"), Studio shall pay DCEH a monthly TSA Fee for the Transition Services equal to the cost per student per month set forth below for each category of Transition Services (the "TSA Rate") for each University System in respect of which Studio requests the Transition Services. After the Initial TSA Term and for the remainder of the Term, Studio shall pay DCEH a monthly TSA Fee for the Transition Services equal to 115% of TSA Rate; *provided* that (a) the cost for the Transition Services with respect to the Ai University System assumes that the Transition Services require 100% of the working time and attention of the Ai Dedicated Employees, (b) if any Ai Dedicated Employee is not providing 100% of its working time and attention to the Transition Services with respect to the Ai University System, DCEH and the Studio shall agree on an appropriate reduction of the TSA Rate set forth in Item 10 below based on the percentage of time of such Ai Dedicated Employee allocated to activities other than the Transition Services set forth herein; and (c) notwithstanding anything to the contrary contained herein, (i) the increase in the TSA Rate after the Initial TSA Term shall not be applicable to the cost of the Ai Dedicated Employees and (ii) the TSA Fee shall not include any amounts payable by DCEH with respect to any Bankruptcy Proceeding involving DCEH.

The TSA Rate set forth below for each category of Transition Services (other than Item 15) is the maximum amount that Studio shall be obligated to pay for such Transition Services, subject to the percentage increase described in the preceding paragraph after the Initial Term; provided, however, that any decrease in DCEH's Fully Burdened Cost of providing the Transition Services shall result in a dollar-for-dollar reduction in the applicable TSA Rate for the remainder of the Term. The TSA Rate for Item 15 shall be DCEH's Fully Burdened Cost of providing such Managed Services.

DCEH agrees to provide such supporting documentation and information as Studio may reasonably request with respect to the calculation of the TSA Fee, DCEH's Fully Burdened Costs and any allocation of such costs and expenses to the applicable University Systems. In the event of a dispute arising out of the calculation of the TSA Fee, DCEH's Fully Burdened Costs and any allocation of such costs and expenses to the applicable University Systems, Studio will deliver a written statement to DCEH listing each disputed item in reasonable detail. The Parties shall seek to resolve all such disputes expeditiously and in good faith. DCEH shall continue to perform the Transition Services as set forth herein in accordance with this Agreement pending resolution of any dispute; *provided* that such dispute is resolved within thirty (30) days after receipt of such notice from Studio.

Studio may terminate all or any particular category or categories of the Transition Services set forth below with respect to any University System at any time without penalty or premium by providing thirty (30) days' prior written notice to DCEH, and the TSA Fee shall be reduced accordingly or terminated completely if all Transition Services are terminated.

Notwithstanding the foregoing, solely with respect to any third party agreement to which DCEH is a party thereto that (a) is an integral component of the Shared IT Systems, (b) is necessary to

provide the Transition Services (other than the Information Technology listed in Item 11 below) and (c) has a term that expires more than 120 days after the Effective Date (each a "Non-IT Contract"), Studio shall pay to DCEH for each University System such University System's allocable portion of the costs of such Non-IT Contract that is included in the applicable category of the TSA Fee for the period beginning on the date that Studio elects to terminate such category of Transition Services for such University System until the expiration of the earlier of (i) the existing term of such Non-IT Contract or (ii) the one-year anniversary of the Effective Date; *provided, however,* that if DCEH modifies, amends, extends or replaces such Non-IT Contract, this provision shall no longer be applicable and Studio shall have no obligation to pay any portion of such Non-IT Contract.

Notwithstanding the foregoing, solely with respect to any third party agreement to which DCEH is a party thereto that (a) is an integral component of the Shared IT Systems, (b) is necessary to provide the Transition Services with respect to the Information Technology listed in Item 11 below and (c) has a term that expires more than 120 days after the Effective Date (each an "IT Contract"), Studio shall pay to DCEH for each University System such University System's allocable portion of the costs of such IT Contract that is included in the Information Technology listed in Item 11 below for the period beginning on the date that Studio elects to terminate such category of Transition Services for such University System until the expiration of the earlier of (i) the existing term of such IT Contract or (ii) the end of the Initial TSA Term; *provided, however,* that if DCEH modifies, amends, extends or replaces such IT Contract, this provision shall no longer be applicable and Studio shall have no obligation to pay any portion of such IT Contract. If Studio does not elect to terminate the Information Technology category of Transition Services with respect to any University System prior to the end of the Initial TSA Term, then Studio shall pay to DCEH a monthly TSA Fee for the Information Technology category of Transition Services for such University System equal to 115 % of TSA Rate commencing at the end of the TSA Initial Term until Studio elects to terminate such category of the Transition Services for such University System.

