## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| MARK DOTTORE, RECEIVER, | ) | CASE NO. 1:19-CV-00380 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | JUDGE DAN AARON POLSTER |
| v. | ) |  |
|  | ) |  |
| STUDIO ENTERPRISE MANAGER, LLC, *et al.*, | ) |  |
|  | ) | MAGISTRATE JUDGE THOMAS |
| Defendants. | ) | M. PARKER |
|  | ) |  |

## DEFENDANT STUDIO ENTERPRISE MANAGER, LLC'S MEMORANDUM IN OPPOSITION TO RECEIVER'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  BACKGROUND .................................................................................................. 3

   A.   Studio Attempts to Reorganize the Arts Institutes .......................................... 3

   B.   DCEH Intentionally Pursues Receivership .................................................... 5

   C.   The Parties Revise the Transaction Structure and Discuss the Transaction with the Department of Education ............................................................................ 6

   D.   The Parties Work Toward a New Reorganization Structure ............................ 7

   E.   The Parties Finalize the Reorganization and Effectuate the Change of Control ............ 8

   F.   Mr. Dottore Introduces a New Plan for Argosy University ............................ 9

   G.   The Parties Account for Transition Services through the MSAs and TSA .................. 10

   H.   DCEH and Argosy Enter Receivership Without Consulting Studio ............................ 12

III.  LAW AND ARGUMENT ..................................................................................... 15

   A.   Mr. Dottore Has Not Established a Substantial Likelihood of Success ........................ 16

   B.   Mr. Dottore and the Receivership Entities Will Not Suffer Irreparable Harm if the Injunction is Not Issued .............................................................................. 19

   C.   A Preliminary Injunction Will Unduly Harm Studio, South University and the Arts Institutes ............................................................................................ 22

   D.   A Preliminary Injunction Will Harm the Public Interest ................................ 24

IV.  CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barnhart v. Nationstar Mortg. LLC*, No. 16-1244, 2016 WL 11005038, at *3 (6th Cir. Oct. 28, 2016) .............................................................................................................. 24

*Brinckerhoff v. Enbridge Energy Co., Inc.,* C.A. No. 5526-VCN, 2012 WL 1931242 (Del. Ch. May 25, 2012) ............................................................................................... 20

*Contech Casting, LLC v. ZF Steering Sys., LLC,* 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013) 21, 23

*Creative Research Manufacturing v. Advanced Bio-Delivery LLC,* No. Civ. A 1211-N, 2007 WL 286735 (Del. Ch. Jan. 30, 2007 ................................................................... 19

*Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) ........................... 17

*Hokanson v. Petty*, 2008 WL 5169633 (Del. Ch. Dec. 10, 2008) ................................................ 20

*Janvey v. Alguire,* No. 3:09-CV-0724-N, 2014 WL 12654910, at *5 (N.D. Tex. July 30, 2014), aff'd, 847 F.3d 231 (5th Cir. 2017) ................................................................... 25

*Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000) .............................................................. 15

*Livonia Props. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC,* 399 F. Appx. 97, 104 (6th Cir. 2010) ..................................................................................... 22

*Marina View Condominium Association of Unit Owners v. Rehoboth Marina Ventures,* LLC, CA No. 2017-0217-PWG, 2018 WL 1172581, at *6 (Del. Ch. Mar. 6, 2018) .............................. 19

*Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 154 (6th Cir.1991) ..................................... 20

*McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 459 (6th Cir. 1997) ............... 15

*Mich. Coal of Radioactive Mat. Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991). 16

*Northeast Ohio Coalition for Homeless and Serv. Emps. Int'l Union Local 1199 v. Blackwell,* 467 F.3d 999, 1099 (6th Cir. 2006) ................................................................. 16

*Ohio Republican Party v. Brunner*, 543 F.2d 357, 461 (6th Cir. 2008) ...................................... 15

*Olympus Healthcare Group, Inc. v. Pacific Employers Insurance Company,* 352 B.R. 603 (D. Del. 2006) ....................................................................................................... 19

*Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).......... 22

*Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1385 (6th Cir.1995).... 18

*Reams v. Vrooman–Fehn Printing Co.,* 140 F.2d 237, 242 (6th Cir.1944) ................................. 26

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) ......................................................................................................... 16

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) .................................................................. 21, 22

*Schlosser & Dennis, LLC,* C.A. No. N16C-05-190, 2017 WL 2894845, *10 (Sup. Ct. Del. 2017) ................................................................................................................. 17

*Winter v. NRDC*, 555 U.S. 7, 24 (2008) ..................................................................................... 15

Defendant Studio Enterprise Manager, LLC ("Studio") hereby files this memorandum in opposition (the "Reply") to the Receiver's Motion for Temporary Restraining Order and Preliminary Injunction (Docket No. 2) (the "Motion"), filed by Mark E. Dottore, receiver (the "Receiver") in the case captioned *Digital Media Solutions, LLC v. South University of Ohio, LLC, et al.*, Case No. 19-00145 (the "Receivership Action"). In support of this Reply, Studio respectfully states as follows:

## I.    PRELIMINARY STATEMENT

Mr. Dottore's Motion seeks a preliminary injunction requiring Studio to immediately pay Mr. Dottore millions of dollars allegedly due under service agreements arising out of Studio's supposed failed involvement in the complicated reorganization of a group of universities. But it is actually Mr. Dottore who has caused the fracturing of the universities' carefully negotiated reorganization plan – a reorganization plan in which Mr. Dottore was intimately involved in creating – and who is putting the long term viability of the universities at further risk. Mr. Dottore now seeks to use this action to rescind and reject all of the reorganization documents while attempting to simultaneously collect the millions of dollars he erroneously claims are due under the agreements he now desires to invalidate. The Receiver's incompatible requests for such relief cannot be sustained.

Prior to the beginning of the Receivership Action, Studio had negotiated in earnest throughout much of 2018 with Dream Center Education Holdings, LLC ("DCEH") regarding a possible acquisition of The Arts Institutes International, LLC (collectively with all of its subsidiaries, the "Arts Institutes"), which would have involved the simultaneous reorganization of Dream Center South University LLC (collectively with all of its subsidiaries, "South University"), Argosy Education Group, LLC ("AEG"), Dream Center Argosy University of California, LLC (and collectively with AEG and all of their respective campuses, "Argosy

University" and collectively with South University and the Arts Institutes, the "Subject Universities"), a group of struggling universities that DCEH had acquired from Education Management Corporation in 2017.[1]  The parties eventually reached a proposed plan to sustain and reorganize the universities that garnered the support of the U.S. Department of Education. Key components of the reorganization include: Studio would i) help effectuate a change of control of the majority of the campuses of South University and the Arts Institutes, ii) provide material services to the Subject Universities for a period of time, and iii) receive transition services from DCEH in the interim period. The parties executed the Reorganization Documents (as defined below) eleven days before the Receivership Action began.

