# EXHIBIT A

Cooley

Jonathon C. Glass
+1 202 776 2691
jglass@cooley.com

**Strictly private and confidential**
Via Email to: diane.jones@ed.gov

December 22, 2018

Diane Jones
Principal Deputy Under Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Re: Art Institutes

Dear Ms. Jones:

This follows Mr. Glass and Studio Enterprise's meeting with you and Ms. Mangold to discuss my client's plans to revive nine of the Art Institute campuses. Thank you for your time and courtesy to discuss these issues and, as requested, we are pleased to amplify on our proposal.

Studio has devoted many months of diligence and analysis, and discussions with landlords and vendors, to develop this plan for the AI campuses that can have a positive and sustainable future. This work has included negotiating the necessary agreements with Dream Center Education Holdings to put this plan into action. Studio is prepared to inject substantial capital into these AI campuses and enter into a services agreement to replace the services currently provided by DCEH to support this plan. As we discussed with you, we are hopeful that these agreements can be executed and put into effect on January 1, 2019, so that the precipitous closure of these schools can be avoided.

As you know, this proposal for the AI schools is being submitted in connection with the broader Interim Framework Agreement that addresses the plans for the other DCEH institutions. A copy is attached for your review. Studio, DCEH and its secured lenders have agreed to the terms of the Interim Framework Agreement and we request your assent on behalf of the Department, which is essential to enable this plan to work.

In addition, we are requesting additional clarity regarding the conditions that the Department may impose in approving the contemplated transaction and arrangements for the AI schools, since those conditions will be a critical factor in whether we can get the AI transactions done by January

We appreciate your review of the following list of Departmental actions and conditions that we consider essential to allow Studio to advance additional capital to support the AI schools and execute this plan:

Cooley

**Strictly private and confidential**

1. Prompt approval of all nine campuses as non-profit institutions.[1] We understand this can be done most quickly based upon the issuance of Temporary Provisional Program Participation Agreements, and we ask that the Department issue those TPPPAs within three business days of the transaction date. In this case, that should be January 4, 2019.

2. Approval of the realignment of the nine AI campuses in connection with this transaction in a manner that is consistent with Departmental, state and accrediting agency requirements. Based on additional review of these issues with you, this will involve four institutions or OPEs, with four main campuses, with plans to consolidate to two OPEs in the future. We remain open to discussion of this issue, especially the best way to address the status of AI-San Diego, but we believe the simplest way to accomplish the realignment is to move AI-San Diego as an additional location under the Houston main campus immediately as of the completion of the transaction. The proposed realignment is attached.

3. The Department would issue four TPPPAs for four OPEs, based on a transaction by which the four existing LLC entities that hold the main campuses are converted to non-profit, non-stock corporations as of the transaction date. The non-profit corporations will be entirely free and independent of any relationship with DCEH or its principals, board members or officers. The non-profit corporations will immediately file for 501(c)(3) status with the IRS, which we would expect to receive on an accelerated basis within six months and, when received, will be effective as of the filing date. The other five additional locations will continue to be organized as single member LLCs under the sole control of the non-profit corporations that hold their main campus. This is necessary because the LLCs under the existing structure derive their 501(c)(3) status from the DCEH parent, and our transaction is designed to remove DCEH from any ongoing role with the nine AI schools whatsoever.

   We would expect to file the ED Applications that reflect these transactions on the day after the closing of the transactions (which should be January 2, 2019 in this case).

   As part of this structure, certain subsidiary entities that have provided ancillary functions or that are associated with other AI campuses that have closed will need to be wound down by being placed into receivership. These entities have no control over or relationship with the nine ongoing AI schools, and the entities that hold the ongoing AI schools will not be affected by the receivership of these other subsidiary entities. Further, the receivership of these other entities would have no effect on the obligations of the ongoing AI schools under the Title IV requirements or this agreement with the Department

4. Based on the TPPPA process, there should be no interruption in eligibility or the flow of Title IV funds to the students at these nine schools.

[1] As we discussed, we modified our earlier plans to revive 12 AI campuses since three of those campuses are only viable if we obtain major landlord concessions that could be negotiated in a receivership, but we understand a receivership is problematic for the Department.

5. Based on our willingness to provide new capital to support these schools, the Department will not impose HCM2 procedures on the delivery of Title IV funds.

6. The schools will work with the Department with all possible speed to set up new bank accounts or lockbox arrangements to handle the flow of future Title IV funds.

7. The Department will not hold the schools or the new non-profit owners responsible in any way for any regulatory compliance issues pertaining to the operation of the schools prior to the transaction date. As a matter of proper Title IV compliance and stewardship, we would expect Studio to assist in preparing the compliance audits for prior periods, including the fiscal year ending December 31, 2018, but even in that case neither the schools nor the non-profit entities nor Studio would have any liability for compliance issues related to those prior periods. This is essential and appropriate since Studio is stepping in as a white knight to preserve these schools and avoid precipitous closures. Moreover, the Department is already holding a very large letter of credit intended to cover these risks, and we suggest the Department look to that letter of credit if any such liabilities are identified in the future.