**Transition Services and TSA Rates:**

1. Accounting Services - $10.14/Student/Month

   - Month-end Closing (including Revenue Pull-Forward analyses, GL290, running Kyriba reports, EBITDA & BS reviews, scholarship analyses, running CARS reports, review and upload corporate journals, payroll backout accruals, PCARD accruals, checklist entries, SIS exports, supply store related entries, accruals)

   - Accounts Receivable Reporting (including AR Drills, AR Dashboard, AR Metrics, Past Due Credit Ext, Long-term AR)

   - Account Reconciliations

   - Unclaimed Property processes

   - Bad Debt Accounting

   - Revenue Accounting

   - Lease Administration

- Lease accounting
- Corporate entries to generate financial reporting
- Monthly detailed ledger and trial balance
- Quarterly financial reporting
- Accounting research
- EF2 reconciliations
- Audit
- Ad Hoc Report (including Regulatory)
- PPE accounting
- T&E Expense management
- A/P Queue Coding/Approval
- AP Check runs
- Pcard management
- AP Reporting
- Kyriba Management
- Insurance Management
- Bank Accounts Management
- Covenant Calculations
- Cash Reporting
- Cash Flow Forecasting including 13-week Projections for DOE and Lenders
- Credit Card Management
- Misc Other

2.  <u>Financial Information Systems Services - $1.29/Student/Month</u>
    - UARF/incidents submittals and approvals for all Finance Systems
    - Workflow modifications and daily support for the various systems within finance
    - Lawson Maintenance, support and monthly close activities which includes the security of finance employees, ongoing inquiries, monthly closing activities of all subsystems, system configuration, system monitoring
    - ProLease Maintenance which includes pulling and preparing monthly rent uploads, month end close process and all maintenance
    - Reporting out of all finance systems
    - Pcard uploads and support which includes pulling bi-weekly statement, preparing payment for AP and providing detail and tie out and month end close activities

- T&E Expense management
- Management and administration for the Square system which includes all set up, user training and configuration
- Month end and quarter end support which includes the migration of all exports from SIS systems, imaging accruals, system updates
- Miscellaneous support/projects/testing/interaction between finance, PR, HR and IT. Varies from month to month
- Vendor Maintenance and support along which includes procure to pay support for requisitions
- PO's and matching

3.  FP&A Services - $4.88/Student/Month
- Month-end departmental P&L analysis/planning/forecasting
- Real Estate expense planning/forecasting
- Reporting of monthly consolidated results, fiscal year forecasts/plans
- Monthly cash forecasting
- Monthly/Quarterly Board reporting
- Campus Support General Questions/Guidance
- AP Support/Analysis
- Other misc. requests (AP, regulatory, capital, etc.)
- Strategic Analyses
- Mobile Stipend Management
- Telecom management
- Ai Management Team Coordination

4.  Procurement Services - $1.77/Student/Month
- Sourcing of products and services
- Negotiate business terms with vendors
- Contracts reviews
- Contract database management
- Generate purchase orders

5.  HR/Benefits Services - $11.95/Student/Month
- Oversight of medical, vision, dental and non-medical (401(k), STD, LTD, Life Insurance, etc.) benefits package offerings including employee enrollment, oversight of Benefit Plan Documents

- Point of contact for employee questions
- Processing of employee documents (FMLA, etc.)
- Employee Scholarships
- Administer employee leave of absence process
- All HR Systems and services support
- Employee hiring and onboarding
- Employee separations
- Internal communications via Go.EDMC
- Alumni relations
- Immigration/visa support
- Background check assistance (to the extent permitted under FCRA which is under review)

6. <u>Payroll Services - $2.69/Student/Month</u>
   - Payroll preparation (checks, direct deposits, paycards)
   - Process garnishments
   - Issue manual checks
   - SSN validation (2x per year)
   - Prepare uncashed check reports
   - Prepare/Issue W2s
   - Time and Attendance tracking
   - Withholding and depositing payroll taxes via ADP
   - Prepare quarterly and annual payroll tax returns via ADP
   - Positive pay for off-cycle checks

7. <u>Marketing Services & Communication Services - $3.88/Student/Month</u>
   - PR / External Communications
   - Alumni relations
   - Marketing Ops
   - Website
   - Social Media
   - Email
   - Events
   - Media