Now, one month after the beginning of the Receivership Action, Mr. Dottore – whose very appointment is currently being challenged in the Receivership Action[2] – has filed a complaint (the "Complaint") seeking to rescind and/or reject all of the Reorganization Documents (as defined below) while also collecting damages for Studio's alleged breach of those agreements. Mr. Dottore is urgently demanding payment of at least $2.1 million from Studio to save the Receivership Entities[3] and the Subject Universities from supposed immediate failure. Further, Mr. Dottore seeks payment of "any and all" funds Studio received in February 2019 in direct violation of the terms of the Reorganization Documents (as defined below) executed just six weeks ago.

---

[1] The history of DCEH and its predecessor Education Management Corporation ("EDMC") is extensively documented in public records, including the precipitous decline in enrollment, numerous campus closings and eventual bankruptcy of EDMC.  Unfortunately, prospects for the Subject Universities did not improve after being acquired by DCEH, and DCEH has been under duress since the closing of the EDMC transaction in 2017. https://en.wikipedia.org/wiki/Education_Management_Corporation. The EDMC universities have continually been suffering from declining enrollment; enrollment was estimated at 158,000 in 2011, but is now 26,000 in 2019.

[2] 3501 Sunflower LLC, a landlord for one of the university campuses, filed a Motion to Vacate the Injunction and Receiver Order, or in the Alternative, to Modify the Scope of the Receiver Order and Injunction (Docket No. 54) in the Receivership Action, and this motion is currently pending before this Court. Studio reserves its rights to further contest the propriety of the Receivership Action.

[3] The "Receivership Entities" include Dream Center Education Holdings, LLC and its subsidiaries, as further detailed in the Motion.

As further set forth below, however, Mr. Dottore's request for a preliminary injunction should be denied because: i) Mr. Dottore has not shown a substantial likelihood of success on the merits; ii) Mr. Dottore's alleged irreparable harm to the Receivership Entities is self-inflicted and preventable; iii) a preliminary injunction will result in undue harm to Studio; and iv) it cannot be in the public interest for Mr. Dottore to use a request for injunctive relief to require Studio to immediately pay funds allegedly due under agreements that he simultaneously seeks to rescind and reject.

## II.  BACKGROUND

### A.  Studio Attempts to Reorganize the Arts Institutes

Studio is an investor-owned service provider of operational and administrative services to universities. Studio has historically been interested in investing in and servicing creative arts programs, such as those offered by the Arts Institutes. Studio understood that the Arts Institutes were looking for a strategic partner around April 2018. Studio had no previous relationship with the Arts Institutes, DCEH, or any of the Subject Universities. Studio initially approached the Arts Institutes to pursue a potential expansion of Studio by partnering with the Arts Institutes. Studio and the Arts Institutes eventually negotiated a series of agreements designed to provide a flexible framework for the restructuring of the Arts Institutes. This flexible plan contemplated that Studio would at least provide non-core services, purchase non-core assets, and renegotiate, assume and/or sublease existing leases for the Arts Institutes, but also set forth a potential path for Studio to acquire twelve campuses of the Arts Institutes.

Throughout many months of 2018, however, the proposed transaction between Studio and the Arts Institutes did not appear to be a priority for DCEH. DCEH consistently struggled to make payroll, rent, and vendor payments, and many schools were constantly at risk of being

closed because landlords threatened to lock the doors for nonpayment of rent.[4] DCEH was also simultaneously attempting to market Argosy University and South University for sale to numerous outside parties, despite Studio's desire to finalize the transaction regarding the Arts Institutes.[5] None of these proposed sales ultimately came to fruition.

DCEH's insistence on continuing to pursue these sales was further complicated by the fact that DCEH operates all of the Subject Universities on a combined basis. This means that all of the employees, vendor agreements, corporate overhead, facilities management, accounting, human resources, marketing, compliance, enrollment, financial aid processing and information technology services are under the control of DCEH. Because it would take many months to effectively separate the Subject Universities in any transaction, any purchaser of a Subject University would have to agree to enter into a transition services agreement with DCEH.

Eventually, Studio, DCEH, Argosy University and the Arts Institutes finalized the following agreements by the end of October 2018 through arms' length negotiations over the course of many months: a Framework Agreement (the "FWA"), a Master Bundled Services Agreement (the "BSA"), a Technology License and Services Agreement (the "TLSA"), a Master Asset Purchase Agreement (the "APA"), a License Agreement (the "License"), and a Restrictive Covenant Agreement (the "Restrictive Covenant Agreement" and collectively with the FWA, BSA, TSLA, APA and License, the "Ai Transaction Documents").  Argosy University was a party to the Ai Transaction Documents because two of Argosy University's campuses (San

---

[4] As part of the reorganization process, Studio engaged Hilco Real Estate to help negotiate lease amendments and payment terms for DCEH.  In one situation, for example, Studio even posted a letter of credit for $300,000.00 on November 7, 2018 to prevent one landlord from terminating a lease.  While Studio attempted to negotiate a lease amendment together with DCEH, DCEH ultimately failed to execute the amendment.
[5] Any sale of Argosy University or South University would impact the proposed transaction regarding the Arts Institutes because all of the Subject Universities would need to rely on DCEH for a transitional period.

Diego and Hollywood) were to be included in the proposed transactions, but no other campuses of Argosy University or South University were included.

Despite the difficulties with regard to the shared services between the Subject Universities, Studio believed that the Ai Transaction Documents provided a viable mechanism for the transition services required to achieve a smooth separation from DCEH of the Arts Institutes campuses subject to the transaction from DCEH. Due to financial instability, however, all parties understood that any transaction with DCEH would involve a substantial risk that DCEH would not be able to perform its obligations under Ai Transaction Documents. Consequently, the Ai Transaction Documents were inextricably intertwined and provided Studio with some flexibility and security against DCEH's potential insolvency.