   We want to be expressly clear that this would apply not only to the nine AI schools to be transferred, but also to any liabilities associated with any other AI schools regardless of whether they are currently part of the same OPE as these nine schools or other schools connected to DCEH.

8. Our reference to approval of these nine campuses as non-profit institutions is intended to mean non-profit for Title IV purposes without any "tail" for the regulations that pertain to proprietary institutions, including the 90/10 Rule and the Gainful Employment Rule. This would include assurance that the Department will not issue additional GE Rates for any educational programs at these schools and, similarly, will not require any further GE reporting for past periods or future periods. We believe this is appropriate and essential since this is not a "conversion" transaction. These schools have been owned and operated by non-profit entities for more than a year, and there is no further need to extend proprietary regulations to them.

9. Based on the need to further improve the educational programs, the Department would not impose growth restrictions. Under the normal terms of provisional certification, we understand that the schools would need to obtain advance approval from the Department to add new programs or modify existing ones, and we suggest that procedures will provide the Department with adequate safeguards.

10. We understand the Department commonly requires a letter of credit in connection with transactions involving schools in financial straits. Both the amount and the timing of the LOC are important. We ask that the Department decide whether any LOC is necessary after the schools have filed their same-day balance sheets so that the Department can assess their financial condition based on the most current information as of the transaction date. In this case, and when Studio's top priority is to move quickly to provide new capital to the schools, if any LOC is required, we ask that it be limited to approximately $6.5

million. We understand this will be close to the normal 10% threshold based on the Title IV volume that the schools expect to receive in 2019. If any LOC is necessary, we ask that the Department accept $6.5 million with a potential mid-year adjustment based on actual results.

11. We understand that if any LOC is required it would remain in place at the same amount at least until the Department reviews the AI schools' A-133 audits for the first fiscal year under the new structure, approximately Fall 2020, regardless of whether any school triggers any of the financial responsibility triggers under the Borrower Defense to Repayment Rule.

12. We also want to address the way in which the conditions discussed above will be memorialized so that they are clearly documented in the eligibility records. In our experience, TPPPAs tend to be issued in a prescribed form without customized conditions. We do not think that is adequate here, given the critical importance of the conditions discussed above to make this transaction viable for Studio and the schools. Accordingly, we ask that when we reach agreement with the Department on the final form of these conditions, that they be memorialized in the TPPPAs or a formal Eligibility Letter to accompany the TPPPAs.

    The Department would issue Final PPPAs promptly after the four main campus non-profit corporations receive their 501(c)(3) designation from the IRS (which will be effective as of the transaction date). By that time, the Department would also have been able to review the same-day balance sheets to be filed by the end of February, so we believe it is reasonable to ask the Department to issue the Final PPPAs within 15 days of receipt of the IRS documents that confirm the schools' 501(c)(3) status.

13. We discussed the servicing agreement for non-core services at a high level. We understand that the Department will need to review that agreement, but appreciate your advance agreement that a cost-plus or similar model for the compensation arrangements is acceptable.

14. We discussed the fact that SACS and the Northwestern accrediting bodies will need to approve this transaction and campus alignment. Given the time pressures, we will appreciate your help in soliciting their prompt review and their agreement to extend the schools' accreditation in some form pending their full review. Further, the Department would need to agree to issue its approvals based on these accrediting agency extensions before the agencies have completed their entire review.

15. We discussed the fact that certain states will need to approve this transaction and campus alignment. Given the time pressures, we will appreciate your help in soliciting their prompt review and their agreement to extend the schools' authorization in some form pending their full review. Further, the Department would need to agree to issue its approvals based on these state agency extensions before the agencies have completed their entire review.

16. We discussed the value of the Department issuing a letter in support of this plan, which we would expect to use in continued discussions with landlords, vendors and others who

 Case: 1:19-cv-00380-DAP Doc #: 9-1 Filed: 02/26/19 6 of 6. PageID #: 654

December 22, 2018
Page Five

**Strictly private and confidential**

are concerned with the future of these schools and whether the Department is receptive to this new non-profit structure. We can prepare a draft for your review, and appreciate your willingness to consider such a letter.

Thank you very much for your review of these issues and your prompt sign-off or feedback on the Interim Framework Agreement and the terms for the AI schools proposed above. We appreciate your response so we can put them in final form and move forward on the many other steps very soon. Please feel free to communicate directly with myself or Mr. Glass on any of these issues at any time.

Sincerely,

Katherine Lee Carey
Jonathon C. Glass
Counsel to Studio

cc: Donna Mangold, Esq.
Bryan Newman

Cooley LLP 1299 Pennsylvania Avenue, NW, Suite 700 Washington, DC 20004-2400
t: (202) 842-7800 f: (202) 842-7899 cooley.com