- Analytics

8. <u>State Licensing Services - $2.04/Student/Month</u>
   - Annual Reporting Requirements
   - Annual License Renewals
   - New Licensure Applications
   - Teach Out Notifications
   - Teach Out Filing Requirements
   - Change of Ownership
   - Quarterly Reporting (including financials)
   - New Program Applications
   - Program Modifications
   - Quarterly ACICS Schools Requirements to State
   - Student Complaints – States
   - State Research, questions, follow up
   - BPC review time
   - Internal grants (research)
   - Catalog reviews
   - Document retention
   - Enrollment agreements (review, state changes)
   - Program integrity
   - Bonds – initial requests, distributions, cancellations
   - Tuition and Fee changes
   - Check requests and procurement
   - Re-entry exception requests
   - State Disclosures
   - Catalog Review
   - Mid Accreditation Review
   - Mock Visits
   - Self-Study Review

9. <u>Central Student Financial Services (not CENTER) - $8.49/Student/Month</u>
   - Annual Compliance Audits

- Close out audits
- State grant audits
- VA visits and audits
- Federal reporting requirements
- Federal surveys
- Annual student consumer information updates
- Campus security and fire safety tracking and reporting
- Closed school notifications and reporting
- DUNS and SAM updates
- Federal Program Reviews (if campus selected by Department of Ed) – program reviews are by OPE ID and would include any campus associated with the OPE ID within the last 2 to 3 award years
- Federal reporting for ACICS campuses
- 90/10 annual audit requirements
- Federal Electronic applications
- BPC
- Default Management
- Perkins Liquidation - Close outs
- Perkins Liquidation - Ongoing
- Policies and procedures
- Forms
- Regular Compliance Calls - FA Specialist, VA, CFA, Student Accounting, Weekly Occurrences
- Campus Based Funding, FISAP Audits, Etc.
- Federal research, regulatory review new federal updates, state review and research
- Campus support-general questions & guidance
- Campus Monitoring Reports - ANA, Attendance
- CFPB Complaints
- Student Complaints
- IPEDS
- Fisk Reporting
- Career Services Reporting

- VA Reporting
- Accreditors Reporting
- Call Recording
- Call Analytics
- Mystery Shopping
- Training Reporting
- Internal reporting and scorecards
- Consent Judgment Reporting and Management
- Ad hoc reporting
- State Grant, Military Survey reporting
- GE Disclosure
- EFIP
- Admission Scripts
- Student Body Flow
- Online Percentage Audit
- GSM Analysis and data mapping
- Persistence and Retention
- Ai Linkage Report
- Financial Aid reporting
- Admissions data
- Directing/loading data to Data Warehouse for reporting

10. <u>Corporate Support - $27.50/Student/Month</u>
- Academics
- Administrative Assistant
- Admissions
- Career Services
- Compliance
- Curriculum
- Housing
- HR
- Institutional Effectiveness

- Library
- Management
- SFS
- Student Affairs
- Supply Store

11. <u>Information Technology - $51.70/Student/Month</u>

- Data Center
- Active Directory Services
- Application Server Work
- Avaya
- Call Copy
- Change Management
- Citrix
- Core Network
- Database Services
- Domain Name Service (DNS)
- Informatica
- ITOC Monitoring
- Network
- Project Management
- Security
- Telephony
- VMWare
- A/V Studio Party Equipment
- Aerialink
- AIO Schedule (Current Schedule)
- Applied Voice Speech Technology (AVST)
- Assist
- AWS Core Infrastructure
- Bridgestreet Housing
- Calero (Call Detail Recording)

- Call Compliance System
- CampusVue Portal
- Check Point Client Encryption
- Clarity
- CMS (Interwoven)
- Content Alert
- Contract Management
- Corporate Facilities
- Course Listing
- Course Revision
- Course Scheduling System (CSS)
- DataBase Inventory
- Database Performance Monitoring
- Decision Navigator
- Direct Loan Pell Reconciliation
- DocuSign
- eBook
- EdConnect
- eLibrary
- Employee Portal
- Enterprise File Transfer
- Enterprise Mass Storage
- Enterprise Message Bus
- Estimated Financial Impact Plan (EFIP)
- ExamSoft
- EZ Proxy
- Faculty Course Import
- Faculty Session Prep
- Firewall
- Foglight
- GoToMeeting

- Holds Automation
- HP ArcSight
- HP Business Process Monitor (BPM)
- HP Business Service Management
- HP Data Protector
- HP Network Node Manager (NNM)
- HP OpenView Operations Manager (OVOW)
- HP SiteScope
- HP Systems Insight Manager
- HP Virtual User Generator (VuGen)
- HVAC
- Image Onsite
- ImageNow Upload Center
- iModules Alumni Community
- Imperva
- IP Control
- Kronos
- Load Balancer
- MHC Document Express
- MiniTab Registration
- Mobile (MCP)
- Mobile Phone
- MSBI Reports
- MyGroups
- NetQOS
- Nexpose
- Office365 - Lync Online
- Office365 - Office Pro Plus
- Office365 – OneDrive
- Office365 - Outlook Online
- OneSource