**B.    DCEH Intentionally Pursues Receivership**

Although the Ai Transaction Documents were seemingly finalized in October, they were not signed then, and the transaction never closed. During the fall of 2018, DCEH did not execute the Ai Transaction Documents, failed to obtain the required consents and lien releases necessary to close the transactions contemplated by the Ai Transaction Documents, and blamed continual delays on regulatory pressures, financial difficulties, and other alleged complications. Studio remained a willing partner, however; Studio continued to expend funds to prevent landlords from closing campuses Arts Institutes campuses.

When DCEH informed Studio it was contemplating entering into a receivership at the end of November 2018, Studio inquired as to how these plans would impact the anticipated closure of the Ai Transaction Documents. DCEH introduced Studio to Mark Dottore, the individual who would purportedly be appointed as receiver, and Mr. Dottore informed Studio that he would be willing to sign the Ai Transaction Documents as receiver if the receivership began prior to the closing of the Ai Transaction Documents.

Throughout December 2018, Mr. Dottore presented to Studio several significant changes to the reorganization of the Subject Universities contemplated by the Ai Transaction Documents, including, but not limited to: i) transferring Argosy University to Eastern Gateway Community College ("EGCC"), an allegedly interested third party; ii) closing down substantially all of Argosy University's ground campuses; and iii) converting EGCC into a full four year college. While Studio was skeptical of Mr. Dottore's plans – particularly with regard to how these plans would further fracture and complicate the need to transition the Subject University's reliance on the shared services from DCEH – Mr. Dottore continually assured Studio that receivership was the only viable option to move forward.

Studio informed DCEH and Mr. Dottore that Studio was not willing to enter into any proposed restructuring if it was not a holistic solution for all of the Subject Universities. Mr. Dottore claimed that he would cooperate with Studio to provide the shared services in the receivership and honor the Ai Transaction Documents. Studio therefore agreed to move forward with the transaction on these conditions.

## C. The Parties Revise the Transaction Structure and Discuss the Transaction with the Department of Education

On December 19, 2018, DCEH, Mr. Dottore, the Lenders,[6] Studio, and various other potential purchasers of the Subject Universities met with the United States Department of Education (the "Department") regarding DCEH's ongoing reorganization. At this meeting, the parties discussed having Studio participate in a holistic restructuring of all of the Subject Universities – not just the Arts Institutes – whereby Studio would help effect a change of control

---

[6] DCEH's lenders include various secured lenders and Candlewood Investment Group, LP ("CIG"). CIG is the manager of Candlewood Special Situations Master Fund II, L.P. ("CSSMF"), and Flagler Master Fund SPC, LTD ("Flagler" and collectively with CIG and CSSMF, "Candlewood"). Candlewood has effective control over all of the secured debt of DCEH and its subsidiaries, and Candlewood and DCEH's lenders are collectively referred to herein as the "Lenders."

of each of the Subject Universities, provide managed services to them for a period of time, and work toward the goal of each of the Subject Universities operating independently of DCEH. Studio also discussed the numerous regulatory issues that would need to be addressed in order to assure a successful separation of the Subject Universities, including maintaining the 501(c)(3) nonprofit status of the Subject Universities, continuing Title IV Funding (as defined below), and maintaining existing accreditation. After the Department was provided with a summary of the proposed restructuring, the parties began work on the transaction.[7] At this time, no other potential purchaser or partner was willing to work with DCEH and the Subject Universities to effect the reorganization and work toward obtaining the Title IV funding that the Subject Universities critically needed to sustain operations in 2019.

**D.      The Parties Work Toward a New Reorganization Structure**

By December 26, 2018, Studio, DCEH, the Lenders and the Subject Universities entered into a new Interim Framework Agreement (as amended, the "IFWA") that set forth the essential terms of the proposed reorganization as discussed with the Department. DCEH also required urgent funding to consummate the reorganization, pay professional fees, and remain viable throughout the end of 2018. Candlewood and CB CA Lending, LLC, an affiliate of Studio, provided a $6.4 million secured loan to DCEH.

Once all parties agreed to the terms in the IFWA, the parties began drafting new definitive transaction documents for the reorganization. Studio was in frequent communication with Mr. Dottore regarding the terms of the IFWA, and Studio provided a copy of the IFWA,

---

[7] Despite Studio's willingness to work with the parties despite the constantly changing deal structure, the Lenders, Mr. Dottore, and DCEH continued to change their position even after this revised agreement was agreed to in principle. On the very same day as the meeting with the Department, the Lenders informed Studio that they had entered into a transaction with a third party for the acquisition of South University, and that Studio was no longer needed for the reorganization of Argosy University and the Arts Institutes. Studio did not see this transaction as a viable option (because it did not account for the transition of the shared services, among many other reasons). When that transaction soured later, however, the Lenders asked Studio to once again reengage. Studio then began negotiating the new reorganization documents in earnest.

together with a letter outlining the proposed structure of the transaction, to the Department in late December.  A copy of this letter is attached hereto as <u>Exhibit A</u>. The Department remained actively involved throughout the process, and Studio provided the Department with an update regarding the transaction via an additional letter on December 31, 2018. A copy of this letter is attached hereto as <u>Exhibit B</u>.  The Department responded to these letters in a response letter dated January 7, 2019, outlining the Department's position on various issues and requesting follow up actions for the Department's approval of the transaction.[8] A copy of this letter is attached hereto as <u>Exhibit C</u>. The Department's position was clear at the end of December 2018: in order for the Subject Universities to remain eligible for their respective students to receive funding under Title IV of the Higher Education Act ("Title IV Funding"), DCEH must no longer be in a position to receive or control such funds.