- OpenVoice
- Outlook
- Password System (Center)
- Presentation Technology
- Printers
- Program Course Management System (PCMS)
- ProofPoint
- Public Key Infrastructure (PKI)
- Rema Grad Team Application
- RIC Process
- Router
- Satellite
- Scanners
- Schedule Manager
- SecureNet (SN)
- Security Equipment
- SendWordNow
- ShareKnowledge
- ShowMgr
- SimMan
- SiteCore
- SOA
- Socrates
- Software
- Solar Winds
- State Grants
- Stipend Generator
- Student Body Flow (SBF)
- Student Course Scheduling System (Student CSS)
- Student Orientation
- Student Payment Application (SPA)

- Subversion
- Switch
- Symantec Data Loss Protection (DLP)
- Symantec Endpoint Protection
- Symantec Validation & ID Protection Service (VIP)
- System Center Configuration Manager (SCCM)
- System Galaxy
- TargetVision
- Tax Factory
- Team Foundation Server
- Telco Carrier
- Textbooks UI
- Third Party Collections UI (TPC)
- TOC (Transfer of Credits)
- Transcript Request System (STS)
- Tripwire
- UPS
- VIsix
- Vordel
- Vormetric
- Voyager / OPAC
- VPN Cisco
- WASP (Point of Sales)
- WebCTRL
- Wireless
- Wireless Controller
- Exchange
- Hyperion
- IARM
- ImageNow
- Lawson

- Lync
- Other Services
- Planview
- RightFax
- ServiceNow
- SharePoint
- Tidal
- User Access Request
- Video Conferencing
- Workstation
- Administrative Computing Services
- Altiris
- Audit
- BizTalk
- Brightspace
- Campaign Dialer
- Campus Facilities
- CampusVue
- Career Center
- Classroom Computer Services
- CRM
- Digital Application
- eCollege
- eLeads
- Enterprise Data Warehouse (EDW)
- Genesys
- Marketing Websites
- Microsoft BI Tools
- My Campus Portal
- Qlikview
- RACER

- Student Financial Planning

- Universal Content Management (UCM)

- Webspace

12.    Data Downloads.  At the request the Studio, DCEH will download Business Data for the University Systems from the Shared IT Systems and deliver to Studio at the Hourly Rate.

13.    Design, Development or Migration of IT Systems.  Requests for assistance in the design, development or migration of systems will be made pursuant to an industry standard SOW/Quote format on a per project basis.

14.    Service Center: $30 per student per month for the following services:

| Service | Description |
| --- | --- |
| Faculty Management | Services include course management, faculty development and training, faculty credentialing and operations, plus management, and eCompanion course management. |
| Registrar | Provide services for transfer of credit processing, transcript requests, and outbound transcripts, enrollment verifications. |
| CFA | Provide financial aid processing including file review, packaging, disbursements, refunds and military/VA. Also includes support services such as compliance/QA, business analysis and training. |
| ESC | Provide technical support students, faculty and staff via telephone. |
| Student Affairs | Provide student success services including student conduct and resolution. |
| Center Training Management | Provide training and administrative support for Training & Professional Development. |
| Admissions Operations | Provide inquiry services including inbound and outbound calling services and inquiry processing. |
| Student Accounting | Provide student accounting support including cash/check processing, reconciliation, annual FISAP reporting, billing and stipend processing. |
| Recovery | Provide account balance recovery and collection services for inactive students. |

15.    Managed Services:  To the extent that Studio requests DCEH to provide any Managed Services that Studio has contracted to provide to the University Systems pursuant to the Managed Services Agreements, Studio shall pay DCEH for its Fully Burdened Costs of providing such Managed Services.