**E.  The Parties Finalize the Reorganization and Effectuate the Change of Control**

Upon receipt of the Department's January 7, 2019, letter, the parties agreed to close the transactions contemplated by the Reorganization Documents. On January 7, 2019, Studio entered into a series of agreements with the Subject Universities and the Lenders, including: a Master Services Agreement with each of the Subject Universities (collectively, the "MSAs"), a Transition Services and License Agreement with DCEH (the "TSA"), the Amended and Restated Framework Agreement (the "Amended FWA"), and an Equity and Asset Purchase Agreement (the "EAPA" and collectively with the IFWA, the MSAs, the TSA and the other transaction documents contemplated by the IFWA, the "Reorganization Documents"). The Reorganization Documents provided, among other things, for a change of control of the Subject Universities

---

[8] The Department's January 7 letter also outlined its position regarding the viability of the remaining Argosy campuses. Although the Department appreciated the parties' "willingness to consider options for including those campuses within the reorganization," the Department concluded that "there is no reasonable path forward at the present time for transitioning Argosy as a part of the immediate reorganization."

through a transfer of the membership interests to a nonprofit entity other than DCEH. As consideration for the considerable time and efforts of Studio in engaging in the transactions contemplated by the Reorganization Documents, the parties agreed that DCEH would assign all of the then-outstanding accounts receivable of the Arts Institutes to Studio, including all closed Arts Institutes campuses owned by Argosy University. The Arts Institutes also granted Studio a lien on all of its assets as part of the security for DCEH's and the Subject Universities' performance under the Reorganization Documents. As the Reorganization Documents were finalized in early January, it appeared that Mr. Dottore, DCEH, the Department, Studio, the Lenders, and the Subject Universities had finally reached a viable reorganization plan.

**F.    Mr. Dottore Introduces a New Plan for Argosy University**

Shortly before the execution of the Reorganization Documents, Mr. Dottore proposed another change to the reorganization.  Mr. Dottore claimed that he had a signed agreement for EGCC to acquire Argosy University, but that EGCC would only do the deal if Argosy University and DCEH were put into receivership. Once again, Studio questioned the viability of Mr. Dottore's plan and, citing concerns with the Department, expressed concern that such a transaction would compromise Argosy University's funding and accreditation, but Mr. Dottore assured Studio that his plan for the receivership was the only option. Furthermore, Mr. Dottore assured Studio that he would honor the Reorganization Documents in the receivership and cooperate with Studio to provide the shared services under the TSA. Accordingly, because Mr. Dottore purportedly had a signed deal with EGCC for the acquisition of Argosy University and because the parties were unsure of the viabilities of Argosy University as a going concern in its current form, Argosy University's ownership was not transferred from DCEH at the initial closing of the transactions contemplated by the Reorganization Documents.

### G.    The Parties Account for Transition Services through the MSAs and TSA

Each of the Subject Universities also executed MSAs with Studio as part of the reorganization. Under the MSAs, Studio would provide all of the non-core services to operate the Subject Universities for a period of time and smoothly transition the shared services for the Subject Universities from DCEH. Studio agreed to provide its services[9] on a cost plus 15% margin (the "Service Margin"), and also agreed to defer payment on the Service Margin for South University and Argosy University.[10] Each MSA also included certain flexible payment provisions that allow for the deferral of certain other fees under the relevant MSA if a university does not have sufficient funds to allow for the reorganization process. The costs associated with the services provided pursuant to the MSAs were also spread out across the campuses to evenly distribute the financial burden. No other party was willing to enter into such an accommodating arrangement that would allow the Subject Universities to separate from DCEH and hopefully reach financial stability.

Due to the interrelatedness of the shared services previously provided by DCEH, all parties agreed that the success of the reorganization was contingent on each Subject University contributing its pro rata share of the relevant expenses and cooperating with Studio as it worked to subcontract and transition the shared services from DCEH over the course of the next year.

---

[9] The services Studio has provided pursuant to the MSAs are substantial and extensive. These services include, but are not limited to, a) maintenance of student and faculty portals; b) maintenance of campus websites; c) student resolution team; d) state and federal regulatory support; e) CFA management of non-institutional stipend review and validation; f) international student services; g) human resources and recruiting services; h) employment law advice; i) background checks for new employees; j) employee relations investigations; k) all functions related to e-books, including negotiation of pricing and troubleshooting; l) developing training materials; m) transcript evaluations; n) analytic support of campus metrics; o) tracking mandatory orientation activity; p) establishing and managing a new repository for achieving documents related to accreditation; q) establishing a new repository for policies and procedures; r) managing CIP codes for federal compliance; s) providing curriculum support, including research and instructional design; t) proving registrar operations support for campus registrars; u) providing campus support and guidance with articulation agreements; and v) providing support for development, launch and analysis of employer and graduate surveys.

[10] In order to avoid short term liquidity issues, Studio agreed to defer payment of the Service Margin until the end of the initial term of the MSAs.  The MSAs for South University and Argosy University have an initial term of one year, and the MSA for the Arts Institutes has an initial term of 15 years.

Studio began to implement this plan immediately after the closing of the Reorganization Documents. Studio met with DCEH representatives and Subject University representatives throughout the week of January 15. Among other actions, Studio introduced the following service plans and work streams that Studio had developed for months prior to the January 7, 2019 closing during its extensive due diligence and planning process:

1) Change in ownership – Coordinating initial applications to accreditors, state authorizers, and ED;
2) Treasury Management – Coordinating banking procedures;
3) Audit/Opening Day Balance Sheets – Coordinating audit requirements;
4) Real Estate – Coordinating, prioritizing and negotiating lease amendments and rents due;
5) Insurance – Securing liability insurance for certain of the Subject Universities;
6) State Bonds – Coordinating and negotiating the acquisition of surety bonds;
7) Human Resources – Negotiating the acquisition of human resource services, including payroll, benefits, and workers' compensation services;
8) Third Party Financial Aid Processing – Negotiating the outsourcing of Title IV processing;
9) Vendor Management – Prioritizing and negotiating with dozens of DCEH vendors to minimize service interruptions and establish new contracts directly with the Subject Universities;
10) Marketing – Reengineering and developing new content for hundreds of marketing campaigns, landing pages and websites; and
11) Data Center/IT – Developing and executing a plan to separate the DCEH shared IT system across all of the Subject Universities.

The TSA executed by the parties also provided that DCEH would provide certain services to Studio for one year throughout the transition process, as may be required for Studio to perform its obligations under the MSAs. In exchange for receipt of such services, Studio agreed to pay DCEH a monthly fee (the "TSA Fees") that would be reduced if the amount of fees paid to Studio by any Subject University pursuant to the applicable MSA is not sufficient for Studio to pay all Non-Core Expenses (as defined in the MSA) of such Subject University. The TSA also provides that Studio is not required to fund any shortfall of such fees. Moreover, the TSA

provides that the TSA Fees will not be used to pay any amounts in connection with any bankruptcy or receivership proceeding.