**Schedule B**
**Regulatory Matters**

DCEH expressly acknowledges its affirmative obligation to conduct its affairs on behalf of the Studio in carrying out its obligations under this Agreement in a manner intended to be in accordance with applicable standards of the higher education community, the requirements of the Regulatory Agencies and applicable provisions of the Final Consent Judgments (the "EMC Consent Judgement"), dated November 16, 2015, against Education Management Corporation (for such period of time as such Final Consent Judgments remain binding upon any postsecondary institution which had been owned by Education Management Corporation). In furtherance thereof, and not by limitation, DCEH warrants, represents, and covenants that:

(a)    DECH's use and maintenance of any educational records containing personally identifiable student information that is provided to it by Studio or any University System pursuant to this Agreement remains subject to the oversight and control of Studio or such University System. DCEH is familiar with, and will use commercially reasonable efforts to comply in all material respects with, all applicable laws and regulations pertaining to student educational records and privacy, including the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g and subsequent codes, and its implementing regulations at 34 C.F.R. Part 99, and the Gramm Leach Bliley Financial Modernization Act, 15 U.S.C. §§ 6801-6803 (collectively, the "Privacy Laws and Regulations"). DCEH will timely notify Studio in the event it receives notice of any investigation, inquiry or proceeding concerning the privacy of student information received by it from Studio or any University System. DCEH will use commercially reasonable efforts to include a provision substantively similar to this section in any contract with any Subsidiary, Subcontractor, or third party to which it provides any information of any University System protected by the Privacy Laws and Regulations. DCEH will use commercially reasonable efforts to require a representation, warranty and covenant similar to this section by any Subsidiary, Subcontractor, or third party to which it provides any information protected by the Privacy Laws and Regulations. DCEH will not divulge any protected student information to any Subcontractor without prior notice to and written consent of Studio (which consent will not be unreasonably withheld, conditioned or delayed); *provided*, *however*, that this requirement shall not restrict such DCEH from divulging protected student information to a Subcontractor for the purpose of providing the Services pursuant to this Agreement where DCEH has included a provision substantively similar to this section in its contract with the Subcontractor.

(b)    In the event this Agreement is terminated, DCEH will use commercially reasonable efforts to promptly deliver to Studio or its designee or successor all data regarding prospective students, applicants and students provided to it by Studio under this Agreement.

(c)    DCEH is familiar with applicable laws and regulations regarding the compensation of Persons directly or indirectly engaged in student recruiting activities by or on behalf of postsecondary educational institutions, as set forth in the Higher Education Act at 20 U.S.C. Section 1094(a)(20) and subsequent codes, and in regulations promulgated by the U.S. Department of Education at 34 C.F.R. Section 668.14(b)(22), and any successor code or regulation (collectively, the "Incentive Compensation Laws and Regulations"). To the extent applicable to the provision of Services provided by DCEH to Studio under this Agreement, DCEH will comply in all material respects with the Incentive Compensation Laws and

Regulations. DCEH and Studio will promptly notify each other in the event either party receives notice of any investigation, inquiry or proceeding from an Educational Agency concerning the compensation of its employees or those of any Subcontractors, agents, or third-party vendors engaged in providing services pertaining to student recruiting or the award of financial aid in connection with this Agreement. DCEH will use commercially reasonable efforts to require a provision substantively similar to this section in any contract with any Subsidiary, Subcontractor, or third party which provides any services for DCEH in connection with this Agreement that may be covered by the Incentive Compensation Law and Regulations.

     **(d)**     To the extent applicable to the provision of Services provided by DCEH to Studio under this Agreement, DCEH will use commercially reasonable efforts to comply in all material respects with applicable state and federal laws and regulations governing advertising, electronic communications and solicitations, and telemarketing including Section 5 of the FTC Act (15 U.S.C. Section 45), the CAN-SPAM Act (15 U.S.C. Sections 7701-7713), the Telemarketing Consumer Fraud and Abuse Prevention Act (15 U.S.C. Sections 1601-1608), the Federal Trade Commission Telemarketing Sales Rule (16 C.F.R. 310.1, et seq.), the Federal Communications Commission telemarketing regulations (47 C.F.R. 64.1200 et seq.), and the U.S. Department of Education regulations pertaining to misrepresentation set forth at 34 CFR Section 668 Subpart F (collectively, the "Marketing Laws and Regulations"). DCEH will use commercially reasonable efforts to require a provision substantively similar to this section in any contract with any Subsidiary, or Subcontractor, including any Subcontractor which provides any marketing or advertising related services for DCEH as part of the Services under this Agreement.

# SCHEDULE C
## Dedicated Employees

(See attached)

{01282732-1}

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
　　Name:
　　Title:


DREAM CENTER EDUCATION HOLDINGS, LLC

By: _____
　　Name:
　　Title:

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

STUDIO ENTERPRISE MANAGER, LLC

By: _____
    Name:
    Title:


DREAM CENTER EDUCATION HOLDINGS, LLC

By: _Randall K. Barton_
    Name: RANDALL K. BARTON
    Title: Chairman & CDO