After entering into the TSA and the MSAs, Studio immediately began to work on behalf of the Subject Universities.  Of paramount importance was the transfer of the bank accounts of South University and the Arts Institutes from DCEH so that the universities could receive Title IV Funding, which had been withheld during the reorganization process.  The Department remained adamant that it would not release Title IV Funding to bank accounts controlled by DCEH. Without prompt receipt of such funding, South University and the Arts Institutes would cease to be financially viable, leaving countless students and employees on the street and potentially leaving U.S. taxpayers with loan relief liabilities.  Therefore, Studio worked tirelessly to transfer these bank accounts, leveraging its banking relationships to reorganize the treasury management of the Subject Universities. Without Studio's services, South University and the Arts Institutes would not have been able to receive sufficient funding to continue their operations in January 2019.

During the first eleven days after the closing of the transactions contemplated by the Reorganization Documents, all parties seemingly cooperated and executed on the plan contemplated by the reorganization. The Subject Universities paid Studio's fully burdened costs and projected TSA Fees, but did not pay any other fees. The first payment under the TSA was not due until mid-February.

## H.    DCEH and Argosy Enter Receivership Without Consulting Studio

The parties never had much of a chance to carry out the plan outlined in the TSA and MSA, however. The Receivership Action began within eleven days of the execution of the Reorganization Documents. Even though the Amended FWA specifically required DCEH and Mr. Dottore to consult with Studio prior to filing any receivership action, Mr. Dottore moved

forward with his plan to enter receivership without any prior notice to Studio. Mr. Dottore was appointed as receiver on January 18, 2019 – the same day the Receivership Action was filed.

While Studio attempted to cooperate with Mr. Dottore in the Receivership Action, the relationship soon deteriorated. Despite commitments made under the TSA and Studio's plans to provide services pursuant to the MSAs, Mr. Dottore immediately began terminating employees at DCEH's headquarters in Phoenix in violation of the Amended FWA. Alarmed at this course of events and the potential implications to DCEH's viability (and therefore the viability of all of the Subject Universities), Studio arranged to meet with Mr. Dottore and the chancellors of the Subject Universities on January 22, 2019 to discuss the plan going forward. Studio provided Mr. Dottore with an update on the flow of funds under the MSAs and TSA. Studio explained that each of the Subject Universities was responsible for paying its core expenses (rent, utilities, salaries and benefits) and that the remainder of the projected non-core expenses (including Studio's costs and the TSA Fees) was to be paid to Studio. Studio would then pay when due the TSA Fees to DCEH. Moreover, Studio was clear with Mr. Dottore that the TSA Fees was only to be used to provide transition services to the Subject Universities, as required by the TSA, and not for the Receivership Action.

Studio notified Mr. Dottore that South University had not yet paid the approximately $600,000 due to Studio pursuant to the approved quarterly budget and the relevant MSA, and that Studio was holding approximately $2.6 million from the Subject Universities to send to DCEH[11] when due pursuant to the TSA. When Studio questioned Mr. Dottore about how he intended to continue to provide the services pursuant to the TSA without additional funding (because the TSA Fees are not enough to cover the current overhead of DCEH and Argosy), Mr.

---

[11] Because of the ongoing Receivership Action, Studio agreed to send such funds to Mr. Dottore directly when appropriate.

Dottore could not provide a response. Studio and Mr. Dottore agreed that Mr. Dottore would provide further details about funding before Studio paid the $2.6 million.

After the January 22 meeting, Studio attempted to further communicate with Mr. Dottore without much success. In the interim period, cooperation has further deteriorated: Mr. Dottore attempted to cause South University to pay its portion of the MSA fee directly to Mr. Dottore, and South University also stopped paying Studio's fully burdened costs pursuant to its MSA. Mr. Dottore also specifically instructed certain DCEH employees to stop performing specific tasks DCEH was to provide pursuant to the TSA.[12]

On February 7, Mr. Dottore sent a letter to the Department that attempted to blame Studio for the numerous issues in the Receivership Action and the Reorganization Documents. A copy of this letter is attached hereto as <u>Exhibit D</u>. When the next bi-weekly payroll after the Receivership Action approached, Mr. Dottore (after ignoring Studio's multiple attempts to resolve issues regarding the MSAs and TSA) contacted Studio to request $1.8 million for alleged payroll expenses – even though Studio believes DCEH had at least $2 million available for disbursement at that time. Studio offered to send the $1.8 million if Mr. Dottore agreed to work with Studio to amend certain of the MSAs. Studio reminded Mr. Dottore that the TSA Fees were only to be used for the Subject Universities and not the Receivership Entities. When Mr. Dottore said that he would stop breaching the MSAs and the TSA promptly and agreed to use the TSA Fees to perform the services as required by the TSA, Studio provided the $1.8 million. Despite

---

[12] Among many other services, DCEH was to provide the following services pursuant to the TSA: i) month-end closing services; ii) accounts receivable reporting; iii) account reconciliations; iv) unclaimed property processes; v) bad debt accounting; vi) AP check runs; vii) Pcard management; viii) credit card management; ix) monthly cash forecasting; x) generation of purchase orders; and xi) telecom management. As of the date of the filing of this Motion, DCEH has not provided any of these services (along with many other services the parties agreed DCEH would provide pursuant to the TSA).

these warnings, Studio understands, but cannot confirm, that at least some of the $1.8 million was used for the Receivership Entities, rather than the Subject Universities.

While Studio has attempted to continue to work with Mr. Dottore in good faith, the parties had no further communications until Mr. Dottore filed the above-captioned action without any attempt to resolve matters with Studio.  Mr. Dottore's attempt to use this action to demand immediate payment from Studio pursuant to the same agreements he has intentionally breached must be stopped.

### III.    LAW AND ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right," and a plaintiff seeking such relief carries a significant burden to prove that such relief is warranted. *Winter v. NRDC*, 555 U.S. 7, 24 (2008); *Ohio Republican Party v. Brunner*, 543 F.2d 357, 461 (6th Cir. 2008). Courts in the Sixth Circuit weigh the following factors when considering whether to issue injunctive relief: (i) whether the movant it has a strong likelihood of success on the merits; (ii) whether the movant will suffer irreparable harm if the injunction is not issued; (iii) whether the issuance of the injunction would cause substantial harm to others if it is issued; and (iv) whether granting the injunction will serve the public interest.  *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing *McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 459 (6th Cir. 1997) ).

Courts should therefore only grant the "extraordinary and drastic remedy" of a preliminary injunction if the plaintiff can present "a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). These factors must be balanced together; for example, "the probability of success . . . is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Northeast Ohio Coalition for Homeless and Serv. Emps. Int'l Union Local 1199*

*v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006). Mr. Dottore now apparently seeks to simultaneously enforce, reject, and rescind the very agreements he was involved in negotiating for at least three months prior to the beginning of the Receivership Action, and these efforts cannot be condoned.

## A.     Mr. Dottore Has Not Established a Substantial Likelihood of Success

Initially, Mr. Dottore has not established – and cannot establish – a substantial likelihood of success on any of the claims in the Complaint. A "substantial likelihood" means that a plaintiff "is always required to demonstrate more than the mere 'possibility of success on the merits.'" *Mich. Coal of Radioactive Mat. Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). Although no single factor is controlling in a court's analysis of a request for a preliminary injunction, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). Mr. Dottore has not established that he is substantially likely to win on any of his claims asserted in the Complaint, and that failure is fatal to his request for a preliminary injunction.

Initially, Mr. Dottore has failed to make a threshold showing of a substantial likelihood of success on his claims for equitable rescission (based on breach of contract, unconscionability, or lack of consideration) of each of the Reorganization Documents. Although Mr. Dottore claims that Studio has not provided any services under the MSAs and has therefore breached the MSAs, Studio disputes these facts. In fact, Studio has already provided substantial services during the short period during which the MSAs have been in effect, as outlined above. Importantly, it was Studio who arranged for new bank accounts to be opened so that the Subject Universities could receive their Title IV Funding at the beginning of 2019; without this funding, none of the Subject Universities would be sustainable.

A claim for equitable rescission can be based on a breach of contract only in limited instances where there was "an unjustified failure to perform basic terms of a contract." *Schlosser & Dennis, LLC*, C.A. No. N16C-05-190, 2017 WL 2894845, *10 (Sup. Ct. Del. 2017).  Here, no such failure to perform exists. Rather, the parties have differences of opinion regarding the timing and amount of the fees due pursuant to the MSAs and TSA. As the Sixth Circuit has held, "a bona fide dispute concerning royalty payments does not, as a matter of law, establish a material breach justifying rescission of the contract absent an express provision in the contract." *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1385 (6th Cir.1995).

Moreover, Mr. Dottore's claims for equitable rescission based on failure of consideration and unconscionability are nonsensical given the circumstances surrounding the negotiation of the Reorganization Documents. After a months-long, arms' length negotiation process (including Mr. Dottore for many of those months), Studio agreed to participate in the reorganization of the Subject Universities, provide certain managed services to the Subject Universities, and pay fees for transition services to DCEH in an effort to save the Subject Universities when no other party was willing to step in. Studio continually worked with DCEH, the Subject Universities, and Mr. Dottore to revise the proposed terms of the restructuring over many months, and Studio even continued to cooperate after DCEH and Mr. Dottore breached the Reorganization Documents by moving forward with the Receivership Action. When Mr. Dottore demanded $1.8 million from Studio to make DCEH's payroll, Studio willingly provided the money based upon Mr. Dottore's promises to begin cooperating with Studio. Mr. Dottore has refused to communicate with or otherwise work with Studio, however, and has instead chosen to pursue this action. Studio cannot continue to act as a bank for Mr. Dottore to pursue his singular goals in the Receivership Action.

This case is not a circumstance where the terms of a contract are "so grossly imbalanced that they shock the conscience" or where a party "did not perform the basic terms of [the contract] to justify the remedy of equitable recession." *Marina View Condominium Association of Unit Owners v. Rehoboth Marina Ventures,* LLC, CA No. 2017-0217-PWG, 2018 WL 1172581, at *6 (Del. Ch. Mar. 6, 2018). While Mr. Dottore claims that DCEH did not have the ability to negotiate the substantive terms of the contracts and "[t]here were no legitimate negotiations," the sheer number of times the parties renegotiated the structure of the transaction, the many months spent discussing transaction terms, the parties' numerous communications with the Department, and the substantial time invested by all parties involved speak for themselves. DCEH, the Subject Universities, and Mr. Dottore did not have an "absence of meaningful choice" while negotiating, renegotiating, and eventually executing the Reorganization Documents; rather, the Reorganization Documents were the summation of a months-long effort by Studio (and all parties involved) to effectuate a meaningful reorganization and transition plan to save the Subject Universities from what seemed like an inevitable demise. *See Olympus Healthcare Group, Inc. v. Pacific Employers Insurance Company,* 352 B.R. 603 (D. Del. 2006) (unconscionability requires both i) contractual terms that are unreasonably favorable to the drafter and ii) no meaningful choice by the other party on the provisions).

Finally, as Mr. Dottore acknowledges, the parties must be able to be returned to their pre-contract state for the remedy of equitable rescission to even be a possibility. *See Creative Research Manufacturing v. Advanced Bio-Delivery LLC,* No. Civ. A 1211-N, 2007 WL 286735 (Del. Ch. Jan. 30, 2007) ("The party seeking rescission bears the burden of establishing that the court can restore the status quo between the parties."). Here, the parties' pre-contract state did not involve the Receivership Action at all. Mr. Dottore's desired remedy of equitable recession

would therefore theoretically require the unwinding of the entire Receivership Action.  It is unknown whether this Court could adequately restore the parties to their pre-reorganization state, but such an analysis is unnecessary at this time; Mr. Dottore has failed to make a threshold showing of a substantial likelihood of success on the merits with regard to his claims[13] for equitable rescission in the Complaint.

**B.**     **Mr. Dottore and the Receivership Entities Will Not Suffer Irreparable Harm if the Injunction is Not Issued**

Mr. Dottore also cannot show that the Receivership Entities will suffer irreparable harm if the injunction is not issued. When considering the potential harm to a party seeking a preliminary injunction, courts in the Sixth Circuit consider "(i) the substantiality of the injury alleged; (ii) the likelihood of its occurrence; and (iii) the adequacy of the proof provided." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 154 (6th Cir.1991). Further, "[t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expanded in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). This irreparable harm must be "both certain and immediate, rather than speculative or theoretical." *Griepentrog,* 945 F.2d at 154 (6th Cir.1991). Finally, the moving party must establish "the inadequacy of alternate remedies available to the plaintiff." *Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809,

---

[13] Mr. Dottore also makes the following claims in the Complaint: i) a request for declaratory judgment finding that he is entitled to reject the Reorganization Documents, ii) a separate claim for breach of contract; and iii) a claim for unjust enrichment. However, Mr. Dottore inexplicably does not even attempt to show that he has a substantial likelihood of success on any of these claims in the Motion, and instead focuses entirely on his claims for equitable rescission based on breach of contract, unconscionability or lack of consideration. Because "issues not deemed waived," Studio will not respond to these claims in this Motion, but reserves its rights respond fully to each of these claims at a later date.  *See Brinckerhoff v. Enbridge Energy Co., Inc.,* C.A. No. 5526-VCN, 2012 WL 1931242 (Del. Ch. May 25, 2012) (finding that the plaintiff's failure to address his claims own claims of rescission and reformation in his briefs resulted in the waiver of those arguments); *see also Hokanson v. Petty*, 2008 WL 5169633 (Del. Ch. Dec. 10, 2008).

818 (E.D. Mich. 2013). Therefore, "[i]rreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary." *Id.*

Here, Mr. Dottore's claim of irreparable harm is inherently speculative under the Sixth Circuit's standard. In broad strokes, Mr. Dottore alleges that if Studio does not immediately pay the money requested in the Motion, "the Receivership Entities will be unable to operate, the [Subject Universities] will close, and the schools' tens of thousands of students will bear the brunt of the damage." *See* Motion. These dramatic claims are tempered by the fact that Mr. Dottore arranged for the voluntary filing of the Receivership Action in mid-January i) without notice to or consultation with Studio (or any other party other than plaintiff in the Receivership Action; ii) without the support of the Department; and iii) without a plan for funding the Receivership Action whatsoever.

Now, one month after the beginning of the Receivership Action – after realizing that his plans have gone awry – Mr. Dottore is now attempting to place blame on Studio, demand that Studio pay for his mistakes, and unwind the entirety of the Reorganization Documents. Courts have not looked kindly on parties seeking injunctive relief to prevent self-inflicted harm. *See Livonia Props. Holdings, LLC v. 12840-12976 Farmington Road Holdings, LLC*, 399 F. Appx. 97, 104 (6th Cir. 2010) (affirming district court's denial of preliminary injunction to enjoin foreclosure of property, where foreclosure was self-inflicted and borrower retained state law rights to reverse the foreclosure under state law).

Further, it is settled law that a party moving for a preliminary injunction must establish more than mere monetary injury. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute

irreparable injury."). In the Motion, Mr. Dottore only seeks an injunction order requiring Studio to pay the alleged $2.1 million due pursuant to the Reorganization Documents, together with "any and all monies received in February 2019"; this supposed need for money alone is not sufficient to constitute an "irreparable injury." If Studio does not immediately pay the millions of dollars requested in the Complaint, it is unlikely that the Subject Universities and the Receivership Entities will instantly fail; Mr. Dottore has simply chosen not to explore any financing alternatives or explore any other option to fund the Receivership Action. Mr. Dottore's request for Studio to pay "any and all monies received in February 2019" also explicitly runs afoul of the negotiated terms of the Reorganization Documents executed just six weeks before the filing of this action. As all parties understood, the MSAs and the TSA (and the fees associated therewith) required cooperation from all parties. The TSA provides that the TSA may be reduced if the amount of fees paid to Studio by any Subject University pursuant to the applicable MSA is not sufficient for Studio to pay all Non-Core Expenses (as defined in the MSA) of such Subject University, and Studio is not required to fund any shortfall of such fees. Mr. Dottore's request for a preliminary injunction requiring Studio to turn over "any and all monies received in February 2019" therefore is outside of the terms of the Reorganization Documents, and effect asks this Court to require Studio to fund the universities' funding shortfall without due consideration.

Further, Mr. Dottore's broad statement that "the Receivership Entities will be unable to operate [and] the Ai University System, the Argosy University System and the South University System will close" is not entirely accurate. Studio understands that both South University and the Arts Institutes are ready, willing and able to pay all of the expenses due pursuant to the Reorganization Documents; it is only Argosy University that cannot fund these expenses. As

detailed in the Department's January 7 letter – issued prior to the Receivership Action – Argosy University is no longer a viable entity, and even the $2.1 million Mr. Dottore urgently requests cannot save Argosy University.

Studio has also shown itself to be a willing partner throughout the entire reorganization process and the beginning of the Receivership Action. Studio offered to amend the fee provisions of certain of the MSAs shortly after beginning of the Receivership Action, but Mr. Dottore refused to engage Studio in any amendment process. Therefore, as the court found in *Contech Casting, LLC v. ZF Steering Sys., LLC* , it is evident that "the crisis is likely avoidable, and thus no injury is truly irreparable." 931 F. Supp. 2d 809, 823 (E.D. Mich. 2013). Because Mr. Dottore cannot show that irreparable harm will result if an injunction is not issued, this Court must deny Mr. Dottore's request for a preliminary injunction.

**C.     A Preliminary Injunction Will Unduly Harm Studio, South University and the Arts Institutes**

Mr. Dottore fails to even address the third factor used in a court's consideration of whether to issue a preliminary injunction: whether the issuance of the injunction would cause substantial harm to others if it is issued. The alleged irreparable harm that will result in the absence of an injunction must be weighed against the harm that will result to the adverse party or any third parties if the injunction is granted. Here, it is unquestionable that Studio will be substantially harmed if the injunction is issued. Studio will lose millions of dollars that it is not required to pay pursuant to the negotiated terms of the Reorganization Documents. More importantly, however, Studio will also be prevented from exercising its rights in the Reorganization Documents, because Mr. Dottore simultaneously seeks to rescind and reject the Reorganization Documents in the Complaint. *See Barnhart v. Nationstar Mortg. LLC*, No. 16-1244, 2016 WL 11005038, at *3 (6th Cir. Oct. 28, 2016) (finding that the party opposing

injunction "would obviously suffer substantial harm if it was prevented from exercising its rights" at issue).

Studio has spent over ten months and millions of dollars negotiating, renegotiating, and executing a viable reorganization plan for the Subject Universities.[14] Further, any funds from the Subject Universities in excess of the service fees under the MSAs (which are held by Studio) are the property of the applicable Subject University and not of Studio. As such, Studio cannot turn those funds over to DCEH or Mr. Dottore without the consent of the applicable Subject University. If either the Arts Institutes or South University are forced to advance further costs outside of the terms of the Reorganization Documents, these entities also might not survive.

One of the Department's goals in connection with transactions contemplated by the Reorganization Documents was to ensure that funds from one Subject University were not used to fund a different Subject University. Currently, the majority of the service fees received by Studio are payable to DCEH under the TSA or are otherwise used to fund Studio's cost of providing services under the MSAs. If Mr. Dottore receives the relief he is requesting, Studio believes that Mr. Dottore may attempt to use the $2.1 million requested in the Motion to pay expenses for the Receivership Entities, including Argosy University and the teach-out entities. Requiring Studio to turn over "any and all monies received in February 2019" – or any other fees that are not yet due pursuant to the terms of the Reorganization Documents – would also

---

[14] Studio is also the licensee of certain software used in providing certain services to the Subject Universities pursuant to the MSAs. If this Court ultimately issues a declaratory judgment finding that Mr. Dottore may reject certain license agreements included in the Reorganization Documents, Studio submits that it will lose access to the software and also suffer substantial harm in this regard. If the license is ultimately rejected, Studio submits that this Court should apply the protections in section 365(n) of the Bankruptcy Code to allow Studio to continue to use the licensed software for the agreed term. *See Janvey v. Alguire,* No. 3:09-CV-0724-N, 2014 WL 12654910, at *5 (N.D. Tex. July 30, 2014), aff'd, 847 F.3d 231 (5th Cir. 2017) ("because equity receivership law and bankruptcy law share similar roots . . . the Court will supplement the sparse equity receivership law by also examining relevant bankruptcy law.").

undermine Studio's extensive efforts to work with DCEH and the Subject Universities over the past ten months to effectuate a meaningful reorganization plan.

Therefore, if this Court orders Studio to immediately pay fees to Mr. Dottore that are not consistent with the negotiated terms of the Reorganization Documents, it will in effect either require one of South University, the Arts Institutes, or Studio to make a non-consensual loan, which in the case of South University and the Arts Institutes, would be inconsistent with the Department's guidance on the reorganization transaction and potentially run afoul of accreditation requirements and state and federal education laws. Studio will certainly suffer substantial harm if this court issues a preliminary injunction.

## D.      A Preliminary Injunction Will Harm the Public Interest

Although Mr. Dottore claims that a preliminary injunction ordering Studio to pay funds will allegedly enable the "preservation of the educational track for tens of thousands of students," the issuance of a preliminary injunction will actually harm the public interest in this instance. Mr. Dottore's request for a preliminary injunction is just the first step in Mr. Dottore's plan to use the Receivership Action as a tool to unwind all of Reorganization Documents, leaving the Receivership Entities and the Subject Universities without a strategy for the provision of shared services, financing, transition processes or numerous other critical circumstances contemplated in Reorganization Documents and required for the continued sustainability of the schools. Courts in the Sixth Circuit have held that "[t]he public interest does not require a court to assist a supplicant for equity who has not acted diligently." *Contech Casting*, 931 F. Supp. 2d at 823 (citing *Reams v. Vrooman–Fehn Printing Co.,* 140 F.2d 237, 242 (6th  Cir.1944) ("It is well settled that 'equity aids the vigilant.'")). If the transactions contemplated by the Reorganization Documents are unwound, or if Studio is put in a position where it is not able to perform under the Reorganization Documents as a result of DCEH's

breaches, South University and the Arts Institutes will be put at grave financial risk – the very risk the Reorganization Documents were meant to alleviate. Allowing Mr. Dottore to use this action to require Studio to immediately pay money allegedly owed under agreements that he simultaneously seeks to rescind and reject – while ultimately leaving the universities without a path to move forward – cannot be in the public interest, and Studio therefore requests that this Court deny Mr. Dottore's request for a preliminary injunction.

## IV.    CONCLUSION

Without Studio's willingness to constantly work with DCEH, the Department, Mr. Dottore, and the Subject Universities over the past many months, none of the Subject Universities would likely be operating today. Mr. Dottore's attempt to leverage the Receivership Action to require Studio to immediately pay additional funds outside of the terms of the Reorganization Documents – and effectively pay for Mr. Dottore's mistakes in the Receivership Action – cannot be condoned. For all of the reasons stated herein, Studio respectfully requests that the Court deny Mr. Dottore's request for a preliminary injunction in full.

February 26, 2019                              Respectfully submitted,

                                               /s/ *M. Colette Gibbons*
                                               M. Colette Gibbons (0003095)
                                               Scott N. Opincar (0064027)
                                               Maria G. Carr (0092412)
                                               Adam C. Smith (0087720)
                                               MCDONALD HOPKINS LLC
                                               600 Superior Ave., E., Ste. 2100
                                               Cleveland, OH 44114
                                               T: (216) 348-5400
                                               F: (216) 348-5474
                                               Email: cgibbons@mcdonaldhopkins.com
                                               sopincar@mcdonaldhopkins.com
                                               mcarr@mcdonaldhopkins.com
                                               asmith@mcdonaldhopkins.com

                                               -and-

                                               Dianne F. Coffino[15]
                                               Martin E. Beeler
                                               Gabriella B. Zahn-Bielski
                                               COVINGTON & BURLING LLP
                                               The New York Times Building
                                               620 Eighth Avenue
                                               New York, NY 10018
                                               Telephone: (212) 841-1000
                                               Facsimile: (212) 841-1010
                                               Email: dcoffino@cov.com
                                               mbeeler@cov.com
                                               gzahnbielski@cov.com

                                               *Co-Counsel for Studio Enterprise Manager, LLC*

---

[15] The Covington & Burling attorneys are in the process of compiling documents to be admitted *pro hac vice* in this action, and the Covington attorneys will file motions for admission *pro hac vice* admission promptly once these materials are completed.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 26, 2019, a copy of the foregoing Memorandum in Opposition to Receiver's Motion for a Temporary Restraining Order and Preliminary Injunction was filed electronically. Notice of this filing will be sent to all parties by the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *M. Colette Gibbons*
M. Colette Gibbons (0003095)